David J. Williams (CA State Bar No. 236919)
  E-Mail:  dwilliams@mabr.com
Quincy J. Chuck (CA State Bar No. 307857)
  E-Mail: qchuck@mabr.com
MASCHOFF BRENNAN
100 Spectrum Center Drive, Suite 1200
Irvine, California 92618
Telephone:  (949) 202-1900
Facsimile:  (949) 453-1104

[Proposed] Special Litigation Counsel for Plaintiff

Treetop Development, LLC

## UNITED STATES BANKRPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>Treetop Development, LLC,<br><br>Debtor.<br>_____<br><br>TREETOP DEVELOPMENT LLC, a California limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>SKYLARK CAPITAL MANAGEMENT, LLC, a California limited liability company,<br><br>Defendant. | Case No. 2:22-bk-14165 BB<br>Chapter 11<br>Adversary No.:<br><br>**COMPLAINT FOR:**<br>**(1)  BREACH OF CONTRACT;**<br>**(2)  BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING;**<br>**(3)  VIOLATION OF CAL. COM. CODE §1304;**<br>**(4)  FRAUD (VIOLATION OF CAL. CIV. CODE, §§ 1572, 1709, & 1710);**<br>**(5)  NEGLIGENT MISREPRESENTATION (VIOLATION OF CAL. CIV. CODE, §§ 1572, 1709, & 1710);**<br>**(6)  NEGLIGENT DISBURSEMENT OF CONSTRUCTION LOAN FUNDS;**<br>**(7)  UNFAIR COMPETITION (VIOLATION OF CAL. BUS. & PROF. CODE, §17200 *ET SEQ.*);**<br>**(8)  ACCOUNTING;**<br>**(9)  EQUITABLE SUBORDINATION;**<br>**(10) WRONGFUL FORECLOSURE;**<br>**(11) SLANDER OF TITLE;**<br>**(12) DAMAGES ON USURIOUS LOAN; and**<br>**(13) DECLARATORY RELIEF.** |

1    Plaintiff TREETOP DEVELOPMENT LLC ("Plaintiff," "Treetop," or "Debtor"), for a complaint

2    against the defendant identified herein, alleges and states as follows:

3                              **I.    VENUE AND JURISDICTION**

4    1.    This action is a civil proceeding arising in the above captioned Debtor's chapter 11

5    bankruptcy case assigned case number 2:22-bk-14165 BB, which is now pending in this judicial district,

6    and arising under, arising in and related to Title 11 United States Code.  This Court has jurisdiction

7    pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157 (b)(2)(A), (B), (K) and (O) to hear and determine

8    this proceeding and to enter an appropriate final order and judgment.  Accordingly, this adversary

9    proceeding is a core proceeding.

10   2.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

11   3.    This matter is an adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure

12   7001(2), (7), (8) and (9).

13   4.    The Debtor commenced its bankruptcy case by filing a voluntary chapter 11 petition on

14   August 1, 2022.  Debtor holds fee title to a large and valuable tract of certain undeveloped real property

15   located in Beverly Hills California, at 9650 Cedarbrook Drive, Beverly Hills, California 90210 (the

16   "Property").  Even more particularly, this lawsuit involves a loan, the related Deed of Trust, and the

17   attempt to foreclose upon the Property located in Los Angeles County, Beverly Hills California—all to

18   Treetop's injury and damage.

19                      **II.    SUMMARY OF CLAIMS AND CAUSES OF ACTION**

20   5.    Plaintiff Treetop hereby alleges a "loan to own scheme" perpetrated on Treetop by

21   Defendant Skylark Capital Management, LLC, a California limited liability company ("Skylark" or

22   "Defendant").  Particularly, Defendant Skylark agreed to lend Treetop $92,775,000.00 to pay off current

23   debt on the Property (of roughly $20,000,000), and then to pay for the construction development on the

24   Property with the remaining funds.  This loan was so that Treetop could then sell the later developed

25   Property for a profit.  Defendant Skylark promised to lend the same, but Skylark never had that amount

26   of funds to lend (and/or, never intended to release that amount of funds to Treetop).  Instead, Defendant

27   Skylark agreed to the loan terms, allowed enough funds to be released so as to pay off the prior debt, and

28   then shortly thereafter, refused to pay the remaining construction fund draw requests (either by refusing

COMPLAINT

to fund timely, refusing to fund at all on certain draws, or refusing to fund such draw requests in full). This in turn led to the construction project not being timely completed and Treetop unable to timely pay the subcontractors performing the work. Thus, mechanic's liens for subcontractor work were filed against the Property and the project was not finalized in time to be sold for a profit when the loan repayment date came due. **In all, Skylark only ended up releasing around $29,085,444.54 out of the $92,775,000.00 of funds that were promised to be released to Plaintiff ($20,000,000 of which was for the underlying debt and only a little more than $9,000,000 being released during the construction phase). However, Skylark, inexplicably, has attempted to claim that they are now owed more than double that amount (or at least $63,054,044.56) by Treetop**. Facts as to Defendant's additional intent for the loan to own scheme are also demonstrated by the fact that Skylark, through its manager Zach Vella (who should have been mere disinterested construction lenders), early on, were scheming to work together with at least one neighboring lot owner to jointly develop the Property after Skylark would later foreclose upon the Property (and in such act, foreclose out the claims of the unwitting subcontractors). Damages and equitable relief are requested herein for these acts. Likewise, each of these facts, as well as additional claims, including that it appears that Defendant began charging interest on interest at the beginning of this loan, without a lender's license in place, are further pled in greater detail below.

### III.    IDENTIFICATION OF THE PARTIES

6.      Plaintiff Treetop is presently, and at all times relevant to the allegations of this Complaint was, a California limited liability company located and doing business in the County of Los Angeles, State of California, including in particular its business activities relating to the facts, as alleged herein.

7.      Defendant Skylark, is on information and belief, a California limited liability company that has (a) its principal place of business in Los Angeles California, and (b) been and is doing business in the County of Los Angeles, State of California, including, in particular, its activities relating to Treetop and the related real property, as alleged herein. At all times mentioned herein Defendant Skylark was managed and ran by an individual named Zach Vella ("Vella"), who on information and belief, (a) resides in the State of Florida, (b) resided at the timing of most of the events alleged herein in the County of Los Angeles, State of California, (c) is the co-founder and managing director of Skylark,

(d) is the signor for agreements and loan documents identified herein, and (f) has been and is doing business in the County of Los Angeles, State of California, including in particular his activities relating to Treetop and the related real property, as alleged herein.

### IV.    ORDER OF COMPLAINT

8.    Having identified briefly the parties to this action, the basis for this Court's exercise of jurisdiction over the defendant, and the propriety of venue in this Court, Plaintiff hereafter provides as follows (with recognition that aspects of the relief Treetop seeks are equitable in nature and thus may be granted by the Court).

### V.    PRELIMINARY FACTUAL ALLEGATIONS

#### A.    <u>Facts As To The Loan Agreements And Related Breaches And Torts</u>

9.    This lawsuit, in large part, involves a carefully orchestrated "loan to own" fraud scheme perpetrated by an unscrupulous lender, in order to obtain unlawful control, and ultimately full ownership of, the Property that secured the debt. The Property is a highly valuable tract of undeveloped land, consisting of at least 27, or more, acres, located in Beverly Hills, California.

10.    This "loan to own" fraud scheme was perpetrated by Defendant Skylark, as lender, in order to obtain unlawful control and ultimately full ownership of Plaintiff's Property that secured the debt.

11.    Plaintiff is the owner of the above-described Property.  Prior to July of 2018, Plaintiff was seeking funds to pay off the then current debt as to the Property and to develop the Property with various high end residential dwellings.  Defendant Skylark, through Vella, represented to the Manager of Treetop that they would be willing and able to lend, through Skylark, the sum of $92,775,000.00 to Plaintiff Treetop (as borrower).  Each of the conversations and representations described herein took place over telephone conversations, in text messages or email correspondence, and/or via in person discussions.  It was discussed and agreed that less than half of the amount loaned would go to pay off the existing debt on the Property.  The remaining amount would be disbursed through draws at the request of Plaintiff, which amounts would go towards development of the Property so that it could later be sold for a profit.

12. Vella, for Defendant Skylark, represented numerous times to Mohamed Hadid ("Hadid"), as the Manager and/or agent of Treetop, whether individually or as agent of a manger entity, prior to entering into the related loan, that Skylark, as lender, had all those funds in place—and was ready, able, and willing to lend and fund the same timely, as would be needed for the project (sometimes, hereafter, the "Project"). Vella represented to Hadid that Skylark had received those funds from a source in London and that all of that money would be set aside to fund the $92,775,000.00 loan to Treetop. Vella, on behalf of Skylark, represented numerous times to Hadid, as the Manager and/or agent of Treetop, and/or its managing entity, prior to entering into the related loan, that Skylark, as lender, would disburse funds on the loan in draws to the extent they were requested by Treetop, so that Treetop could finish developing the Property in a timely fashion to pay off the loan and related promissory note, when it would become due. It was also discussed between those parties at length that the draws had to be timely paid in order for the Property to be developed timely, so that the loan could thereafter be timely paid off. It was also known that draws had to be timely paid to Treetop so that it could pay the contractors and/or subcontractors that would be conducting the construction on the project and to avoid any related mechanic's liens as to such construction.

13. Importantly, before closing on the loan, a budget as to funds to lend for the Project was agreed to between Skylark (on the lender's side), and Hadid and Treetop (from the borrower's side) (the "Budget"). Never at any point in time after the closing on the loan did that Budget for the Project ever change from Treetop's perspective or request. However, Defendant later utilized the claim that funds requested by Plaintiff were "out of budget", when they had not changed at all (as described further below). This was all part of Defendant's long-term, and intentional, loan to own scheme. In this scheme, Defendant failed to timely release the promised funds, whether in amount and/or time, as previously agreed or contracted, all while collecting fees and points. These failures by Defendant slowed and hindered the construction, caused Plaintiff to seek funds previously promised by Defendant, elsewhere, and caused various other sub-contractors to not be able to be paid—thus, halting the construction project, leaving sub-contractors unpaid, and causing the filing of mechanic's liens. In this way, the Project could not be timely completed, and/or sold for a profit, or otherwise, before the timing of the portions of the loan that were released became due pursuant to the terms to the related promissory

note.  **More Particularly, Defendant only ended up releasing about $30 million (more particularly around $29,085,444.54) out of the $92,775,000.00 of funds that were promised to be released to Plaintiff.  However, in that roughly three (3) year period, Defendant, inexplicably, has attempted to claim in its recorded Notice of Trustee's Sale ("NOS") relating to the Property, that it is now owed more than double that amount (or at least $61,588,040.73**).  In fact, the latest declaration to by Vella identifies that Skylark claims that the sum of "not less than $63,054,044.56" is owed by Treetop to Skylark.  Charging this high amount in such a short period of time (more than double the amount released) has also injured Plaintiff's ability to redeem or pay off the debt, so that an accounting and equitable relief is necessary by the Court, as equitably requested in this case.

14.    Based on the above representations, and not knowing Defendant's intent to engage in the loan to own scheme, in or around July of 2018, Plaintiff, as borrower, and Skylark, as lender, entered into various loan agreements, including but not limited to the following agreements (sometimes, collectively, the "Loan Agreements").  It is alleged that Skylark did not have any license to lend under the circumstances identified in this Complaint at the time of the Loan Agreements. These Loan Agreements included but were not limited to the following documents:

a.   A Loan Agreement;

b.   A Promissory Note;

c.   A Deed of Trust, Security Agreement and Assignment of Rents;

d.   A Contingent Interest Agreement;

e.   A Completion Guaranty;

f.   An Indemnity Agreement;

g.   An Environmental Indemnity Agreement;

h.   An Assignment of Agreements;

i.   A Sponsor Pledge Agreement;

j.   An Assignment of Construction Agreements; and

k.   A Memorandum of Understanding.

15.    While Plaintiff intended to comply at all times with the terms of the Loan Agreements, the Defendant intentionally, and maliciously, never intended to comply with the same.  In fact,

Defendant knew that it was never going to comply with its side of the Loan Agreements, and was never going to comply with releasing the Budget amounts (despite agreeing to lend based upon the same). Defendant knew that it did not have the money needed to fully fund the development/construction portion of the Project, and that Skylark was purposefully not going to release the draws needed, as requested (and described above as the loan to own scheme). Alternatively, even if Defendant, at one time, had the funds in place, Skylark (through Vella) intended to utilize such funds for other purposes and not to fund the construction of the Property—as agreed and represented. Skylark, thus, conspired to not fund the finalization of the development so that the Property could not be developed and sold to it through a later foreclosure (all while claiming that Skylark was owed more than double what it released). This was done intentionally so that Skylark could then utilize the resulting failure of Plaintiff to timely repay the loan, because the Property and Project could not be timely finished and sold, in order to call a default and attempt to foreclose on the Property. Skylark's intent was to foreclose on the Property (thus, injuring Plaintiff and taking the Property without lending as agreed) and also to foreclose out all of the sub-contractors' liens for work already performed on the Property (also injuring other third-parties). This is a classic loan to own scheme, where the lender fails to fund the loan, which the lender itself causes the inability to repay, so that the lender can then foreclose upon the collateral.

16. These intentional facts only came to light to the Plaintiff recently, as Plaintiff has learned that Skylark did not have the money needed to fully fund the Project in the beginning, either because Defendant never had the full funds, or because, even if it once had such funds, it had used such funds to instead develop numerous other properties relating to Vella—instead of releasing the money in draws as agreed (and as later requested by Plaintiff). Skylark also intended from before entering into the Loan Agreements to later argue that the funds to be requested were "out of budget". It is alleged that Plaintiff has also since learned that Defendant Skylark, or at least its manager Vella, through other entities and/or agents, has engaged in similar loan to own foreclosure schemes various times in the past. These facts equate to intentional fraud and misrepresentations, in bad faith, on behalf of Defendant, which will injure Plaintiff and other third-parties.

17. More particularly, there were times when money or draws for development of the Project were requested by Plaintiff to the Defendant, on various dates and on various occasions, pursuant to

prior Loan Agreements.  However, these contracted draw requests were either denied outright, without

cause, so that no money was provided as needed for the Project, or less money than what was needed

and required for such draws was provided.  As such, the Project could not be developed as contracted

and intended by Plaintiff, which was the purpose for Plaintiff entering into those Loan Agreements.

This is further evidenced by the fact that Skylark only released roughly $30 million **(more particularly**

**around $29,085,444.54)** in funds towards the project and is claiming that it is now owed at least $61-

$63 million from the loan (more than double from what was released).  Specifically, as part of the loan

terms, $20,000,000.00 was released at the loan closing to pay of prior debt on the Property.  From there,

the following draw requests were made, many of which were not complied with either in part, in full, or

in relevant timing (and some of which draw request amounts are alleged to have gone to pay Skylark's

points and fees).  Particularly, the following approximate amounts and dates demonstrate that only

$29,085,444.54 of loan funds were advanced, despite many more draw amounts being required

($20,000,000 of the funds was advanced at closing for the prior debt and $9,085,444.54 was advanced

through the following draws):

| DRAW REQUEST | DATE SUBMITTED | AMOUNT REQUESTED | DATES(S) PAID | AMOUNT PAID | AMOUNT NOT PAID |
|---|---|---|---|---|---|
| DRAW 1 | | $ 2,500,000.00 | 7/31/2018 | $ 2,500,000.00 | Funded at Closing |
| DRAW 2 | | $ 2,225,000.00 | 7/31/2018 | $ 2,225,000.00 | Funded at Closing |
| DRAW 3 | 9/13/2019 | $ 1,115,380.97 | 11/27/2018 | $ 1,000,000.00 | $ 115,380.97 |
| DRAW 4&5 | 9/16/19 | $ 2,412,000.56 | 2/5/19 & 9/16-10/9/19 | $ 1,708,106.05 | $ 694,714.55 |
| DRAW 6 | 10/16/2019 | $ 549,695.59 | 10/18-10/30/19 | $ 358,396.97 | $ 191,298.62 |
| DRAW 7 | 11/11/2019 | $ 302,404.03 | 11/18-11/21/19 | $ 302,404.03 | 0 |
| DRAW 8 | 11/25/2019 | $ 463,962.45 | 12/31/19 & 2/4/20 | $ 383,628.22 | $ 80,334.23 |
| DRAW 9 | 12/18/2019 | $ 292,247.19 | 12/23/2019 7/1/2020 | $ 207,909.27 $ 12,913.53 | $ 71,424.39 * PART OF $400k on 7/1/20 |
| DRAW 10 | 3/2/2020 | $ 174,168.41 | 7/1/2020 | $ 174,168.41 | * PART OF $400k on 7/1/20 |
| DRAW 11 | 3/3/2020 | $ 212,918.06 | 7/1/2020 | $ 212,918.06 | * PART OF $400k on 7/1/20 |
| DRAW 12 | 6/11/2020 | $ 1,138,133.21 | | 0 | $ 1,138,133.21 |
| DRAW 13 | 7/21/2020 | $ 4,524,580.45 | | 0 | $ 4,524,580.45 |
| DRAW 14 | 10/27/20 | $ 1,333,577.69 | | 0 | $ 1,333,577.69 |
| DRAW 15 | Est 11/20 | $ 1,863,168.24 | | 0 | $ 1,863,168.24 |

| | | | | | |
|---|---|---|---|---|---|
| TOTALS | | $ 19,098,056.89 | | $ 9,085,444.54 | $ 10,012,612.35 |

18.   These intentional and knowing acts by the Defendant severely damaged Plaintiff, and third parties, and completely stalled the development of the Project.  More particularly, multiple liens started accruing on the Property and the Project that could not be paid, as the proper money was not being funded as previously represented would be released by Defendant.  Additional debt had to be created to attempt to hold off such damages, causing Plaintiff further and additional damages.  These intentional acts by the Defendant also created additional delays and defaults relating to the Property and the Project, all to Plaintiff's detriment.  These damages also included reputational damages from vendors who did not want to do more work on this or other projects due to the acts of the Defendant.  All of these acts and the consequences therefrom damaged Plaintiff.

19.   Furthermore, even after creating all of these issues, Skylark called a payment default on the Loan Documents when the loan became due and filed the NOS, for an inflated amount, to attempt to foreclose upon the very valuable Property.  It is alleged that this was Skylark's plan all along—e.g., cause a default on the Loan Agreements by not actually lending amounts needed to conduct the Project so that the Project could not be finished and sold in time, and then use the foreclosure process, and inflated loan default amounts, to finalize their loan to own scheme, aka, to take the Property from Plaintiff and leave sub-contractors in the lurch.

**B. <u>Additional Facts as to Bad Faith and Neighbors to the Property</u>.**

20.   Additional facts that support this improper intent by Skylark to conduct the loan to own scheme include other intentional acts, as follows: Alex Von Furstenberg is a neighbor to the Property and may have control over certain easement rights relating to access to portions of the Property. Defendant, through Vella, who should be nothing more than disinterested lenders relating to the Property, and who should not attempt to interfere with the borrower developing the Property, reached out to Alex Von Furstenberg early on to interfere with Plaintiff and Hadid's potential use of the Property, offering (as the lender) to partner with Alex Von Furstenberg to take over and develop the Property (instead of properly funding the loan to finalize the Project on the Property).

21.   Furthermore, Vella, as manager of Skylark, was communicating all along with that neighbor to the Property, Alex Von Furstenberg, to likewise partner with him as well, to develop the

Property at a later time when the loan to own scheme was finalized and Skylark would attempt to take over the Property (i.e., by causing a default for failure to properly fund the Project, and using such causation to call a default on the subject Loan Agreements—and thereafter foreclose pursuant to the scheme described herein).  Finally, it is alleged that the Defendant, and/or at least Vella, as the Manger of Skylark, has engaged in similar schemes in the past.

### C. <u>Facts As To Usury and Further Breaches</u>

22.    Over and above each of the breaches and other bad acts described above, there exist usury issues with the loan and the handling of the loan funds.  The Loan Agreement, at paragraph 3.2(c), set up an interest reserve for the loan, holding back a sum of $17,600,000.00 for such interest reserves.  The Loan Agreement, at paragraph 2.2(c) indicates that "[a]ny amounts in the Holdbacks shall not bear interest unless and until such amounts are advanced to Borrower."  It appears from current accountings, and the amounts demanded from Skylark as to the loan, that the $17,600,000.00 interest reserve started accruing interest from inception, even though it was withheld and not advanced.  This would constitute a breach of agreement but also create usury issues with the loan.  Thus, while the loan on its face indicates that the interest charged on the Note was 8.10%, there appears that there was also additional interest charged on the unadvanced interest reserves, which, after a proper accounting will identify usurious amounts charged under California law.  It is alleged that Skylark, as the lender, did not have the proper licensing to lend over the California usury rate at the time of making the loan.  These items should also be considered together with the numerous additional points and fees charged, and the transfer of equity interest to Skylark as part of the transaction as to the issue of usury.  In this way, the interest required exceeded the statutory maximum, and the lenders willfully intended to take the overcharged amount of interest received.  Whether Defendant Skylark was aware of it or not, it had Plaintiff enter into, and pay into, a usurious transaction under California law.  Skylark then utilized this overly inflated amount as a payoff to make Plaintiff's ability to pay off the purported debt to avoid foreclosure (absent of filing this Complaint and the related chapter 11 filing).

/ / /

/ / /

/ / /

# FIRST CAUSE OF ACTION

## (Breach of Contract Against Skylark)

23.    Plaintiff incorporates by reference the preceding paragraphs, 1 through 22, as though set forth in full herein.

24.    On or about December 15, 2017, Plaintiff, on the one hand, and Skylark, on the other hand, entered into the Loan Agreements.  As part of those Loan Agreements, Skylark promised that it was willing and able to disburse draw requests to Plaintiff to develop the Project and the Property.

25.    Plaintiff has done all, or substantially all, of the significant things required of it under the Loan Agreements up to the point of Defendant's breaches thereof, whereby, Defendant failed and refused to comply with the draw requests to develop the Property.

26.    Thus, Plaintiff has been excused after the prior breaches of Defendant from complying with the remaining terms of the Loan Agreements.

27.    Skylark owed Plaintiff a duty to comply with the same and Skylark breached those duties and agreements by engaging in the various acts described in the referenced paragraphs of this Complaint.  Each of these acts damaged and harmed Plaintiff in an amount to be determined at trial, but which is over the jurisdictional limits of this Court.

28.    The Loan Agreements breached by Defendant also have attorneys' fees provision(s), allowing the prevailing party to recover its fees and costs.

29.    Plaintiff has performed on its part with all requirements and terms of the Loan Agreements, except as performance thereof has been excused by Skylark's breaches.

30.    Skylark's breaches of the Loan Agreements were a substantial factor in causing Plaintiff's harm, all in an amount to be determined at trial, but which is over the jurisdictional limits of this Court.  Plaintiff should also be entitled to recover its contractually permitted attorneys' fees and costs for Skylark's breaches of the Loan Agreements identified herein and be entitled to the remedy of recission.

/ / /

/ / /

/ / /

COMPLAINT

1

2

3

4

**SECOND CAUSE OF ACTION**

**(Breach of Covenant of Good Faith and Fair Dealing Against Skylark)**

31.     Plaintiff incorporates by reference the preceding paragraphs 1 through 22, as though set forth in full herein.

5

6

7

32.     Every contract contains an implied covenant of good faith and fair dealing which presumes that the parties to a contract will deal with each other honestly, fairly, and in good faith, so as to not destroy the right of the other party to receive the benefits of the contract.

8

9

10

33.     Plaintiff hereby incorporates each of the elements establishing the existence of the Loan Agreements and the related duties by Skylark to lend the sums promised thereunder and incorporates the facts establishing their failures to so comply with the same as alleged in this Complaint.

11

12

34.     Plaintiff has performed on its part with all requirements and terms of the Loan Agreements, except as performance thereof has been excused by Skylark's breaches.

13

14

15

16

35.     Plaintiff has done all, or substantially all, of the significant things required of it under the Loan Agreements, but Skylark has breached the above referenced covenant by failing to pay the related amounts requested, all in an amount to be determined at trial, but which is over the jurisdictional limits of this Court.

17

18

**THIRD CAUSE OF ACTION**

**(Violation of California Commercial Code §1304 Against Skylark)**

19

20

36.     Plaintiff incorporates by reference the preceding paragraphs 1 through 22, as though set forth in full herein.

21

22

23

24

37.     California Commercial Code §1304 reads that: "Every contract or duty within this code imposes an obligation of good faith in its performance and enforcement". This  presumes that the parties to a contract will deal with each other honestly, fairly, and in good faith, so as to not destroy the right of the other party to receive the benefits of the contract.

25

26

27

38.     Plaintiff hereby incorporates each of the elements establishing the existence of the Loan Agreements and the related duties by Skylark, to lend the sums promised thereunder and incorporates the facts establishing their failures to so comply with the same as alleged in this Complaint.

28

COMPLAINT

39.     Plaintiff has performed on its part with all requirements and terms of the Loan

Agreements, except as performance thereof has been excused by Skylark's breaches.

40.     Plaintiff has done all, or substantially all, of the significant things required of it under the

Loan Agreements, but Skylark has failed to pay the related amounts requested, all in an amount to be

determined at trial, but which is over the jurisdictional limits of this Court.

<u>**FOURTH CAUSE OF ACTION**</u>

**(Fraud Against Skylark)**

41.     Plaintiff incorporates by reference the preceding paragraphs 1 through 22, as though set

forth in full herein.

42.     Defendant Skylark defrauded Plaintiff by means of numerous materially false and

misleading representations, statements, and/or omissions, on which Plaintiff relied to its detriment and

damage, as outlined in specific detail hereinabove.

43.     As described above in this Complaint, Defendant, Skylark, through its manager Vella,

represented to the Manager of Treetop, Hadid, various times in telephone conversations, in text

messages, email correspondence, and/or via in person discussions that they would be willing and able to

lend, through Skylark, the sum of roughly $92,775,000.00 to Plaintiff Treetop (as borrower).  More

particularly, it was discussed and agreed that less than half of the amount loaned would go to pay off

existing debt on the Property.  The remaining amount would be disbursed through draws at the request

of Plaintiff, which amounts would go towards development of the Property so that it could later be sold

for a profit.

44.     Vella, on behalf of Defendant Skylark, represented numerous times to Hadid, prior to

entering into the related Loan Agreements, that Vella's company, Skylark, as lender, had all those funds

in place—and was ready, able, and willing to lend and fund the same, timely, as would be needed for the

Project.  Vella, on behalf of Defendant Skylark, represented to Hadid that Skylark had received those

funds from a source in London and that all of that money would be set aside to fund the $92,775,000.00

loan to Treetop.  Vella, on behalf of Defendant Skylark, represented numerous times to Hadid, prior to

entering into the related Loan Agreements, that Skylark, as lender, would disburse funds on the loan in

draws to the extent they were requested by Treetop, so that Treetop could finish developing the Property

1    in a timely fashion to pay off the loan and related promissory note, when it would become due.  It was

2    also discussed between those parties at length that the draws had to be timely paid in order for the

3    Property to be developed timely, so that the loan could thereafter be timely paid off.  It was also known

4    that draws had to be timely paid to pay the contractors and/or subcontractors that would be conducting

5    the construction on the Project and to avoid any related mechanic's liens as to such construction.

6        45.     Importantly, before closing on the loan, the Budget, described above, as to funds to lend

7    for the Project was agreed to.  Never at any point in time after the closing on the loan did that Budget for

8    the Project ever change from Treetop's perspective or request.  However, Skylark utilized the later claim

9    that funds requested by Plaintiff were "out of budget", when they had not changed at all.  This was all

10    part of Skylark's long-term, and intentional, loan to own scheme.  In this scheme, Skylark failed to

11    timely release the promised funds, whether in amount and/or time, as previously agreed or contracted

12    (and described in the above identified chart), all while collecting fees and points on the loan.  These

13    failures by Defendant slowed and hindered the construction on the Project, caused Plaintiff to seek funds

14    previously promised by Defendant, elsewhere, and caused various other sub-contractors to not be able to

15    be paid—thus, halting the construction project, leaving sub-contractors unpaid, and causing the filing of

16    mechanic's liens.  In this way, the Project could not be timely completed, and/or sold for a profit, or

17    otherwise, before the timing of the portions of the loan that were released became due pursuant to the

18    terms to the related promissory note.  **More Particularly, Skylark only ended up releasing about $30**

19    **million (more particularly around $29,085,444.54) out of the $92,775,000.00 of funds that were**

20    **promised to be released to Plaintiff.  However, in that roughly three (3) year period, Skylark,**

21    **inexplicably, has attempted to claim in its recorded Notice of Trustee's Sale ("NOS") relating to**

22    **the Property, that it is now owed more than double that amount (or at least $61,588,040.73—and**

23    **have more currently declared that the latest amount owed is at least $63,054,044.56)**.  Charging this

24    high amount in such a short period of time (more than double the amount released) has also injured

25    Plaintiff's ability to redeem or pay off the debt, so that an accounting and equitable relief is necessary by

26    the Court, as equitably requested in this case.

27        46.     While Plaintiff intended to comply at all times with the terms of the Loan Agreements,

28    Skylark intentionally, and maliciously, never intended to comply with the same, from even before

entering into any agreements.  In fact, Skylark knew that they were never going to comply with their side of the Loan Agreements, and were never going to comply with releasing the draw amounts (despite agreeing to lend based upon the same).  Skylark knew that it did not have the money needed to fully fund the development/construction portion of the Project, and that it was purposefully not going to release the draws needed, as requested (and described above as the loan to own scheme).  Skylark, thus, intended to not fund the finalization of the development so that the Property could not be developed and sold. In this way, Skylark would take the Property through a later foreclosure (all while claiming that it was owed more than double what it released).  This was done intentionally so that Skylark could then utilize the resulting failure of Plaintiff to timely repay the loan, because the Property and Project could not be timely finished and sold, in order to call a default and attempt to foreclose on the Property.  Skylark's intent was to foreclose on the Property (thus, injuring Plaintiff and taking the Property without lending as agreed) and also to foreclose out all of the sub-contractors' liens for work already performed on the Property (also injuring other third-parties).  This is a classic loan to own scheme, where the lender fails to fund the loan, which the lender itself causes the inability to repay the loan, so that the lender can then foreclose upon the collateral.

47.    These intentional facts only came to light to the Plaintiff recently, as Plaintiff has learned that Skylark did not have the money needed to fully fund the Project in the beginning, either because Defendant never had the full funds, or because, even if it once had such funds, it had used such funds to instead develop numerous other of Vella's own properties—instead of releasing the money in draws as agreed (and as later requested by Plaintiff).  Plaintiff has also since learned that Skylark, or at least Vella, through other entities and/or agents, has engaged in similar loan to own foreclosure schemes various times in the past.  These facts equate to intentional fraud and misrepresentations, in bad faith, on behalf of Skylark, which will injure Plaintiff and other third-parties.

48.    More particularly, there were times when money or draws for development of the Project were requested by Plaintiff to Skylark, on various dates and on various occasions, addressed in detail above, pursuant to prior Loan Agreements.  However, these contracted for draw requests were either denied outright, without cause, so that no money was provided as needed for the Project, or less money than what was needed and required for such draws was provided, as described above.  As such, the

Project could not be developed as contracted and intended by Plaintiff, which was the purpose for Plaintiff entering into those Loan Agreements.  This is further evidenced by the fact that Defendant only released roughly $30 million **(more particularly around $29,085,444.54)** in funds towards the Project and is claiming that it is owed at least $61-63 million from the loan (more than double what was released).  Specifically, as part of the loan terms, $20,000,000.00 was released at the loan closing to pay for  prior debt on the Property.  From there, the above charted draw requests were made, many of which were not complied with either in part, in full, or in relevant timing.  Ultimately, only $29,085,444.54 of loan funds were advanced, despite many more draw amounts being required ($20,000,000 of the funds was advanced at closing for the prior debt and $9,085,444.54 was advanced through the draws identified in the chart above).  It is also alleged that even some of the $9,085,444.54 was used to pay lender Skylark's points and fees.

49.    These intentional and knowing acts by Skylark severely damaged Plaintiff, and third parties, and stalled completely the development of the Project.  More particularly, multiple liens started accruing on the Property and the Project that could not be paid, as the proper money was not being funded as previously represented would be released by Skylark.  Additional debt had to be created to attempt to hold off such damages, causing Plaintiff further and additional damages.  These intentional acts by Skylark also created additional delays and defaults relating to the Property and the Project, all to Plaintiff's detriment.  These damages also included reputational damages from vendors who did not want to do more work on this or other projects due to the acts of Skylark.  All of these acts and the consequences therefrom damaged Plaintiff.

50.    Furthermore, even after creating all of these issues, Skylark called defaults on the Loan Documents and filed the NOS, for an inflated amount, to attempt to foreclose upon the very valuable Property.  It is alleged that this was Skylark's plan all along—to cause a default on the Loan Agreements by not actually lending pursuant thereto (or in an amount to fully fund construction) so that the Project could not be finished and sold in time, and then use the foreclosure process, and inflated loan default amounts, to finalize their loan to own scheme to take the Property from Plaintiff, and ultimately leave sub-contractors in the lurch.

51.     Additional facts that support this improper, and prior, intent by Skylark to conduct the loan to own scheme include other intentional acts, as follows: Alex Von Furstenberg is a neighbor to the Property and may have control over certain easement rights relating to access to portions of the Property.  Defendant Skylark, through Vella, who should be nothing more than disinterested lenders relating to the Property, and who should not attempt to interfere with the borrower developing the Property, reached out to Alex Von Furstenberg early on to interfere with Plaintiff and Hadid's potential use of the Property, offering (as the lender) to partner with Alex Von Furstenberg to take over and develop the Property (instead of properly funding the loan on the Property).

52.     Furthermore, Defendant Skylark, through Vella, was communicating all along with that neighbor, Alex Von Furstenberg, to likewise partner with him as well, to develop the Property at a later time when the loan to own scheme was finalized and Defendant would attempt to take over the Property (i.e., by causing a default for failure to properly fund the Project, even according to the Budget, and using such causation to call a default on the subject Loan Agreements—and thereafter foreclose pursuant to the scheme described herein).  Finally, it is alleged that the Defendant, and/or at least Skylark's manager, Vella, has engaged in similar schemes in the past.

53.     In this case, these Skylark perpetrated frauds against Plaintiff through a combination of threats, false information, and false promises.

54.     Skylark had knowledge of the true facts and had no actual intention, nor did it have the legal basis, to call a default on the Loan Agreements.  However, Skylark represented that the, above listed, misrepresentations were true when they were knowingly and intentionally false.  This was primarily done in perpetuation of the loan to own fraud scheme, as described in detail in this Complaint.  These representations were knowingly and intentionally false when they were made, and/or at a minimum were made without regard for their truth.

55.     Skylark intended that Plaintiff rely on the representations.

56.     Plaintiff reasonably and justifiably relied on Skylark's representations, including their material omissions, not knowing at the time of their falsity or Skylark's malevolent intentions, by entering  into the Loan Agreements and securing the same with the Property as collateral, therefore.

57. As a result of Skylark's false and fraudulent misrepresentations, Plaintiff has been damaged in that, among other things, Plaintiff has not been able to develop the Project and Property as agreed, or thereafter sell the Property, as agreed.

58. Plaintiff's reliance on Skylark's representations was a substantial factor in causing the harm complained of.

59. All of these fraudulent acts were done with malice, oppression, and aforethought so as to entitle Plaintiff to punitive and exemplary damages in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

### (Negligent Misrepresentation Against Skylark)

60. Plaintiff incorporates by reference the preceding paragraphs 1 through 22, as though set forth in full herein.

61. Skylark misrepresented to Plaintiff by means of numerous materially false and misleading representations, statements, and omissions, on which Plaintiff relied to its detriment and damage, as outlined in specific detail hereinabove.

62. Skylark had knowledge, or was negligent in not realizing, that such representations were not true. However, Skylark represented that the above listed misrepresentations were true, when they were knowingly and intentionally false, or at least it was negligent in not realizing that they were false. Thus, these representations were knowingly and intentionally false when they were made, and/or at a minimum, were made without regard for their truth.

63. Skylark intended that Plaintiff rely on the representations.

64. Plaintiff reasonably and justifiably relied on Skylark's representations, including their material omissions, not knowing at the time of their falsity, by entering into the Loan Agreements and securing the same with the Property as collateral, therefore.

65. As a result of Skylark's false misrepresentations, Plaintiff has been damaged in that, among other things, Plaintiff has not been able to develop the Project and Property as agreed, or thereafter sell the Property for a profit, as agreed.

66. Plaintiff's reliance on Skylark's representations was a substantial factor which caused the harm complained of.

1    67.    But for Skylark's negligent misrepresentations, Plaintiff would not have sustained such

2    monetary losses and Skylark's representations were a substantial factor in causing Plaintiff's harm.

3    **SIXTH CAUSE OF ACTION**

4    **(Negligent Disbursement of Construction Loan Funds Against Skylark)**

5    68.    Plaintiff incorporates by reference the preceding paragraphs 1 through 22, as though set

6    forth in full herein.

7    69.    Plaintiff claims that it was harmed by Plaintiff's negligent acts, including the failure to

8    properly disburse construction loan funds, as described herein above.

9    70.    By engaging in said acts, Skylark's was at least negligent by engaging in said acts.

10    71.    Plaintiff alleges that it has been harmed by Skylark's above stated acts and that Skylark's

11    negligence was a substantial factor in causing harm and damages to Plaintiff, all in an amount to be

12    determined at trial but over the jurisdictional limits of this court.

13    72.    As a proximate result of the negligent or reckless conduct of Skylark the Plaintiff has

14    been impaired and it is threatened with the eminent loss of its Property despite the fact that Plaintiff has

15    made all payments in accordance with the Loan Agreement up to the point of prior breach thereof by

16    Defendant.

17    **SEVENTH CAUSE OF ACTION**

18    **(Violation of Business and Professions Code Section 17200 Against Skylark)**

19    73.    Plaintiff incorporates by reference the preceding paragraphs 1 through 22, as though set

20    forth in full herein.

21    74.    Business and Professions Code section 17200 defines unfair competition to include "any

22    unlawful, unfair or fraudulent business act or practice. . . ." California's Unfair Competition Law also

23    provides for injunctive relief and restitution for violations.

24    75.    Skylark has committed numerous unfair and unlawful business practices, as described in

25    the prior paragraphs of this Complaint and Plaintiff incorporates those paragraphs, for this cause of

26    action.

27    76.    Plaintiff alleges that each defendant has benefited financially from participating in their

28    loan to own scheme, and to appropriate Plaintiff's assets for themselves, all to Plaintiff's detriment.

77.    Plaintiff reasonably and justifiably relied on the foregoing representations and statements, without knowledge of their falsity or of Skylark's misrepresentations.

78.    As a result of Skylark's false representations, and Plaintiff's reliance thereon, Plaintiff has been damaged in that, among other things, Plaintiff has been unable to finalize the Project and development of the Property to sell the same for profit.  Plaintiff was harmed when Skylark represented and provided materially false information, resulting in the damages complained of herein.  Plaintiff has been damaged by these misrepresentations, as participated by Skylark as alleged herein, in an amount to be proven at trial but over the jurisdictional limits of this Court.  Plaintiff also alleges that Skylark engaged in these acts, including in relation to the lending of funds, without any licensing to do so.

79.    Pursuant to Business and Professions Code section 17200 et seq., it is an unfair and unlawful business practice to make false representations in order to take a person's business interests.

80.    Plaintiff was harmed by Skylark's acts identified herein.  Thus, Skylark's unfair and unlawful business practices were a substantial factor in causing Plaintiff's harm.

81.    As a direct and proximate result of Defendant's conduct, Plaintiff suffered economic losses in excess of the jurisdictional limits of the court as outlined herein.

82.    As a direct and proximate result of Skylark's conduct, Plaintiff was required to retain the services of legal counsel to prosecute this case.

83.    Plaintiff has reasonably and necessarily incurred legal fees, and Plaintiff is informed and believes that he will reasonably and necessarily incur further legal fees in the future, all in an amount to be proven at trial.

### EIGHTH CAUSE OF ACTION

**(Accounting Against Skylark)**

84.    Plaintiff incorporates by reference the preceding paragraphs 1 through 22, as though set forth in full herein.

85.    Under the circumstances of this case, as alleged in detail above, an accounting is a necessary and appropriate remedy in that Skylark engaged in numerous and complex transactions to assume control of the Project from Plaintiff, to create a false and heavily discounted foreclosure value for the Property, and to orchestrate the wrongs complained of herein.  In doing so, Skylark engaged in

COMPLAINT

other, unjustified, improper, false, and fraudulent practices, as alleged herein, such that a balance of

damages due from Skylark to Plaintiff can only be ascertained by an accounting.  Thus, circumstances

are appropriate for an accounting where, as here, only Skylark is in possession of knowledge,

information, and documents needed to determine the amount of damages owed to Plaintiff.

86.    Without an accounting, the damages and/or the full extent thereof suffered by Plaintiff

cannot be traced or determined with accuracy.

## NINTH CAUSE OF ACTION

### (Equitable Subordination Against Skylark)

87.    Plaintiff incorporates by reference the preceding paragraphs 1 through 22, as though set

forth in full herein.

88.    Plaintiff claims that it was harmed by Skylark's improper acts, including the failure to

properly disburse construction loan funds, as described herein above.  This also included by means of

numerous materially false and misleading representations, statements, and omissions, on which Plaintiff

relied to its detriment and damage, as outlined in specific detail hereinabove.  These acts also include the

intent to damage third party sub-contractor creditors by foreclosing out their mechanic's liens after they

provided labor, materials, and/or services, for which they could not be paid due to Skylark's refusal to

timely and properly fund construction on the Property.

89.    Skylark had knowledge of the true facts and it did not have the legal basis to call a default

on the Loan Agreements, including in the amounts demanded.  However, Skylark represented that the

above listed misrepresentations were true when they were knowingly and intentionally false.  This was

primarily done in perpetuation of the loan to own fraud scheme.  These representations were knowingly

and intentionally false when they were made, and/or at a minimum were made without regard for their

truth so as to injure Plaintiff and the described third-party creditors.

90.    By engaging in said acts, Skylark engaged in various inequitable acts.

91.    Plaintiff alleges that it has been harmed by Skylark's above stated acts and that Skylark's

misconduct injured numerous other creditors (including the numerous sub-contractors and contractors,

including those that have filed claims for mechanic's liens) and conferred an unfair advantage on

Skylark, all in an amount to be determined at trial.

92.    In this setting, subordination would not be inconsistent with the Bankruptcy Code.

93.    Under principles of equitable subordination and 11 U.S.C. § 510(c), the Court must order the subordination of Skylark's claim to all other claims in the bankruptcy estate and order the transfer of Skylark's lien to the bankruptcy estate.

## TENTH CAUSE OF ACTION

### (Wrongful Foreclosure Against Skylark)

94.    Plaintiff incorporates by reference the preceding paragraphs 1 through 22, as though set forth in full herein.

95.    As a proximate result of the negligent or reckless conduct of Skylark the Plaintiff has been impaired and it is threatened with the eminent loss of its Property despite the fact that they have made all payments in accordance with the Loan Agreement up to the point of prior breach thereof by Skylark.

96.    Unless enjoined, the Plaintiff will suffer irreparable harm and will not have an adequate remedy at law.

97.    As a proximate result of the negligent or intentional actions of Skylark, the Plaintiff has suffered consequential damage and will continue to suffer additional damage in an amount to be fully proven at the time of trial in that Skylark has initiated foreclosure proceedings on the extremely valuable Property.

## ELEVENTH CAUSE OF ACTION

### (Slander of Title Against Skylark)

98.    Plaintiff incorporates by reference herein the preceding paragraphs 1 through 22, as though set forth in full herein.

99.    Skylark has caused to be recorded various documents, including a Notice of Trustee Sale, which has impaired the Plaintiff's title and which constitutes slander of title.  In this way, Plaintiff has been harmed by such improper and untrue recording on public title that casts doubts about Plaintiff's ownership or right to maintain and own the Property.

/ / /

/ / /

1      100.    Skylark knew or acted with reckless disregard as to the truth or falsity of the grounds

2    related to such recording and Skylark should have recognized that someone else might act in reliance on

3    such recording to title on the Property, which would cause Plaintiff financial loss.

4      101.    As such, Plaintiff should be awarded resulting damages to be fully proved at the time of

5    trial in that Plaintiff has suffered immediate and direct financial harm, including by incurring legal

6    expenses, causing others to react to such recordings, and casting doubt as to the veracity of Plaintiff's

7    claim and title to the Property.

8      102.    These acts by Skylark were a substantial factor in causing the Plaintiff harm in an amount

9    to be proven at trial.

10                      **TWELFTH CAUSE OF ACTION**

11                  **(Damages for Usurious Loan Against Skylark)**

12      103.    Plaintiff incorporates by reference herein the preceding paragraphs 1 through 22, as

13    though set forth in full herein.

14      104.    As described in detail above, Plaintiff and Skylark entered into the Loan Agreements for

15    the purpose of developing the Project on the Property in or around July of 2018.  As addressed in detail

16    above, the face interest rate on the subject promissory note was 8.1% interest.  However, numerous other

17    factors, including charging interest on unadvanced interest reserves, as well as additional points fees and

18    an additional equity interest in the Project being transferred to Skylark, for no additional consideration,

19    made the note exceed the allowable legal interest rate of 10% under California law.

20      105.    Furthermore, on at least the dates listed above, Plaintiff made usurious payments towards

21    the debt represented by the Loan Agreements.

22      106.    Plaintiff is thus entitled to bring this action for Skylark's violation of the usury laws.

23      107.    Plaintiff should also be entitled to recover treble the amount of interest in excess of the

24    amount legally allowable, which treble amount is to be determined at trial but is in excess of the

25    jurisdictional limits of this Court.

26      108.    Skylark willfully intended to enter into the transaction and to receive the rate of interest

27    over and above 10% per annum, which rate was usurious.

28    / / /

COMPLAINT

### THIRTEENTH CAUSE OF ACTION

### (Declaratory Relief Against Skylark)

109.    Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 22, as if fully set forth herein.

110.    An actual controversy has arisen and now exists between Plaintiff and Skylark. As described above, Plaintiff contends that Skylark intended, or at least negligently, disrupted the contractual and/or economic relationships, including ownership and possession of the Property and/or knew (or were negligent in not realizing) that disruption of the relationship(s) was certain or substantially certain to occur and each of those relationships was disrupted so that Plaintiff's development, ownership and business interests and related liabilities were harmed and Skylark's conduct was a substantial factor in causing Plaintiff's harm.  In that this is the case, Plaintiff claims that the Loan Agreements should not be enforced by Skylark, as against Plaintiff, and Skylark claims otherwise.  Also, an issue exists as to the various usury items identified in the Complaint without Skylark having proper licensing.

111.    A judicial determination of these issues and of the respective duties of Skylark is necessary and appropriate at this time under the circumstances for the reasons described above, a judicial determination is necessary to prevent further injury to Plaintiff.

112.    A judicial determination of the validity, priority and extent of Skylark's liens against the Property are likewise necessary and appropriate at this time under the circumstances for the reasons described above, a judicial determination is necessary to prevent further injury to Plaintiff.

### PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing, Plaintiff prays for judgment against Skylark, as follows:

1.    An order from this Court declaring the Loan Agreements invalid on the grounds of fraud;

2.    An order from this Court rescinding the Loan Agreements;

3.    An order from this Court terminating any foreclosure action from Skylark as to the Property;

4.    Damages sufficient to compensate the injury suffered by Plaintiff as alleged above, in an amount to be proved at trial;

1     5.      Punitive damages, in an amount to be proven at trial;

2     6.      Treble damages, in an amount to be proven at trial;

3     7.      A full accounting;

4     8.      Attorney fees and costs;

5     9.      Rescission;

6     10.     Statutory relief;

7     11.     Injunctive relief; and

8     12.     Any other and further relief that this Court deems proper.

9     DATED:  September 15, 2022

10                                          David J. Williams
                                            Quincy Chuck
11                                          Maschoff Brennan

12                                          By: /s/ David J. Williams_____
                                                 David J. Williams
13                                          Attorneys for Debtor/Plaintiff
                                            TREETOP DEVELOPMENT LLC
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT