David J. Williams (CA State Bar No. 236919)
  E-Mail:  dwilliams@mabr.com
Quincy J. Chuck (CA State Bar No. 307857)
  E-Mail: qchuck@mabr.com
MASCHOFF BRENNAN
100 Spectrum Center Drive, Suite 1200
Irvine, California 92618
Telephone:  (949) 202-1900
Facsimile:   (949) 453-1104

Special Litigation Counsel for Plaintiff

Treetop Development, LLC

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>Treetop Development, LLC,<br><br>               Debtor.<br><br>————————————————<br><br>TREETOP DEVELOPMENT LLC, a California limited liability company,<br><br>               Plaintiff,<br><br>      v.<br><br>SKYLARK CAPITAL MANAGEMENT, LLC, a California limited liability company; and ZACHARY VELLA, an individual,<br><br>               Defendants. | Case No. 2:22-bk-14165 BB<br>Chapter 11<br>Adversary No.: 2:22-ap-01178 BB<br><br>**SECOND AMENDED COMPLAINT FOR:**<br>**(1)   BREACH OF CONTRACT;**<br>**(2)   BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING;**<br>**(3)   FRAUD (VIOLATION OF CAL. CIV. CODE, §§ 1572, 1709, & 1710);**<br>**(4)   NEGLIGENT MISREPRESENTATION;**<br>**(5)   UNFAIR COMPETITION (VIOLATION OF CAL. BUS. & PROF. CODE, §17200 *ET SEQ.*);**<br>**(6)   ACCOUNTING;**<br>**(7)   EQUITABLE SUBORDINATION;**<br>**(8)   DAMAGES ON USURIOUS LOAN;**<br>**(9)   OBJECTION TO CLAIM PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 3007; and**<br>**(10) DECLARATORY RELIEF.** |

Plaintiff TREETOP DEVELOPMENT LLC ("Plaintiff," "Treetop," or "Debtor"), in this Second Amended Complaint ("SAC") against Defendants SKYLARK CAPITAL MANAGEMENT, LLC, a California limited liability company ("Skylark") and ZACHARY VELLA, an individual ("Vella"), alleges and states as follows:

## I.    VENUE AND JURISDICTION

1.    This action is a civil proceeding arising in the above captioned Debtor's chapter 11 bankruptcy case assigned case number 2:22-bk-14165 BB, which is now pending in this judicial district, arising under, arising in, and related to, Title 11 United States Code. This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157 (b)(2)(A), (B), (K) and (O) to hear and determine this proceeding and to enter an appropriate final order and judgment. Accordingly, this adversary proceeding is a core proceeding.

2.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

3.    This matter is an adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7001(2), (7), (8) and (9).

4.    The Debtor commenced its bankruptcy case by filing a voluntary chapter 11 petition on August 1, 2022. Debtor holds fee title to a large and valuable tract of certain undeveloped real property located in Beverly Hills, California, commonly known as 9650 Cedarbrook Drive, Beverly Hills, California 90210 (the "Property"). Even more particularly, this lawsuit involves a loan, the related deed of trust, the failure to properly fund the loan, and the attempt to foreclose upon the Property, all to Treetop's injury and damage.

## II.    IDENTIFICATION OF THE PARTIES

5.    Plaintiff Treetop is presently, and at all times relevant to the allegations of this SAC was, a California limited liability company located and doing business in the County of Los Angeles, State of California, including in particular its business activities relating to the facts, as alleged herein.

6.    Defendant Skylark is, on information and belief, a California limited liability company that has (a) its principal place of business in Los Angeles California, and (b) been and is doing business in the County of Los Angeles, State of California, including, in particular, its activities relating to Treetop and the related Property, as alleged herein. At all times mentioned herein Defendant Skylark

2

1    was managed and run by an individual, Vella.

2         7.      Defendant Vella, is an individual who on information and belief, (a) resides in the State

3 of Florida, (b) resided at the timing of most of the events alleged herein in the County of Los Angeles,

4 State of California, (c) is the co-founder and managing director of Skylark, (d) is the signor for

5 agreements and loan documents identified herein, and (f) has been and is doing business in the County

6 of Los Angeles, State of California, including in particular his activities relating to Treetop and the

7 related Property, as alleged herein.

8                 **III.    SUMMARY OF CLAIMS AND CLAIMS FOR RELIEF**

9         8.      Plaintiff Treetop hereby alleges a "loan to own scheme" perpetrated on Treetop by

10 Skylark and Skylark's manager, Vella (collectively, "Defendants"). These Defendants sought out

11 Treetop, and its manager, Mohamed Hadid ("Hadid"), to induce Treetop to enter into a predatory

12 lending transaction whereby Skylark could thereafter foreclose on Treetop's valuable Property.

13         9.      Treetop's Property is a large tract of undeveloped land in Beverly Hills, California, worth

14 approximately $87,000,000.00 (undeveloped), worth approximately $106,000,000.00 (once additional

15 road and utility improvements are completed), and worth potentially $250,000,000.00 (once fully

16 developed).

17         10.      Treetop had no prior interactions or business dealings with the Defendants prior to the

18 loan at issue in this case (the "Loan"). Instead, Defendants sought out Treetop, around mid-2018, and

19 offered to lend Treetop $92,775,000.00 to pay off current debt on the Property (of roughly $20,000,000),

20 and then to pay for construction development on the Property (the "Project") with the remaining funds

21 (aka, the Loan). The maturity date for the Loan was calculated to conclude with the completion of the

22 Project, with sufficient time for Plaintiff to first sell the fully developed Property before paying off the

23 Loan. As described herein, Skylark, as an entity, was created and set up by Vella primarily to lend

24 Treetop the funds under this Loan and one other (related) loan. Vella is believed to have been the sole

25 member (and/or the main directing member), of the Skylark LLC and to have been its managing

26 member at all relevant times. While a now deceased party named Jonathan Shapiro ("Shapiro") may

27 have had some positions, or membership interests, as to Skylark, it is alleged herein that Vella still made

28 all decisions for Skylark and that Shapiro only had such positions to attempt to further shield Vella from

1    liability. Thus, as alleged in detail below, Skylark is alleged to have been set up to attempt to avoid

2    liability for the claims identified in this SAC and to have been the alter ego of Vella.

3        11.    Although Skylark promised to fund the Loan, unknown to Treetop was that Skylark never

4    had the resources to fully fund the Loan and/or, never intended to release the entire Loan facility to

5    Treetop. Instead, Defendants agreed to the Loan, funded only a portion of the Loan facility that paid off

6    the prior secured debt, and then shortly thereafter, refused to fund the remaining construction requests

7    (either by refusing to fund timely, by refusing to fund at all on certain draw requests, or by refusing to

8    fund such draw requests in full).

9        12.    As a result, the Debtor suffered from a liquidity shortage caused by Defendants and

10   Treetop was unable to timely pay the subcontractors performing the work. Accordingly, the

11   subcontractors filed mechanic's liens against the Property. This Skylark-induced liquidity shortage also

12   severely delayed construction, and the Project was not completed within the time contemplated by the

13   parties, or in time to pay off the Loan when it matured.

14       13.    In all, Skylark only released approximately $29,085,444.54 out of the promised

15   $92,775,000.00 loan facility ($20,000,000 of which refinanced the existing secured debt, and

16   approximately $9,000,000 for preliminary construction). However, Skylark claims that it is now owed

17   more than double the amount actually released (or at least $63,054,044.56). *See* Declaration of Zachary

18   Vella, ¶ 5, Dkt. No. 29, *In re Treetop Development, LLC*, 2:22-bk-14165 BB, (Bankr. C. D. Cal. 2022).

19   Despite Treetop's demand, to date, Skylark has not provided an accounting of its purported claim.

20       14.    Debtor is informed and believes, and on that basis alleges, that Skylark is not a

21   conventional lender, but is run and managed by Vella—who is a real estate developer. One online

22   biography describes Vella as follows: "Zachary Vella, CEO of Vella Group, LLC and Skylark Capital

23   Management, LLC, is a predominant developer in New York City, Miami, Las Vegas, and Los Angeles.

24   Zach now primarily develops real estate where he owns and operates a wide variety of properties,

25   including hotels, high-street retail, and creative office." http://www.dragonglobal.com/zachary-vella/;

26   https://vellagroup.com/about/.

27   / / /

28   / / /

SECOND AMENDED COMPLAINT

15.     As a developer, Vella, through Skylark, intended to foreclose upon, develop, and then sell the Property to benefit himself and Skylark.

16.     Skylark was not licensed as a lender at the time the Loan Agreement at issue was executed (the "Loan Agreement") and was not otherwise a conventional lender. (See Exhibit B, hereto).

17.     Debtor is informed and believes, and herein alleges, that at all relevant times, Skylark and/or Vella intended to use the Loan as a scheme to take title to the Property for less than half of its anticipated value.

18.     Based upon information and belief, Skylark's only known business at its creation was to lend on this Loan, and an accompanying $31,300,000.00 loan on a similar project in a different litigation matter (the "Summitridge Property"). Other than these two related loans, Skylark is a single purpose entity created to facilitate these two loans, with no other lending history (other than to attempt the foreclosures identified herein). Skylark was newly and specially formed in 2018 to facilitate this alleged scheme.

19.     Plaintiff believes that Skylark was not looking for a simple interest return on the Loan, as would be the business model of a conventional lender. Skylark's sole purpose in providing this Loan was to force Plaintiff into a default and gain a windfall by profiting from sale of the end Project itself, to the exclusion of Plaintiff.

20.     For instance, Skylark, unlike a conventional lender on a multi-million dollar project, never required Plaintiff to provide its financials at any time, and to Plaintiff's information and belief, never obtained Treetop's credit report. Skylark, likewise, never required Hadid's credit or financials as the manager of Treetop and a personal guarantor of the Loan. Skylark did not conduct customary due-diligence which was irrelevant to Skylark, as the Defendants were only looking to manufacture a situation that would enable them to foreclose on the Project and exclude Plaintiff from its anticipated profits upon completion of the Project.

21.     The Loan was set up from its inception as usurious. The minimum interest rate, as evident from the face of the Loan was a minimum of 10.17, which is in excess of the maximum allowable interest rate in California. As more fully set forth below, the minimum interest rate is defined in the Loan Agreement as the "Contract Rate". The Contract Rate equals the LIBOR Margin at 8.10%

SECOND AMENDED COMPLAINT

plus the LIBOR Rate at a minimum of 2.07% = 10.17%). (Exhibit B, pp. 4, 9). Skylark, which was set up shortly before the Loan, did not have a lender's license when the Loan was executed and the Loan did not meet any of the other usury exemptions. The Loan also charged additional points and fees payable to Skylark which is alleged to have further brought the interest rate well over the usurious limit.

22.    Upon information and belief, during the term of the Loan, Skylark never formally or informally provided a notice of default to Treetop on the Loan.

23.    Upon information and belief, the first time that Skylark provided a notice of default was after the Loan's maturity date. The basis for the notice of default was the expiration of the maturity date, when it was, or should have been, obvious to Skylark that due to delays in construction, the Project was not complete and could not be sold for the full anticipated value due to Skylark's failure to timely fund the construction Loan.

24.    Throughout the Loan term, Skylark repeatedly affirmed (primarily from Vella to Hadid) that Skylark's inability to timely fund was due to Skylark's own funds being delayed from Skylark's source in London. When pressed for more information after Skylark stopped funding the Loan entirely, Skylark additionally began arguing that the draw requests were out of budget (they were not), while still maintaining that Skylark did not have the funds from its London source.

25.    In order to mitigate its damages from Skylark's failure to fund as required under the Loan, Treetop secured a junior lien from Lydda Lud on or about November 5, 2019 (the "Lydda Lud Loan") in the principal amount of $6,000,000.00. The Lydda Lud Loan was approved by Skylark and Skylark directed the use of the Lydda Lud proceeds. Based on Skylark's representations, Treetop believed that the Lydda Ludd Loan was a short-term bridge loan that was only necessary until Skylark obtained its own funding. Lydda Lud recorded a Deed of Trust to secure the Lydda Lud Loan on the Property on May 6, 2021. A true and correct copy of the Lydda Lud Deed of Trust is attached hereto as Exhibit "A" and is incorporated herein.

26.    Treetop is informed and believes and herein alleges that it was Defendants' intent to cause the default on the Loan, declare a default at the maturity of the Loan, foreclose on the Deed of Trust for the Property, and extinguish the junior lien holder, including mechanic's liens, to obtain title to the Property. Once it foreclosed, Skylark could finalize development of the Property and realize all of

the profit from the Property and the Project to the exclusion of Plaintiff (aka, up to $250,000,000.00, or, at a minimum $86,000,000.00 for the raw land [based on a contemporary appraisal], instead of collecting only short-term interest on the Loan).

27.    Treetop was unaware when it agreed to the Loan that Skylark, or at least Vella, through other entities and/or agents, had engaged in similar "loan to own" foreclosure schemes. The Defendants engaged in a similar scheme in relation to the Summitridge Property, where, Vella fraudulently transferred 1 acre of property from the borrower to himself, individually. It is also alleged on information and belief that Vella was involved in another "loan to own scheme" for a large residential construction project in Bel Air, California, located at 675 Perugia Way, Los Angeles, California 90077 (the "Perugia Property"). Treetop's investigation is ongoing and it expects that Skylark/Vella's other "loan to own" schemes will be exposed during discovery.

28.    Further evidence to support Defendants' intent to perpetrate a "loan to own" scheme here is supported by the fact that Skylark, through Vella, during the term of the Loan, was also scheming to work together with at least one neighboring lot owner to, presumably, jointly develop the Property after Skylark later foreclosed upon the Property. Further facts as to these claims are detailed below.

29.    Damages and equitable relief are requested herein for these acts and are further pled in greater detail below.

## IV.    ALTER EGO ALLEGATIONS

30.    Treetop alleges that Skylark was the alter ego and agent of Vella, and in doing the things hereinafter alleged, was at all times acting within the purpose and scope of said agency, servitude, and/or employment. Treetop is further informed and believes that each Defendant was involved in a co-conspiracy to injure it and to impair its interests, and that both Defendants consented to, ratified, or authorized the conduct with the intent and knowledge that such action would result in damage to Treetop. As a direct result of Defendants' combined wrongdoing, Treetop suffered substantial injury and damages. Treetop alleges that Skylark, at all times relevant to the allegations of this SAC, was the alter ego of Vella by reason of at least the following:

a.    Treetop alleges that, at all times herein mentioned, Vella dominated, influenced, and controlled the officers, managers, business, property, and affairs of Skylark.

b.      Treetop alleges that, at all times herein mentioned, there existed and now exists a unity of interest and ownership between Vella and Skylark, such that separateness of Vella and Skylark has ceased.

c.      Treetop alleges that, at all times herein mentioned, Skylark was created and continued to exist pursuant to a fraudulent plan, scheme, and device conceived and operated by Vella, whereby the income, revenue, and profits of Skylark were diverted, and/or intended to be diverted, by Vella to himself and to be utilized for improper purposes as alleged in this SAC.

d.      Treetop alleges that, at all times herein mentioned, Skylark was organized by Vella as a device to avoid personal liability for Vella, and for the purpose of substituting such financially irresponsible entity in the place and stead of Vella, and accordingly, Skylark was formed with capitalization totally inadequate for the business in which the entity was engaged. This fact is shown and demonstrated by, despite the Defendants' representations otherwise, the fact that Skylark did not have the funds in place and/or was ultimately not able to fund the construction Loan in this case. Skylark also did not have a lender's license and/or insurances to cover claims against that entity, as a conventional lender would have.

e.      As a consequence of the foregoing, adherence to the fiction of the separate corporate and/or other entity existence of Skylark would, under the circumstances, sanction a fraud and promote injustice in that Treetop would be impaired in its ability to realize upon any judgment in its favor (as Skylark would, as intended, be an empty shell to collect judgment against).

f.      Skylark is alleged to also be the alter ego of Vella by the following additional facts, each of which will be proven at trial:

        i.   The commingling of funds and other assets between Skylark and Vella;

        ii.  Failing to segregate the funds of the Defendants;

        iii. The unauthorized diversion of Skylark funds or assets to other than Skylark uses (including usurping the transfer of 1 acre of property to Vella, personally, in the Summitridge matter and transferring money between this Project and the Summitridge construction matter—and potentially other projects) at the whim of Vella;

iv.    The treatment by Vella of the assets of Skylark as his own;

v.    The failure to maintain minutes or adequate company records for Skylark, including accounting records;

vi.    Vella's complete domination and control of the Skylark entity;

vii.    Vella's sole ownership of Skylark;

viii.    The failure to adequately capitalize Skylark (as evidenced by its inability to fund the Loan, among other facts alleged herein);

ix.    The total absence of company assets of Skylark;

x.    The use by Vella of Skylark as a mere shell, instrumentality or conduit for the two loan ventures identified in this SAC;

xi.    The disregard of legal formalities and the failure to maintain arm's length relationships between Vella and Skylark;

xii.    The diversion of assets from Skylark to Vella, personally, or to his other side projects, to the detriment of creditors and Plaintiff; and

xiii.    The intent of Defendants to avoid performance of properly funding the Loan by use of Skylark as a shield against personal liability for Vella.

31.    Treetop thus alleges that, at all times since the formation of Skylark, Skylark has been, and now is, a mere shell and naked framework that Vella used as a conduit for the conduct of his personal business, and affairs, including with respect to the matters identified in this SAC.

32.    Treetop alleges that, as members of the conspiracy alleged more fully below, each of the Defendants participated and acted together with, or in furtherance of, the conspiracy, or aided or assisted in carrying out the purposes of the conspiracy, and performed acts and made statements in furtherance of the conspiracy. As such, Defendants conspired together, building upon each other's wrongdoing, to perform, undertake, or accomplish wrongful acts outlined in this SAC.

33.    Defendants are thus sued as principals, participants, aiders and abettors, and co-conspirators in the wrongful conduct alleged in this Cross-Complaint, and the liability of each arises from the fact that each has engaged in all, or part, of the improper acts, plans, schemes, conspiracies, or transactions complained of herein and from the alter ego status of Vella and Skylark.

# V.    PRELIMINARY FACTUAL ALLEGATIONS

## A.    <u>Facts as to Initial Inducement</u>

34.    This lawsuit, in large part, involves a carefully orchestrated "loan to own" fraud scheme perpetrated by unscrupulous lenders (Defendants), in order to obtain unlawful control over, and ultimately full ownership of, the Property that secured the debt. The Property is a highly valuable tract of undeveloped land, consisting of at least 27 acres located in Beverly Hills, California.

35.    This "loan to own" fraud scheme was perpetrated by Defendants with Skylark, as the lender, and Vella as Skylark's manager. These Defendants engaged in this scheme in order to ultimately obtain full ownership of the Property that secured the Skylark Loan. At all material times, Defendants intended to complete the development of the Project and sell the Property in order to usurp Treetop's anticipated profits from the Project.

36.    Treetop's Property is a valuable tract of undeveloped land, worth over $87,000,000.00 (undeveloped), worth approximately $106,000,000.00 (with additional road and utility improvements), and worth, potentially, $250,000,000.00 (once fully developed, as planned). The undeveloped valuation, and valuation with additional road and utility improvements, is based upon an appraisal performed shortly prior to the execution of the Loan Agreement that, on information and belief, Skylark had access to. The estimated valuation once fully developed is based upon industry-standard estimations. Prior to July of 2018, Plaintiff was seeking funds to pay off the then-current secured debt against the Property (around $20 million) and to develop the Property with various high-end residential dwellings.

37.    Plaintiff did not solicit Vella or Skylark, either personally or through a broker.

38.    Treetop is informed and believes, and thereon alleges, that Vella's associate learned of Treetop's ownership of the Property and its need for funding to develop the Property. Defendants initiated contact to Treetop, and its manager, Hadid. Unbeknownst to Plaintiff at the time, Defendants intended to induce Treetop to enter into the predatory Loan transaction so that Skylark could foreclose on the valuable Property and Defendants could then reap a large windfall in the amounts listed above.

39.    Treetop had no prior interactions or business dealings with the Defendants. In early-2018, Defendants sought out Treetop and spoke to Hadid, offering the Loan transaction. Vella appeared to already know many details about the Property at that time.

SECOND AMENDED COMPLAINT

40.     Skylark agreed to lend Treetop $92,775,000.00 to pay off current secured debt on the Property (of roughly $20,000,000), and then to pay for construction development for the Project with the remaining funds. The maturity date for the Loan was calculated to conclude with the completion of the Project, with sufficient time to sell the fully developed Property. Using industry-standard valuation methods, it was expected that the value of the Project would be approximately $250,000,000.00 once fully developed.

41.     Skylark did not require Treetop's financials prior to extending the Loan or signing the related agreements, or require additional evaluations, engineering reports, and/or other requirements typical of conventional lenders. Nor did Skylark require Hadid's financials or request that Hadid authorize a credit check, even though Hadid personally guaranteed the Loan.

42.     On information and belief, and with the benefit of hindsight, Plaintiff asserts that Vella had inside knowledge from Vella's prior associates of Plaintiff's Property and existing secured debt on the Property. Vella and Skylark specifically targeted Treetop to advance the Loan with terms that appeared tailor-made to enable Treetop to begin developing the Property and resolve prior secured loans—all without the burdensome evaluations required by conventional lenders.

43.     Unbeknownst to Treetop, Defendants designed this Loan specifically to induce Treetop to execute it, while Defendants never actually intended to release the funds needed to complete construction on the Project. Defendants intended to release just enough funds to enable Defendants to effectuate the "loan to own" scheme. Each of these above facts shall sometimes be referred to herein as the "Initial Inducement Facts".

**B.     Misrepresentations as to Ability/Willingness to Fund**

44.     Although Skylark promised to fund the Loan, and unknown to Treetop at all material times, Skylark never had the resources to fully fund the Loan (and/or, never intended to release the entire Loan facility to Treetop). Instead, Skylark agreed to the Loan, funded only an initial portion of the facility that paid off the prior secured debt, and then shortly thereafter, refused to fund the remaining construction requests (either by refusing to fund timely, refusing to fund at all on certain draw requests, or refusing to fund such draw requests in full).

/ / /

45. Particularly, Skylark, through Vella, represented to Hadid, for Treetop, that Skylark would lend the sum of $92,775,000.00 to Treetop. Each of the conversations and representations described herein took place during telephone conversations, in text messages, or email correspondence, and/or via in-person discussions in or around July of 2018. Hadid, for Treetop, and Vella, for Skylark discussed and agreed at that time that less than a quarter of the amount loaned was earmarked to pay off the existing secured debt on the Property. The remaining facility was available for the development of the Property, through draw requests, so that it could later be sold for a profit (which proceeds would be needed to repay the Loan at the maturity date). The maturity date for the Loan was specifically calculated to conclude with the completion of the Project, with sufficient time to sell the fully developed Property. As such, Treetop would pay off the Loan and profit from its business venture and Skylark would receive the interest amounts charged on the Loan. Each of these items were discussed between Vella and Hadid at those times, around July of 2018.

46. Vella, for Defendant Skylark, represented numerous times to Hadid, for Treetop, prior to entering into the related Loan in or around July of 2018, that Skylark, as lender, had the full Loan facility in place, and was ready, able, and willing to fund the same timely, as would be needed for the Project. In or around July of 2018, Vella represented to Hadid that Skylark had received those funds from a source in London and that all of that money would be set aside to fund the $92,775,000.00 Loan to Treetop. Vella, on behalf of Skylark, represented numerous times to Hadid, prior to entering into the Loan, that Skylark, as lender, would disburse funds on the Loan in draws to the extent they were requested by Treetop. The parties also discussed at length around July of 2018 that the draws had to be timely paid in order for the Property to be developed timely—so that the Loan could thereafter be timely paid off. The parties were also well aware that draws had to be timely paid to Treetop so that it could pay the contractors and/or subcontractors to avoid any related mechanic's liens.

47. Vella and Hadid discussed each of these items around July of 2018. Vella made these misrepresentations specifically to induce Treetop to enter the Loan Agreement as Defendants were well aware that Treetop needed assurances that the Loan would be fully and timely funded.

/ / /

/ / /

48.     The entire Loan Agreement was structured around a budget (the "Budget") which included a specific timetable designed to require the Loan proceeds to be timely and fully paid in order to develop the Property on time, sell it, and thereby pay off the Loan when it became due.

49.     Plaintiff alleges herein that all of these representations by the Defendants were materially false and that Defendants' true intentions, and/or inabilities to fund, were omitted to be disclosed to Treetop. These facts shall sometimes be referred to hereinafter as, the "Ability to Fund Misrepresentations".

**C.      Facts As To The Loan Agreements And Related Breaches And Torts**

50.     Based on the above representations, and not knowing Defendants' intent to engage in the "loan to own" scheme, in or around July of 2018, Plaintiff entered into various loan agreements, including but not limited to the following agreements (sometimes, collectively, the "Loan Agreements"):

a.      A Loan Agreement;

b.      A Promissory Note;

c.      A Deed of Trust, Security Agreement and Assignment of Rents;

d.      A Contingent Interest Agreement;

e.      A Completion Guaranty;

f.      An Indemnity Agreement;

g.      An Environmental Indemnity Agreement;

h.      An Assignment of Agreements;

i.      A Sponsor Pledge Agreement;

j.      An Assignment of Architectural Agreements;

k.      A Post Closing Letter Agreement;

l.      Various miscellaneous certificates and waivers; and

m.      A Memorandum of Understanding. Attached hereto as Exhibit "B", "C", and "D", respectively, are the Loan Agreement, Promissory Note and Deed of Trust.

51.     Plaintiff intended to comply at all times with the terms of the Loan Agreements.

52.     Defendants intentionally, and maliciously, never intended to perform as agreed under the Loan Agreements. Defendants knew that Skylark was never going to release the Budget draw amounts.

Defendants intentionally misrepresented that the Loan facility was fully funded to Skylark and despite these representations, Skylark could not fully fund the development portion of the Project when Plaintiff provided draw requests. Alternatively, even if Skylark, at one time, had the funds in place, Skylark (through Vella) intended to utilize such funds for other purposes not relating to the Project or the Loan (i.e., to benefit Vella or his own separate projects).

53.    Plaintiff further alleges that even if Skylark had the ability to access the funds needed to comply with the Loan Agreement, Vella, who had control of Skylark, intended to, and did, prevent Skylark from accessing and/or releasing the funds, in order to frustrate Plaintiff's receipt of the funds due under the Loan Agreements. Both Vella and Skylark also intended, by denying Plaintiff access to the funds, and after inducing Plaintiff to reasonably rely on timely receiving those funds, to interfere with Plaintiff's contracts with its subcontractors and other creditors.

54.    Unbeknownst to the Plaintiff at all material times, Defendants conspired to short fund the development of the Property so as to cause a default under the Loan Agreements—to allow Skylark to, instead, take title to the Property through a foreclosure to the detriment of Plaintiff and all junior secured creditors, including Lydda Lud and all of the sub-contractors.

55.    Unknown to Plaintiff at all material times, Plaintiff is informed and believes, and thereon alleges, that Skylark, and/or Vella, through other entities and/or agents, have engaged in similar "loan to own" foreclosure schemes various times in the past, including on the Summitridge Property and the Perugia Property. Treetop's investigations are ongoing and it expects that other "loan to own" schemes by Defendants may be exposed during discovery.

56.    It is further alleged that even if Skylark had the ability to access the funds needed to comply with the Loan Agreement, Vella, who controlled Skylark, intended to, and did, prevent Skylark from accessing and/or releasing those funds, in order to frustrate Plaintiff's receipt of the funds due under the Loan Agreements. Both Vella and Skylark also intended, by denying Plaintiff access to the funds, and after inducing Plaintiff to reasonably rely on timely receiving those funds, to interfere with Plaintiff's contracts with its subcontractors and other creditors by frustrating Plaintiff's ability to timely pay.

/ / /

### D.    Skylark's Failure to Fund the Loan

57.    The Parties agreed on the Budget prior to entering into the Loan Agreements. The Budget set forth the amount and timing of the requested draws in order to enable Plaintiff to timely complete the Project and to repay the Loan.

58.    The Budget did not change since the execution of the Loan Agreements. However, after the Loan closed, Vella, in or around September of 2019, and the months thereafter, affirmed in person and in telephone calls to Hadid, that Skylark's inability to timely fund the Loan was because their money source in London was not providing the funds to Skylark. After Skylark began refusing to fund any draw requests entirely, and upon being pressed on its continued representations that it was waiting for funds from London (which contradicted Skylark's prior representations that money was all available and set aside), Skylark began arguing, additionally, that draws provided for in the Budget were "out of budget". Skylark denied fully funding the draw requests on that pretext even when the draw requests matched the Budget or when any Budget issues were caused by Defendants. Skylark never claimed that its failure to fund was due to a default by Treetop (and did not at that time notice such a default).

59.    These failures by Skylark caused Plaintiff to suffer from a liquidity shortage which slowed and hindered the construction, caused Plaintiff to seek out and secure other loans to replace the funds previously promised by Skylark, and caused various other sub-contractors to not be able to be paid. This halted the construction on the Project, caused the filing of mechanic's liens, and prevented the Project from timely completion prior to the Maturity Date.

60.    As early as September 13, 2019, although Skylark refused to adequately fund the draw requests, Skylark continued to collect fees and points on the Loan, and to draw down on the $17.8 million interest reserves earlier than permitted and/or in usurious amounts, as described below.

61.    Skylark only released approximately $30 million (more particularly around $29,085,444.54) out of the $92,775,000.00 of the Loan facility.

62.    In that roughly three (3) year period, Skylark claims in its recorded Notice of Trustee's Sale ("NOS") recorded on May 23, 2022, that it is now owed more than double that amount (at least $61,588,040.73). Vella claimed in a declaration filed in the bankruptcy case that its claim is "not less than $63,054,044.56". It is believed that these amounts include the charging of usurious interest (a

minimum of 10.17%) under the Loan Agreement.

63.     Plaintiff suffered damages in that the Skylark's inflated claim prevented Plaintiff's ability to redeem or pay off the debt.

64.     The chart below demonstrates the draw requests and the actual amount(s) funded:

| DRAW REQUEST | DATE SUBMITTED | AMOUNT REQUESTED | DATES(S) PAID | AMOUNT PAID | AMOUNT NOT PAID |
|---|---|---|---|---|---|
| DRAW 1 | | $ 2,500,000.00 | 7/31/2018 | $ 2,500,000.00 | Funded at Closing |
| DRAW 2 | | $ 2,225,000.00 | 7/31/2018 | $ 2,225,000.00 | Funded at Closing |
| DRAW 3 | 9/13/2019 | $ 1,115,380.97 | 11/27/2018 | $ 1,000,000.00 | $      115,380.97 |
| DRAW 4&5 | 9/16/19 | $ 2,412,000.56 | 2/5/19 & 9/16-10/9/19 | $ 1,708,106.05 | $      694,714.55 |
| DRAW 6 | 10/16/2019 | $      549,695.59 | 10/18-10/30/19 | $      358,396.97 | $      191,298.62 |
| DRAW 7 | 11/11/2019 | $      302,404.03 | 11/18-11/21/19 | $      302,404.03 | 0 |
| DRAW 8 | 11/25/2019 | $      463,962.45 | 12/31/19 & 2/4/20 | $      383,628.22 | $       80,334.23 |
| DRAW 9 | 12/18/2019 | $      292,247.19 | 12/23/2019 7/1/2020 | $      207,909.27 $       12,913.53 | $       71,424.39 * PART OF $400k on 7/1/20 |
| DRAW 10 | 3/2/2020 | $      174,168.41 | 7/1/2020 | $      174,168.41 | * PART OF $400k on 7/1/20 |
| DRAW 11 | 3/3/2020 | $      212,918.06 | 7/1/2020 | $      212,918.06 | * PART OF $400k on 7/1/20 |
| DRAW 12 | 6/11/2020 | $ 1,138,133.21 | | 0 | $ 1,138,133.21 |
| DRAW 13 | 7/21/2020 | $ 4,524,580.45 | | 0 | $ 4,524,580.45 |
| DRAW 14 | 10/27/20 | $ 1,333,577.69 | | 0 | $ 1,333,577.69 |
| DRAW 15 | Est 11/20 | $ 1,863,168.24 | | 0 | $ 1,863,168.24 |
| | | | | | |
| TOTALS | | $ 19,098,056.89 | | $ 9,085,444.54 | $ 10,012,612.35 |

65.     Skylark did not notice any defaults of the Loan Agreements by Treetop at the time of any of the draw requests referenced in paragraph 64, and Vella, on multiple occasions during those dates identified in paragraph 64, stated that the failure to fund the draw requests was due to the failure of Skylark's funding source in London to provide requested funds. These intentional and knowing acts by the Defendants severely damaged Plaintiff, and third parties, and completely stalled the development of the Project. More particularly, multiple liens started accruing on the Property, as the money Plaintiff

16

relied on to pay them was not being funded or released as Defendants previously represented. Additional debt had to be created to attempt to hold off such damages, causing Plaintiff further and additional damages. These intentional acts by the Defendants also created additional delays and defaults relating to the Property and the Project, all to Plaintiff's detriment. These damages also included reputational damages from vendors who refused to continue to work on this or other projects due to the acts of the Defendants. All of these acts, and the consequences therefrom, damaged Plaintiff.

66.    Furthermore, even after creating all of the above issues by not funding default on the Loan Documents when the loan matured and filed the Notice of Sale on May 23, 2022, for an inflated amount, to attempt to foreclose upon the valuable Property. It appears that this was Skylark's plan all along—e.g., charge a usurious interest amount, cause a default on the Loan Agreements by not actually releasing amounts needed to complete construction on the Project, so that the Project could not be finished and sold in time, and then use the foreclosure process, and inflated Loan default amounts, to finalize their "loan to own" scheme…, aka, to take the Property from Plaintiff and leave sub-contractors and junior creditors in the lurch.

**E.    Additional Facts as to Defendants Conspiring with Neighbors as to the Property**

67.    Plaintiff is informed and believes and thereon alleges that additional facts that support this improper intent by Skylark to conduct the "loan to own" scheme include other intentional acts, as follows: Alex Von Furstenberg is a neighbor to the Property and may have control over certain easement rights relating to access to portions of the Property. Skylark and Vella, who should be nothing more than disinterested lenders relating to the Property, and who should not attempt to interfere with the borrower developing the Property, reached out to Alex Von Furstenberg early on to interfere with Plaintiff and Hadid's potential use of the Property, offering (as the lender) to partner with Alex Von Furstenberg to take over and develop the Property (instead of properly funding the Loan for Treetop to finalize the Project on the Property). A conversation as to this fact was overheard by a third-party and Plaintiff believes that discovery will further support this allegation. These facts shall sometimes be referred to herein as "Conspiring with Neighbors". Plaintiff expects that further evidence demonstrating these events will be uncovered after a reasonable opportunity for further investigation and discovery.

/ / /

**F.      The Loan Was Facially Usurious Prior To Consideration Of Later Contingent**

**Shared Appreciation Interest**

68.     The Loan was made in California and is subject to California law. (Exhibit B, p. 292, §
7.9). At the relevant time to the Loan the maximum interest permitted in California, without an
exemption was 10% (Cal. Const., art. XV, §1, subds. (1)-(2)). The Federal Reserve's discount rate has
never reached 5% per annum, or above, at the relevant times. Thus, the Federal Reserve's discount rate
plus 5 percent has not exceeded 10% from 2018 to the present and 10% was the maximum interest rate
permitted during the term of the Loan. The Loan Agreement (Ex. B) in Section 2.3 sets forth the interest
on the date of the Loan at the "Contract Rate", which in turn is no less than 10.17%--exceeding the limit
(without an exemption). Cal. Const., art. XV, § 1, subds. (1)-(2).

69.     The Loan Agreement defines "Contract Rate" as a rate per annum equal to the LIBOR
Margin plus the LIBOR Rate (Exhibit B, p. 76). "LIBOR Margin" is defined as eight and ten hundredths
percent (8.10%) per annum.  (Exhibit B, ¶. 81). "LIBOR Rate" is defined as a daily fluctuating rate per
annum equal to the rate of interest which is identified and normally published by Bloomberg
Professional Service page USD-LIBOR-ICE and "[n]otwithstanding the foregoing, in no event shall the
LIBOR Rate be an amount less than the one-month LIBOR Rate determined on the Business Day prior
to the Closing Date and two and seven hundredths percent (2.07%)." Based on these definitions, the
Contract Rate (interest charged) as read from the Loan Agreement is 10.17% (Being the LIBOR Margin
of 8.10%, plus the LIBOR Rate minimum of 2.07%).

70.     At the time of entering into the Loan, Skylark did not have real estate or lender's license.
The Loan Agreement, at paragraph 3.2(c), set up an interest reserve for the Loan for $17,600,000.00 (the
"Interest Reserve"). The Loan Agreement also includes, among other points and fees, a "payment to
Lender of a loan origination fee in the amount of Three Million Seven Hundred Eleven Thousand and
No/100 Dollars ($3,711,000.00) (the "Loan Origination Fee")", which constitutes additional interest
which is alleged to also go well over the usury limit. (See, Exhibit B, p. 17, Section 2.2(b)).

71.     Plaintiff is informed and believes and thereon alleges that Skylark drew down on the
Interest Reserve from inception, and in an amount that is usurious under California law. Plaintiff has
requested an accounting of the same and Defendants have so far failed and refused to provide the same.

72.    Despite demand, Skylark refuses to provide an accounting. Thus, Plaintiff requests the Court order an accounting to get to the bottom of this issue. This improper additional interest also served the alleged "loan to own" scheme, by ensuring that Defendants could devalue the Property at foreclosure enough to enable them to obtain the Property at a minimal cost.

73.    All of these above-described acts by Defendants caused Plaintiff substantial damages. These damages include extensive monetary damages in an amount to be proven at trial. Additionally, Defendants' failure to timely fund, as pled herein, caused numerous additional damages, including physical damages to the Property, by the Property being left without funds to safeguard and upkeep it. These delays have resulted in: (1) severe soil erosion at the Property, including three truckloads of soil that had swept into, and must be removed, from a neighbor's yard, and a collapse of a portion of the access road at the property; (2) approximately 250 caissons at the property with exposed rebar sit rusting and exposed to the elements (including approximately 60 rebar cages that have not been installed yet and other equipment); and (3) a 300 foot retaining wall which needs remediation. Likewise, to restart construction after the stall, all of the materials and improvements need to be re-inspected and remediated, which will result in additional costs to the physically-damaged Property. Additional damages include: (1) the potential for loss of Plaintiff's Property; (2) damage to Plaintiff's reputation with vendors/contractors, other lenders, and potential customers; (3) damage to the value and reputation of the Property itself (given the negative stigma now attached to land meant for high-end mansions); and (4) the risk of losing construction permits relating to the Property, causing irreparable harm.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract Against All Defendants)

74.    Plaintiff incorporates by reference the preceding paragraphs, 1 through 73, as though set forth in full herein.

75.    On or about December 15, 2017, Plaintiff, on the one hand, and Skylark, on the other hand, began negotiations to enter into the Loan Agreements, and specifically, the Loan Agreement (attached as Exhibit "B"). Plaintiff and Skylark executed and agreed to be bound by all of the terms of the Loan Agreements as stated in the preceding paragraphs.

/ / /

76.     On July 31, 2018, Plaintiff and Skylark executed the Loan Agreements. (Exhibits "B" –

"D"). As part of the Loan Agreement, Skylark promised that it was willing and able to, and would

disburse draw requests to Plaintiff to develop the Project and the Property according to the terms

specified in the Loan Agreement, including but not limited to:

> Borrower has requested and that Lender make a loan in the maximum principal amount
> of up to … ($92,775,000)… Lender has agreed to make the Loan…

(Exhibit "B", page 1, Recitals);

> Lender shall hold back from Loan Proceeds an amount equal to… ($45,000,000.00)…
> (the 'Construction Costs Holdback'). Lender shall, upon Borrower's written request and
> Lender's determination that the applicable conditions to disbursement have been
> satisfied, advance Loan Proceeds from the Construction Costs Holdback… on a monthly
> basis.

(Exhibit "B", page 17, section 2.2(c )(i));

> Lender shall make additional advances of Loan Proceeds… subject to the conditions to
> such advances set forth on Exhibit B attached hereto.

(Exhibit "B", page 31, section 4.2(b));

> Following receipt and approval of a draw request…, Lender shall make advances from
> the Holdback (and/or releases of funds from the Balance Reserve Account) within ten
> (10) Business Days…

(Exhibit "B", (a));

> Upon the Closing of the Loan[1], Lender shall disburse the initial advance in an amount
> equal to… ($47,775,000.00) (the 'Initial Advance'). [2]

(Exhibit "B", page 17, section 2.2(a));

> Any amounts in the Holdbacks shall not bear interest unless and until such amounts are
> advanced to borrower….

(Exhibit "B", page 17, section 2.2(c ));

---

[1] The Loan Agreement defines "Closing" as "the consummation of the Loan on the Closing Date upon satisfaction of the conditions thereto as determined by the Lender in its sole discretion; the Loan Agreement defines "Closing Date" as "the date of this Agreement" (July 31, 2018) (Exhibit "B", page 3, "Definitions").

[2] The agreement provides that Lender shall disburse the initial advance less the loan origination fee ($3,711,000), borrower funded interest reserve $1,000,000, borrower funded phase II interest reserve ($17,600,000), and borrower funded site improvements holdback ($5,000,000), for a total of $20,464,000.00 to be disbursed to borrower on the Closing Date. (Exhibit "B", page 17, section 2.2(a)).

SECOND AMENDED COMPLAINT

Time is of the essence with respect to this Agreement and the other Loan Documents, and each representation, warranty, covenant and condition hereunder and thereunder.

(Exhibit "B", page 67, section 9.9).

77.     Skylark, by and through its managing member, Vella, (who is alleged at length in the SAC to be the alter ego of Skylark as addressed at length above) breached these foregoing provisions of the Loan Agreement by failing to disburse the draw requests to Plaintiff as specified in the Loan Agreement and, as stated in the preceding paragraphs of this SAC, by failing to do so timely, as agreed, and by charging interest on the borrower funded interest reserves and on the undisbursed reserve funds and holdbacks, e.g., on the Construction Cost Holdback. At the time Skylark failed to release these funds, Defendants identified that their funding source in London had failed to provide the funds and did not otherwise call a default on the Loan due to any acts by Treetop.

78.     Plaintiff has done all, or substantially all, of the significant things required of it under the Loan Agreements up to the point of Defendant's breaches thereof, whereby, Defendants failed and refused to comply with the draw requests to develop the Property.

79.     Plaintiff has been excused after the prior breaches of Defendants from complying with the remaining terms of the Loan Agreements.

80.     Defendants owed Plaintiff a duty to perform the terms of the Loan Agreements, and specifically the Loan Agreement (Exhibit "B"), but Defendants breached those duties and agreements by engaging in the various acts described in the preceding paragraphs of this SAC. Each of these acts damaged and harmed Plaintiff in an amount to be determined at trial, but which is over the jurisdictional limits of this Court.

81.     The Loan Agreements contain attorneys' fees provision(s), allowing the prevailing party to recover its fees and costs.

82.     Vella is named in this Claim based upon each of the alter ego allegations alleged at length herein as to Skylark, and any other facts which may be otherwise proven at trial.

83.     Plaintiff has performed on its part all requirements and terms of the Loan Agreements, except as to those items that performance thereof has been excused by Defendants' breaches.

84.     Defendants' breaches of the Loan Agreements were a substantial factor in causing Plaintiff's harm, all in an amount to be determined at trial, but which is over the jurisdictional limits of

1  this Court. Plaintiff should also be entitled to recover its contractually permitted attorneys' fees and

2  costs for Defendants' breaches of the Loan Agreements identified herein and be entitled to the remedy

3  of recission.

4  ## SECOND CLAIM FOR RELIEF

5  **(Breach of Implied Covenant of Good Faith and Fair Dealing Against All Defendants)**

6      85.    Plaintiff incorporates by reference the preceding paragraphs 1 through 73, as though set

7  forth in full herein.

8      86.    Every contract contains an implied covenant of good faith and fair dealing which

9  presumes that the parties to a contract will deal with each other honestly, fairly, and in good faith, so as

10  to not destroy the right of the other party to receive the benefits of the contract. It is well settled that a

11  complaint may plead alternative theories of recovery under separate counts, wherein the wrong of each

12  count arises from the same conduct, and there is no requirement in law that causes of action not be

13  duplicative. *Eichler Homes of San Mateo, Inc. v. Superior Court*, 55 Cal. 2d 845, 847-848 (1961); *see*

14  *also Burks v. Poppy Const. Co.*, 57 Cal. 2d 463, 470 (1962) (a plaintiff may proceed to trial on

15  alternative causes of action if they are properly pleaded.)

16      87.    Plaintiff hereby incorporates each of the elements establishing the existence of the Loan

17  Agreements and the related duties by Skylark to lend the sums promised thereunder and incorporates the

18  facts establishing their failures to so comply with the same as alleged in this SAC. More particularly,

19  even in the event that the court cannot find that a specific provision of the Loan Agreements was

20  breached, as separately and independently requested in the first claim for relief, acts conducted outside

21  of the breach of contract claim show that there was a separate and distinct breach of the implied

22  covenant of good faith and fair dealing by Skylark as against Treetop. This includes that the Court can

23  find a breach of the covenant of good faith and fair dealing where, as alleged here, the Defendants

24  engaged in acts which are objectively unreasonable, or were done with a dishonest purpose, with

25  intention to mislead or take advantage, and/or in an attempt to deprive Treetop of the benefits of the

26  Loan Agreements (which is the gravamen of this Claim).

27  / / /

28  / / /

88.  Defendants had an independent duty to refrain from actions that will injure the rights of the Debtor to receive the benefits of the agreement and to not engage in acts that unfairly frustrate the Plaintiff's right to receive the benefits of the agreements.

89.  Defendants engaged in separate and independent acts that support this claim for relief, over and above breaching the Loan Agreements. More particularly, outside of strict compliance with the Loan Agreements' terms, Defendants knowingly engaged in acts which are alleged to have frustrated the entire purpose of the Loan Agreements (whether any provision was breached or not). The purpose of these Loan Agreements was for Treetop to have the funds to develop the Property, then to sell to the Property to be able to pay off the Loan, and ultimately be able to make a profit from the sale of the finished Project.

90.  Thus, Defendants made active efforts to undermine or prevent the Plaintiff from obtaining the benefits of the Loan Agreements, over and above breaching the Loan Agreements. These acts include but are not limited to the following: Defendants are alleged to have schemed to not release funds from the Loan on time; schemed to have caused mechanic's liens to encumber the Property (and then later attempt to foreclose on them through the foreclosure process); schemed to, thus, cause a default on the Loan Agreements (by Treetop's inability to pay off released funds timely due to inability to sell and profit from the Project); schemed to then attempt to foreclose on the Property and take the Property for themselves; schemed with neighboring property owners to join in on the attempted takeover of the Property and then to jointly develop the Property together, thereafter; and schemed to cause additional issues with the Project's completion by also recording various notices and defaults relating to the Loan Agreements, as alleged in this SAC.

91.  All of these above acts, and the others mentioned throughout this SAC show unfair, dishonest, and/or interfering facts engaged in by the Defendants which prevented Treetop from receiving the benefits of the Loan Agreements (again, whether or not any express provisions thereof were breached or not).

92.  Thus, Plaintiff entered into the Loan Agreements and Plaintiff has performed on its part with all, or substantially all, of the significant things required by the terms of the Loan Agreements, except as performance thereof has been excused by the Defendants' breaches of the covenant of good

1    faith and fair dealing.

2           93.    Skylark breached the above referenced covenant by failing to pay the related amounts

3    contracted for, and engaging in the above-listed acts, such that Defendants did not act fairly and in good

4    faith and Plaintiff was harmed by the Defendants' conduct.

5           94.    Vella is named in this Claim based upon his own acts to prevent Plaintiff from receiving

6    the benefits of the subject agreements and to the extent that Skylark is found to be the alter ego of Vella,

7    as alleged herein.

8           95.    Even in the event that the Court does not find that a specific provision(s) of the Loan

9    Agreements was breached, as separately and independently requested in the first claim for relief, acts

10   conducted outside of the breach of contract claim show that there was a separate and distinct breach of

11   the implied covenant of good faith and fair dealing by Defendants against Treetop.

12          96.    Therefore, Plaintiff has, on its part, performed all requirements and complied with all

13   terms of the Loan Agreements, except where performance thereof has been excused by the Defendants'

14   breaches and/or improper acts. Plaintiff has done all, or substantially all, of the significant things

15   required of it under the Loan Agreements, but Defendants have breached the above referenced covenant

16   by failing to pay the related amounts requested, all in an amount to be determined at trial, but which is

17   over the jurisdictional limits of this Court and which damages are over and beyond simple damages for

18   breach of the Loan Agreements.

19                                   **THIRD CLAIM FOR RELIEF**

20                                 **(Fraud Against All Defendants)**

21          97.    Plaintiff incorporates by reference the preceding paragraphs 1 through 73, as though set

22   forth in full herein.

23          98.    Defendants defrauded Plaintiff by means of numerous materially false and misleading

24   representations, statements, and/or material omissions, on which Plaintiff relied to its detriment and

25   damage, as outlined in specific detail hereinabove.

26          99.    As described above in this SAC, Defendant, Skylark, through its manager Vella,

27   represented to the Manager of Treetop, Hadid, various times in telephone conversations, in text

28   messages, email correspondence, and primarily via in person discussions in or around July of 2018, that

Defendants would lend, through Skylark, the sum of $92,775,000.00 to Plaintiff Treetop (as borrower). More particularly, Hadid and Vella discussed and agreed at those times that less than a quarter of the amount loaned would go to pay off existing debt on the Property. The Loan Agreement, as entered into (Exhibit "B"), explicitly states that "Upon the Closing of the Loan, Lender shall disburse the initial advance in an amount equal to Forty-Seven Million Seven Hundred Seventy-Five Thousand and No/100 Dollars ($47,775,000.00)" (Exhibit "B", page 17, section 2.2(a)). The remaining facility was represented to be available for the development of the Property, through draw requests, so that it could later be sold for a profit, and certain amounts were to be held back from the initial advance (see e.g, Exhibit "B", pages 28-29, section 3.2(b) and (c)).

100.     Before entering into the Loan Agreements, Defendants never intended to perform as agreed. Thereafter, Skylark failed to properly honor and fund the draw requests as set forth in paragraphs 34-66, above.

101.     These facts and intents were intentionally omitted and misrepresented otherwise in and around July of 2018. Plaintiff was not aware of these facts at all material times.

102.     Simply stated, Skylark represented on July 31, 2018 (the Closing Date) that it would pay the draws requested, but Skylark did not pay the draws as requested from at least September 13, 2019, forward, evidencing that it never had any intent to pay the amounts and/or never had the funds to pay the amounts. Thus, Skylark never intended for Plaintiff to gain the benefit of the contract to be able to develop the Property. Rather, Skylark's actions demonstrate that it schemed to defraud Plaintiff and itself gain possession of Plaintiff's Property, in that now, rather than merely seeking repayment of its amount loaned, Defendants fraudulently seek to *foreclose* on the Property, including by inexplicably claiming in Skylark's recorded NOS relating to the Property that it is now owed by Plaintiff *more than double* the amount of the funds that it did disburse. (See Exhibit "E"). Skylark and Vella intentionally misrepresented these facts to Plaintiff, and concealed the intents in relation thereto from Plaintiff.

103.     Vella, on behalf of Defendant Skylark, represented numerous times to Hadid, prior to entering into the related Loan Agreements in July of 2018, the Initial Inducement Facts and the Ability to Fund Misrepresentations (as addressed above). Vella, on behalf of Defendant Skylark, represented to Hadid at those times that Skylark had received those funds from a source in London and that all of that

money would be set aside to fund the $92,775,000.00 loan to Treetop. Vella, on behalf of Defendant

Skylark, represented numerous times to Hadid in July of 2018, prior to entering into the related Loan

Agreements, that Skylark, as lender, would disburse funds on the Loan in the amount of the agreed-upon

initial advance and later in draws to the extent they were requested by Treetop, so that Treetop could

finish developing the Property in a timely fashion to pay off the Loan. It was also discussed between

those parties at length at those times (in person and on the phone) that the draws had to be timely paid in

order for the Property to be developed timely, so that the Loan could thereafter be timely paid off. It was

also known that draws had to be timely paid to pay the contractors and/or subcontractors that would be

conducting the construction on the Project and to avoid any related mechanic's liens as to such

construction. Hadid (on behalf of Treetop) reasonably relied on these representations by Vella, on behalf

of Skylark, in entering into the Loan Agreements and was unaware of the material omissions relating

thereto on behalf of Skylark.

104.    Importantly, before closing on the Loan, the Budget for the Project was agreed to. Never

at any point in time after the closing on the Loan did that Budget for the Project ever change from

Treetop's perspective or request. However, Skylark utilized the later claim that funds requested by

Plaintiff were "out of budget," even when they were within the agreed-upon Budget. Further evidencing

this, Skylark never noticed any defaults by Treetop at that time and allowed Treetop to take out the

Lydda Lud Loan (requesting that portions of it be used for the Project) in or around November 5, 2019

and including up through May 6, 2021. This was all part of Defendants' long-term, and intentional,

"loan to own" scheme. In this scheme, Skylark failed to timely release the promised funds, whether in

amount and/or time, as previously agreed or contracted (and described in the above identified chart), all

while it is believed that Skylark was collecting fees and points on the Loan. These failures by

Defendants slowed and hindered the construction on the Project, caused Plaintiff to seek funds

previously promised by Skylark, elsewhere, and caused various other sub-contractors to not be able to

be paid—thus, halting the construction Project, and causing the filing of mechanic's liens. In this way,

the Project could not be timely completed, and/or sold for a profit, or otherwise, before the repayment of

the portions of the Loan that were released became due.

/ / /

105. **Skylark only ended up releasing about $30 million (more particularly around $29,085,444.54) out of the $92,775,000.00 of funds that were promised to be released to Plaintiff. However, in that roughly three (3) year period, Skylark, inexplicably, has attempted to claim in its recorded NOS relating to the Property, that it is now owed more than double that amount (or at least $61,588,040.73—and have more currently declared that the latest amount owed is at least $63,054,044.56**). Charging this high amount in such a short period of time (more than double the amount released) has also injured Plaintiff's ability to redeem or pay off the debt, so that an accounting and equitable relief is necessary by the Court, as equitably requested in this case.

106. While Plaintiff intended to comply at all times with the terms of the Loan Agreements, Defendants intentionally, and maliciously, never intended to comply with the same, from even before entering into any agreements. In fact, Defendants knew that they were never going to comply with their side of the Loan Agreements, and were never going to comply with releasing the draw amounts (despite agreeing to lend based upon the same). Defendants knew that Skylark did not have the money needed to fully fund the development/construction portion of the Project (or that it would not release that money even if it did), and that they were purposefully not going to release the draws needed, as requested (and described above as the loan to own scheme). Skylark, thus, intended (from before, during, and after the term of the Loan) to not fund the finalization of the development so that the Property could not be developed and sold. Defendants' intent was to foreclose on the Property (thus, injuring Plaintiff and taking the Property without lending the full amount as agreed) and also to foreclose out all of the sub-contractors' liens for work already performed on the Property (also injuring other third-parties). This is a classic "loan to own" scheme, where the lender fails to fund the loan, which causes the inability to finalize the project, which causes the inability to repay the loan, so that the lender can then foreclose upon the collateral.

107. In order to perpetrate this scheme, Vella, on behalf of Skylark, purposely concealed these intentions from Plaintiff, and knowingly made false misrepresentations to Plaintiff, regarding Defendants' ability and willingness to fund the development/construction portion of the Project, and in order to induce Plaintiff to enter into the Loan Agreements.

///

108.   Moreover, Plaintiff has since learned that Defendants had inside knowledge from associates that Plaintiff owned the Property that was worth at least $87 million (undeveloped). As a sophisticated real estate developer, Vella would have known that the potential value of the fully developed Property would be around $250 million, using standard industry valuations. Plaintiff was not seeking any financing at the time, and did not engage any brokers to seek financing to develop the Property. Defendants reached out to Plaintiff out of the blue to offer financing, which, Plaintiff now understands must have been based on inside knowledge from mutual associates. In this way, Defendants concluded that Plaintiff owned valuable Property, and could be induced to enter into Loan Agreements from which Defendants could perpetrate a "loan to own" scheme. Moreover, prior to executing the Loan Agreements, Defendants were in possession of an appraisal that informed Defendants that the Property, undeveloped, was worth $87,500,000, and, with some basic preparatory work, would be worth $106,000,000. Thus, Defendants were well aware that they could induce Plaintiff into entering into the Loan Agreements by offering the Loan that would enable Plaintiff to unlock the full potential $250 million in value for the completed Project (sweetening the deal by skipping over many of the normal steps a conventional lender would take such as requesting financials, etc…). Defendants were also well aware that they could improperly maximize their own profits from misleading Plaintiff by promising a large Loan but only actually releasing a minimal amount of funds to: (1) wipe out prior secured loans, and (2) make a minimal investment (~$9 million) to complete the preparatory steps to reach the $106,000,000 valuation—all before forcing Plaintiff to default and then seek to foreclose on the Property. In this way, Defendants stood to maximize the delta between the actual funds released (less than $30 million) and the value of the Property ($106,000,000—undeveloped but with some basic preparatory work). Plaintiff alleges that these were the intents of the Defendants from even before entering into the Loan.

109.   As further evidence of intent, Defendants drafted the Loan Agreements in order to maximize their profit in the "loan to own" scheme. They did this by charging usurious interest from inception of the Loan and arguing that charging the same was covered by the so-called "shared appreciation provision" in the Loan Agreement. However, as addressed herein, the shared appreciation provision in the Loan Agreement would not apply to the usurious interest rate charged of 10.17%,

1  because such amount was not contingent or placed at risk.

2      110.    Plaintiff has also since learned that Skylark, or at least Vella, through other entities and/or

3  agents, has engaged in similar loan to own foreclosure schemes various times in the past, as alleged

4  herein. These facts equate to intentional fraud and misrepresentations, in bad faith, on behalf of Skylark,

5  which will injure Plaintiff and other third-parties.

6      111.    More particularly, multiple liens started accruing on the Property and the Project that

7  could not be paid, as the proper money was not being funded as previously represented would be

8  released by Skylark. Additional debt had to be created to attempt to hold off such damages, causing

9  Plaintiff further and additional damages. These intentional acts by Skylark also created additional delays

10  and defaults relating to the Property and the Project. These damages also included reputational damages

11  from vendors who did not want to do more work on this or other projects due to the acts of Skylark, as

12  well as with other lenders and potential customers. All of these acts and the consequences therefrom

13  damaged Plaintiff.

14      112.    Furthermore, even after creating all of these issues, Skylark called defaults on the Loan

15  Documents, and filed the NOS, for an inflated amount, to attempt to foreclose upon the very valuable

16  Property. It now appears  that Defendants' plan all along was to cause a default on the Loan Agreements

17  by not actually lending pursuant thereto (or in an amount to fully fund construction), so that the Project

18  could not be finished and sold in time, and then use the foreclosure process, and inflated loan default

19  amounts, to finalize their "loan to own" scheme. The end result was to try and take the Property from

20  Plaintiff, and ultimately leave sub-contractors in the lurch. This chapter 11 filing was made by the debtor

21  just prior to such foreclosure sale.

22      113.    These fraud, misrepresentation and/or omission acts are described in detail above, and go

23  far beyond a simple breach of contract claim for relief. Indeed, these acts also include but are not limited

24  to the following: Defendants schemed, from even before entering into the Loan, to not release funds

25  from the Loan on time; schemed to have caused mechanic's liens to pile up on the Property (and then

26  later attempt to wipe them out through the foreclosure process); schemed to, thus, cause a default on the

27  Loan Agreements (by Treetop's inability to pay off released funds timely due to inability to sell and

28  profit from the Project); schemed to then attempt to foreclose on the Property and take the Property for

itself; schemed with neighboring property owners to join in on the attempted takeover of the Property and then to jointly develop the Property together, thereafter; and schemed to cause additional issues with the Project's completion by also recording various notices and defaults relating to the Loan Agreements, as alleged in this SAC. In this case, Defendants perpetrated frauds against Treetop through a combination of threats, false information, omissions of material facts, and false promises.

114.    Skylark and Vella had knowledge of the true facts and had no actual intention, nor did Defendants have the legal basis, to call a default on the Loan Agreements. However, Defendants represented that the, above listed, misrepresentations were true when they were knowingly and intentionally false and/or they omitted them when material for Treetop to know. This was primarily done in perpetuation of the "loan to own" fraud scheme, as described in detail in this SAC. These representations were knowingly and intentionally false when they were made, and/or at a minimum were made without regard for their truth.

115.    Defendants intended that Plaintiff rely on the representations.

116.    Plaintiff reasonably and justifiably relied on Defendants' representations, including their material omissions, not knowing at the time of their falsity or Defendants' malevolent intentions, by entering into the Loan Agreements and securing the same with the Property as collateral, therefore.

117.    As a result of Defendants' false and fraudulent misrepresentations, Plaintiff has been damaged in that, among other things, Plaintiff has not been able to develop the Project and Property as agreed, or thereafter sell the Property, as agreed.

118.    Plaintiff's reliance on Defendants' representations was a substantial factor in causing the harm complained of.

119.    Vella is named in this Claim based upon his own acts which are alleged to constitute fraud and/or intentional misrepresentation(s) and is also named to the extent that Skylark is found to be the alter ego of Vella, as alleged herein—including any other facts which may be otherwise proven at trial.

120.    All of these fraudulent acts were done with malice, oppression, and aforethought so as to entitle Plaintiff to punitive and exemplary damages in an amount to be proven at trial.

/ / /

SECOND AMENDED COMPLAINT

# FOURTH CLAIM FOR RELIEF

## (Negligent Misrepresentation Against All Defendants)

121.    Plaintiff incorporates by reference the preceding paragraphs 1 through 73, as though set forth in full herein.

122.    It is well settled that a complaint may plead alternative theories of recovery under separate counts, wherein the wrong of each count arises from the same conduct, and there is no requirement in law that causes of action not be duplicative. *Eichler Homes of San Mateo, Inc. v. Superior Court*, 55 Cal. 2d 845, 847-848 (1961); *see also Burks v. Poppy Const. Co.,* 57 Cal. 2d 463, 470 (1962) (a plaintiff may proceed to trial on alternative causes of action if they are properly pleaded.) Thus, alternatively, if Skylark did not intentionally defraud Plaintiff, Defendants negligently misrepresented to Plaintiff by means of numerous materially false and misleading representations, statements, and omissions, on which Plaintiff relied to its detriment and damage, as outlined in specific detail hereinabove.

123.    Defendants were at least negligent in not realizing that their representations set forth in paragraphs 34-66, above, were not true.

124.    Defendants represented that the above listed misrepresentations were true, when in fact they were false. As a limited example and at least, Vella, on behalf of Skylark, represented on July 31, 2018 (the Closing Date) that it had the funds to disburse to Plaintiff the agreed-upon draws advances on the Closing Date. However, Skylark did not disburse to Plaintiffs these amounts, and thus, these representations were not true, among each of the other misrepresentations outlined herein (which were equally made a least negligently).

125.    Defendants intended that Plaintiff rely on the representations.

126.    Plaintiff reasonably and justifiably relied on Defendants' representations, including their material omissions, not knowing at the time of their falsity, by entering into the Loan Agreements and securing the same with the Property as collateral.

127.    As a result of Defendants' negligently false misrepresentations, Plaintiff has been damaged in that, among other things, Plaintiff has not been able to develop the Project and Property as agreed, or thereafter sell the Property for a profit, as agreed, and Defendants have put Plaintiff in danger

1    of losing ownership of the Property, which is more than merely an economic loss.

2    128.    Plaintiff's reliance on Defendants' representations was a substantial factor which caused

3    the harm complained of.

4    129.    Vella is named in this Claim based upon his own acts which are alleged to constitute at

5    least negligent misrepresentation(s) and is also named to the extent that Skylark is found to be the alter

6    ego of Vella, as alleged herein—including any other facts which may be otherwise proven at trial.

7    130.    But for Defendants' negligent misrepresentations, Plaintiff would not have sustained such

8    harm, and thus, Defendants' representations were a substantial factor in causing Plaintiff's harm.

9    **FIFTH CLAIM FOR RELIEF**

10    **(Violation of Business and Professions Code Sections 17200, et seq. Against All Defendants)**

11    131.    Plaintiff incorporates by reference the preceding paragraphs 1 through 130, as though set

12    forth in full herein.

13    132.    Business and Professions Code section 17200 identifies three separate varieties of

14    "unfair competition" prohibited by the statute, each of which have separate elements. For liability to

15    attach, the acts or practices may be unlawful, or unfair, or fraudulent.

16    133.    Defendants are alleged herein to have committed numerous acts that independently and

17    separately attach liability under either the unlawful, unfair, or fraudulent prongs, as described in the

18    prior paragraphs of this SAC, and Plaintiff incorporates those paragraphs in this claim for relief. These

19    include, but are not limited to, that Skylark has charged usurious interest and has defrauded Plaintiff for

20    a security interest in Plaintiff's Property, and Skylark has now unfairly caused Plaintiff to be in jeopardy

21    of losing ownership of its Property.

22    134.    Plaintiff alleges numerous unlawful acts that would each independently satisfy the

23    "unlawful" prong, each of which allegations are incorporated herein (including, paragraphs 68-73). Such

24    acts include but are not limited to Defendants charging usurious interest rates in violation of California

25    usury law. (See SAC ¶¶ 68-73).

26    135.    Plaintiff further alleges that Defendants benefited financially from participating in their

27    "loan to own" scheme, and to appropriate Plaintiff's assets for themselves, all to Plaintiff's detriment.

28    This provides separate and independent support, additionally, under the second fraudulent prong.

136.    Plaintiff alleges fraudulent acts, which include, but are not limited to, Skylark, through its manager Vella, represented to the Manager of Treetop, Hadid, various times in telephone conversations, in text messages, email correspondence, and primarily via in person discussions in or around July of 2018, that Skylark would lend, through Skylark, the sum of $92,775,000.00 to Plaintiff Treetop (as borrower). More particularly, Skylark, through Vella, specifically represented that it had these funds ready, available, and set aside to fund Treetop's Loan. During the time of the Loan Agreement, Skylark, through Vella, repeatedly failed to properly honor and fund the draw requests, as set forth in paragraphs 33-69, above. Thus, despite Defendants' specific representations to the contrary, Skylark did not actually have the funds ready and available. Defendants were waiting for the funds to come from Defendants' funding source in London (or at least Defendants represented this fact thereafter). Moreover, Defendants made continuing misrepresentations that they were expecting the funding to come through from London shortly, inducing Plaintiff to continue retaining contractors and buying materials for the Project and to enter into short-term bridge loans with other lenders.

137.    Plaintiff alleges that Defendants misrepresented either: (1) that Defendants intended to lend the full amount, (2) that Defendants had the money available or set aside, or (3) that Defendants were expecting to receive the money, or all three. Additionally, Defendants omitted to inform Plaintiff that they did not have the money, or did not expect to receive the money, or that Defendants never intended to perform as agreed under the Loan Agreements, from even before entering into the same.

138.    These facts and intents were intentionally omitted and misrepresented otherwise in and around July of 2018. Plaintiff was not aware of these facts at all material times.

139.    Plaintiff further alleges that Defendant schemed to not release funds from the Loan on time; schemed to have caused mechanic's liens to be filed on the Property (and then later attempt to foreclose on them); schemed to cause a default on the Loan Agreements by Treetop's inability to pay off released funds timely due to inability to sell and profit from the Project; schemed to attempt to foreclose on the Property and take the Property for itself; schemed with neighboring property owners to join in on the attempted takeover of the Property and then to jointly develop the Property together; and schemed to cause additional issues with the Project's completion by recording various notices and defaults relating to the Loan Agreements. Skylark perpetrated these acts against Treetop through a combination of

1    threats, false information, omissions of material facts and false promises.

2        140.    Plaintiff is informed and believes that additional facts that support this improper, and

3    prior, intent by Defendants to conduct the "loan to own" scheme include other intentional acts identified

4    above as the Initial Inducement Facts, the Ability to Fund Misrepresentations, Conspiring with

5    Neighbors, and the Usuary Facts, which are incorporated herein.

6        141.    Plaintiff reasonably and justifiably relied on the foregoing representations, statements,

7    and/or omissions of material fact, without knowledge of their falsity or of Skylark's misrepresentations

8    and/or material omissions.

9        142.    Skylark is a lender, engaged in the business of lending funds, while Plaintiff was the

10   consumer, receiving these loan services from Skylark. Plaintiff, as the consumer, relied on Defendants'

11   representations about its willingness and ability to fund the Loan, amongst other misrepresentations and

12   omissions described in this SAC.

13       143.    As a result of Skylark's false representations, and Plaintiff's reliance thereon, Plaintiff

14   has been damaged in that, among other things, Plaintiff has been unable to finalize the Project and

15   development of the Property to sell the same for profit. Plaintiff was harmed when Skylark represented

16   and provided materially false information, resulting in the damages complained of herein. Plaintiff has

17   been damaged by these misrepresentations by Skylark as alleged herein, in an amount to be proven at

18   trial but over the jurisdictional limits of this Court. Plaintiff also alleges that Skylark engaged in these

19   acts, including in relation to the lending of funds, without any licensing to do so.

20       144.    Moreover, while not necessary to maintain a Section 17200 claim under the fraudulent

21   prong, Treetop alleges that the Defendant, and/or at least Skylark's manager, Vella, has engaged in

22   similar schemes disseminating similar misrepresentations and/or omissions in other "loan to own"

23   schemes affecting other consumers, including in relation to the Perugia Project and the Summitridge

24   Project, as alleged in greater detail in paragraph 27 of this SAC.

25       145.    As a third independent basis for a Section 17200 claim, Skylark and Vella's conduct was

26   also unfair.

27       146.    Plaintiff as an LLC is a consumer. Plaintiff has suffered significant injury, as discussed in

28   the foregoing: Plaintiff has been defrauded, and has unfairly made improvements to the Property to the

benefit of Defendants only, has become indebted to third party contractors for work done on the Property without any benefit to Plaintiff, and is now at risk of losing ownership of and title to the Property, a parcel of real property, without recourse, due to Defendants' unfair business practices. The injury is outweighed by any countervailing benefits to consumers, because Defendants' conduct as described herein does not provide any benefit to consumers whatsoever, rather, it provides a benefit only to Defendants at the unfair expense of its consumers, Plaintiff, and other actual and/or potential borrowers.

147.    Plaintiff could not have avoided this injury, because Defendants made false representations that Plaintiff reasonably relied on, and Plaintiff had no reason nor opportunity to discover that Defendants were dishonest and merely seeking to unfairly and wrongly obtain title to Plaintiff's Property.

148.    Plaintiff also alleges that Skylark has caused to be publicly recorded various documents, including a Notice of Default and a Notice of Trustee Sale (the NOS), which publicly contains falsified information with respect to the amount that Skylark states that Plaintiff owes (including by including improperly usurious interest and other improperly calculated interest that inflated the amounts owed as stated in these publicly recorded documents to more than double the amount of funds actually disbursed). These documents were recorded and thus disseminated publicly and are likely to deceive the public into thinking that Plaintiff owed more money than it did. These misrepresentations in the public record damaged Plaintiff as it damaged Plaintiff's ability to seek financing and continue work on the Project. These misrepresentations in the public record also damage other members of the public and contravene public policy in that they were intended to wipe out junior liens of other lenders as well as contractors and other small businesses.

149.    Pursuant to Business and Professions Code section 17200 et seq., it is an unfair and unlawful business practice to make false representations in order to take a person's business interests.

150.    Plaintiff was harmed by Skylark's acts identified herein. Thus, Skylark's unfair and unlawful business practices were a substantial factor in causing Plaintiff's harm.

151.    As a direct and proximate result of Defendant's conduct, Plaintiff suffered damages and losses in excess of the jurisdictional limits of the court as outlined herein.

152.     As a direct and proximate result of Skylark's conduct, Plaintiff was required to retain the services of legal counsel to prosecute this case.

153.     Plaintiff has reasonably and necessarily incurred legal fees, and Plaintiff is informed and believes that he will reasonably and necessarily incur further legal fees in the future, all in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF

### (Accounting Against All Defendants)

154.     Plaintiff incorporates by reference the preceding paragraphs 1 through 73, as though set forth in full herein.

155.     A claim for relief for accounting is appropriate when some balance is due to the plaintiff that can only be ascertained by an accounting, but no fiduciary relationship between the plaintiff and defendant is required. Under the circumstances of this case, as alleged in detail above, an accounting is a necessary and appropriate remedy in that Defendants engaged in numerous and complex transactions to assume control of the Project from Plaintiff, to create a false and heavily discounted foreclosure value for the Property, and to orchestrate the wrongs complained of herein.

156.     In doing so, Defendants engaged in other, unjustified, improper, false, and fraudulent practices, as alleged herein, such that a balance of damages due from Defendants to Plaintiff can only be ascertained by an accounting.

157.     Additionally, Skylark claims in its Notice of Trustee's Sale filed against the Property that Skylark is owed $63,054,044.56 from Plaintiff, which is more than double the amount of funds that Skylark actually released for lending to Plaintiff.

158.     Plaintiff seeks an accounting wherein Skylark sets forth each and every basis for claiming that this amount is owed from Plaintiff. Thus, circumstances are appropriate for an accounting where, as here, only Skylark is in possession of knowledge, information, and documents needed to determine the amount of damages owed to Plaintiff.

159.     Treetop is also informed and believes that Skylark wrongly sought to charge interest on the aforementioned borrower interest reserve and on undisbursed funds and that other sums charge may have been miscalculated during the times when Skylark was not using a professional servicing company

1  and was servicing the Loan itself. As such, Treetop seeks an accounting wherein Skylark sets forth each

2  and every basis for claiming that this amount is owed from Plaintiff on the Loan and the related

3  transactions, including an accounting of all interest sought to be charged against Plaintiff.

4      160.    Thus, circumstances are appropriate for an accounting where, as here, only Defendants

5  are in possession of knowledge, information, and documents needed to conduct such accounting and

6  determine the amount of damages owed to Plaintiff.

7      161.    Vella is named in this Claim to the extent that Skylark is found to be the alter ego of

8  Vella, as alleged herein.

9      162.    Without an accounting, the damages and/or the full extent thereof suffered by Plaintiff

10  cannot be traced or determined with accuracy.

11  **<u>SEVENTH CLAIM FOR RELIEF</u>**

12  **(Equitable Subordination Against All Defendants)**

13      163.    Plaintiff incorporates by reference the preceding paragraphs 1 through 73, as though set

14  forth in full herein.

15      164.    Plaintiff claims that it was harmed by Defendants' improper acts, including the failure to

16  properly disburse construction loan funds, as described herein above. This also included by means of

17  numerous materially false and misleading representations, statements, and omissions, on which Plaintiff

18  relied to its detriment and damage, as outlined in specific detail hereinabove. These acts also include the

19  intent to damage third party sub-contractor creditors by foreclosing out their mechanic's liens after they

20  provided labor, materials, and/or services, for which they could not be paid due to Skylark's refusal to

21  timely and properly fund construction on the Property.

22      165.    Plaintiff and Skylark were not merely in an arms-length lender-borrower transaction.

23  Rather, Skylark, by and through its managing member Vella, made numerous exacerbated attempts to

24  induce Plaintiff to borrow from Skylark, as stated in the preceding paragraphs. Vella, on behalf of

25  Defendant Skylark, represented numerous times to Hadid, as the Manager and/or agent of Treetop,

26  whether individually or as agent of a manager entity, prior to entering into the related loan, that Skylark,

27  as lender, had all those funds in place—and was ready, able, and willing to lend and fund the same

28  timely, as would be needed for the Project. Vella represented to Hadid that Skylark had received those

SECOND AMENDED COMPLAINT

funds from a source in London and that all of that money would be set aside to fund the $92,775,000.00 loan to Treetop. However, Skylark never intended to comply with the Loan Agreement, because Skylark did not even come close to fully disbursing the aforementioned draws explicitly contracted for in the Loan Agreement, starting as early as September 13, 2019. Simply stated, Skylark represented on July 31, 2018 (the Closing Date) that it would pay such draws, but Skylark quickly refused to do so, only releasing a small portion of the Loan. Now, Skylark is not merely seeking a return of its funds, but is improperly attempting to gain ownership of Plaintiff's Property.

166.    Defendants had knowledge of the true facts and did not have the legal basis to call a default on the Loan Agreements at a time when they did so, including in the inflated amounts demanded. Defendants represented that the above listed misrepresentations were true when they were knowingly and intentionally false. This was primarily done in perpetuation of the "loan to own" fraud scheme. These representations were knowingly and intentionally false when they were made, and/or at a minimum were made without regard for their truth so as to injure Plaintiff and the described third-party creditors.

167.    By engaging in said acts, Skylark engaged in various inequitable acts.

168.    Plaintiff alleges that it has been harmed by Skylark's above stated acts and that Skylark's misconduct injured numerous other creditors (including the numerous sub-contractors and contractors, including those that have filed claims for mechanic's liens) and conferred an unfair advantage on Skylark, all in an amount to be determined at trial.

169.    In this setting, subordination would not be inconsistent with the Bankruptcy Code.

170.    Vella is named in this Claim based upon his own acts which are alleged in detail herein, and is also named to the extent that Skylark is found to be the alter ego of Vella, as alleged herein—including any other facts which may be otherwise proven at trial.

171.    Under principles of equitable subordination and 11 U.S.C. § 510(c), the Court must order the subordination of Skylark's claim to all other claims in the bankruptcy estate and order the transfer of Skylark's lien to the bankruptcy estate.

/ / /

/ / /

## EIGHTH CLAIM FOR RELIEF

### (Damages for Usurious Loan Against All Defendants)

172.    Plaintiff incorporates by reference the preceding paragraphs 1 through 73, as though set forth in full herein, including the "Usury Facts".

173.    The Loan was usurious at its inception. The elements of usury claim in California are: (1) the transaction must be a loan or forbearance; (2) the interest to be paid must exceed the statutory maximum; (3) the loan and interest must be absolutely repayable by the borrower; and (4) the lender must have a willful intent to enter into a usurious transaction. Here, the first element for usury, that, the transaction must be a loan or forbearance is met because there cannot be a dispute that the Loan was a loan (and not some other type of contract).

174.    Here, the second element for usury, that, the interest to be paid must exceed the statutory maximum is also met. The Loan Agreement identified that it charged a usurious minimum (a fixed amount of interest at 10.17% which is over the 10% usury limit in California, without and exemption).

175.    More particularly, the Loan was made in California and is subject to California law. (See, Exhibit B, Loan Agreement, at ¶ 7.9). At the relevant time to the Loan, the maximum interest permitted in California, without an exemption, was 10%. (Cal. Const., art. XV, § 1, subds. (1)-(2)).[3] The Loan Agreement (Ex. B) in  Section 2.3 sets forth the interest rate on the date of the Loan at the "Contract Rate", which in turn is no less than 10.17%—exceeding the limit (without an exemption). (Cal. Const., art. XV, § 1, subds. (1)-(2)).

176.    The Loan Agreement defines "Contract Rate" as a rate per annum equal to the LIBOR Margin plus the LIBOR Rate. (See, Exhibit B, p. 4). "LIBOR Margin" is defined as eight and ten hundredths percent (8.10%) per annum. (See, Exhibit B, p. 9). "LIBOR Rate" is defined as a daily fluctuating rate per annum equal to the rate of interest which is identified and normally published by Bloomberg Professional Service page USD-LIBOR-ICE and "[n]otwithstanding the foregoing, in no event shall the LIBOR Rate be an amount less than the one-month LIBOR Rate determined on the

---

[3] The Federal Reserve's discount rate has never reached 5% per annum, or above. Thus, the Federal Reserve's discount rate plus 5 percent has not exceeded 10% from 2018 to present, and 10% was the maximum interest rate permitted during the term of the Loan.

Business Day prior to the Closing Date and two and seven hundredths percent (2.07%)." (See, Exhibit B, p. 9). Based on these definitions, the Contract Rate (interest charged) as read from the Loan Agreement is 10.17% (being the LIBOR Margin of 8.10%, plus the LIBOR Rate minimum of 2.07%). (See, Exhibit B, p. 18, Section 2.3).

177.    The Loan Agreement provided, on its face, that the interest to be paid exceeded 10%. Additionally, the Loan Agreement also includes, among other points and fees, a "payment to Lender of a loan origination fee in the amount of Three Million Seven Hundred Eleven Thousand and No/100 Dollars ($3,711,000.00) (the "Loan Origination Fee")", which constitutes additional interest over the usury limit. (See, Exhibit B, p. 17, Section 2.2(b)).

178.    Here, the third element for usury, that the loan and interest must be absolutely repayable by the borrower, is also met. The 10.17% minimum amount of interest charged on the face of the Loan Agreement is fixed by the Loan Agreement and is not contingently owed to the lender. The additional Loan Origination Fee and other points and fees bring the total facial interest charged well over the usury limit, removing any doubt as to the usurious nature of the Loan Agreement.

179.    Here, the fourth element for usury, that, the lender have a willful intent to enter into a usurious transaction is also met. The conscious and voluntary taking of more than the legal rate of interest constitutes the only intent necessary on the part of the lender. Additionally, when the transaction is in the form of a loan and the loan is usurious on its face (as it is here), there is no need to examine the underlying facts, and the lender's intent is presumed.

180.    The Defendants also did not have a lender's license at the time of the Loan. The Loan also does not fit within a legal exemption for usury.

181.    Plaintiff alleges, herein, that Defendants charged and drew down on the Interest Reserves in a usurious amount in this case (likely in the sum of $17,600,000.00—but the exact amounts of which is still begin requested through the accounting Claim and discovery). Thus, Plaintiff made usurious payments towards the debt represented by the Loan Agreements.

182.    Plaintiff therefore requests to be entitled to recover treble the amount of interest in excess of the amount legally allowable, which treble amount is to be determined at trial but is in excess of the jurisdictional limits of this Court, as well as request the cancelation of any offending interest charged on

1    the Loan, as permissible by law.

2         183.    By engaging in these acts, Defendants willfully intended to enter into the transaction and

3    to receive the rate of interest over and above the rate permitted by law, which rate was usurious.

4         184.    Finally, numerous other factors, including charging interest on unadvanced interest

5    reserves, as well as the charging of additional points fees and an additional equity interest in the Project

6    being transferred to Skylark, for no additional consideration, may be found to have made the Loan

7    interest rate exceed even further than the 10.17% under the facts of this case.

8         185.    The charging of the excess interest rate is also evidenced by the fact that Skylark's NOS

9    relating to the Property claims that Skylark is now owed at least $63,054,044.56, which is more than

10   double the amount actually disbursed to Plaintiff.

11        186.    Vella is named in this Claim to the extent that Skylark is found to be the alter ego of

12   Vella, as alleged herein.

13                            **NINTH CLAIM FOR RELIEF**

14        **(Objection to Claim Pursuant to Federal Rule of Bankruptcy Procedure 3007**

15                            **Against All Defendants)**

16        187.    Plaintiff incorporates by reference the preceding paragraphs 1 through 73, as though set

17   forth in full herein.

18        188.    On May 18, 2022, Skylark asserted its alleged claim against the Property in the amount

19   of $61,588,040.73 pursuant to the NOS. On or about September 14, 2022, Vella, on behalf of Skylark,

20   submitted a declaration asserting Skylark's claim in the amount of $63,054,044.56 as of August 2, 2022.

21   Declaration of Zachary Vella, ¶ 5, Dkt. No. 29, *In re Treetop Development, LLC*, 2:22-bk-14165 BB,

22   (Bankr. C. D. Cal. 2022).

23        189.    Plaintiff asserts that the value of the Property securing Skylark's alleged claim is over

24   $87,000,000 (based upon an appraisal performed shortly prior to the execution of the Loan Agreements)

25   and that Skylark has only released roughly $29,085,444.54 to Plaintiff under the Loan.

26        190.    The liens and/or claims that Skylark has asserted against the Property encumber the

27   Property.

28   / / /

191.     Pursuant to Section 502(b) of the Bankruptcy Code and Rule 3007 of the Federal Rules of Bankruptcy Procedure, Plaintiff hereby objects to Skylark's claims for amounts owed and/or as against the Property.

192.     Any and all amounts asserted by Skylark were not permissible based on the terms of the Loan Agreements (including any usurious interest charged or applied the debt).

193.     Skylark's claims wrongly seek interest charges and penalties against Plaintiff that are not provided for in the contract or in law, nor has Skylark provided an accounting or any other basis in support of its amount claimed.

194.     Plaintiff objects to the portion of Skylark's alleged claim that is in excess of principal that seeks accrued interest, costs, and other advances, pursuant to Federal Rule of Bankruptcy Procedure 3007. Furthermore, any amounts asserted in Skylark's claim with respect to unmatured interest as of the petition date should be disallowed pursuant to section 502(b)(2) of the Bankruptcy Code. 11 U.S.C. § 502(b)(2). Additionally, any amounts asserted in Skylark's claim that seek interest in excess of the legal limit for an unlicensed lender, or any claims for interest charges on undisbursed funds or on interest reserves, should be disallowed.

195.     Although Plaintiff cannot determine the true amount of Skylark's alleged claim without further discovery, and in fact Plaintiff avers that Skylark's entire alleged claim as to the Property has no merit whatsoever, Plaintiff is unaware of the basis for the amounts Skylark seeks that are in excess of principal, and Skylark has provided no detail in that regard.

196.     Moreover, upon information and belief, the amount of Skylark's claim against the Property includes miscalculations of default interest, as well as undocumented penalty fees, thereby inflating the amount Skylark seeks beyond any actual amount due and owing.

197.     Vella is named in this Claim based upon his own acts which are alleged in detail herein, and is also named to the extent that Skylark is found to be the alter ego of Vella, as alleged herein and may be proven at trial.

198.     To the extent that Skylark may be found to have a valid claim against Plaintiff, any amount owed would be significantly less than Skylark's asserted claim; therefore, pursuant to Section 502(b) and Rule 3007 of the Federal Rules of Bankruptcy Procedure, Plaintiff objects to Skylark's

1   claims for amounts owed and/or as against the Property.

2   **TENTH CLAIM FOR RELIEF**

3   **(Declaratory Relief Against All Defendants)**

4   199.   Plaintiff incorporates by reference the preceding paragraphs 1 through 73, as though set

5   forth in full herein.

6   200.   An actual controversy has arisen and now exists between Plaintiff and Defendants. As

7   described above, Plaintiff contends that Defendants intended, or at least negligently, disrupted the

8   contractual and/or economic relationships, including ownership and possession of the Property and/or

9   knew (or were negligent in not realizing) that disruption of the relationship(s) was certain, or

10  substantially certain, to occur and each of those relationships was disrupted so that Plaintiff's

11  development, ownership and business interests and related liabilities were harmed and Defendants'

12  conduct was a substantial factor in causing Plaintiff's harm. Plaintiff claims that the Loan Agreements

13  should not be enforced by Skylark, as against Plaintiff, and Defendants claim otherwise. Also, an issue

14  exists as to the various usury items identified in this SAC without Skylark having proper licensing at the

15  time the relevant agreements were entered into and as to whether the "shared appreciation" provision

16  met the statutory requirements. Finally, Plaintiff is unfairly and fraudulently at risk of losing ownership

17  of its Property. Plaintiff seeks declaratory relief that its Property remain in its possession and ownership

18  as against Skylark's fraudulent attempts to obtain ownership of it. Additional declaratory relief as to

19  items placed on title for the Property are needed in this action.

20  201.   A judicial determination of these issues and of the respective duties of Defendants is

21  necessary and appropriate at this time under the circumstances for the reasons described above, a

22  judicial determination is necessary to prevent further injury to Plaintiff.

23  202.   Vella is named in this Claim based upon his own acts and to the extent that Skylark is

24  found to be the alter ego of Vella, as alleged herein.

25  203.   A judicial determination of the validity, priority and extent of Skylark's liens against the

26  Property and what the correct, legally allowable interest is, are likewise necessary and appropriate at this

27  time under the circumstances for the reasons described above, a judicial determination is necessary to

28  prevent further injury to Plaintiff.

SECOND AMENDED COMPLAINT

1

# **PRAYER FOR RELIEF**

2    WHEREFORE, in light of the foregoing, Plaintiff prays for judgment against Defendants, as

3 follows:

4    1.    An order from this Court declaring the Loan Agreements invalid on the grounds of fraud;

5    2.    An order from this Court rescinding the Loan Agreements;

6    3.    Damages sufficient to compensate the injury suffered by Plaintiff as alleged above, in an

7 amount to be proved at trial;

8    4.    Punitive damages, in an amount to be proven at trial;

9    5.    Treble damages, in an amount to be proven at trial;

10    6.    A full accounting;

11    7.    Attorney fees and costs;

12    8.    Rescission;

13    9.    Statutory relief;

14    10.    Equitably subordinating the Defendants' claim(s) to all other claims in the bankruptcy

15 estate pursuant to section 510(c) of the Bankruptcy Code.

16    11.    Injunctive relief; and

17    12.    Any other and further relief that this Court deems just and proper.

18 DATED:  March 21, 2023

19                    David J. Williams
                    Quincy Chuck
20                    MASCHOFF BRENNAN

21                    By:  /s/ David J. Williams_____
                        David J. Williams
22                    Attorneys for Debtor/Plaintiff
                    TREETOP DEVELOPMENT LLC

23

24

25

26

27

28

SECOND AMENDED COMPLAINT

# EXHIBIT A

**This page is part of your document - DO NOT DISCARD**





## 20210728690



**Pages:**
**0023**

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**05/06/21 AT 03:18PM**

| | |
|---|---|
| FEES: | 150.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 225.00 |
| PAID: | 375.00 |



**L E A D S H E E T**



**202105060160238**

**00020329604**



**012101979**

**SEQ:**
**01**

**SECURE - Daily**



**THIS FORM IS NOT TO BE DUPLICATED**

E441953



444_6352090_4_E

Recording Requested By And:
When Recorded Return To:

Haddan & Zepfel, LLP
610 Newport Center Drive, Suite 330
Newport Beach, CA 92660
Attn: Jon Haddan

## DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING WITH REQUEST FOR NOTICE

ATTENTION COUNTY RECORDER: This instrument is intended to be effective as a financing statement filed as a fixture filing pursuant to Section 9502 of the California Commercial Code. Portions of the goods comprising a part of the mortgaged property are or are to become fixtures related to the real property described in Exhibit A hereto. This instrument is to be filed for record in the records of the county where deeds of trust on real property are recorded and should be indexed as both a deed of trust and as a financing statement covering fixtures. The addresses of trustor (debtor) and agent (secured party) are specified in Section 3.12 of this instrument.

NOTE: This deed of trust secures an obligation incurred in part for the construction of improvements on land and is a "construction mortgage" as that term is defined in California Commercial Code Section 9334(h).

THIS DEED OF TRUST, ASSIGNMENT OF RENTS AND LEASES, SECURITY AGREEMENT AND FIXTURE FILING, WITH REQUEST FOR NOTICE (the "*Deed of Trust*") is made as of November 5, 2019 by Treetop Development LLC, a California limited liability company ("*Trustor*"), Fidelity National Title Company, ("*Trustee*"), and Lydda Lud Lender Tree, LLC, a California limited liability company ("*Beneficiary*").

TRUSTOR HEREBY IRREVOCABLY GRANTS, TRANSFERS AND ASSIGNS TO TRUSTEE, IN TRUST, WITH POWER OF SALE, all that certain vacant property located in Los Angeles, California 90210 (Assessor's Parcel Numbers 4387-022-021; 4352-001-051; 4352-001-044; 4352-001-047; 4387-025-001; and 4387-026-012) and all buildings and other improvements now thereon or hereafter constructed, and described on **Exhibit "A"** attached hereto and incorporated by reference herein thereon (the "*Premises*").

TOGETHER WITH all of the following which, with the Premises, are collectively called the "*Mortgaged Property*":

A.    All rights, privileges, franchises now or hereafter appurtenant in or to the Premises;

B.    All interest of Trustor in adjacent streets and public places, opened or proposed, and all easements and rights of way, public or private, now or hereafter used in connection with the Premises and shares of stock pertaining to water or water rights, the ownership of which

1

Recording Requested By And:
When Recorded Return To:

Haddan & Zepfel, LLP
610 Newport Center Drive, Suite 330
Newport Beach, CA 92660
Attn: Jon Haddan

## DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING WITH REQUEST FOR NOTICE

ATTENTION COUNTY RECORDER: This instrument is intended to be effective as a financing statement filed as a fixture filing pursuant to Section 9502 of the California Commercial Code. Portions of the goods comprising a part of the mortgaged property are or are to become fixtures related to the real property described in Exhibit A hereto. This instrument is to be filed for record in the records of the county where deeds of trust on real property are recorded and should be indexed as both a deed of trust and as a financing statement covering fixtures. The addresses of trustor (debtor) and agent (secured party) are specified in Section 3.12 of this instrument.

NOTE: This deed of trust secures an obligation incurred in part for the construction of improvements on land and is a "construction mortgage" as that term is defined in California Commercial Code Section 9334(h).

THIS DEED OF TRUST, ASSIGNMENT OF RENTS AND LEASES, SECURITY AGREEMENT AND FIXTURE FILING, WITH REQUEST FOR NOTICE (the "*Deed of Trust*") is made as of November 5, 2019 by Treetop Development LLC, a California limited liability company ("*Trustor*"), Fidelity National Title Company, ("*Trustee*"), and Lydda Lud Lender Tree, LLC, a California limited liability company ("*Beneficiary*").

TRUSTOR HEREBY IRREVOCABLY GRANTS, TRANSFERS AND ASSIGNS TO TRUSTEE, IN TRUST, WITH POWER OF SALE, all that certain vacant property located in Los Angeles, California 90210 (Assessor's Parcel Numbers 4387-022-021; 4352-001-051; 4352-001-044; 4352-001-047; 4387-025-001; and 4387-026-012) and all buildings and other improvements now thereon or hereafter constructed, and described on **Exhibit "A"** attached hereto and incorporated by reference herein thereon (the "*Premises*").

TOGETHER WITH all of the following which, with the Premises, are collectively called the "*Mortgaged Property*":

A.      All rights, privileges, franchises now or hereafter appurtenant in or to the Premises;

B.      All interest of Trustor in adjacent streets and public places, opened or proposed, and all easements and rights of way, public or private, now or hereafter used in connection with the Premises and shares of stock pertaining to water or water rights, the ownership of which

1

affects the Premises;

    C.    All right, title and interest of Trustor to the insurance policies and proceeds therefrom and any unearned premiums thereon maintained by Trustor on the Premises and any other properties described herein;

    D.    All payments, including interest thereon, which may be made with respect to the Mortgaged Property as a result of injury to or decrease in the value of the Mortgaged Property or as a result of the exercise of the right of eminent domain;

    E.    Subject to Beneficiary's rights under Section1.6 below, all of Trustor's interest in all leases now or hereafter existing on any part of the Premises, all of the rents, issues and profits of the Mortgaged Property, and all security or utility deposits arising from the Mortgaged Property;

    F.    All improvements, fixtures, equipment, furniture, construction materials and other articles of property in which Trustor now has, or at any time hereafter acquires, an interest and which are now or at any time hereafter attached to, installed in, used in connection with or situated on the Premises, and all permits, approvals, plans, specifications, architect's contracts, construction contracts, maintenance agreements, service contracts and similar items that relate in any way to the development, construction, use, occupancy, operation, maintenance, enjoyment, acquisition or ownership of the Mortgaged Property.

    FOR THE PURPOSE OF SECURING, in such order of priority as the Beneficiary may elect:

    1.    Payment of all present and future indebtedness evidenced by or arising under (i) that certain Six Million Dollar ($6,000,000) promissory note of even date herewith made by Trustor and others to the order of Beneficiary, (the "*Note*"), (ii) the Loan and Security Agreement among Beneficiary, Trustor, and others, dated November 5, 2019 (the "*Loan Agreement*"), and (iii) under any other "*Loan Documents*" (as defined in the Loan Agreement), together with interest thereon and all other sums due to Lender under the Loan Documents, including, without limitation, the "Contingent Payment" provided for in the Loan Agreement and all other charges, fees, costs and expenses payable pursuant any Loan Document (collectively the "**Indebtedness**").

    2.    Due, prompt and complete performance of every obligation of Trustor contained herein or in the Note, the Loan Documents any other instrument executed by Trustor for the purpose of (a) evidencing or further securing the Indebtedness, or (b) inducing Beneficiary to agree to the creation of the Indebtedness including, without limitation payment of the Profits Interest provided for in the Loan Agreement.

    3.    Payment and performance of any additional existing or future obligations of Trustor or its members to Beneficiary when evidence by a writing or writings reciting that they are secured by this Deed of Trust;

2

4.      Payment of all other sums, with interest thereon, becoming due or payable under the provisions hereof to either Trustee or the Beneficiary; and

5.      Any and all amendments, modifications, renewals and/or extensions of any of the foregoing, including, but not limited to amendments, modifications, renewals or extensions which are evidenced by new or additional instruments, documents or agreements or which change the rate of interest or payment terms of any obligations secured hereby.

1.      <u>PROVISIONS RELATING TO THE MORTGAGED PROPERTY.</u>

    1.1      <u>Taxes & Claims.</u>

Trustor agrees to pay or cause to be paid at least ten (10) days prior to delinquency, all taxes, assessments and governmental or quasi-governmental charges whatsoever levied upon or assessed or charged against the Mortgaged Property, including, but not limited to, assessments on appurtenant water stock. Trustor shall give to Beneficiary not later than thirty (30) days after each such due date a receipt or receipts, or certified copies thereof, evidencing every such payment by Trustor.  Trustor agrees to pay and satisfy when due any other governmental and non-governmental claims, liens or encumbrances affecting or purporting to affect the title to, or which may be or appear to be liens on, the Mortgaged Property or any part thereof and all costs, charges, interest and penalties on account thereof, and to give Beneficiary, upon demand, evidence satisfactory to Beneficiary of the payment or satisfaction thereof.

    1.2      <u>Insurance.</u>

a.      Trustor shall maintain in effect such fire, extended coverage and such other types of insurance as may be required by the Beneficiary.

b.      All insurance policies shall be issued by a carrier and in such amounts and form and with such endorsements as may be approved or required by the Beneficiary and shall be endorsed with a standard non-contributory mortgagee clause in favor of the Beneficiary.  Copies of the policies evidencing the insurance required by this Section1.2 certified to be true and correct by the insurer or insurers together with receipts for the payment of premiums thereon shall be delivered to Beneficiary from time to time upon demand by Beneficiary. All such insurance policies shall require at least thirty (30) days' notice to the Beneficiary prior to any cancellation or modification. Trustor agrees to pay all premiums on such insurance at least thirty (30) days before due and give Beneficiary satisfactory evidence of renewal at least ten (10) days prior to the premium due date. Trustor shall not permit any condition to exist on or with respect to the Mortgaged Property which would wholly or partially invalidate any insurance thereon, and Trustor agrees not to adjust, compromise or settle any loss or claim under any insurance required hereunder without the prior written consent of Beneficiary. Beneficiary shall not by the fact of approving, disapproving, accepting, preventing, obtaining or failing to obtain any such insurance, incur any liability for the form or legal sufficiency of insurance contracts, solvency of insurers or payment of losses, and Trustor hereby expressly assumes full responsibility therefor and all liability, if any, thereunder.  Beneficiary shall have the

3

right, but not the obligation, to assign the policies to the purchaser of the Mortgaged Property at trustee's or sheriff's sale or to the grantee of a deed in lieu thereof.

### 1.3    Condemnation and Other Awards.

Should the Mortgaged Property or any part thereof be damaged or be taken by reason of any exercise of eminent domain by any governmental or quasi-governmental authority or any public improvement, or be transferred in lieu thereof, the Beneficiary shall be entitled to receive (subject to the rights of a holder of a senior lien recorded against the Mortgaged Property) all compensation which Trustor may have or receive as a result thereof and enforce all claims thereon, without regard to the adequacy of the security hereunder, and the Beneficiary may, after deducting therefrom its expenses, including attorneys' fees, apply the same upon the indebtedness secured hereby in such order as the Beneficiary may determine. The balance, if any, after all such indebtedness is paid in full, shall be paid to Trustor. At Beneficiary's option, the amount so collected, or any part thereof, may be released to Trustor upon such conditions as Beneficiary may impose. Beneficiary may appear in and prosecute, either in its own name or in the name of Trustor, any action or proceeding in connection with the foregoing, and adjust, compromise or settle any claim in connection therewith.

### 1.4    Establishment of Impound Account.

If Trustor fails to pay taxes or other governmental claims as required under Section1.1 above, or fails to maintain insurance policies and pay insurance premiums therefor as required under Section1.2 above, Beneficiary, at its option, may require, subject to the rights of the holder of a senior lien record against the Mortgaged Property, that an impound account be established with Beneficiary for the purpose of paying present and future real property taxes, assessments and other governmental claims and premiums for insurance required to be maintained hereunder. If Beneficiary elects to establish an impound account, Trustor shall pay, in addition to the monthly interest payments required under the Note, an amount equal to 1/12th of the total sum estimated by Beneficiary to be required for payment of such real property taxes and insurance premiums. Beneficiary shall pay all real property taxes and assessments levied against the Mortgaged Property and all insurance premiums for insurance required to be maintained hereunder on or before the respective due dates therefor. If the amounts paid by Trustor as provided in this Section1.4 are insufficient to pay such taxes and insurance premiums when due, Trustor agrees to pay to Beneficiary, immediately upon Beneficiary's demand therefor, such additional sums as may be required. Beneficiary shall not be required to pay interest on any funds in the impound account.

### 1.5    Condition of Mortgaged Property.

a.    Trustor agrees to keep the Mortgaged Property in good condition and repair. Trustor further agrees not to cause or permit any improvement constructed on the Premises to be removed, demolished or structurally altered without the prior written consent of the Beneficiary. Trustor shall not erect new buildings, additions to existing buildings or other structures or improvements on the Mortgaged Property without the prior written consent of Beneficiary. Trustor agrees not to abandon the Premises or leave the Premises vacant or

deserted, and not to cause or permit any waste to the Mortgaged Property. Trustor also agrees to restore and reconstruct in a good and workmanlike manner to the conditions required hereby any improvement on the Premises which may hereafter be damaged or destroyed. Trustor further agrees not to permit any mechanics lien to attach to the Mortgaged Property, to comply with all laws and restrictions affecting the Mortgaged Property, to make or cause to be made from time to time all needful or proper replacements, repairs and renewals, and to do any other act or acts, all in a timely and proper manner, which from the character or use of the Mortgaged Property may be reasonably necessary to protect and preserve the value of the Mortgaged Property.

b.      Trustor agrees that, as to any permitted alteration, addition, construction or improvement or development to be made upon the Premises, all plans and specifications therefor shall be subject to Beneficiary's approval in advance of the commencement of work. Once commenced, all work thereunder shall be prosecuted with due diligence, and all construction thereof will be done in a good and workmanlike manner fully in accordance with the plans and specifications so approved and will comply with all laws, ordinances or regulations made or promulgated by any governmental agency or other lawful authority and with the rules of any applicable Board of Fire Underwriters.

c.      The Beneficiary may, at any time and without notice to Trustor, enter, inspect and protect the Mortgaged Property. If Trustor fails to maintain the Mortgaged Property in the manner specified herein, the Beneficiary may undertake such maintenance for the account of Trustor as the Beneficiary deems necessary. The cost of any such repairs or maintenance undertaken by Beneficiary shall become immediately due and payable to Beneficiary, and Beneficiary shall be reimbursed therefor in accordance with the provisions of Section 3.2 hereof. The right of Beneficiary to undertake such repairs or maintenance shall be optional and shall in no way limit Beneficiary's right to declare a default under this Deed of Trust for Trustor's failure to maintain the Mortgaged Property in accordance with the covenants herein.

d.      Without Beneficiary's prior written consent, Trustor may not grant any easement or dedication, seek a zoning reclassification or variance, file any map, declaration or restrictions or take any other similar action with respect to the Mortgaged Property.

1.6     Assignment of Leases and Rents.

a.      Subject to the rights of a holder of a senior lien recorded against the Mortgaged Property, Trustor hereby grants, transfers and assigns to Beneficiary all right, title and interest of Trustor in and to all lease, rental, occupancy and use agreements of every kind (collectively the "*Leases*"), whether written or oral and whether for a definite term or month-to-month, now or hereafter relating to the Premises, or any part thereof, and all rents, issues and profits thereunder. This assignment shall extend to and cover any and all extensions and renewals of existing and future Leases and to any and all present and future rights against guarantors of those obligations and to any and all rents, issues and profits collected under the Leases or other rentals. This assignment is given to facilitate payment and performance of the Note, this Deed of Trust and any other agreements at any time securing the Note. Beneficiary shall not be obligated to perform or discharge any obligation, duty or liability under any of the Leases, or under or by reason of this assignment, and Trustor shall indemnify and hold

5

Beneficiary harmless from any liability, loss or damage which Beneficiary might incur under any Lease or under or by reason of this assignment and from any claims and demands whatsoever which may be asserted against Beneficiary by reason of any alleged obligations or undertakings on Beneficiary's part to perform or discharge any of the terms, covenants or agreements contained in the Leases. In pursuance of this assignment, and not in lieu hereof, Trustor shall on demand give Beneficiary a separate specific assignment or assignments of rents and leases covering some or all of the Leases, and terms of such assignment or assignments shall be incorporated herein by reference. All future Leases shall be subject to the prior, written approval of Beneficiary and shall be subordinate to the lien of this Deed of Trust.

b.    Prior to an Event of Default hereunder, Trustor retains the right to collect the rents, issues and profits from the Leases and the Mortgaged Property. Upon the occurrence of an Event of Default hereunder and at any time while such Event of Default remains uncured, Beneficiary may notify all tenants of the Premises that all payments required under the Lease be made directly to Beneficiary. The collection of any such payments by the Beneficiary shall not constitute the Beneficiary a mortgagee in possession. Trustor hereby relieves said tenants from any liability to Trustor by reason of said payments being made to Beneficiary.

c.    Rents collected by Beneficiary may be applied against taxes and liens levied against the Premises, to the payment of amounts due Beneficiary under the Note and this Deed of Trust, to the payment of operating expenses of the Premises and to Trustor in such manner and in such order as Beneficiary deems appropriate. Receipt by Beneficiary of those rents, issues or profits shall not constitute a waiver of the rights and remedies of Beneficiary under this Deed of Trust or applicable law nor shall the receipt and application thereof cure any default hereunder or affect any foreclosure proceeding or any sale authorized by this Deed of Trust or applicable law.

d.    Trustor shall have no right or power without the prior written consent of Beneficiary to further assign the rents, issues or profits from the Mortgaged Property. Trustor shall not (i) accept prepayments of any installments of rent in excess of one (1) month except prepayments in the nature of security not to exceed one (1) month's rent, or (ii) terminate, amend, modify or accept the surrender of any Lease having a term in excess of one (1) year without the prior written consent of Beneficiary. Any action so prohibited without the express written consent of Beneficiary shall be null and void as against Beneficiary.

1.7    <u>Title</u>.

a.    Trustor agrees to protect, preserve and defend its interest in the Mortgaged Property and title thereto, to appear and defend this Deed of Trust in any action or proceeding affecting or purporting to affect the Mortgaged Property, the lien of this Deed of Trust thereon or any of the rights of either Trustee or Beneficiary hereunder, and to pay all costs and expenses incurred by either Trustee or Beneficiary in or in connection with any such action or proceeding, including attorneys' fees, whether any such action or proceeding progresses to judgment and whether brought by or against Trustee or Beneficiary. Trustor shall give Beneficiary prompt written notice of any such action or proceeding.

b.        Beneficiary or Trustee, as the case may be, shall be reimbursed for any such costs and expenses in accordance with the provisions of Section 3.2 hereof. Trustee or Beneficiary may, but shall not be under any obligation to, appear or intervene in any such action or proceeding and retain counsel therein and defend the same or otherwise take such action therein as either may be advised and may settle or compromise the same and, in that behalf and for any of such purposes, may expend and advance such sums of money as either may deem necessary, and Beneficiary or Trustee, as the case may be, shall be reimbursed therefor in accordance with the provisions of Section 3.2 hereof.

1.8    Personal Property Security Interest.

a.        All property covered by Section F above shall, to the fullest extent permitted by law, be deemed a part of the real property. To the extent any property covered by this Deed of Trust consists of property of any kind covered by the Uniform Commercial Code in effect in the jurisdiction where the Mortgaged Property is located (the "*Collateral*"), this Deed of Trust constitutes a "*Security Agreement*", and Trustor hereby grants a security interest in the Collateral to Beneficiary. This Deed of Trust shall be self-operative with respect to the Collateral, but Trustor agrees to execute and deliver on demand such security agreements, financing statements and other instruments as Beneficiary may request in order to impose the lien hereof more specifically upon any of the Collateral and to perfect that lien. If the lien of this Deed of Trust on any portion of the Collateral shall be subject to a prior security interest thereon, upon the occurrence of any Event of Default (as specified below), all the right, title and interest of Trustor in and to any and all deposits thereon is hereby assigned to Beneficiary, together with the benefit of any payments now or hereafter made thereon.

b.        Trustor agrees that all property of every nature and description, whether real or personal, covered by this Deed of Trust, together with all Collateral, are encumbered as one unit, and that upon default by Trustor under the Note, this Deed of Trust, or any security agreement given pursuant to this Section 1.8, this Deed of Trust and those security interests, at Beneficiary's option, may be foreclosed or sold in the same proceeding, and all of the Mortgaged Property (both realty and personalty) may, at Beneficiary's option, be sold as such in one unit as a going business or separately. The filing or recording of a financing statement relating to any personal property or rights or interests generally or specifically described herein shall not be construed to diminish or alter any of Beneficiary's rights or remedies.

c.        This Deed of Trust also constitutes a financing statement with respect to the Collateral filed as a fixture filing in the Official Records of the County Recorder of each county in which the Mortgaged Property is located. For the purposes of this fixture filing, the "Debtor" is the Trustor and the "Secured Party" is the Beneficiary. Trustor is the record owner of the Mortgaged Property.

1.9    Due on Sale/Encumbrance.

a.        All sums secured hereby shall, at the option of Beneficiary, immediately become due and payable, without notice to Trustor, upon the sale, transfer,

7

assignment, conveyance or other disposition of the Premises or any portion thereof, including any improvements thereon, or any further encumbrance, mortgage or hypothecation of the same, whether direct or indirect, legal or equitable, voluntary or involuntary, or the issuance, sale, assignment, transfer, conveyance, or other disposition, voluntary or involuntary, of any direct or indirect equity interest in Trustor, any other "Borrower" as defined in the Loan Agreement or in any entity having an equity interest in Trustor or other such Borrower, whether direct or indirect, unless expressly authorized by Beneficiary in writing in advance at Beneficiary's sole discretion.

b.    If ownership of the Premises, Trustor, or any part thereof, becomes vested in a person or persons other than Trustor, without the prior written consent of Beneficiary, then Beneficiary may, without notice to Trustor, waive such default and deal with such successor or successors-in-interest with reference to this Deed of Trust, the Loan Agreement and the Note in the same manner as with Trustor, without in any way releasing, discharging or otherwise affecting the liability of Trustor hereunder or for the indebtedness hereby secured.  No transfer or further encumbrance of the Premises or any interest in Trustor, no forbearance on the part of Beneficiary, no extension of the time for the payment of the indebtedness hereby secured or any change in the terms thereof consented to by Beneficiary shall in any way whatsoever operate to release, discharge, modify, change or affect the original liability of Trustor herein, either in whole or in part.  Without limiting any other rights or remedies of Beneficiary exercisable upon Trustor's default under this Section I.9.b, any deed or instrument conveying the Premises or ownership of Trustor, or any part thereof or interest therein, without the prior written consent of Beneficiary, shall be deemed to include an implied covenant of the transferee thereunder whereby the transferee agrees to and does assume all of the Trustor's obligations under the Note, this Deed of Trust and all other agreements now or hereafter securing the Note.

c.    Consent by Beneficiary under this Section 1.9 to one such transfer or encumbrance specified in this Section 1.9 shall not be deemed to be a waiver of the right to require consent to any subsequent transfer or encumbrance.  Trustor acknowledges that Beneficiary may charge such fee as Beneficiary may customarily charge, at the time of receipt of the application, for processing an application seeking consent by Beneficiary to any transfer or encumbrance specified in this Section 1.9, but Trustor acknowledges that payment of that fee does not estop or prevent Beneficiary from denying the consent sought.

d.    Trustor further acknowledges that Beneficiary may condition its consent under this Section 1.9 in any manner, including, but not limited to, the following: that (i) no default exists under the Note, this Deed of Trust or the Loan Documents, (ii) Beneficiary approves the credit and management abilities of the proposed transferee, (iii) Beneficiary receives an assumption fee in such amount as Beneficiary may require; (iv) Trustor and the proposed transferee execute Beneficiary's form of assumption agreement which, among other things, will provide that the proposed transferee agrees to assume the obligations set forth in the Note, this Deed of Trust and the Loan Agreement; and (v) Trustor and the proposed transferee comply with such other requirements as Beneficiary may establish to protect its security.  The recital of these sample conditions does not constitute an undertaking by Beneficiary to consent to any transfer whatsoever or to impose reasonable conditions to that consent.

8

1.10    Continuing Responsibility for Environmental Matters.

a.    Trustor covenants and agrees, at its sole cost and expense, to keep or cause the Mortgaged Property to be kept free of any hazardous or toxic materials, substances, pollutants, contaminants or wastes, and to remove or take remedial action with regard to any such materials released to the environment at, on or near the Mortgaged Property, provided that (i) any such removal or remedial action shall be undertaken in a manner so as to minimize any impact on the business conducted at the Mortgaged Property, and (ii) Trustor shall indemnify the Beneficiary for any action taken by Trustor under this Section 1.10.a. in accordance with Section 1.11.

b.    In the event Trustor fails fully to comply with the obligations contained in Section 1.10.a., and upon written notice to Trustor, the Beneficiary may, at its option, declare all indebtedness secured hereby immediately due and payable, cause the hazardous or toxic materials to be removed from the Mortgaged Property and add all costs incurred in effecting the removal to the indebtedness evidenced by the Note and secured by this Deed of Trust. Trustor grants to the Beneficiary and its agents and employees access to the Mortgaged Property and the license to remove such hazardous or toxic materials and agrees to indemnify and hold the Beneficiary harmless from all cost and expense involved in accordance with Section 1.11.

1.11    Environmental Indemnification.

Trustor acknowledges and agrees that it will reimburse, defend, indemnify and hold the Beneficiary harmless from and against any and all liabilities, claims, damages, penalties, expenditures, losses or charges (including, but not limited to, all costs of investigation, monitoring, legal fees, remedial response, removal, restoration or permit acquisition) which may now or in the future be undertaken, suffered, paid, awarded, assessed or otherwise incurred as a result of:

a.    any contamination existing on, above or under the Mortgaged Property at the time of execution of this Deed of Trust or at any time in the future;

b.    any investigation, monitoring, cleanup, removal, restoration, remedial response or remedial work undertaken on the Mortgaged Property by or on behalf of Trustor with regard to environmental contamination thereof.

2.    DEFAULT PROVISIONS.

2.1    Events of Default.

The occurrence of any one of the following shall be a default hereunder ("*Event of Default*"):

a.    Failure to Pay Indebtedness. If any of the indebtedness secured hereby is not paid when due (and any applicable grace period provided in the Note has expired),

9

whether by acceleration or otherwise.

b. Event of Default under the Note. The occurrence of any "Event of Default" as defined under the Note including, without limitation, an Event of Default under the Loan Agreement.

c. Abandonment. If Trustor abandons any of the Mortgaged Property.

d. Dissolution, etc. If Trustor or any guarantor of any indebtedness secured hereby dies, dissolves, liquidates, or merges with or is consolidated into any other entity.

e. Default Under Other Obligations. Any default, breach or event of default under any note or other obligation secured by the Mortgaged Property or any part thereof, or the commencement by the holder of any lien or security interest on the Mortgaged Property of any foreclosure or other proceedings for the enforcement of its remedies thereunder.

f. Breach or Default. The default by Trustor of any of its obligations or covenants set forth herein, including, without limitation, Trustor's obligations under Section 1.10, or any in other instrument securing the Note, and the breach by Trustor of any representation or warranty set forth herein or in any other instrument securing the Note.

g. Transfer or Encumbrance of Mortgaged Property. If any event which requires Beneficiary's consent under Section 1.9 above occurs prior to the granting of that consent.

h. Grant of Easement, Etc. If, without the prior written consent of Beneficiary, Trustor grants any easement or dedication, seeks a zoning reclassification or variance, files any plat, development plan, condominium declaration or restrictions which affects all or substantially all of the Mortgaged Property.

i. Bankruptcy or Insolvency. If the Trustor, the owner of the Mortgaged Property or any person obligated to pay, or guaranteeing payment of, the indebtedness secured hereby: (i) files a petition under any chapter of the Federal Bankruptcy Code or any similar law, state or federal, whether now or hereafter existing; (ii) in any involuntary proceeding under the Bankruptcy Code commenced against any of them files an answer admitting that it is generally not paying its debts as such debts become due or fails to obtain a dismissal of the proceeding within sixty(60) days of its commencement,  (iii) is the subject of an order for relief in any bankruptcy proceeding;  or (iv) has a custodian or trustee, as defined in the Federal Bankruptcy Code, appointed for or take possession of either the Premises or substantially all of its property or has any court take jurisdiction of either the Premises or substantially all of its property.

2.2    Remedies Upon Default.

a.    At any time after the occurrence of an Event of Default, the Beneficiary may declare all indebtedness secured hereby immediately due and payable and irrespective of whether Beneficiary exercises that option, it may, at its option and in its sole discretion, without any prior notice or demand to or upon Trustor, do one or more of the following:

b.    Beneficiary may enter upon, take possession of, manage and operate the Mortgaged Property or any part thereof; complete construction, make repairs and alterations, and do any acts which Beneficiary deems proper to protect the security hereof; and either with or without taking possession, in its own name, sue for or otherwise collect and receive rents, issues, and profits, including those past due and unpaid, and apply the same less costs and expenses of operation and collection, including attorneys' fees, upon any indebtedness secured hereby, and in such order as Beneficiary may determine. Upon request of Beneficiary, Trustor shall assemble and make available to Beneficiary at the Premises any of the Mortgaged Property which has been removed therefrom. The entering upon and taking possession of the Mortgaged Property, the collection of any rents, issues and profits and the application thereof as aforesaid, shall not cure or waive any default theretofore or thereafter occurring, or affect any notice of default hereunder or invalidate any act done pursuant to any such notice or constitute Beneficiary a mortgagee in possession. Notwithstanding Beneficiary's continuance in possession or receipt and application of rents, issues or profits, Beneficiary shall be entitled to exercise every right provided for in this Deed of Trust or by law upon or after the occurrence of a default, including the right of exercise of the power of sale. Any of the actions referred to in this Section may be taken by Beneficiary at the time as Beneficiary is so entitled, without regard to the adequacy of any security for the indebtedness hereby secured.

c.    Beneficiary shall, without regard to the adequacy of any security for the indebtedness hereby secured and without notice, be entitled to the appointment of a receiver to take possession of and protect the Mortgaged Property, and operate the same and collect the rents, issues and profits therefrom.

d.    Beneficiary may bring an action in any court of competent jurisdiction to foreclose this Deed of Trust or to enforce any of the covenants hereof.

e.    Beneficiary may elect to cause the Mortgaged Property or any part thereof to be sold pursuant to the power of sale granted herein as follows:

(1)    Beneficiary may proceed as if all of the Mortgaged Property were real property, in accordance with subsection (4) below, or Beneficiary may elect to treat any of the Mortgaged Property which consists of a right in action or which is property that can be severed from the Premises without causing structural damage thereto as if the same were personal property, and dispose of the same in accordance with subsection (3) below, separate and apart from the sale of real property, the remainder of the Mortgaged Property being treated as real property.

11

(2)    Beneficiary may cause any such sale or other disposition to be conducted immediately following the expiration of any statutory notice period, if any, or Beneficiary may delay any such sale or other disposition for such period of time as Beneficiary deems to be in its best interest. Should Beneficiary desire that more than one such sale or other disposition be conducted, Beneficiary may at its option cause the same to be conducted simultaneously or successively on the same day or at such different days or times and in such order as Beneficiary may deem to be in its best interest.

(3)    Should Beneficiary elect to cause any of the Mortgaged Property to be disposed of as personal property as permitted by subsection (1) above, it may dispose of any part thereof in any manner now or hereafter permitted by Article 9 of the Uniform Commercial Code in effect in the jurisdiction where the Premises are located, or in accordance with any other remedy provided by law. Both Trustor and Beneficiary shall be eligible to purchase any part or all of such property at any such disposition. Any such disposition may be either public or private as Beneficiary may so elect, subject to the provisions of the Uniform Commercial Code.

(4)    Should Beneficiary elect to sell the Mortgaged Property which is real property or which Beneficiary has elected to treat as real property, upon such election Beneficiary or Trustee shall give such notice of default and election to sell as may then be required by law. Thereafter, upon the expiration of such time and the giving of such notice of sale as may then be required by law, Trustee, at the time and place specified by the notice of sale, shall sell such Mortgaged Property, or any portion thereof specified by Beneficiary, at public auction to the highest bidder for cash in lawful money of the United States, subject, however, to the provisions of subsection (8) below. Trustee may, pursuant to applicable law or upon request of Beneficiary shall, from time to time, postpone the sale by public announcement thereof at the time and place noticed therefor. If the Mortgaged Property consists of several lots or parcels, Beneficiary may designate the order in which the property shall be offered for sale or sold. Any person, including Trustor, Trustee or Beneficiary, may purchase at the sale. Upon any sale, Trustee shall execute and deliver to the purchaser or purchasers a deed or deeds conveying the property so sold, but without any covenant or warranty whatsoever, express or implied, whereupon the purchasers shall be let into immediate possession. In the event Trustor fails to or refuses to surrender possession of the Mortgaged Property after any trustee's sale, Trustor shall at Beneficiary's option be deemed a tenant at sufferance, subject to eviction by means of unlawful detainer proceedings.

(5)    In the event of a sale or other disposition of any property, or any part thereof, and the execution of a deed or other conveyance, pursuant thereto, the recitals therein of facts, such as a default, the giving of notice of default and notice of sale, terms of sale, sale, purchaser, payment of purchase money, and any other fact affecting the regularity or validity of that sale or disposition, shall be conclusive proof of the truth of those facts; and any such deed or conveyance shall be conclusive against all persons as to facts recited therein.

12

(6)    Beneficiary and Trustee shall apply the proceeds of any sale or disposition hereunder to payment of the following: (i) the expense of such sale or disposition, together with Trustee's fees and attorneys' fees, and the actual cost of publishing, recording, mailing and posting notice; (ii) the cost of any search or other evidence of title procured in connection therewith and revenue stamps on any deed or reconveyance; (iii) the Note; (iv) all other sums secured hereby or required to be expended in connection with the Mortgaged Property whether or not expressly contemplated hereby; and (v) the remainder, if any, to the person or persons legally entitled thereto in the order of their priority.

(7)    Trustor hereby expressly waives any right Trustor may have to direct the order in which any of the Mortgaged Property shall be sold.

(8)    Upon any sale of the Mortgaged Property, whether made under the power of sale herein granted or pursuant to judicial proceedings, if the holder of the Note is a purchaser at the sale, the holder shall be entitled to use and apply all or any portion of the indebtedness then secured hereby for or in settlement or payment of all or any portion of the purchase price of the property purchased.

(9)    Except as may be specifically provided to the contrary in the Note or under applicable law, Trustor and each person or entity liable for the indebtedness secured hereby shall remain jointly and severally liable for any deficiency existing after sale of the Mortgaged Property and disposition of the proceeds in the manner provided above.

f. Beneficiary's remedies shall be subject to the requirements of applicable law, except to the extent provisions of applicable law may be waived and are herein waived by Trustor.

2.3    <u>Remedies Not Exclusive</u>.

a.    No remedy herein conferred upon Trustee or the Beneficiary is intended to be exclusive of any other remedy herein or by law provided, but each shall be cumulative. Beneficiary shall have, in addition to all other rights and remedies provided herein and at law or in equity, the rights and remedies afforded by applicable law.

b.    Every power or remedy given by this Deed of Trust to Trustee or Beneficiary, or to which either of them may be otherwise entitled, may be exercised from time to time and as often as may be deemed expedient by Trustee or Beneficiary, and either of them may pursue inconsistent remedies. If there exists additional security for the performance of the obligations secured hereby, the holder of the Note, at its sole option, and without limiting or affecting any rights or remedies hereunder, may exercise any of the rights and remedies to which it may be entitled hereunder either concurrently with whatever other rights it may have in connection with such other security or in such order as it may determine. At Beneficiary's option, Trustee shall be authorized to exercise the rights and remedies explicitly reserved to Beneficiary herein.

13

### 2.4    Waiver of Defenses.

Trustor waives any requirement of presentment, demand for payment, notice of nonpayment or late payment, protest, notice of protest, notice of dishonor, and all other formalities. Trustor waives all rights and privileges it might otherwise have to require Trustee or Beneficiary to proceed against or exhaust the assets encumbered hereby or by any other security document or instrument securing the Note or to proceed against any guarantor of that indebtedness, or to pursue any other remedy available to Beneficiary in any particular manner or order under the legal or equitable doctrine or principle of marshalling or suretyship and further agrees that Trustor and Beneficiary may proceed against any or all of the assets encumbered hereby or by any other security document or instrument securing the Note in such order and manner as Beneficiary in its sole discretion may determine. Any person signing this Deed of Trust as a surety or accommodation party, or that has subjected property to the lien of this Deed of Trust to secure the indebtedness of another, hereby expressly waives to the extent permitted by law the benefits of the provisions of applicable law relating to sureties or guarantors and waives any defense arising by reason of disability or other defense of Trustor or by reason of the cessation from any cause whatsoever of the liability of Trustor.

### 3.    GENERAL PROVISIONS.

### 3.1    Non-Waiver.

The acceptance by the Beneficiary of any sum after the same is due shall not constitute a waiver of the right either to require prompt payment, when due, of all other sums hereby secured or to declare a default as herein provided. The acceptance by the Beneficiary of any sum in an amount less than the sum then due shall be deemed an acceptance on account only and shall not constitute a waiver of the right to require prompt payment of the balance of such sum then due or as of any or all other rights and remedies of the Beneficiary, including without limitation, the right to proceed with a trustee's sale.

### 3.2    Substitute Performance by the Beneficiary.

Should Trustor fail to pay or perform when required hereunder any obligation of Trustor hereunder, the Beneficiary may, but shall not be obligated to, and without regard to the adequacy of the security and without prejudice to the Beneficiary's right to declare a default hereunder, pay or perform the same without notice to or demand upon Trustor. The payment by Beneficiary of any delinquent tax, assessment or governmental charge, or any lien or encumbrance which Beneficiary in good faith believes might be prior hereto, or any insurance premium for insurance which Trustor is obligated to provide hereunder but which Beneficiary in good faith believes has not been supplied, shall be conclusive between Beneficiary and Trustor as to the legality and amount so paid. Beneficiary shall be subrogated to all rights, equities and liens discharged by any such expenditure. Before and after default hereunder and whether or not an action is instituted to enforce any provision of this Deed of Trust or the Note, Trustor promises to pay to Beneficiary all sums incurred by Beneficiary for attorneys' fees and costs to enforce this Deed of Trust or the Note or to protest or enforce any of Beneficiary's rights hereunder. Any amounts so

paid pursuant to this Section 3.2, or the cost of that performance, together with all costs and expenses incurred by Beneficiary in connection with that payment or performance, and any amounts for which Trustor is specifically obligated to reimburse Beneficiary or Trustee pursuant to provisions of this Deed of Trust, including attorneys' fees and interest on all such amounts at the lesser of ten percent (10%) per annum or the maximum amount permitted by law from the date paid by Beneficiary until repaid to Beneficiary, shall be payable by Trustor to Beneficiary immediately upon notice to Trustor of the amount owing, without further demand, shall be secured by this Deed of Trust, and shall be added to the judgment in any suit brought by Beneficiary or Trustee against Trustor.

### 3.3   Reconveyance.

Upon written request of the Beneficiary stating that all sums secured hereby have been paid, and upon surrender of this Deed of Trust and the Note to Trustee for cancellation, and upon payment of its fees, Trustee shall convey, without warranty, the property then held hereunder. The grantee in such reconveyance may be described as "the person or persons legally entitled thereto".

### 3.4   Statute of Limitations.

The pleading of any statute of limitations as a defense to any obligation secured by this Deed of Trust is hereby waived to the fullest extent permitted by law.

### 3.5   Substitution of Trustee.

The Beneficiary may substitute the Trustee hereunder from time to time by instrument in writing in any manner now or hereafter provided by law.

### 3.6   Non-Liability of Trustee.

At any time or from time to time, without liability therefor and without notice, and without affecting the lien of this Deed of Trust upon the Mortgaged Property for the full amount secured hereby, Trustee may upon the written request of Trustor if but only if consented to in writing by Beneficiary (i) consent to the making of any map or plat thereof, (ii) join in granting any easement thereon or in creating any covenants or conditions restricting use or occupancy thereof, or (iii) join in any extension agreement or in any agreement subordinating the lien or charge hereof.

### 3.7   Compensation and Indemnification of Trustee.

Trustee shall be entitled to reasonable compensation for all services rendered or expenses incurred in the administration or execution of the trust hereby created and Trustor hereby agrees to pay same, subject to all legal limitations. Trustee and Beneficiary shall be indemnified, held harmless and reimbursed by Trustor for any liability, damage or expense, including attorneys' fees and amounts paid in settlement, which they or either of them may incur or sustain in the execution of this trust or in the doing of any act which they, or either of them, are required or

15

permitted to do by the terms hereof or by law, and shall be reimbursed therefor in accordance with the provisions of Section 3.2.

### 3.8    Amendment.

No alteration or amendment of this Deed of Trust or the Note shall be effective unless in writing and signed by the party or parties sought to be charged or bound thereby.

### 3.9    Severability.

Should any term, provision, covenant or condition of this Deed of Trust be held to be void or invalid, the same shall not affect any other term, provision, covenant or condition of this Deed of Trust, but the remainder hereof shall be effective as though such void or invalid term, provision, covenant or condition had not been contained herein.  If this Deed of Trust should be deemed ineffective as a deed of trust, then these presents shall be construed and enforced as a mortgage with Trustor being the mortgagor and Beneficiary being the mortgagee.

### 3.10    Governing Law; Venue.

This Deed of Trust shall be governed by and construed in accordance with the laws of the jurisdiction where the Mortgaged Property is located as such laws are applied to contracts in writing between residents of said jurisdiction to be performed within said jurisdiction. Any action, suit, claim or proceeding (collectively "*Action*") arising under this Deed of Trust or the other related documents may, at Beneficiary's option, be brought and maintained in a federal or state court of competent jurisdiction located in Orange County California.  Trustor irrevocably submits to the exclusive jurisdiction of such courts for the adjudication of any dispute hereunder or in connection herewith or discussed herein, and irrevocably waives, and agrees not to assert in an Action, any claim that they are not personally subject to the jurisdiction of such court, that such Action is brought in an inconvenient forum or that the venue of such action is improper.

### 3.11    Further Assurances.

Trustor will, upon request of Beneficiary, promptly correct any error or omission which may hereafter be discovered in the contents of this Deed of Trust or in the execution or acknowledgment hereof, and will execute, acknowledge and deliver such further instruments and do such further acts as may be necessary or as may be requested by Beneficiary to impose the lien and security interests hereby created on any of Trustor's properties, rights or interests covered or intended to be covered hereby, and to perfect and maintain such lien and security interests.

### 3.12    Notices.

All notices given pursuant to this Deed of Trust shall be sufficient if given in writing and shall be deemed to have been properly given (i) upon delivery if delivered in person, (ii) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, (iii) three (3) Business Days after having been deposited in any post office or

mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, or (iv) one (1) Business Day after delivery if sent by email, provided that the recipient has acknowledged receipt by telephone and that a carbon copy of such notice is sent simultaneously by the other methods provided in this Section, addressed to the addresses set forth below in this Section or as such party may from time to time designate by written notice to the other parties. Either party by notice to the other in the manner provided herein may designate additional or different addresses for subsequent notices or communications. As used herein, the term Business Day means any day other than a Saturday or Sunday that is not a federal or State of California holiday.

> To Trustor:    Treetop Development LLC
> 9454 Wilshire Blvd, Suite 208
> Beverly Hills, CA 90212

> To Beneficiary:  Lydda Lud Lender Tree, LLC
> 287 Crescent Bay Drive
> Laguna Beach, CA 92651

### 3.13    Waiver of Jury Trial

To the fullest extent not prohibited by applicable law, Trustor and Beneficiary, each hereby (i) expressly, knowingly and voluntarily waives any right to trial by jury of any claim or cause of action arising under this Deed of Trust or in any way connected with or incidental to the dealings of the parties with respect to any loan document or the transactions contemplated thereby, whether now existing or hereafter arising, and whether sounding in contract, tort or otherwise, and (ii) agrees and consents that any such claim or cause of action shall be decided by court trial without a jury, and that any party to this Deed of Trust may file an original counterpart or a copy of this section as written evidence of the consents of the parties to the waiver of their respective rights to trial by jury. If the foregoing waiver of jury trial is determined or held to be ineffective or unenforceable, the parties agree that all claims and causes of action shall be resolved by reference to a private judge sitting without a jury, pursuant to California Code of Civil Procedure Section 638, before a mutually acceptable referee or, if the parties cannot agree, a referee selected by the presiding judge of the Superior Court of California for the County of Orange. Such proceeding shall be conducted in Orange County, California, with California rules of evidence and discovery applicable to such proceeding. If claims or causes of action are to be resolved by judicial reference, any party may seek from any court having jurisdiction thereover any prejudgment order, writ or other relief and have such prejudgment order, writ or other relief enforced to the fullest extent permitted by law notwithstanding that all claims and causes of action are otherwise subject to resolution by judicial reference. Notwithstanding the foregoing, nothing in this Section 3.13 shall limit the right of any party to exercise self-help remedies such as setoff, foreclosure against, or sale of, any real or personal property collateral or security, or to obtain provisional or ancillary remedies from a court of competent jurisdiction before, after, or during the pendency of any reference proceeding. The exercise of any one or more remedies does not waive the right of either party to resort to reference.

### 3.14    Request for Notice.  In accordance with Section 2924b of the California

Civil Code, request is hereby made by Beneficiary and Trustor that a copy of any notice of default and a copy of any notice of sale under the deed of trust recorded on October 4, 2018 as Instrument 20181013436 in the Official Records of Los Angeles County, California executed by Tree Lane, LLC, a California limited liability company, as trustor (or mortgagor), in which Skylark Capital Management, LLC, a California limited liability company is named as beneficiary (or mortgagee) be mailed to Lydda Lud Lender Tree, LLC at 287 Crescent Bay Drive, Laguna Hills, CA 92651.

    3.15   <u>Miscellaneous</u>.

The term "Beneficiary" means the original Beneficiary named herein, or any future owner and holder of the Note. The obligations of each Trustor, if more than one, are joint and several, and this Deed of Trust in all respects applies to and binds the heirs, administrators, executors, successors and assigns of Trustor. The provisions of this Deed of Trust shall apply according to the context thereof and without regard to the tense or gender of words or expressions used.

Trustor has executed this Deed of Trust as of the date first set forth above.

            Treetop Development LLC
            By Its Sole Member
            Casablanca Grand LLC, a California
            limited liability

            By: _____
            Mohamed Hadid, Sole Member &
            Manager of Casablanca Grand LLC

Certificate of Acknowledgement of Notary Public

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California,
County of ___ Los Angeles

On this _4-1-21_ before me _Thomas Gallagher_,

Notary Public, personally appeared _Mohamed Hadid_, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the state of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature of Notary _____

THOMAS GALLAGHER
Notary Public - California
Los Angeles County
Commission # 2338234
My Comm. Expires Oct 30, 2024

Re: Deed of Trust

EXHIBIT "A"

LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES IN THE COUNTY OF
LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1 (APN: 4387-022-021):

PARCEL D OF PARCEL MAP L.A. NO. 1987, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES,
STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 31, PAGE 81 OF PARCEL MAPS, IN THE OFFICE
OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM THAT PORTION OF SAID LAND BEGINNING AT THE MOST NORTHEASTERLY
CORNER OF SAID PARCEL D, SAID CORNER ALSO BEING A POINT IN THE SOUTHERLY RIGHT-OF-WAY OF
CEDARBROOK DRIVE, 34 FEET WIDE, AS SHOWN ON SAID PARCEL MAP; THENCE ALONG THE EASTERLY
LINE OF SAID PARCEL D SOUTH 02°44'22" EAST 42.36 FEET; THENCE SOUTH 27°27'10" WEST 46.00 FEET;
THENCE SOUTH 03°30'00" EAST 67.00 FEET; THENCE LEAVING SAID EASTERLY LINE AT RIGHT ANGLES TO
COLDWATER CANYON DRIVE, NORTH 89°41'30" WEST 15.00 FEET; THENCE PARALLEL TO SAID
COLDWATER CANYON DRIVE, NORTH 00°18'30" EAST 148.53 FEET TO A POINT IN SAID SOUTHERLY RIGHT OF WAY; THENCE ALONG SAID SOUTHERLY RIGHT OF WAY, NORTH 87°15'15" EAST 29.33 FEET TO THE POINT OF BEGINNING.

PARCEL 2 (APN: 4352-001-051):

LOT 4 OF TRACT NO. 10202, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF
CALIFORNIA, AS PER MAP RECORDED IN BOOK 182, PAGE 15 OF MAPS, IN THE OFFICE OF THE COUNTY
RECORDER OF SAID COUNTY.

EXCEPT THEREFROM THE SOUTHERLY 330 FEET OF SAID LOT 4.

ALSO EXCEPT THAT PORTION INCLUDED IN TRACT NO. 10926, AS PER MAP RECORDED IN BOOK 206, PAGES 37 THROUGH 41, INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID
COUNTY.

1

ALSO EXCEPT THAT PORTION OF SAID LOT 4, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF TRACT NO. 9146, IN SAID CITY,
COUNTY AND STATE, AS
RECORDED IN BOOK 187, PAGE 22 OF MAPS, IN THE OFFICE OF THE COUNTY
RECORDER OF SAID COUNTY; THENCE WESTERLY ALONG THE NORTHERLY LINE
OF SAID LOT 4 NORTH 88°59'39" WEST 156.14 FEET; THENCE SOUTHERLY, LEAVING
SAID NORTHERLY LINE ALONG A LINE THAT IS PARALLEL TO AND DISTANT 441.44
FEET EASTERLY OF THE WESTERLY LINE OF SAID LOT 4, SOUTH 00°32'49" EAST
331.64 FEET; THENCE SOUTH 88°59'52" EAST 99.75 FEET TO A POINT IN THE
WESTERLY LINE OF TRACT NO. 10926, IN SAID CITY, COUNTY AND STATE, AS PER
MAP RECORDED IN BOOK 206, PAGES 37 THROUGH 41, INCLUSIVE OF MAPS, IN
THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE NORTHERLY
ALONG THE SAID WESTERLY LINE NORTH 01°31'03" EAST 57.12 FEET; THENCE
NORTH 05°13'42" EAST 76.82 FEET; THENCE NORTH 34°26'49" EAST 120.35 FEET TO
THE BEGINNING OF A NON-TANGENT CURVE CONCAVE NORTHEASTERLY AND
HAVING A RADIUS OF 26.00 FEET, A RADIAL LINE FROM SAID POINT BEARS SOUTH
02°54'50" WEST; THENCE ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF
135°26'26" AN ARC DISTANCE OF 61.46 FEET TO A POINT IN THE WESTERLY LINE OF
SAID TRACT NO. 9146; THENCE NORTHERLY ALONG SAID WESTERLY LINE NORTH
03°03'11" WEST TO THE TRUE POINT OF BEGINNING.
SAID LAND IS ALSO SHOWN AS PROPOSED PARCEL 1 OF LOT LINE ADJUSTMENT
CASE NO. AA-2010-2234-PMEX, RECORDED OCTOBER 07, 2010 AS INSTRUMENT NO.
20101435078 OFFICIAL RECORDS.

PARCEL 3 (APN: 4352-001-044):

THAT PORTION OF TRACT NO. 9146, IN THE CITY OF LOS ANGELES, COUNTY OF
LOS ANGELES, STATE OF
CALIFORNIA, AS PER MAP RECORDED IN BOOK 187, PAGE 22 OF MAPS, IN THE
OFFICE OF THE COUNTY
RECORDER OF SAID COUNTY, LYING WEST OF THE WEST LINE OF LOT 19 OF
TRACT NO. 10926, IN THE
CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER
MAP RECORDED IN
BOOK 206, PAGES 37 THROUGH 41, INCLUSIVE OF MAPS, IN THE OFFICE OF THE
COUNTY RECORDER OF
SAID COUNTY.

PARCEL 4 (APN: 4352-001-047):

THE SOUTHERLY 330 FEET OF LOT 4 OF TRACT NO. 10202, IN THE CITY OF LOS
ANGELES, COUNTY OF LOS
ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 182, PAGE 15
OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

2

EXCEPT THAT PORTION OF SAID LOT INCLUDED WITHIN TRACT NO. 10926, IN THE
CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER
MAP RECORDED IN BOOK 206, PAGES 37 THROUGH 41, INCLUSIVE OF MAPS, IN
THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 5 (APN: 4387-025-001):

THE SOUTH HALF OF THE SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER
OF SECTION 1,
TOWNSHIP 1 SOUTH, RANGE 15 WEST, SAN BERNARDINO MERIDIAN, IN THE CITY
OF LOS ANGELES,
COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL
PLAT OF THE SURVEY
OF SAID LAND ON FILE IN THE BUREAU OF MANAGEMENT.

EXCEPT THE EASTERLY 20 FEET THEREOF, CONVEYED TO THE COUNTY OF LOS
ANGELES FOR PUBLIC
RECORDS.

ALSO EXCEPT THE WESTERLY 10 FEET OF THE EASTERLY 30 FEET THEREOF.

ALSO EXCEPT THAT PORTION OF SAID SOUTH HALF INCLUDED WITHIN THE LINES
OF THE TRACT NO.
12321, AS PER MAP RECORDED IN BOOK 320, PAGES 18 AND 19 OF MAPS, IN THE
OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 6 (APN: 4387-026-012):

LOT 12 OF TRACT NO. 12321, IN THE CITY OF LOS ANGELES, COUNTY OF LOS
ANGELES, STATE OF
CALIFORNIA, AS PER MAP RECORDED IN BOOK 320, PAGES 18 AND 19 OF MAPS, IN
THE OFFICE OF THE
COUNTY RECORDER OF SAID COUNTY.

# EXHIBIT B

**LOAN AGREEMENT**

dated as of July 31, 2018

between

**TREETOP DEVELOPMENT, LLC,**
a California limited liability company,
as Borrower

and

**SKYLARK CAPITAL MANAGEMENT, LLC,**
a California limited liability company,
as Lender

# TABLE OF CONTENTS

**Page**

ARTICLE 1 CERTAIN DEFINITIONS. ..................................................................................1

ARTICLE 2 THE LOAN; INTEREST RATE; PAYMENTS.................................................16
    Section 2.1    Evidence of Loan ...........................................................................16
    Section 2.2    Advance of the Loan; Loan Origination Fee; Holdbacks. ...........17
    Section 2.3    Interest Rate. .................................................................................18
    Section 2.4    Past Due Charge and Default Interest Rate...................................19
    Section 2.5    Payment of Interest .......................................................................19
    Section 2.6    Maturity Date. ...............................................................................19
    Section 2.7    Prepayment. ...................................................................................20
    Section 2.8    Indebtedness Absolute; No Offset; Waiver. .................................21
    Section 2.9    Lawful Limits.................................................................................22
    Section 2.10    Increased Costs; Capital Adequacy. .............................................22
    Section 2.11    Partial Release of Collateral.........................................................24
    Section 2.12    Extension of Maturity Date...........................................................25

ARTICLE 3 ACCOUNTS AND RESERVES ........................................................................26
    Section 3.1    Security Grant. ...............................................................................26
    Section 3.2    Reserves. .......................................................................................27

ARTICLE 4 CONDITIONS TO DISBURSEMENTS ...........................................................29
    Section 4.1    Conditions to Initial Advance. ......................................................29
    Section 4.2    Conditions to Additional Advances. .............................................30

ARTICLE 5 CONSTRUCTION...............................................................................................31
    Section 5.1    Borrower's Construction Responsibilities. ...................................31
    Section 5.2    Liens and Stop Notices. .................................................................31
    Section 5.3    Compliance with Plans and Specifications. ..................................32
    Section 5.4    Contractor Information. .................................................................32
    Section 5.5    Prohibited Contracts......................................................................33
    Section 5.6    Inspections. ....................................................................................33
    Section 5.7    Delivery of Final Plans and Specifications; As-Built Survey........33
    Section 5.8    Fees. ..............................................................................................33

ARTICLE 6 REPRESENTATIONS AND WARRANTIES....................................................34
    Section 6.1    Representations and Warranties.....................................................34
    Section 6.2    Continuation of Representations and Warranties. .........................40

ARTICLE 7 BORROWER COVENANTS...............................................................................41
    Section 7.1    Performance of Obligations. ..........................................................41
    Section 7.2    Existence; Compliance with Legal Requirements. ........................41
    Section 7.3    Single Purpose Entity....................................................................41
    Section 7.4    ERISA..............................................................................................41

Section 7.5     Defense and Notice of Actions and Certain Other Events ..............................42
Section 7.6     Right of Inspection; Due Diligence ................................................42
Section 7.7     Liens..........................................................................43
Section 7.8     Further Assurances; Supplemental Affidavits. ....................................43
Section 7.9     Financial Reporting............................................................43
Section 7.10    Taxes. ........................................................................45
Section 7.11    Insurance. ....................................................................46
Section 7.12    Disposition of Insurance and Condemnation Proceeds and Damages.............48
Section 7.13    Maintenance and Preservation of the Property. ..................................50
Section 7.14    Borrower Improvements; Construction Activities...............................51
Section 7.15    Phase II Existing Debt. ........................................................51
Section 7.16    Proceedings to Enjoin..........................................................52
Section 7.17    Distributions...................................................................52
Section 7.18    Transfer or Encumbrance of the Property........................................52
Section 7.19    Leases.........................................................................52
Section 7.20    Prohibition Against Additional Recordings.......................................53
Section 7.21    Change in Name................................................................53
Section 7.22    Debt Cancellation; Settlement of Claims........................................53
Section 7.23    Affiliate Transactions..........................................................53
Section 7.24    Limitation on Issuance of Equity Interests. .....................................53
Section 7.25    Compliance. ..................................................................53
Section 7.26    Anti-Terrorism; OFAC; Patriot Act.............................................54
Section 7.27    Material Contracts.............................................................54
Section 7.28    Limitation on Debt.............................................................54
Section 7.29    Changes in Approved Construction Budget. .....................................55
Section 7.30    Hazardous Materials Covenants. ...............................................55
Section 7.31    In-Balance. ...................................................................55

ARTICLE 8 DEFAULTS .............................................................................56
Section 8.1     Event of Default................................................................56
Section 8.2     Remedies Conferred upon Lender. ..............................................60
Section 8.3     Right of Lender to Make Advances to Cure Event of Defaults;
                Obligatory Advances. ..........................................................61
Section 8.4     Payment of Costs, Expenses and Attorneys' Fees................................61
Section 8.5     Remedies Cumulative; No Waiver. ..............................................61
Section 8.6     Severance. ....................................................................62
Section 8.7     Default Rate ..................................................................63

ARTICLE 9 MISCELLANEOUS .......................................................................63
Section 9.1     Notices .......................................................................63
Section 9.2     Reimbursement for Expenses ...................................................64
Section 9.3     Indemnity. ....................................................................64
Section 9.4     Amendments and Waivers ......................................................65
Section 9.5     Invalid Provisions .............................................................66
Section 9.6     Loan Agreement Provisions Control over Other Instruments .....................66
Section 9.7     Approvals; Third Parties; Conditions ...........................................66
Section 9.8     Lender Not in Control; No Partnership..........................................66

Section 9.9    Time of the Essence ........................................................................67
Section 9.10    Successors and Assigns....................................................................67
Section 9.11    Renewal, Extension or Rearrangement............................................67
Section 9.12    Cumulative Rights ...........................................................................67
Section 9.13    Singular and Plural; Phases; Construction .......................................68
Section 9.14    Exhibits; Schedules; and Recitals ....................................................68
Section 9.15    Titles of Articles, Sections and Subsections ....................................68
Section 9.16    Survival ............................................................................................68
Section 9.17    Representation by Legal Counsel .....................................................69
Section 9.18    Waiver of Jury Trial .........................................................................69
Section 9.19    Governing Law .................................................................................69
Section 9.20    Waivers .............................................................................................69
Section 9.21    Entire Agreement .............................................................................70
Section 9.22    Injunctive Relief...............................................................................70
Section 9.23    Counterparts......................................................................................70
Section 9.24    Refinance of Phase II Existing Loan. ..............................................70
Section 9.25    Assignments, Participations, and Syndications ...............................71
Section 9.26    Limitation on Liability of Lender's Members, Employees, Etc. ......74
Section 9.27    Confidentiality and Publicity ...........................................................74
Section 9.28    Estoppel Certificates ........................................................................75
Section 9.29    Retention of Servicer .......................................................................75
Section 9.30    Taxes.................................................................................................76

## EXHIBITS

Exhibit A    Legal Description of Property

Exhibit B    Draw Procedures and Conditions to Disbursements

Exhibit C    Single Purpose Entity Provisions

Exhibit D    Insurance Policies

Exhibit E    List of Loan Documents and Other Documents

Exhibit F    Refinance Term Sheet

## SCHEDULES

Schedule I      Environmental Reports

Schedule II     Borrower's Organizational Chart

## LOAN AGREEMENT

LOAN AGREEMENT dated as of July 31, 2018 (this "**Agreement**") between **TREETOP DEVELOPMENT, LLC,** a California limited liability company ("**Borrower**"), and **SKYLARK CAPITAL MANAGEMENT, LLC,** a California limited liability company, together with its successors and assigns ("**Lender**").

## R E C I T A L S

WHEREAS, Borrower has requested that Lender make a loan in the maximum principal amount of up to Ninety-Two Million Seven Hundred Seventy-Five Thousand and No/100 Dollars ($92,775,000.00) (the "**Loan**") to be secured by, among other things, a first lien deed of trust on that certain real property legally described on **Exhibit A** attached hereto; and

WHEREAS, Lender has agreed to make the Loan upon completion of Lender's standard legal and business due diligence, satisfaction by Borrower of all the conditions precedent set forth herein and receipt of final Loan Documents, each acceptable to Lender and Borrower.

NOW, THEREFORE, in consideration of the above recitals and for other good and valuable consideration, Lender and Borrower hereby agree as follows.

## ARTICLE 1

## CERTAIN DEFINITIONS.

As used herein, the following terms have the meanings indicated:

"**Affiliate**" means, with respect to any Borrower Party: (i) any Borrower Party, or (ii) any Person that directly or indirectly (a) owns more than ten percent (10%) of, or (b) is Controlling, Controlled by, or under direct or indirect common Control with, Borrower or any Borrower Party, or (iii) any director, officer, employee, manager, child or spouse (or any trust for the benefit of a child or spouse) of any Person described in subsection (i) or (ii) above. The term "**Affiliate**" when used with reference to Lender means any entity that Controls, is Controlled by, or is under direct or indirect common Control with, Lender.

"**Agreement**" is defined in the introductory paragraph of this Agreement.

"**Alteration**" has the meaning given to such term in Section 7.13(b).

"**Appraisal**" means a written statement independently and impartially prepared by a qualified appraiser, setting forth an opinion as to the "**as-is**" market value of the applicable Property that is (i) dated not more than sixty (60) days prior to the applicable date of calculation required pursuant to the terms of this Agreement, (ii) addressed to Lender, its successors and assigns, and (iii) made in compliance with the requirements of Title XI of the Federal Institution Reform, Recovery, and Enforcement Act of 1989 and the Uniform Standards of Professional Appraisal Practice which are maintained by the Appraisal Standards Board of the Appraisal Foundation. As used herein, an Appraisal shall also mean any written supplement or update of a prior Appraisal, that otherwise satisfies the conditions set forth in this definition.

1

"**Approved Accounting Method**" means GAAP or any other method of accounting utilized by Borrower and approved by Lender, consistently applied.

"**Approved Construction Budget**" has the meaning given to such term in Section 4.2(a)(v).

"**Architect**" means IR Architects and any other architect for the Project approved by Lender.

"**Assignment of Agreements**" means that certain Assignment of Agreements made by Borrower in favor of Lender of even date herewith, as the same may be amended, restated, or supplemented or otherwise modified from time to time.

"**Assignment of Construction Documents**" means that certain Assignment of Construction Agreements made by Borrower in favor of Lender of even date herewith and consented to by Contractor, Architect and Engineer, as the same may be modified, amended or restated from time to time.

"**Balance Reserve Account**" has the meaning given to such term in Section 7.31.

"**Bank Products Agreement**" means any agreement to provide cash management services, including treasury, depository, overdraft, credit or debit card, electronic funds transfer and other cash management or depositary arrangements entered into between Borrower and a Lender or an Affiliate of Lender, in its separate capacity as a provider of such cash management services provided for in such Bank Products Agreement.

"**Bankruptcy Proceeding**" has the meaning given to such term in Section 8.1(f)(i).

"**Borrower**" has the meaning given to such term in the introductory paragraph.

"**Borrower Funded Interest Reserve**" has the meaning given to such term in Section 3.2(c).

"**Borrower Funded Phase II Interest Reserve**" has the meaning set forth in Section 3.2(b).

"**Borrower Funded Site Improvements Holdback**" has the meaning given to such term in Section 2.2(c)(ii).

"**Borrower Improvements**" means any capital or other improvements contemplated to be constructed by Borrower at the Property as permitted hereunder and in accordance with the Approved Construction Budget, including, without limitation, the construction of a eighty thousand (80,000) square foot single-family home.

"**Borrower Party**" means Borrower, Parent and the Guarantor.

"**Business Day**" means (i) any day that is not a Saturday, Sunday or other day on which commercial banks in California are authorized or required by law to remain closed and (ii) with respect to all notices, determinations, fundings and payments in connection with the LIBOR Rate,

2

the term "**Business Day**" means any day which is a business day described in clause (i) and which is also a day for trading by and between banks in dollar deposits in the London interbank market.

"**Change in Law**" means (i) the adoption of any law, rule or regulation after the Closing Date, (ii) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (iii) compliance by Lender (or, for purposes of Section 2.10 by any lending office of Lender or by its holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date. It is expressly agreed that any regulation, letter ruling or other determination impacting or affecting the implementation of the Dodd-Frank Wall Street Reform and Consumer Protection Act, as the same is now or hereafter amended, is deemed a Change in Law.

"**Claims**" means any and all liabilities, obligations, losses, damages, penalties, claims, actions, litigation, proceedings, investigations, judgments, suits, fees, costs, expenses, charges, advances and disbursements of any kind (including, without limitation, fees, costs, expenses and charges of counsel).

"**Closing**" means the consummation of the Loan on the Closing Date upon satisfaction of the conditions thereto as determined by Lender in its sole discretion.

"**Closing Date**" means the date of this Agreement.

"**Closing Instruction Letter**" means that certain letter and escrow agreement from Lender's legal counsel, as acknowledged by Lender, Borrower and Title Company.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended (or any corresponding provision or provisions of any succeeding law).

"**Collateral**" means all collateral now or hereafter securing or intended to secure the Obligations, including the Property and all other property and assets of Borrower and all other property in which a lien has been granted to Lender pursuant to any of the Loan Documents.

"**Commencement Date**" means the date by which Borrower shall have caused Contractor to commence construction of the Borrower Improvements, which shall be no later than October 31, 2018.

"**Complete**", "**Completed**" and "**Completion**" each means, as the context requires, the substantial completion of the applicable Borrower Improvements, as the case may be, free and clear of all liens, subject only to the following: (i) (a) Lender's receipt of a written certificate executed by a licensed contractor approved by Lender certifying, without qualification or exception (other than being conditioned only upon receipt of payment), that the construction of the applicable Borrower Improvements is complete, except for minor (as reasonably determined by Lender) "**punch list**" items, (b) Lender's receipt of all required occupancy permits or equivalent issued by the local government agency having jurisdiction and authority to issue the same, if required to be issued, to permit Borrower to open business and operate the Property as a creative office building, and (c) the expiration of any statutory periods within which valid

3

mechanic's liens, materialman's liens and/or stop notices may be recorded and/or served by reason of the applicable Borrower Improvements, as the case may be, pursuant to a "**Notice of Completion**" or by statute or, alternatively, Lender's receipt of valid unconditional and recordable releases (or conditioned only upon payment) thereof from all Persons entitled to record said liens and/or serve stop notices; or (ii) Lender's receipt of such other evidence of lien-free completion of the applicable Borrower Improvements, as the case may be, as Lender deems satisfactory in Lender's sole and absolute discretion.

"**Completion Date**" means the date by which Borrower is obligated to cause the construction of the Borrower Improvements to be Completed in accordance with this Agreement, which shall be no later than July 31, 2020.

"**Confidential Information**" has the meaning given to such term in <u>Section 9.27(b)</u>.

"**Contingent Interest**" means twenty-five percent (25%) of the Net Sale Proceeds of all or any portion of the Property. "**Contingent Interest**" shall be in addition to (and not included in) interest accrued on the Loan at the Contract Rate and/or other amounts payable by Borrower hereunder and under the Note and the other Loan Documents, and shall be payable as additional interest on the Loan.

"**Construction Contract**" means a construction contract between Borrower and Contractor relating to the construction of the Borrower Improvements, in form and substance satisfactory to Lender in its sole and absolute discretion, to be entered into after the Closing Date and prior to the Commencement Date.

"**Construction Costs Holdback**" has the meaning given to such term in <u>Section 2.2(c)(i)</u>.

"**Construction Gap Funds**" has the meaning given to such term in <u>Section 7.31</u>.

"**Contract Rate**" means a rate per annum equal to the LIBOR Margin plus the LIBOR Rate.

"**Contractor**" means a California-licensed general contractor selected by Borrower and approved by Lender in its sole and absolute discretion.

"**Control**" and any derivative of such term, including "**Controlling**" and "**Controlled**", means, when used with respect to any Person, (i) the direct or indirect beneficial ownership of fifty-one percent (51%) or more of the outstanding voting securities or voting equity of such Person or (ii) the power to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"**Cost Savings**" means either (i) the completion (as determined by Lender in its reasonable discretion) of any line item in the Approved Construction Budget without the expenditure of all amounts allocated to such line item in the Approved Construction Budget (whether within a particular phase of construction or between phases of construction), or (ii) demonstration by Borrower to Lender's reasonable satisfaction that a cost savings has been, or is reasonably likely to be, realized with respect to any uncompleted line item in the Approved

Construction Budget (whether within a particular phase of construction or between phases of construction).

"**Covered Taxes**" has the meaning given to such term in Section 9.30(a).

"**Debt**" means, for any Person, without duplication: (i) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property or services for which such Person or its assets is liable, (ii) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable, if such amounts were advanced under such loan agreement or credit facility or if such letter of credit was issued, (iii) all amounts required by such Person as a guaranteed payment to partners or a preferred or special dividend, including any mandatory redemption of shares or interests, (iv) all indebtedness guaranteed by such Person, directly or indirectly, (v) all obligations under leases (including capital leases) for which such Person is liable, and (vi) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

"**Debt Service**" means, for any period of time, the sum of all scheduled principal (if any) and interest payments on the Loan that are due and payable during such period of time.

"**Default**" means the occurrence of any event, circumstance or condition which constitutes a breach of or a default under any Loan Document and which, after the giving of any required notice and/or the passage of any applicable cure period, would constitute an Event of Default under this Agreement or any other Loan Document.

"**Default Rate**" means a rate per annum equal to the lesser of (i) five percent (5%) over the Contract Rate, or (ii) the maximum rate of interest permitted to be charged by applicable laws or regulation governing this Agreement until paid, such additional interest to be compounded monthly.

"**Disbursement Request**" and "**Disbursement Requests**" have the meaning given to such terms in Paragraph (a) of **Exhibit B** hereto.

"**Distribution**" means any distribution of cash by Borrower to any Person having any direct or indirect legal or beneficial interest in Borrower, pursuant to such Person's interest in Borrower. "**Distribute**" shall mean the act of making a Distribution.

"**Engineer**" means an engineer for the Project selected by Borrower and approved by Lender in its sole and absolute discretion.

"**Environmental Indemnity**" means that certain Environmental Indemnity Agreement dated as of even date herewith executed by Borrower and Guarantor for the benefit of Lender, as the same may be amended, restated, supplemented or otherwise modified from time to time. The obligations under the Environmental Indemnity are not secured by the Liens granted in the Loan Documents.

"**Environmental Proceedings**" has the meaning given to such term in 0.

"**Environmental Reports**" means collectively the reports identified on <u>Schedule I</u> attached hereto.

"**Equity Interests**" means, with respect to any Person, its equity ownership interests, its membership interests, its common stock and any other capital stock or other equity ownership units of such Person authorized from time to time, and any other shares, options, interests, participations or other equivalents (however designated) of or in such Person, direct or indirect and whether voting or nonvoting, including, without limitation, common stock, options, warrants, preferred stock, phantom stock, membership units (common or preferred), stock appreciation rights, membership unit appreciation rights, convertible notes or debentures, stock purchase rights, membership unit purchase rights and all securities convertible, exercisable or exchangeable, in whole or in part, into any one or more of the foregoing.

"**ERISA**" has the meaning given to such term in <u>Section 6.1(o)</u>.

"**Event of Default**" has the meaning given to such term in <u>Section 8.1</u>.

"**Exit Fee**" means, in connection with a prepayment of the Loan in full to be made on any date of determination, an amount equal to the product of (a) the portion of the Borrower Funded Interest Reserve which has not been utilized on or prior to such date to pay Debt Service in respect of the Loan in accordance with <u>Section 3.2(c)</u> hereof *multiplied by* (b) a fraction the numerator of which is the portion of the Holdbacks that remains unfunded on such date, and the denominator of which is $92,775,000.00. If no portion of the Holdbacks remains unfunded on such date, then the Exit Fee shall be zero (-0-) in connection with a prepayment in full of the Loan on such date.

"**First Extended Maturity Date**" means January 29, 2021, or such earlier date on which the final payment of principal of the Loan becomes due and payable as herein provided, whether by declaration of acceleration, or otherwise.

"**Federal Bankruptcy Code**" means Title 11 of the United States Code, as may be amended from time to time or any successor statute.

"**First Subsequent Advance**" means the first disbursement from either the Construction Costs Holdback or Borrower Funded Site Improvements Holdback following the Initial Advance.

"**Fixtures**" has the meaning given to such term in the Security Instrument.

"**Fourth Extended Maturity Date**" means July 29, 2022, or such earlier date on which the final payment of principal of the Loan becomes due and payable as herein provided, whether by declaration of acceleration, or otherwise.

"**GAAP**" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the

6

accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"**Governmental Authority**" means any federal, state, foreign, county, city, or municipal government, or political subdivision thereof, any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality or public body, or any court or administrative tribunal, whether now or hereafter in existence, and that has jurisdiction over any Borrower Party or the Property.

"**Guarantor**" means individually and collectively, and jointly and severally, Sponsor, Parent and any other Person who now or hereafter guarantees any or all of the Obligations. Wherever the term Guarantor is used said term shall mean, as applicable, each one or more of the Persons who comprise Guarantor.

"**Guaranty**" means, individually and collectively, (i) that certain Indemnity Agreement dated as of even date herewith executed by each Guarantor in favor of Lender, (ii) that certain Completion Guaranty dated as of even date herewith executed by each Guarantor in favor of Lender, and (iii) any other guaranty agreement executed and delivered by any Guarantor or any other Person in favor of Lender in connection with the Loan, as each may be modified, amended or restated from time to time.

"**Hazardous Materials**" means any chemical, substance, object, condition, material or waste that is or may be hazardous to human health or safety or to the environment, due to its radioactivity, ignitability, corrosivity, flammability, toxicity, infectiousness or other harmful properties or effects, including all chemicals, substances, materials and wastes that are now or hereafter may be regulated in any manner, classified as dangerous, hazardous or toxic, or as pollutants or contaminants, or to which exposure is prohibited or restricted by any federal, state or local government or public agency, board, body or authority or by any Hazardous Materials Law. Hazardous Materials include flammable explosives, radioactive materials, polychlorinated biphenyls, asbestos, mold, radon, toxic substances (including, without limitation, Toxic Mold) or other related materials whether in the form of a chemical, element, compound, solution, mixture or otherwise, including those materials defined as "**hazardous substances**", "**hazardous materials**", "**toxic substances**", "**air pollutants**", "**toxic pollutants**", "**hazardous wastes**", "**extremely hazardous waste**" or "**restricted hazardous waste**" by any Hazardous Materials Law. "**Hazardous Materials**" shall not include commercially reasonable amounts of such materials used in the ordinary course of operation of the Property which are used and stored at all times in accordance with all then applicable Hazardous Materials Laws.

"**Hazardous Materials Claims**" shall have the meaning given to such term in Section 7.30(c).

"**Hazardous Materials Law**" means any federal, state, or local law, ordinance or regulation or any rule adopted or guideline promulgated pursuant thereto, or any order, ruling or directive of any federal, state, local, executive, judicial, legislative, administrative or other governmental or public agency, board, body or authority relating to health (including Toxic Mold), industrial hygiene, the environment, or the occupational or environmental conditions on, under or about the subject Property (including ambient air, soil, soil vapor, groundwater, surface water or land use), whether now or hereafter in force, including those relating to the release,

7

emission or discharge of Hazardous Materials, those in connection with the construction, fuel supply, power generation and transmission, waste disposal or any other operations or processes relating to the subject Property. Hazardous Materials Law shall include, but not be limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Emergency Planning and Community Right-to-Know Act, the Hazardous Materials Transportation Act, the Resource Conservation and Recovery Act, the Solid Waste Disposal Act, the Clean Water Act and the Clean Air Act, the Safe Drinking Water Act, and all applicable laws of the state where the Property is located.

"**Holdbacks**" means, collectively, the Construction Costs Holdback and the Borrower Funded Site Improvements Holdback.

"**Improvements**" means any building, structures, Fixtures and other improvements now or hereafter located on the Land of the Property and which are owned by Borrower.

"**In-Balance**" has the meaning given to such term in Section 7.31.

"**Increased Cost Payment Date**" has the meaning given to such term in Section 2.10(d).

"**Indebtedness**" means, for Borrower, without duplication, the principal of and accrued interest on the Loan, any Prepayment Premium or Exit Fee which has become due and payable in accordance herewith, and other all present and future indebtedness, whether direct or contingent, funded or unfunded, evidenced by or arising under this Agreement with respect to the Loan, or under any other Loan Document, together with interest thereon as provided herein or therein and all other sums due to Lender in respect of the Loan under any Loan Document (including sums added to the principal balance of the Loan in accordance with the terms of any Loan Document, all Protective Advances, Past Due Charges, Loan Expenses and all other charges, fees, costs and expenses payable pursuant to any Loan Document).

"**Indemnified Liabilities**" has the meaning given to such term in Section 9.3(a).

"**Independent Manager**" has the meaning given to such term in Paragraph (ii)(ii) of **Exhibit C** hereto.

"**Initial Advance**" has the meaning given to such term in Section 2.2(a).

"**Initial Construction Costs**" has the meaning given to such term in Section 4.2(a)(i).

"**Initial Maturity Date**" means July 31, 2020.

"**Land**" means, individually and collectively, each of those certain parcels of real estate legally described in **Exhibit A** to this Agreement, together with all easements and other rights appurtenant thereto.

"**Lease**" means any lease, license or agreement for use of all or any part of the Property.

"**Legal Requirements**" means all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Borrower, any Guarantor or the Property or any part thereof or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, including, without limitation, the Americans with Disabilities Act of 1990, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower or any Guarantor at any time in force affecting Borrower, any Guarantor or the Property or any part thereof, including, without limitation, any which may (i) require repairs, modifications or alterations in or to the Property or any part thereof, or (ii) in any way limit the use and enjoyment thereof.

"**Lender**" is defined in the introductory paragraph of this Agreement.

"**Lender's Construction Consultant**" means any Person retained by Lender, in its sole discretion, as a construction consultant in relation to the Property.

"**LIBOR Margin**" means eight and ten hundredths percent (8.10%) per annum.

"**LIBOR Rate**" means a daily fluctuating rate per annum equal to the rate of interest which is identified and normally published by Bloomberg Professional Service page USD-LIBOR-ICE as the offered rate for loans in United States dollars for a one (1) month period, rounded upwards, if necessary, to the nearest $1/100^{th}$ of one percent (0.01%). Such rate for any day shall be the rate set by the ICE Benchmark Administration as of 11:00 a.m. (London time) on such day (or if such day is not a Business Day, then as of the most recent Business Day). If Bloomberg Professional Service (or another nationally-recognized rate reporting source acceptable to Lender) no longer reports the LIBOR Rate or Lender determines in good faith that the rate so reported no longer accurately reflects the rate available to Lender in the London Interbank Market or if such index no longer exists or if page USD-LIBOR-ICE no longer exists or accurately reflects the rate available to Lender in the London Interbank Market, Lender may select a replacement index or replacement page, as the case may be. Notwithstanding the foregoing, in no event shall the LIBOR Rate be an amount less than the one-month LIBOR Rate determined on the Business Day prior to the Closing Date and two and seven hundredths percent (2.07%).

"**Lien**" means any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, preference, assignment, security interest or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting all or any part of the Property or any interest therein, or any direct interest in Borrower, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances recorded or file against, or otherwise encumbering, the Property or any portion thereof. "**Lien**" shall not include any Permitted Exceptions.

"**Loan**" has the meaning given to such term in the Recitals.

"**Loan Documents**" mean: this Agreement; the Note; each Guaranty; the Contingent Interest Agreement; the Memorandum of Understanding; the Environmental Indemnity; the Security Instrument; the Assignment of Agreements; the Assignment of Construction Documents; the Post-Closing Letter Agreement; the Pledge Agreements; the Uniform Commercial Code financing statements; such assignments of management agreements, brokerage agreements, contracts and other rights as may be required or otherwise requested by Lender; and all other documents evidencing, securing, governing or otherwise pertaining to the Loan and the other Obligations, including but not limited to any Note executed by Borrower, any post-closing agreement by and between Borrower and Lender and all amendments, restatements, modifications, renewals, substitutions and replacements of any of the foregoing.

"**Loan Expenses**" mean all amounts described in Section 9.2 of this Agreement and any other costs or expenses identified as Loan Expenses in this Agreement or any other Loan Document.

"**Loan Origination Fee**" has the meaning given to such term in Section 2.2(b).

"**Loan Proceeds**" mean all amounts advanced as part of the Loan, whether advanced directly to Borrower or otherwise.

"**Loan to Value Ratio**" means, as of any date of determination, the ratio computed as follows: (i) the numerator of the ratio shall be equal to the sum of outstanding principal balance of the Loan plus any unfunded portion of the Holdbacks; and (ii) the denominator of the ratio shall be the aggregate "**as is**" value of the Property.

"**Major Change Order**" has the meaning given to such term in Section 5.3(a).

"**Management Fee**" means any fee paid to a Property Manager pursuant to any Property Management Agreement.

"**Material Adverse Change**" means any development, event, condition, obligation, liability or circumstance or set of events, conditions, obligations, liabilities or circumstances or any change(s) which, as determined by Lender in good faith:

    (i)     has prevented, impeded or limited, or could reasonably be expected to prevent, impede or limit, the enforceability or validity of any Loan Document, the perfection or priority of any Lien created under any Loan Document or the remedies of Lender under any Loan Document;

    (ii)    has been, or reasonably could be expected to be, material and adverse to the ownership, use, enjoyment or value of any material portion of the Collateral or to the business, operations, prospects, properties, assets, liabilities or condition (financial or otherwise) of Borrower or any Guarantor; or

    (iii)    has materially impaired, or reasonably could be expected to materially impair, the ability of Borrower or any Guarantor to pay or perform any of its respective Obligations under the Loan Documents.

"**Material Contract**" means the Property Management Agreement (if any), the Construction Contract and each other contract and agreement relating to the ownership, management, development, use, operation, leasing, maintenance, repair or improvement of the Property or any other contract and/or agreement that provides for payments to or by Borrower in excess of One Hundred Thousand and No/100 Dollars ($100,000.00) per annum or that is otherwise material to the ownership of the Property or to Borrower.

"**Maturity Date**" means the Initial Maturity Date (as such Maturity Date may be extended pursuant to Section 2.12 hereof), or such earlier date on which the final payment of principal of the Loan becomes due and payable as herein provided, whether by declaration of acceleration, or otherwise.

"**Member Cessation Event**" has the meaning given to such term in **Exhibit C**.

"**Memorandum of Understanding**" means that certain Memorandum of Understanding dated as of even date herewith executed by Mohamed Hadid, an individual, and Lender.

"**Monthly Payment Date**" means the first (1st) day of each calendar month (or, if such first (1st) day is not a Business Day, then the first Business Day thereafter).

"**New Lending Office**" has the meaning given to such term in Section 9.30(f).

"**Net Sale Proceeds**" mean, in the event of a sale (as such term is used in the context of a "Transfer", as defined herein) of the Property (or any portion thereof), the amount equal to (i) the sum of the gross proceeds paid or credited to Borrower on account of any such sale (together with the gross proceeds of any prior sale of any portion of the Property), plus the sum of the cash balances in the Reserves, minus (ii) the sum of the following: (A) the then unpaid principal balance of the Loan; plus (B) the aggregate amount of deposits made by or on behalf of Borrower into the Balance Reserve Account pursuant to Section 7.31 hereof; plus (C) actual real estate commissions, if any, paid by Borrower to third party brokers (which are not Affiliates or otherwise related to Borrower, Parent or Sponsor) in connection with such sale(s), in an amount not to exceed reasonable, ordinary, and customary commissions for properties similar to the Property in the City of Los Angeles California; plus (D) ordinary, customary and reasonable closing costs incurred in connection with such sale(s) of a type and in an amount normally paid by a seller of residential property in the City of Los Angeles, California (including actual title policy costs, the cost of a survey, transfer taxes, recording fees, escrow charges, and reasonable seller's attorneys' fees), which are paid by Borrower to third parties who are not Affiliates of or otherwise related to Borrower, Parent or Sponsor; provided, however, that the maximum aggregate amount which may be deducted from the gross proceeds pursuant to items (ii) (C) and (ii) (D) above shall not exceed five percent (5%) of the gross proceeds of the sale(s) for the purpose of determining Net Sale Proceeds, unless otherwise approved in writing by Lender.

"**Note**" means any promissory note or notes, in form and substance satisfactory to Lender in its sole discretion, executed and delivered by Borrower and payable to the order of Lender, in an aggregate principal amount equal to the stated principal amount of the Loan.

11

"**Obligations**" means the Indebtedness and all other obligations (other than payment of the Indebtedness) of Borrower or any Borrower Party under any of the Loan Documents or under any Bank Products Agreement.

"**Obligors**" has the meaning given to such term in Section 2.8.

"**OFAC**" shall mean the U.S. Department of Treasury's Office of Foreign Asset Control.

"**Other Taxes**" has the meaning given to such term in Section 9.30(b).

"**Parent**" means Casablanca Grand LLC, a California limited liability company which is wholly-owned by Sponsor.

"**Parent Pledge Agreement**" means that Pledge Agreement dated as of the date hereof, executed by Parent, as pledgor, in favor of Lender, as the same may be modified, amended or restated from time to time.

"**Partial Release**" means release of Lender's Lien on the Release Property, to the extent applicable.

"**Participant**" has the meaning given to such term in Section 9.25(b).

"**Past Due Charge**" has the meaning given to such term in Section 2.4.

"**Patriot Act**" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Title III of Pub. L. 107-56 (signed into law October 26, 2001), as amended.

"**Permitted Debt**" has the meaning given to such term in Section 6.1(s).

"**Permitted Discretion**" means a determination or judgment made in good faith in the exercise of reasonable (from the perspective of a secured lender) credit or business judgment.

"**Permitted Exceptions**" mean and includes (i) applicable zoning and building ordinances and land use regulations existing as of the date hereof, (ii) the lien of taxes and assessments for the year 2018 and subsequent years not yet due and payable, (iii) any documents or matters listed on Schedule B of the Title Policy with respect to the Property, as approved by Lender, (iv) any Liens in favor of Lender, and (v) easements and encumbrances otherwise permitted under Section 7.20.

"**Person**" means any individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity.

"**Personal Property**" means the tangible personal property described in each Security Instrument.

"**Phase I Second Home Site**" means one or more unimproved parcel(s) of land included in the Property in which no development (other than improvements that are not material and/or are temporary in nature) has occurred and in which no development is scheduled to occur on or prior to the Maturity Date.

"**Phase II Borrower(s)**" has the meaning given to such term in Section 9.24(a).

"**Phase II Existing Loan**" means that certain loan in the maximum principal amount of Twenty-Five Million and No/100 Dollars ($25,000,000.00) made pursuant to a loan agreement dated March 17, 2017 among Coldwater Development LLC, a California limited liability company, and Lydda Lud, LLC, a California limited liability company, collectively as borrower, and Romspen California Mortgage Limited Partnership, an Ontario limited partnership, as lender.

"**Phase II Refinancing Loan**" has the meaning given to such term in Section 9.24(a).

"**Phase II Refinancing Loan Documents**" means the loan agreement which shall be entered into between or among the Phase II Borrower(s) and Lender in connection with the Phase II Refinancing Loan if and when such loan is made pursuant to Section 9.24 hereof, in substantially the form of **Annex 1 to Exhibit F** hereto, together with the promissory note of even date therewith executed by Phase II Borrowers and payable to the order of Lender in the principal amount of the Phase II Refinancing Loan and secured by, among other things, the deed(s) of trust with respect to the Phase II Parcels made by Phase II Borrowers, to the trustee named therein, for the benefit of Lender, and all other documents evidencing, securing, governing or otherwise pertaining to the Phase II Refinancing Loan.

"**Plans and Specifications**" has the meaning set forth in Section 5.1 of this Agreement.

"**Pledge Agreements**" means, collectively, the Sponsor Pledge Agreement and Parent Pledge Agreement.

"**Policy**" or "**Policies**" has the meaning given to such term in Paragraph (d) of **Exhibit D**.

"**Prepayment Premium**" means, in connection with a prepayment of the Loan in whole or in part to be made on any date of determination, an amount equal to the product of (a) the portion of the Borrower Funded Interest Reserve which has not been utilized on or prior to such date to pay Debt Service in respect of the Loan in accordance with Section 3.2(c) hereof *multiplied by* (b) a fraction the numerator of which is the principal amount of the Loan to be prepaid on such date, and the denominator of which is $92,775,000.00.

"**Proceeding**" has the meaning given to such term in Section 9.3(c).

"**Project**" means the eighty thousand (80,000) square foot single-family home to be constructed by Borrower pursuant to the terms hereof and in accordance with the Plans and Specifications.

"**Property**" means each parcel of real estate comprising the Land and all Improvements, Personal Property, Fixtures and all related facilities and amenities, now or hereafter located on, or relating to each such parcel and the operation thereof.

"**Property Claim Proceeds**" has the meaning given to such term in Section 7.12(a)(i).

"**Protective Advance**" means any advance deemed necessary or appropriate in Lender's sole and exclusive discretion to protect or preserve the value of the Collateral, Lender's lien priority with respect to the Collateral and to ensure the Collateral's compliance with Legal Requirements.

"**Register**" has the meaning given to such term in Section 9.25(c).

"**Reimbursement Party**" has the meaning given to such term in Section 9.2.

"**Release Price**" means an amount at least equal to Fifteen Million and No/100 Dollars ($15,000,000.00).

"**Release Property**" means the Phase I Second Home Site.

"**Required Amount**" has the meaning given to such term in Section 3.2(b).

"**Required Property Improvements**" means any improvements to be Completed by Borrower pursuant to the Approved Construction Budget.

"**Reserves**" means, collectively, the Balance Reserve, the Tax and Insurance Reserve, the Borrower Funded Interest Reserve, the Borrower Funded Phase II Interest Reserve and such other reserves held by Lender.

"**Restoration Threshold**" has the meaning given to such term in Section 7.11(c).

"**Second Extended Maturity Date**" means July 30, 2021, or such earlier date on which the final payment of principal of the Loan becomes due and payable as herein provided, whether by declaration of acceleration, or otherwise.

"**Security Instrument**" or "**Security Instruments**" means that certain Construction Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing executed by Borrower in favor of Lender dated as of the date hereof, as well as any similar security document executed by Borrower in favor of Lender in relation to the Property or other Collateral, each as recorded in the jurisdiction where the Property is located and as may be amended, restated, extended or supplemented from time to time.

"**Servicer**" has the meaning given to such term in Section 9.29.

"**Single Purpose Entity**" has the meaning given to such term in **Exhibit C**.

"**Special Member**" has the meaning given to such term in **Exhibit C**.

"**Sponsor**" means Mohamed Hadid, an individual.

"**Sponsor Pledge Agreement**" means the Pledge Agreement dated as of the date hereof, executed by Sponsor, as pledgor, in favor of Lender, as the same may be modified, amended or restated from time to time.

"**Springing Member**" has the meaning given to such term in **Exhibit C**.

"**Stored Materials**" has the meaning given to such term in Paragraph (a)(1) of **Exhibit B** hereto.

"**Tax and Insurance Reserve**" has the meaning given to such term in Section 3.2(a)(ii).

"**Taxes**" means all taxes, assessments, levies and charges imposed by any public or quasi-public authority having jurisdiction over the Property which are or may affect, or become a Lien upon, the Property or the rents, royalties, profits and income of the Property, or interest therein, or imposed by any Governmental Authority upon Borrower or Lender by reason of their respective interests in the Property or by reason of any payment, or portion thereof, made to Lender hereunder or pursuant to any Obligation or any of the other Loan Documents, other than taxes which are measured by and imposed upon Lender's general net income.

"**Tenant**" or "**Tenants**" means, collectively or individually (as the context provides), any tenant or licensee from time to time party to any Lease of the Property.

"**Term**" means the entire term of this Agreement, which shall expire upon indefeasible repayment in full of the Indebtedness and full performance of each and every obligation to be performed by Borrower pursuant to the Loan Documents (other than those indemnification obligations and other inchoate obligations expressly stated to survive the repayment of the Indebtedness).

"**Third Extended Maturity Date**" means January 31, 2022, or such earlier date on which the final payment of principal of the Loan becomes due and payable as herein provided, whether by declaration of acceleration, or otherwise.

"**Title Company**" means Fidelity National Title Insurance Company.

"**Title Policy**" means that certain 2015 ALTA Mortgagee Policy of Title Insurance issued by Title Company in the form of the pro forma attached to the Closing Instruction Letter.

"**Toxic Mold**" means mold or fungus of a type that may pose a risk to human health or the environment or would negatively and materially impact the value of the Property.

"**Transaction Persons**" has the meaning given to such term in Section 6.1(d).

"**Transfer**" means the sale, transfer, hypothecation, encumbrance, mortgage, conveyance, lease, alienation, assignment, disposition, divestment, or leasing with option to purchase, or assignment of the Property, or any portion thereof or interest therein (whether direct or indirect, legal or equitable, including the issuance, sale, assignment, alienation, conveyance, divestment, transfer, disposition, hypothecation, mortgage or encumbrance of any direct or indirect Equity Interest in Borrower or in any entity having an Equity Interest in Borrower, whether direct or indirect); or entering into any agreement or contract to do any of the foregoing which is not conditioned on compliance with the terms of the Loan Documents with respect to Transfers, or undertaking, suffering or causing any of the foregoing to occur voluntarily, involuntarily or by operation of law.

"**Transferee**" has the meaning given to such term in Section 9.25(a).

"**UCC**" means the Uniform Commercial Code as in effect in the State of California; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of California. "**UCC**" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"**Updated Information**" has the meaning set forth in Section 9.25(i)(i).

## ARTICLE 2

## THE LOAN; INTEREST RATE; PAYMENTS

Subject to the terms and provisions of this Agreement and the other Loan Documents, Lender hereby agrees to make, and Borrower hereby promises to repay to Lender on account of, the Loan. All proceeds of the Loan shall be funded pursuant to, and repaid in accordance with, the terms of this Agreement and the other Loan Documents.

**Section 2.1**   **Evidence of Loan**.

(a)   Lender shall maintain, in accordance with its usual practice, true, correct and complete electronic or written records evidencing the outstanding Indebtedness owed by Borrower to Lender hereunder and under each of the other Loan Documents, including without limitation the amount of principal and interest payable and paid to Lender from time to time under this Agreement.

(b)   The entries made in the electronic or written records maintained pursuant to this Section 2.1 shall be prima facie evidence of the existence and amounts of the Indebtedness therein recorded; provided, however, that the failure of Lender to maintain such records or any error therein shall not in any manner affect the obligation of Borrower to repay the correct amount owed pursuant to the Loan, including all disbursements made hereunder and all other Obligations of Borrower hereunder or under any other Loan Document, in accordance with the terms of this Agreement and the other Loan Documents.

(c)   Lender will account to Borrower monthly with a written statement of the amount outstanding under the Loan, the respective balances of the Holdbacks, the Reserves and any charges and payments made pursuant to this Agreement or any other Loan Document; provided, however, that the failure of Lender to provide such written statement shall not constitute a default or breach by Lender of this Agreement or any other Loan Documents or excuse the timely payment of all Indebtedness due and payable. In the absence of manifest error, such accounting rendered by Lender shall be deemed final, binding and conclusive, unless Lender is notified by Borrower in writing to the contrary within thirty (30) calendar days of receipt of each accounting, which notice shall be deemed an objection only to items specifically objected to therein.

**Section 2.2**     **Advance of the Loan; Loan Origination Fee; Holdbacks**.

(a)     Advance of the Loan.  Upon the Closing of the Loan, Lender shall disburse the initial advance in an amount equal to Forty-Seven Million Seven Hundred Seventy-Five Thousand and No/100 Dollars ($47,775,000.00) (the "**Initial Advance**").   A portion of the proceeds of the Initial Advance shall be paid directly to Lender in payment of the Loan Origination Fee pursuant to Section 2.2(b), and a portion of the proceeds of the Initial Advance shall be retained by Lender in respect of (i) the Borrower Funded Interest Reserve pursuant to Section 3.2(c), (ii) Borrower Funded Phase II Interest Reserve pursuant to Section 3.2(b) and (iii) the Borrower Funded Site Improvements Holdback pursuant to Section 2.2(c).  The Loan is not a revolving credit facility and therefore, may not be drawn, repaid and redrawn. Any payments of principal on the Loan shall be applied to permanently reduce the Loan in accordance with this Agreement and, once repaid, no portion of the Loan may be re-borrowed.

(b)     Loan Origination Fee.  The Initial Advance of the Loan shall include payment to Lender of a loan origination fee in the amount of Three Million Seven Hundred Eleven Thousand and No/100 Dollars ($3,711,000.00) (the "**Loan Origination Fee**").

(c)     Holdbacks.  On the Effective Date, Lender has established or shall establish the Holdbacks as provided below in this Section 2.2(c). Any amounts in the Holdbacks shall not bear interest unless and until such amounts are advanced to Borrower.

(i)     Construction Costs Holdback.  Lender shall hold back from Loan Proceeds an amount equal to Forty-Five Million and No/100 Dollars ($45,000,000.00), representing Lender's portion of the anticipated hard and soft costs for Completion of construction of the Borrower Improvements in accordance herewith, inclusive of any required contingency ("**Construction Costs Holdback**"). Lender shall, upon Borrower's written request and Lender's determination that the applicable conditions to disbursement have been satisfied, advance Loan Proceeds from the Construction Costs Holdback on a monthly basis, the proceeds of which shall be disbursed in order to pay base building improvements costs and associated soft costs of construction of the Borrower Improvements pursuant to the Approved Construction Budget. Provided no Event of Default or Default exists, Lender shall allow for reallocation of actual documented Cost Savings for the hard or soft costs of construction under the following parameters: (A) up to five percent (5%) for any line item for hard costs, (B) up to two percent (2%) for any line item for soft costs, (C) up to five percent (5%) in the aggregate for all hard and soft cost line items, (D) reallocation of any savings after completion of a certain line item, and (E) other reallocations as approved by Lender and Lender's Construction Consultant after a reasonable request therefor from Borrower, together with all required backup information. Borrower shall be permitted to deliver to Lender for review and approval evidence demonstrating a proposed Cost Savings concurrently with its delivery of a Disbursement Request.

(ii)     Borrower Funded Site Improvements Holdback.  Lender shall reserve from proceeds of the Initial Advance an amount equal to Five Million and No/100 Dollars ($5,000,000.00), representing Lender's portion of the anticipated hard and soft costs solely for grading and other Property site improvements in accordance with the Plans and Specifications or otherwise approved by Lender ("**Borrower Funded Site Improvement Holdback**").  Lender shall, upon Borrower's written request and Lender's determination that the applicable conditions

17

to disbursement have been satisfied, advance such requested amount from the Borrower Funded Site Improvement Holdback on a monthly basis, the proceeds of which shall be disbursed in order to pay such costs pursuant to the Approved Construction Budget. Provided no Event of Default or Default exists, Lender shall allow for reallocation of actual documented Cost Savings for the hard costs of construction under the following parameters: (A) up to five percent (5%) for any line item (B) reallocation of any savings after completion of a certain line item, and (C) other reallocations as approved by Lender and Lender's Construction Consultant after a reasonable request therefor from Borrower, together with all required backup information. Borrower shall be permitted to deliver to Lender for review and approval evidence demonstrating a proposed Cost Savings concurrently with its delivery of a Disbursement Request.

(iii)   <u>Conditions</u>. Lender's obligation to make available to or for the benefit or account of Borrower portions of the Loan in the amounts and for the purposes set forth in this <u>Section 2.2(c)</u> shall be subject to the satisfaction of all conditions precedent to such disbursement set forth in this Agreement, including, without limitation, in **Article 4** hereof and in **Exhibit B** attached hereto, and the requirement that the Loan be in In-Balance. In addition, Lender shall have the right to reasonably require any other document, evidence or information that Lender may request under any provision of this Agreement or the other Loan Documents, or that Lender may otherwise reasonably require. Borrower acknowledges that Lender's approval process with respect to disbursements of proceeds of the Loan may result in disbursement delays, and Borrower hereby consents to such delays.

**Section 2.3**   <u>Interest Rate</u>.

Subject to <u>Section 2.4</u> hereof, the outstanding principal balance under the Loan shall bear interest at the Contract Rate. Whenever, subsequent to the date hereof, the LIBOR Rate is increased or decreased, the Contract Rate, as set forth herein, shall be similarly changed without notice or demand of any kind by an amount equal to the amount of such change in the LIBOR Rate on the day of such change. The monthly interest due on the principal balance of the Loan outstanding shall be computed for the actual number of days elapsed during the month in question on the basis of a year consisting of three hundred sixty (360) days (which results in higher interests, fees and costs than if a three hundred sixty-five (365) day year were used) and shall be calculated by determining the average daily principal balance outstanding for each day of the month in question. The daily rate shall be equal to $1/360^{th}$ times the Contract Rate. If any statement furnished by Lender for the amount of a monthly payment due exceeded the actual amount that should have been paid because the LIBOR Rate decreased and such decrease was not reflected in the monthly statement, Borrower shall make the payment specified in the monthly statement from Lender and Borrower shall receive a credit for the overpayment, which credit shall be applied towards the next subsequent monthly payment due hereunder. If any statement furnished by Lender for the amount of a monthly payment due was less than the actual amount that should have been paid because the LIBOR Rate increased and such increase was not reflected in the monthly statement, Borrower shall make the payment specified in the monthly statement from Lender and Borrower shall be required to pay any resulting underpayment with the next subsequent monthly payment due hereunder. Provided that funds in the Borrower Funded Interest Reserve are sufficient for such purposes, Lender shall disburse to itself each month from the Borrower Funded Interest Reserve the amount necessary to pay such accrued and unpaid interest on the Loan (and Borrower hereby irrevocably authorizes such disbursement). All amounts so

disbursed by Lender from the Borrower Funded Interest Reserve shall be deemed to be amounts outstanding under the Loan. Neither the depletion of or insufficiency of the Borrower Funded Interest Reserve nor the non-satisfaction of any condition to disbursement contained in Article 4 of this Agreement shall release Borrower from any of Borrower's obligations under this Agreement or the other Loan Documents, including the obligation to pay interest and other charges and payment under or with respect to the Loan when due from other funding sources of Borrower.

### Section 2.4    Past Due Charge and Default Interest Rate.

Borrower recognizes and acknowledges that any default in respect of any payment, or portion thereof, due hereunder or to be made under any of the other Loan Documents, will result in losses and additional expenses to Lender in servicing the Indebtedness, and in losses due to Lender's loss of the use of funds not timely received. Borrower further acknowledges and agrees that in the event of any such Default, Lender would be entitled to damages for the detriment proximately caused thereby, but that it would be extremely difficult and impracticable to ascertain the extent of or compute such damages. Therefore, if for any reason Borrower fails to pay any interest or principal or any other amount required to be paid under this Agreement when due, including any payment due at maturity or upon acceleration, or fails to pay any amounts due under any of the other Loan Documents when due, then Borrower shall pay to Lender, in addition to any such delinquent payment, an amount equal to five percent (5.00%) of such delinquent payment or the maximum amount permitted by applicable law ("**Past Due Charge**"). In addition, upon the occurrence and during the existence of an Event of Default (including at any time from and after the Maturity Date (including upon any acceleration of maturity of the Indebtedness), if any portion of the Indebtedness remains outstanding), interest shall automatically accrue hereunder, without notice to Borrower, at the Default Rate. The Default Rate shall be calculated and due from the date that the Default occurred which led to the Event of Default without regard to any grace or cure period as may be applicable, and shall be payable upon demand.

### Section 2.5    Payment of Interest.

(a)    Monthly Payments of Principal and Interest. Commencing on the Monthly Payment Date occurring September 3, 2018 and continuing on each Monthly Payment Date through and including the month in which the Maturity Date occurs, Borrower hereby promises to pay monthly installments of interest as calculated in accordance with Section 2.3 above, and such interest shall be payable in arrears.

(b)    Business Days. Whenever in this Agreement or any other Loan Document any payment is required to be made on a date that is not a Business Day, such payment shall be made on the first Business Day after such date (and any such extension of time shall be included in the computation of payment of interest (including interest at the Default Rate)).

### Section 2.6    Maturity Date.

The entire balance of principal and accrued interest and other amounts then outstanding under the Loan are due and payable on the Maturity Date. Borrower acknowledges that such amount will equal the outstanding principal balance of the Loan, accrued and unpaid

interest and all other amounts due and owing under this Agreement and the other Loan Documents.

**Section 2.7** **Prepayment**.

(a)  Borrower shall not prepay the Loan, in full or in part, except as permitted by and in accordance with this Section 2.7(a).

(b)  Borrower may prepay the Loan in full or from time to time in part only if (A) Borrower delivers to Lender written notice of such prepayment not less than five (5) Business Days' and not more than fifteen (15) Business Days' prior to the prepayment date, which notice in each instance shall specify the date of prepayment and the principal amount of the Loan to be prepaid, and (B) such prepayment is made together with payment of the Prepayment Premium, and (C) in connection with a prepayment of the Loan in full, Borrower terminates Lender's commitment to fund the portion of the Holdbacks which is unfunded on the prepayment date and such prepayment is made together with payment of the Exit Fee (if any).  Each prepayment notice shall be irrevocable after delivery thereof to Lender.  Upon delivery of such a prepayment notice, the principal amount specified therein to be prepaid shall become due and payable on the prepayment date specified therein.  In addition to payment of the Prepayment Premium and Exit Fee (if any, and of applicable), Borrower shall pay in cash any and all accrued and unpaid interest on the Loan together with any prepayment of principal of the Loan, as a condition to Borrower's right to make such prepayment of principal.

(c)  Acceleration. If the maturity of the Loan is accelerated for any reason, other than casualty or condemnation, Borrower shall pay to Lender, in addition to all other amounts outstanding under the Loan Documents, the Prepayment Premium and Exit Fee which would be payable upon a voluntary prepayment of the Loan in full as of the date of acceleration.

(d)  Acknowledgment of Borrower. Borrower acknowledges that the Prepayment Premium (and Exit Fee, if applicable) required by this Section 2.7 is partial compensation to Lender for the cost of reinvesting the prepayment proceeds and for the loss of the contracted rate of interest on the Loan.  Furthermore, Borrower acknowledges that the loss that may be sustained by Lender as a result of such a prepayment by Borrower or acceleration of the Loan is not susceptible of precise calculation and the Prepayment Premium (and Exit Fee, if applicable) represents the good faith effort of Borrower and Lender to compensate Lender for such loss.

(e)  **TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY EXPRESSLY (I) WAIVES ANY RIGHTS IT MAY HAVE UNDER CALIFORNIA CIVIL CODE SECTION 2954.10 TO PREPAY THE NOTE, IN WHOLE OR IN PART, WITHOUT PENALTY, UPON ACCELERATION OF THE MATURITY DATE, AND (II) AGREES THAT IF, FOR ANY REASON, A PREPAYMENT OF ALL OR ANY PORTION OF THE PRINCIPAL AMOUNT OF THE NOTE IS MADE UPON OR FOLLOWING ANY ACCELERATION OF THE MATURITY DATE BY LENDER ON ACCOUNT OF ANY DEFAULT BY BORROWER INCLUDING, WITHOUT LIMITATION, ANY TRANSFER, DISPOSITION, OR**

FURTHER ENCUMBRANCE PROHIBITED OR RESTRICTED BY THE SECURITY INSTRUMENT, THEN BORROWER SHALL BE OBLIGATED TO PAY CONCURRENTLY WITH SUCH PREPAYMENT THE PREPAYMENT PREMIUM AND EXIT FEE SPECIFIED IN THE FOREGOING PROVISIONS. BY INITIALING THIS PROVISION IN THE SPACE PROVIDED BELOW, BORROWER HEREBY DECLARES THAT THE AGREEMENT TO MAKE THE LOAN EVIDENCED BY THE NOTE AT THE CONTRACT RATE AND FOR THE TERM SET FORTH IN THIS AGREEMENT CONSTITUTES ADEQUATE CONSIDERATION, GIVEN INDIVIDUAL WEIGHT BY BORROWER FOR THIS WAIVER AND AGREEMENT.

Borrower's Initials: _____

**Section 2.8      Indebtedness Absolute; No Offset; Waiver**. The payment obligations of Borrower hereunder are absolute and unconditional, without any right of rescission, setoff, counterclaim or defense for any reason against Lender. The Loan has not been compromised, adjusted, extended, satisfied, rescinded, set-off or modified, and the Loan Documents are not subject to any litigation, dispute, refund, claims of rescission, setoff, netting, counterclaim or defense whatsoever, including but not limited to, claims by or against Borrower, Guarantor or any other party. Payment of the Indebtedness by Borrower, when due and payable pursuant to the terms of this Agreement and the other Loan Documents, is not subject to compromise, adjustment, extension, satisfaction, rescission, set-off, counterclaim, defense, abatement, suspension, deferment, deductible, reduction, termination or modification, whether arising out of transactions concerning the Loan, or otherwise. Without limitation to the forgoing, to the fullest extent permitted under applicable law and notwithstanding any other term or provision contained in this Agreement or any other Loan Document, Borrower hereby waives (and shall cause each Borrower Party to waive) (a) presentment, protest and demand, notice of default (except as expressly required in the Loan Documents), notice of intent to accelerate, notice of acceleration, notice of protest, notice of demand and of dishonor and non-payment of the Indebtedness, (b) any requirement of diligence or promptness on Lender's part in the enforcement of its rights under the provisions of this Agreement and any other Loan Document, (c) any rights, legal or equitable, to require any marshalling of assets or to require foreclosure sales in a particular order, (d) all notices of every kind and description which may be required to be given by any statute or rule of law, other than such notices that cannot be waived pursuant to applicable law pertaining to the foreclosure of the Security Instrument, (e) the benefit of all laws now existing or that may hereafter be enacted providing for any appraisement before the sale of any portion of the Collateral, (f) all rights of homestead, exemption, redemption, valuation, appraisement, stay of execution, notice of election to mature or declare due the whole of the Obligations in the event of foreclosure of the Liens created by the Loan Documents, (g) the pleading of any statute of limitations as a defense to any demand under any Loan Document, and (h) any defense to the obligation to make any payments required under the Loan Documents, including the obligation to pay Taxes based on any damage to, defects in or destruction of the Collateral or any other event, including obsolescence of any of the Collateral, it being agreed and acknowledged that such payment obligations are unconditional and irrevocable. Borrower further acknowledges and agrees (i) to any substitution, subordination, exchange or release of any security or the release of any party primarily or secondarily liable for the payment of the Loan; (ii) that Lender shall not be required to first institute suit or exhaust its remedies hereon against others liable for repayment of all or any part of the Loan, whether primarily or secondarily (collectively, the

21

"Obligors"), or to perfect or enforce its rights against any Obligor or any security for the Loan; and (iii) that its liability for payment of the Loan shall not be affected or impaired by any determination that any security interest or lien taken by Lender for the benefit of Lender to secure the Loan is invalid or unperfected. Borrower acknowledges, warrants and represents in connection with each waiver of any right or remedy of Borrower contained in any Loan Document, that it has been fully informed with respect to, and represented by counsel of its choice in connection with, such rights and remedies, and all such waivers, and after such advice and consultation, has presently and actually intended, with full knowledge of its rights and remedies otherwise available at law or in equity, to waive or relinquish such rights and remedies to the full extent specified in each such waiver.

Section 2.9    **Lawful Limits.**

In no contingency or event whatsoever, whether by reason of acceleration or otherwise, shall the interest and other charges paid or agreed to be paid to Lender for the use, forbearance or detention of money hereunder exceed the maximum rate permissible under applicable law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto. If, due to any circumstance whatsoever, fulfillment of any provision hereof, at the time performance of such provision shall be due, shall exceed any such limit, then, the obligation to be so fulfilled shall be reduced to such lawful limit, and, if Lender shall have received interest or any other charges of any kind which might be deemed to be interest under applicable law in excess of the maximum lawful rate, then such excess shall be applied first to any unpaid fees and charges hereunder (to the extent not constituting interest under applicable law), then to unpaid principal balance owed by Borrower hereunder, and if the then remaining excess interest is greater than the previously unpaid principal balance, Lender shall promptly refund such excess amount to Borrower and the provisions hereof shall be deemed amended to provide for such permissible rate. The terms and provisions of this Section 2.9 shall control to the extent any other provision of any Loan Document is inconsistent herewith.

Section 2.10    **Increased Costs; Capital Adequacy.**

(a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, Lender (except any such reserve requirement reflected in the Contract Rate);

(ii)    impose on Lender or the London Interbank Market any other condition affecting this Loan Agreement or the Loan; or

(iii)    make it unlawful for Lender to make or maintain the indebtedness evidenced by the Loan in Eurodollars;

and such Change in Law increases the cost to Lender of making or maintaining the Loan (or of maintaining its obligation to make the Loan) or reduces the amount of any sum received or receivable by Lender under this Loan Agreement (whether of principal, interest or otherwise), then Borrower shall pay to such Lender such additional amount or amounts as will compensate Lender for such additional costs incurred or reduction suffered.

22

(b)    If at the time of or prior to any determination of the Contract Rate, Lender determines (which determination shall be conclusive in the absence of manifest error) that by reason of circumstances affecting the London interbank market generally, (i) deposits in United States Dollars in the relevant amounts and of the relevant maturity are unavailable to Lender in the London Interbank Market, (ii) the Contract Rate does not adequately or fairly reflect the cost to Lender of making or maintaining the Loan due to changes in administrative costs, fees, tariffs or taxes or other matters outside of Lender's reasonable control or (iii) adequate and fair means do not or will not exist for determining the Contract Rate, then Lender shall promptly notify Borrower, and the Loan shall bear interest, and continue to bear interest until Lender determines that the applicable circumstance described in the foregoing clauses (i), (ii) or (iii) no longer pertains, at a fluctuating rate per annum based on a substitute index selected by Lender plus a suitable margin to approximate, in Lender's judgment, the return that Lender would have received if the circumstance had not occurred.

(c)    If Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of Lender's holding company, if any, as a consequence of this Loan Agreement or the Loan made by Lender to a level below that which Lender or its holding company, as applicable, could have achieved but for such Change in Law (taking into consideration Lender's policies and the policies of Lender's holding company, as applicable, with respect to capital adequacy), then from time to time Borrower shall pay to Lender such additional amount or amounts as will compensate Lender's holding company, as applicable, for any such reduction suffered.

(d)    A certificate from Lender setting forth the amount or amounts necessary to compensate Lender or its holding company, under Section 2.10(a), Section 2.10(b) or Section 2.10(c) shall be delivered to Borrower and shall be conclusive absent manifest error. Borrower shall pay Lender the amount shown as due on any such certificate within ten (10) Business Days after receipt (the date of such payment being the "**Increased Cost Payment Date**").

(e)    Failure or delay on the part of Lender to demand compensation pursuant to this Section 2.10 shall not waive Lender's right to demand such compensation; provided that Borrower shall not be required to compensate Lender under this Section 2.10 for any increased costs or reductions incurred more than one hundred eighty (180) days prior to the date Lender notifies Borrower of the Change in Law giving rise to such increased costs or reductions and of Lender's intention to claim compensation for such increased costs or reduction; provided, further, if the Change in Law giving rise to such increased costs or reductions is retroactive, then such one hundred eighty (180)-day period will be extended to include the period of such retroactive effect.

(f)    Notwithstanding anything to the contrary in this Loan Agreement, the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith shall be deemed to be a Change in Law and/or a change in capital adequacy requirements, as applicable, regardless of the date enacted, adopted or issued.

23

**Section 2.11    Partial Release of Collateral.**

So long as no Default or Event of Default has occurred and is continuing or would result therefrom, Lender shall permit the release of Lender's Lien on the Release Property (with Lender's Lien on the remaining portion of the Property remaining in full force and effect and otherwise unaffected by such release) in the event Lender receives a Release Notice and each and all the following conditions precedent have been satisfied:

(a)    Lender shall have received from Borrower at least sixty (60) days prior to the requested date of release of the Release Property from the Lien of the Deed of Trust (such release date is referred to herein as the "**Release Date**"), a written request for the release of the Release Property (such notice is referred to herein as the "**Release Notice**");

(b)    Concurrently with the closing of Borrower's sale of the Release Property pursuant to a purchase and sale agreement therefor that is in form and substance satisfactory to Lender, Borrower shall prepay principal of the Loan pursuant to Section 2.7 hereof in an amount at least equal to the Release Price, together with accrued and unpaid interest on the Loan and all Contingent Interest that is then due and payable.  For the avoidance of doubt, if and to the extent Lender actually receives payment of the Release Price, such payment shall be applied by Lender to reduce the outstanding principal amount of the Loan, and payment of Contingent Interest shall be in addition to repayment of principal in an amount at least equal to the Release Price and payment of accrued and unpaid interest on the Loan, and such payment of Contingent Interest shall not reduce the outstanding principal amount of the Loan;

(c)    The partial release documents for the release of the Release Property from Lender's Lien shall be initially prepared by Borrower at its sole expense and shall also be in form and content reasonably satisfactory to Lender and its counsel, provided, however, that such release documents shall expressly state that the release of the Release Property by Lender shall be without recourse of any kind or nature to Lender and made without representation or warranty of any kind or nature from Lender. The fully-executed and acknowledged release documents shall be held by Lender's counsel in escrow to be used in connection with the Partial Release that is being undertaken in accordance with the terms of this Agreement, or if requested in writing by Borrower, the Lender-approved and fully executed and acknowledged release documents may be delivered into such sale escrow, provided that the foregoing shall all be subject to Lender's approval of such proposed title escrow agent designated by Borrower in writing so delivered to Lender, and further provided that the fully executed and acknowledged release documents shall not be released (whether by Lender's counsel or by the Lender-approved title escrow agent, as applicable) until, and only if, Lender has received payment of all amounts that are required to be paid by Borrower pursuant to this Section 2.11;

(d)    Lender shall have received an endorsement to the Title Policy reflecting the release of the Release Property and, if applicable, a subdivision endorsement insuring that the remaining Property consists of a legally subdivided lot or legally subdivided lots;

(e)    following the release of Lender's Lien on the Release Property, all of the covenants in the Loan Documents shall continue to be satisfied and all of the representations and warranties shall continue to be true and correct in all material respects, in each case, as to the remaining Property;

(f)    Borrower shall have paid to Lender all of Lender's out-of-pocket costs and expenses (including, without limitation, legal fees and disbursements of Lender) in connection with the release of the Release Property;

(g)    Lender shall have received evidence reasonably acceptable to Lender that the Release Property is being sold to a third-party, non-Affiliate of Borrower or any Borrower Party on an arms-length basis for which purchase no Affiliate of Borrower or any Borrower Party is providing seller financing (or any other compensation or concessions not expressly disclosed to, and approved in writing by, Lender) in connection with such sale;

(h)    Lender shall have determined that the Loan to Value Ratio, after giving effect to the release and transfer of the Release Property and the application of such Release Price to the outstanding Obligations, will not be greater than fifty percent (50%) (which determination may be based, at Lender's sole option, on an Appraisal in form and substance acceptable to Lender in the exercise of its Permitted Discretion, the cost of preparation of which shall be at Borrower's sole cost and expense); provided however, that Borrower may make a partial prepayment of the then outstanding principal balance of the Loan to Lender in order to satisfy the condition precedent set forth in this clause (h);

(i)    the remaining Property owned by Borrower after the release of the Release Property shall (i) comply with all applicable Legal Requirements, (ii) have dedicated access to a public right-of-way, (iii) not encroach upon the Release Property, and (iv) consist of legally subdivided lots. Borrower shall provide to Lender new title reports, zoning reports and such other due diligence as Lender determines, in its Permitted Discretion, is or are necessary in order for Lender to make the applicable determinations in this Section 2.11, and Borrower shall pay the cost of each and all such items, together with the costs of Lender's review thereof, including, but not limited to, reasonable attorneys' fees actually incurred.

**Section 2.12    <u>Extension of Maturity Date</u>.**

Borrower may request that Lender extend the Maturity Date to the First Extended Maturity Date ("**First Extension**"), and if the First Extension theretofore has occurred, to the Second Extended Maturity Date ("**Second Extension**"), and if the Second Extension theretofore has occurred, to the Third Extended Maturity Date ("**Third Extension**"), and if the Third Extension theretofore has occurred, to the Fourth Extended Maturity Date ("**Fourth Extension**") in accordance with this Section 2.12. Each such extension request shall be granted to Borrower upon the satisfaction of the following conditions:

(a)    Borrower shall have delivered to Lender a written request to extend the Maturity Date at least sixty (60) but not more than one hundred twenty (120) calendar days prior to the current applicable Maturity Date;

(b)    Borrower shall have delivered to Lender, concurrently with delivery of the written extension request in clause (a) above, an extension fee equal to the product of one percent (1.00%) and the then outstanding principal balance of the Loan plus the undisbursed Loan proceeds;

(c)    No Default or Event of Default shall have occurred and be continuing at the time of making the extension request or on the applicable Maturity Date prior to the effectiveness of any such extension;

(d)    Borrower shall have executed any agreements, documents or amendments to Loan Documents reasonably requested by Lender in connection with such extension of the applicable Maturity Date;

(e)    During the extended term of the Loan, all terms and conditions of the Loan Documents shall continue to apply;

(f)    The Loan to Value Ratio of the Property shall not exceed seventy percent (70.0%), as determined by an Appraisal in form and substance acceptable to Lender in its sole discretion, and Lender shall have the right to order a new Appraisal, at Borrower's expense, in connection with each requested extension;

(g)    Lender shall have determined (in its Permitted Discretion) that the funds remaining in the Reserves and the Holdbacks shall be sufficient to meet all reserve requirements during each such extension period;

(h)    Lender shall be satisfied that there has been no Material Adverse Change to (i) the financial condition of Borrower or Parent, or (ii) the value of the Collateral (including, without limitation, the Property);

(i)    Borrower shall pay all actual out-of-pocket costs and expenses incurred by Lender in connection with each such extension of the Maturity Date and Lender's reasonable attorneys' fees;

(j)    Concurrently with any request to extend the then-effective Maturity Date of the Loan as set forth herein this Section 2.12, the Phase II Borrower(s) shall have (1) timely requested an extension of the maturity date of the Phase II Refinancing Loan to the date to which Borrower has requested to extend the Maturity Date, under and in accordance with the terms of the Phase II Refinancing Loan Documents, and (2) satisfied all conditions set forth therein in order to effect such extension of such maturity date.

## ARTICLE 3

## ACCOUNTS AND RESERVES

Section 3.1    Security Grant.

(a)    Borrower has granted to Lender, within the security agreement provisions of the Security Instrument, and hereby grants to Lender, a first lien and security interest in all of Borrower's right, title and interest (if any) in, to and under the Reserves and any and all deposit accounts in which Reserves are deposited (each, a "**Reserve Account**") (and the funds therein, any interest earned thereon and proceeds thereof), and Borrower hereby pledges all Reserves (and all such Reserve Accounts and the funds therein, any interest earned thereon and proceeds thereof) as collateral security for the payment of all Indebtedness and the performance of all

26

Obligations. Borrower further agrees that, upon request made by Lender, it shall enter into a deposit account control agreement with Lender and the depositary bank in respect of any Reserve Account, in substantially the form of such depositary bank's form agreement for blocked accounts to which the account owner has no right of access or instruction. Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Reserve Account, any Reserve or the monies deposited in any Reserve Account or permit any Lien to attach thereto, or any levy to be made thereon, or any UCC Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto. Borrower shall not establish any deposit account other than the Reserve Accounts without prior written consent of Lender, a reaffirmation of Lender's existing security interest in such deposit account and delivery to Lender of a deposit account control agreement in form and content satisfactory to Lender in its sole discretion.

(b)    This Agreement is, among other things, intended by the parties to be a security agreement for purposes of the UCC. As such, and in connection with the security grant contained in each Security Instrument, Lender is irrevocably authorized to file UCC Financing Statements naming Borrower as debtor, to perfect Lender's security interest in the Collateral, in all jurisdictions in which Lender believes in its sole discretion that such filing is appropriate. If Lender believes that an "**all-asset**" collateral description, as contemplated by Section 9-504(2) of the UCC, is appropriate, Lender is irrevocably authorized to use such a collateral description, whether in one or more separate filings or as part of the collateral description in a filing that particularly describes the Collateral. Lender is irrevocably authorized to file such continuation statements and other similar documents as it determines, in its sole opinion, are appropriate to protect and perfect its rights.

**Section 3.2    Reserves.**

The Reserves will be held by Lender, and shall not constitute trust funds and may be commingled with other monies held by Lender. Disbursements by Lender from a Reserve shall be subject to all conditions to making disbursements from each such Reserve as set forth in this Agreement. Lender's rights with respect to Protective Advances or other advances permitted under any of the Loan Documents shall include the right to disburse funds from any Reserve for the purpose of making any payments for which such Reserve was created. Lender shall have no obligation whatsoever to make any advances or disbursements under this Section 3.2 or pursuant to any other applicable provision hereunder if a Default or an Event of Default shall have occurred and is continuing. Borrower shall not be entitled to any earnings or interest on funds deposited in any of the Reserve unless Lender elects, in its sole discretion, that such Reserve is an interest bearing account.

(a)    Tax and Insurance Reserve.

(i)    Commencing on the first Monthly Payment Date and continuing on each Monthly Payment Date thereafter, Borrower shall pay to Lender a sum equal to one-twelfth $(1/12^{th})$ of an amount which would be sufficient to pay the Taxes payable, or reasonably estimated by Lender to be payable based on the current Tax bills during the ensuing twelve (12) months to be held by Lender as a tax reserve to fund payment of future Taxes (the "**Tax Reserve**"). If requested by Lender, Borrower shall also deposit into the Tax Reserve an amount

which, together with the aggregate of deposits to be made on each Monthly Payment Date pursuant to the first sentence of this subsection (i), shall be sufficient, as of one (1) month prior to the date on which the next installment of Taxes becomes due, to pay in full such Taxes, as estimated by Lender based on the current Tax bills. Lender shall apply such funds to, or (at the sole option of Lender) release such funds to Borrower or Property Manager (if any) for, payment of such Taxes, prior to delinquency, provided that Borrower has promptly supplied Lender with timely notice of all Taxes due.

(ii)    Commencing on the first Monthly Payment Date and continuing on each Monthly Payment Date thereafter, Borrower shall pay to Lender a sum equal to one-twelfth $(1/12^{th})$ of the most recent annual insurance premiums to be held as an insurance reserve to pay for all liability and property insurance required to be to be held and maintained (the "**Insurance Premiums**") by Borrower pursuant to this Agreement (the "**Insurance Reserve**", and together with the Tax Reserve, collectively referred to herein as the "**Tax and Insurance Reserve**"). If requested by Lender from time to time, Borrower shall also deposit into the Tax and Insurance Reserve an amount which, together with the aggregate of the monthly deposits to be made pursuant to this paragraph, shall be sufficient, as of one month prior to the date on which the next installment of the next annual Insurance Premium becomes due, to pay in full such insurance premium, as estimated by Lender based on the current invoices. Lender shall apply such funds to, or (at the sole option of Lender) release such funds to Borrower or Property Manager (if any) for, payment of such Insurance Premiums prior to delinquency, provided that Borrower has promptly supplied Lender with timely notices of all Insurance Premiums due.

(iii)    In making any payment relating to Taxes or Insurance Premiums, Lender may do so according to any bill, statement or estimate procured from the appropriate public office, with respect to Taxes, and insurer, with respect to Insurance Premiums, without inquiry into the accuracy of such bill, statement or estimate, in any case, or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim, as it relates to Taxes. If the total amount retained in the Tax and Insurance Reserve attributable to (A) the Tax Reserve exceeds the amount of payments actually applied by Lender as set forth in <u>Section 3.2(a)(i)</u> above, and (B) the Insurance Reserve exceeds the amount of payments actually applied by Lender as set forth in <u>Section 3.2(a)(ii)</u> above, in each case, such excess may be credited by Lender on subsequent payments to be made by Borrower under <u>Section 3.2(a)(i)</u> and <u>Section 3.2(a)(ii)</u>, as applicable, or at the option of Lender, refunded to Borrower; but if the funds in the Tax Reserve or the Insurance Reserve shall not be sufficient to pay the sums required by <u>Section 3.2(a)(i)</u> and <u>Section 3.2(a)(ii)</u>, respectively, at least thirty (30) days before the same are due and payable, Borrower shall, within ten (10) Business Days after written demand therefor from Lender, deposit with Lender the full amount of any such deficiency. At the expiration of the Term, provided the Loan and all amounts outstanding in respect thereof have been indefeasibly paid to Lender and all obligations under the Loan Documents have been satisfied, excluding any contingent obligations which specifically survive repayment, the balance, if any, of the Tax and Insurance Reserve shall be released to Borrower.

(b)    <u>Borrower Funded Phase II Interest Reserve</u>. Lender shall reserve from proceeds of the Initial Advance an amount equal to One Million and No/100 Dollars ($1,000,000.00) (the "**Borrower Funded Phase II Interest Reserve**"), the proceeds of which shall, subject to the applicable conditions to disbursement, be applied on a monthly basis to pay

accrued and unpaid interest on the Phase II Existing Loan. All amounts so reserved by Lender in the Borrower Funded Phase II Interest Reserve shall be deemed to be amounts outstanding under the Loan. At the Maturity Date, provided the Indebtedness has been indefeasibly been paid and all Obligations have been satisfied, the balance, if any, of the Borrower Funded Phase II Interest Reserve shall be released to Borrower.

(c)    Borrower Funded Interest Reserve. Lender shall reserve from proceeds of the Initial Advance an amount equal to Seventeen Million Six Hundred Thousand and No/100 Dollars ($17,600,000.00) (the "**Borrower Funded Interest Reserve**"), which shall, subject to the applicable conditions to disbursement, be applied on a monthly basis to pay Debt Service in respect of the Loan. All amounts so reserved by Lender from proceeds of the Initial Advance and constituting the Borrower Funded Interest Reserve shall be deemed to be amounts outstanding under the Loan for all purposes of this Agreement, the Note and the other Loan Documents (including, without limitation Section 2.6 and Section 8.2(c) hereof). Provided that sufficient funds remain in the Borrower Funded Interest Reserve, Lender is hereby authorized by Borrower to disburse to itself each month from the Borrower Funded Interest Reserve the amount necessary to pay Debt Service in respect of the Loan. The depletion of the Borrower Funded Interest Reserve shall not release Borrower from any of its obligations under this Agreement or the other Loan Documents, including the obligation to pay interest and other charges on or with respect to the Loan when due from other funding sources of Borrower.

## ARTICLE 4

## CONDITIONS TO DISBURSEMENTS

**Section 4.1    Conditions to Initial Advance**.

Lender's obligation to disburse the Initial Advance on the Closing Date is subject to the satisfaction of each of the following conditions precedent on or before the Closing Date:

(a)    Loan Documents. Lender shall have received fully executed originals of all Loan Documents (except the Assignment of Construction Documents);

(b)    Organizational Documents. Lender shall have received (i) copies of the articles of organization of Borrower, and any of its constituent members as Lender shall request; (ii) copies of the operating agreement of Borrower and any of its respective constituent members as Lender shall request; (iii) a certificate of good standing dated no earlier than thirty (30) days prior to the date of this Agreement, with respect to Borrower and any of its respective constituent members as Lender shall request, issued by the Secretary of State of the state of such entity's formation; (iv) evidence of Borrower's qualification to do business in the state in which the Property is located; and (v) duly executed authorizing resolutions in form and substance satisfactory to Lender which authorize the execution, delivery and performance of the Loan Documents;

(c)    Title. Lender shall have received and approved the Title Policy in the amount of the Loan, insuring Lender and its respective successors and/or assigns that the Security Instrument constitutes a valid first priority lien upon Borrower's interest in the Property, subject only to such title exceptions as Lender shall approve in its sole and absolute discretion, together

with endorsements and otherwise in form and substance acceptable to Lender and Lender's counsel. Such Title Policy shall at all times expressly insure against any mechanics' liens;

(d)    Documents and Evidence. Lender shall have received such further documents, reports (including, without limitation, acceptable environmental reports, soils reports, zoning reports, surveys and Appraisal(s)), agreements or evidence as Lender or Lender's counsel may request;

(e)    Opinions of Counsel. Counsel for Borrower, Guarantor and such other parties required by Lender shall have executed and delivered an opinion letter dated as of the date of this Agreement, addressed to Lender and in form and substance satisfactory to Lender;

(f)    Representations and Warranties. Each and every representation and warranty contained in this Agreement and the other Loan Documents shall be true and correct in all respects;

(g)    No Event of Default or Potential Event of Default. No Default or Event of Default shall have occurred;

(h)    Additional Deliverables. Lender shall have received any other document, material or information as Lender shall reasonably request.

**Section 4.2**    **Conditions to Additional Advances.**

(a)    First Subsequent Advance. Lender's obligation to disburse the First Subsequent Advance is subject to the satisfaction of each of the following conditions precedent on or before the date of such First Additional Advance:

(i)    Approval of the Contractor, Architect and Engineers by Lender and Lender's Construction Consultant;

(ii)    Receipt and approval by Lender and Lender's Construction Consultant of (A) the Construction Contract, (B) all agreements with Architect and Engineers, (C) all other agreements relating to construction of the Borrower Improvements and (D) a report of any changes, replacements, substitutions, additions or other modification in the list of contractors, subcontractors and materialmen involved or expected to be involved in the construction of the Borrower Improvements;

(iii)    Lender shall have received a fully executed original of the Assignment of Construction Documents, together with all consents from Contractor, Architect and any Engineers as Lender may require, each in the form attached to the Assignment of Construction Documents;

(iv)    Receipt and approval by Lender and Lender's Construction Consultant of the final Plans and Specifications;

(v)    Receipt and approval by Lender and Lender's Construction Consultant of the construction and improvement budget relating to the construction of the

Borrower Improvements pursuant to and in accordance with the Plans and Specification (such budget, when approved by Lender, the "**Approved Construction Budget**");

(vi)    Delivery to Lender and Lender's Construction Consultant of all permits issued in connection with the Property and the construction of the Borrower Improvements thereon; and

(vii)    Satisfaction of the conditions to advance set forth on **Exhibit B** attached hereto.

(b)    <u>Additional Advances</u>.  Lender shall make additional advances of Loan Proceeds (other than the First Subsequent Advance), subject to the conditions to such advances set forth on **Exhibit B** attached hereto.

## ARTICLE 5

## CONSTRUCTION

**Section 5.1    <u>Borrower's Construction Responsibilities</u>.**

Borrower shall be solely responsible for all aspects of Borrower's conduct and business in connection with the Property and construction of the Borrower Improvements, including, without limitation, for the quality and suitability of the approved Plans and Specifications and their compliance with all Legal Requirements, the supervision of the work of construction, the qualifications, financial condition and performance of all architects, engineers, contractors, material suppliers, consultants and property managers, and the accuracy of all applications for payment and the proper application of all disbursements. Borrower shall commence construction of the Borrower Improvements on or before the Commencement Date and shall Complete the Borrower Improvements on or before the Completion Date. All Borrower Improvements shall be Completed in a good and workmanlike manner in accordance with the plans and specifications reviewed and approved by Lender pertaining thereto (the "**Plans and Specifications**") and the recommendations of any soils or engineering report approved by Lender. Borrower shall not be permitted to construct any improvements at the Property other than the Borrower Improvements. Borrower shall at all times construct the Borrower Improvements in accordance with all Legal Requirements, recorded covenants and restrictions, and requirements of all regulatory authorities having jurisdiction over the Property or the Borrower Improvements. Lender shall not be obligated to supervise, inspect or inform Borrower or any third party of any aspect of the construction of the Borrower Improvements.

**Section 5.2    <u>Liens and Stop Notices</u>.**

In the event that a claim of Lien or Lien is recorded which affects the Property, or a bonded stop notice is served upon Lender, Borrower shall, within twenty (20) calendar days following such recording or service upon Lender, or within ten (10) Business Days of Lender's demand, whichever occurs first: (a) pay and fully discharge the claim of Lien, Lien or bonded stop notice; (b) cause the release thereof by recording or delivering to Lender and any other necessary parties a surety bond in form and amount sufficient to Lender in its sole discretion; or (c) provide Lender with any other assurances as Lender deems in its discretion to be satisfactory

for the payment of such claim of Lien, Lien or bonded stop notice, to stop any foreclosure thereunder and to ensure the full and continuous protection of Lender and the Property from the effect of such claim of Lien, Lien or bonded stop notice.

**Section 5.3**    **Compliance with Plans and Specifications**.

(a)    Changes; Lender Consent. Borrower shall not make any changes to the Plans and Specifications without Lender's prior written consent if such change (each, a "**Major Change Order**"): (i) constitutes a material change in the building materials or equipment specifications, or in the architectural or structural design, value or quality of any of the Borrower Improvements; (ii) would result in an increase of construction costs in excess of FIFTY THOUSAND AND NO/100 DOLLARS ($50,000.00) for any single change or in excess of FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($500,000.00) in the aggregate during the Term; or (iii) would adversely affect the structural integrity, quality of building materials, or overall efficiency of operating systems of the Improvements. Borrower shall at all times maintain, for inspection by Lender, a full set of working drawings of the Borrower Improvements. Lender acknowledges and agrees that Borrower may make minor changes to the Plans and Specifications without obtaining Lender's consent, provided, that any such minor change does not, individually or in the aggregate during the Term, constitute a Major Change Order.

(b)    Changes; Submission Requirements. Borrower shall submit any proposed Major Change Order to Lender for approval at least ten (10) days prior to the commencement of construction relating to such proposed Major Change Order. Such requests for any Major Change Order shall be accompanied by current working drawings and a written description of the proposed Major Change Order, submitted on a change order form acceptable to Lender, signed by Borrower and, if required by Lender, also by Contractor for the same. At Lender's option, as a condition to Lender's approval of such a proposed Major Change Order, Lender may require Borrower to provide evidence satisfactory to Lender of the costs and time necessary to complete the proposed Major Change Order.

(c)    Delays. Borrower acknowledges that Lender's review of any changes and required consent may result in delays in construction and hereby consents to any such delays.

**Section 5.4**    **Contractor Information**. Borrower shall deliver, from time to time within ten (10) days of Borrower's receipt of Lender's written request therefor, in a form acceptable to Lender, the following: (a) a list containing the name, address, telephone number and contact party of each contractor, subcontractor and material supplier previously employed, or to be employed, or to be used in connection with Completion of the Borrower Improvements whose aggregate contract value is in excess of FIFTY THOUSAND AND NO/100 DOLLARS ($50,000.00), which list shall include the dollar amount, inclusive of any change orders, if any, of each contract and subcontract, and specifying the portion thereof, if any, paid through the date of such list; (b) true, correct and complete copies of each contract, subcontract, and schedule of materials identified in such list, including any changes thereto; (c) a breakdown of each cost of the projected total cost of completing the Borrower Improvements, specifying that portion, if any, of each cost item which has been incurred; and (d) a detailed construction progress schedule specifying the progress of all construction and projected sequencing and Completion time for all yet to be Completed work, all as of the date of such schedule. Lender may contact any such

32

contractor, subcontractor or material supplier to discuss the course of construction. Borrower acknowledges and agrees that Lender may disapprove any contractor, subcontractor or material supplier which, in Lender's good faith determination, is deemed financially or otherwise unqualified. Borrower acknowledges that the absence of any such disapproval shall not constitute and shall not be deemed to constitute a representation or warranty of qualification by Lender.

### Section 5.5    Prohibited Contracts.

Borrower shall not contract for any materials, furnishings, equipment, Fixtures or other parts or components of the Borrower Improvements, if any third party shall retain any ownership interest in such items after their delivery to the Property.  Borrower shall have ten (10) days to effect the removal of any such retained interest. Notwithstanding the foregoing, Borrower may request Lender's prior written consent to any such contract, which consent shall be granted or withheld at Lender's sole and absolute discretion.

### Section 5.6    Inspections.

Lender and its agents shall have the right to enter upon the Property at all reasonable times and upon reasonable notice (provided no notice shall be required during the continuance of an Event of Default) to inspect the construction work and the Borrower Improvements to verify information disclosed or required pursuant to this Agreement or any of the other Loan Documents. Any inspection or review of the Borrower Improvements by Lender or its agents is solely to determine whether Borrower is properly discharging its obligations to Lender, and such inspection or review may not be relied upon by Borrower or by any third party as a representation or warranty of compliance with this Agreement or any other agreement. Lender and its agents owe no duty of care to Borrower or any third party to protect against, or to inform Borrower, Guarantor or any third party of, any negligent, faulty, inadequate or defective design or construction of the Borrower Improvements as determined by Lender and/or its agents. Further, and throughout the course of construction of the Borrower Improvements, Lender and its agents shall have the right, in their respective good-faith discretion, to employ, at Borrower's sole cost and expense, an inspector or inspectors and a consultant or consultants who shall review as agents for Lender all construction activities undertaken with respect to the Property. If required by Lender, a certificate, inspection report or indication from such inspector(s) and/or consultant(s) that construction complies with any applicable plans and budget shall be a further condition precedent to Lender's approval of each draw request.

### Section 5.7    Delivery of Final Plans and Specifications; As-Built Survey.

Upon Completion of the Borrower Improvements, and in no event later than thirty (30) calendar days following the Completion Date, Borrower shall deliver to Lender a set of final Plans and Specifications. If required by Lender in its sole discretion, Borrower shall also deliver a final as-built ALTA/NSPS Survey of the Property within thirty (30) calendar days following Lender's request therefor.

### Section 5.8    Fees.

Except for construction management or developer fees, which in the aggregate shall not exceed two percent (2.0%) of total hard costs as set forth in the Approved Construction

Budget, Borrower shall not pay any fees, including, without limitation, any acquisition fees, asset management fees or guaranty fees, to Borrower, Guarantor or any Affiliate thereof, from any Loan Proceeds, including the Holdbacks, without Lender's prior written consent and unless and until (a) no Default or Event of Default exists and (b) Borrower has paid all principal and/or interest payments then due under the Note, all Operating Expenses and all required deposits into the Reserves. Any such fees permitted hereunder shall be subordinated to the Loan.

## ARTICLE 6

## REPRESENTATIONS AND WARRANTIES.

**Section 6.1**    <u>**Representations and Warranties**</u>.

To induce Lender to execute and perform this Agreement, Borrower hereby represents, warrants and, with respect to any statement of future conduct, covenants, to Lender as follows:

(a)    Borrower has good, marketable and indefeasible fee simple title to the Property, subject to no Liens except for the Permitted Exceptions. All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements in connection with the transfer of the Property to Borrower have been paid.

(b)    Borrower is, and prior to the Closing Date, has always been since the date of its formation in the State of California, a limited liability company, duly formed, validly existing and in good standing under the laws of the State of California. The address of Borrower's principal place of business is 9454 Wilshire Blvd. Suite 208, Beverly Hills, California 90212. Borrower is not a "**foreign person**" within the meaning of Sections 1445 or 7701 of the Code. Parent is the sole member of Borrower and is a limited liability company, duly formed, validly existing and in good standing under the laws of the State of California. Borrower and Parent are duly qualified to do business and are in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, business and operations. All organizational documents of Borrower and Parent furnished to Lender are true, correct and complete copies thereof and are all in full force and effect. No default exists under any of the organizational documents and no event has occurred which, with the giving of notice or lapse of time or both, would result in any default thereunder. Attached hereto as <u>Schedule II</u> is a true and complete organizational chart of Borrower and Parent and their respective direct and indirect owners.

(c)    Each of Borrower and Parent is a Single Purpose Entity.

(d)    No Borrower Party, nor any Person Controlling or Controlled by Borrower Party, nor any Person who at any times owns, directly or indirectly, more than twenty percent (20%) of the outstanding Equity Interests of any Borrower Party, nor any Person having a beneficial interest in Borrower Party, nor any Person for whom any Borrower Party is acting as agent or nominee in connection with this transaction ("**Transaction Persons**") (A) is a Person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079

34

(2001)), (B) engages in any dealings or transactions prohibited by Section 2 of such executive order, or is otherwise associated with any such Person in any manner in violation of Section 2 of such executive order, or (C) is a Person on the list of Specially Designated Nationals and Blocked Persons or is in violation of the limitations or prohibitions under any other OFAC regulation or executive order.

(e)     No part of the proceeds of the Loan will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(f)     Borrower acknowledges by executing this Agreement that Lender has notified Borrower and that Borrower has notified the Borrower Parties and any Person who at any time owns, directly or indirectly, more than twenty percent (20%) of the outstanding Equity Interests of any Borrower Party that, pursuant to the requirements of the Patriot Act, Lender is required to obtain, verify and record such information as may be necessary to identify such Persons (including, without limitation the name and address of such Person) in accordance with the Patriot Act.

(g)     Borrower has full power and authority to conduct its business as presently conducted, to own the Property, to enter into this Agreement and to perform all of its duties and obligations under this Agreement and under the Loan Documents; such execution and performance have been duly authorized by all necessary Legal Requirements. Neither Borrower nor any Borrower Party has been convicted of a felony and there are no proceedings or investigations being conducted involving criminal activities of Borrower or any Borrower Party.

(h)     Except as disclosed in writing to Lender prior to the Closing Date, there are, and has never been, no actions, suits or other proceedings at law or in equity by or before any Governmental Authority now pending or, to Borrower's knowledge, threatened against any Borrower Party or Borrower, or, to Borrower's actual knowledge after due inquiry, all or any portion of the Property, which, if adversely determined, could reasonably be expected to materially adversely affect the condition (financial or otherwise) or business of Borrower Party, Borrower (including the ability of any Borrower Party or Borrower to carry out its obligations under any Loan Documents to which it is a party) or the use, value, condition or ownership of the Property.

(i)     This Agreement, the Security Instrument, the other Loan Documents and any other documents and instruments required to be executed and delivered by Borrower and/or any Borrower Party in connection with this Loan, when executed and delivered, will constitute the duly authorized, valid and legally binding obligations of the party required to execute the same and may be enforced strictly in accordance with their respective terms (except to the extent that enforceability may be affected or limited by applicable bankruptcy, insolvency and other similar debtor relief laws affecting the enforcement of creditors' rights generally). No approval of, or consent from, any Governmental Authority or any other Person not holding a direct or indirect ownership interest in Borrower or any Borrower Party is required in connection with the execution and delivery by Borrower or any Borrower Party of this Agreement or any of the other

35

Loan Documents to which each is a party. No basis presently exists for any claim against Lender under this Agreement, under the Loan Documents, or with respect to the Loan. Enforcement of this Agreement and the Loan Documents is subject to no defenses of any kind. The Security Instrument when properly recorded in the appropriate records, together with any UCC Financing Statements required to be filed in connection therewith, will create (i) a valid, perfected first priority Lien on Borrower's interest in the Property, and (ii) valid and perfected first priority security interests in and to, and perfected collateral assignments of, all personalty, all in accordance with the terms thereof, in each case subject only to any applicable Permitted Exceptions. All mortgage, recording, stamp, intangible or other similar taxes required to be paid by any Person under applicable Legal Requirements in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents have been paid.

(j)    The execution, delivery and performance of this Agreement, the Security Instrument, the other Loan Documents and any other documents or instruments to be executed and delivered by Borrower or any Borrower Party pursuant to this Agreement or in connection with this Loan and to the occupancy and use of the Property do not: (i) violate any Legal Requirements; or (ii) conflict with, be inconsistent with, or result in any breach or default of any of the terms, covenants, conditions or provisions of any indenture, mortgage, deed of trust, instrument, document, agreement or contract of any kind to which Borrower or any Borrower Party is a party or by which any of them may be bound. Neither Borrower nor any Borrower Party is in default (without regard to grace or cure periods) under any contract or agreement to which it is a party, the effect of which default could reasonably be expected to adversely affect the performance by Borrower or any Borrower Party of its obligations pursuant to and as contemplated by the terms and provisions of this Agreement and/or the other Loan Documents.

(k)    No condition, circumstance, event, agreement, document, instrument, restriction, litigation or proceeding (or, to Borrower's actual knowledge, threatened litigation or proceeding or basis therefor) exists, or has existed, which could reasonably be expected to (i) adversely affect the validity or priority of the liens and security interests granted Lender under the Loan Documents, (ii) materially adversely affect the ability of Borrower or any Borrower Party to perform their obligations under the Loan Documents or could reasonably be anticipated to be a Material Adverse Change, or (iii) constitute an Event of Default or a Default under any of the Loan Documents.

(l)    All Collateral is located in the United States.

(m)    The Property and the present use and occupancy of the Property does not violate or conflict with any Legal Requirements, applicable law, statute, ordinance, rule, regulation or order of any kind, including, without limitation, Hazardous Material Laws, zoning, building, land use, noise abatement, occupational health and safety laws, storm and sanitary disposal regulations, or any permit, easement, covenant, condition or restriction, whether recorded or not applicable to any storm and sanitary sewage disposal system, water system, drainage system, and all mechanical systems. In addition, any applicable Governmental Authority having jurisdiction over the Property has issued the permits for the construction, tap on and operation of those systems referred to in the prior sentence. No legal proceedings are pending or, to the knowledge of Borrower, threatened with respect to the zoning of the Property. Neither the

zoning nor any other right to construct, use or operate the Property is in any way dependent upon or related to any property other than the Property. There has not been committed by Borrower or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording any Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. No portion of the Property has been purchased with proceeds of any illegal activity. If a third party is required under any covenants, conditions and restrictions of record or any other agreement to consent to the use and/or operation of the Property, such approval has been obtained from such party.

(n)     None of the proceeds of the Loan will be used by Borrower for the purpose of purchasing or carrying "**margin stock**" within the meaning of Regulation T, U or X issued by the Board of Governors of the Federal Reserve System, as at any time amended, and Borrower agrees to execute all instruments which may be necessary from time to time, if any, to comply with all the requirements of Regulation U of the Federal Reserve System, as at any time amended.

(o)     Borrower is not an "**employee benefit plan**" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") which is subject to Title I of ERISA. The assets of Borrower do not constitute "**plan assets**" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101. Borrower is not and will not be a "**governmental plan**" within the meaning of Section 3(32) of ERISA. Transactions by or with Borrower are not subject to any state or other statute, regulation or other restriction regulating investments of, or fiduciary obligations with respect to, governmental plans within the meaning of Section 3(32) of ERISA which is similar to the provisions of Section 406 of ERISA or Section 4975 of the Code and which prohibit or otherwise restrict the transactions contemplated by this Agreement, including but not limited to the exercise by Lender of any of its rights under the Loan Documents.

(p)     Borrower is not (i) an "**investment company**" or a company "**controlled**" by an "**investment company**", within the meaning of the Investment Company Act of 1940, as amended, (ii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money, or (iii) a "**bank holding company**" or a direct or indirect subsidiary of a "**bank holding company**" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

(q)     Except as may be set forth in the Environmental Reports or otherwise previously disclosed to Lender in writing:

(i)     Neither Borrower nor, any portion of the Property is in violation of any Hazardous Materials Laws;

(ii)     Neither Borrower nor any other Borrower Party has received, or has received a copy of, any notice of any violation or alleged violation of any Hazardous Materials Laws with respect to the Property;

(iii)    There are no pending civil (including actions by private parties), criminal or administrative actions, suits or proceedings against Borrower, any Borrower Party or, the Property relating to environmental matters ("**Environmental Proceedings**") and neither Borrower nor any Borrower Party has any knowledge of any threatened Environmental Proceedings;

(iv)    Neither Borrower nor, due inquiry, any other Person, has used, generated, manufactured, stored or disposed of on, under or about the Property or transported to or from the Property any Hazardous Materials (other than in compliance with Hazardous Materials Laws). The inquiry, the Property is not subject to any private or governmental Lien or judicial or administrative notice or action or inquiry, investigation or claim relating to hazardous, toxic and/or dangerous substances, Toxic Mold or any other Hazardous Materials;

(v)    No Toxic Mold is on or about the Property which requires remediation under any applicable Hazardous Materials Laws or otherwise poses a danger to persons or property;

(vi)    There have been no environmental investigations, studies, audits, reviews or other analyses conducted by or on behalf of Borrower which are in Borrower's possession or control and which have not been provided to Lender; and

(vii)    The Property has not been used, permanently or temporarily, as a disposal site or storage site for any Hazardous Materials in violation of any applicable Hazardous Materials Laws and the Property, and all parts thereof, are free of all Hazardous Materials other than Hazardous Materials that do not violate any applicable Hazardous Materials Laws.

(r)    All financial statements of Borrower or any Borrower Party submitted to Lender by Borrower, any Borrower Party or any Affiliate in connection with the Loan are true and correct in all material respects, have been prepared in accordance with the GAAP consistently applied, and fairly present the respective financial conditions and results of operations of the Persons which are their subjects. Since the date of such financial statements, there has been no Material Adverse Change in the financial condition, operations or business of Borrower, any Borrower Party, or the Property from that set forth in said financial statements.

(s)    Neither Borrower nor any Borrower Party has any Debt other than (i) the Indebtedness and Obligations evidenced by this Agreement, (ii) trade payables incurred in connection with the construction of the Project pursuant to the Approved Construction Budget, and (ii) the Phase II Existing Loan ("**Permitted Debt**").

(t)    This Agreement and all financial statements, budgets, schedules, opinions, certificates, confirmations, sworn statements, applications, rent rolls, affidavits, agreements and other materials submitted to Lender in connection with or in furtherance of this Agreement by or on behalf of Borrower or any Borrower Party fully and fairly state the matters with which they purport to deal, and none misstate any material fact nor, separately or in the aggregate, fail to state any material fact necessary to make the statements made not misleading.

(u)    All utility and municipal services required for the occupancy and operation of the Property for its intended use, including water supply, storm and sanitary sewage disposal

38

systems, cable services, electric and telephone facilities are available for use and tap-on at the boundaries of the Property. The Property has rights of access to public ways (including curb cuts and street access), and all utility, permits and easements, to the extent required for the use of the Property for its current use, have been granted and issued by all Governmental Authorities with respect to the Property.

(v)     None of the Improvements encroach, and upon Completion of the Borrower Improvements none of the Improvements will encroach, upon any building line, set back line, side-yard line, or any recorded or visible easement which exists with respect to the Property.

(w)     The Property is comprised of one (1) or more parcels which constitute separate tax lots and do not constitute a portion of any other tax lot not a part of the Property.

(x)     No condemnation or other similar proceeding has been commenced or, to Borrower's knowledge, is threatened or contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

(y)     The Loan, including interest rate, fees and charges as contemplated hereby, is a business loan; the Loan is an exempted transaction under the Truth In Lending Act, 12 U.S.C. § 1601, *et seq.*; and the Loan does not, and when disbursed will not, violate the provisions of the usury laws of the State of California, or any consumer credit laws or usury laws of any state which may have jurisdiction over this transaction, Borrower or the Collateral.

(z)     As of the date hereof, there are no outstanding financing statements (other than any such statements identifying Lender as the secured party) naming Borrower or any Borrower Party (or Affiliate thereof), as a debtor, and there are no federal tax liens against or bankruptcy filings by or against Borrower or any Borrower Party.

(aa)     To the extent required, Borrower has filed (or has obtained effective extensions for filing) all federal, state and local tax returns required to be filed and has paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments payable by Borrower.

(bb)     No Borrower Party is contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency law or the liquidation of all or a major portion of its property, and Borrower has no knowledge of any Person contemplating the filing of any such petition against any Borrower Party. In addition, no Borrower Party nor any parent, principal nor Affiliate of any Borrower Party nor any of their respective constituent members has been a debtor in any such bankruptcy proceeding, and no Borrower Party has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors. Notwithstanding anything to the contrary contained in this Section 6.1(bb), nothing in this paragraph is intended as a representation regarding any partners of Guarantor, or shareholders in the parent or constituent equity holder in any such partners or shareholders.

(cc)     Borrower has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and Borrower has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the

Loan and the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total probable liabilities, including subordinated, unliquidated, disputed and/or contingent liabilities, including the maximum amount of their contingent liabilities or their debts as such debts become absolute and matured. Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur Debt and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such Debt and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower).

(dd)    The Property or any portion thereof is not subject to any Lease.

(ee)    Neither the Property nor any part thereof are subject to any purchase options, rights of first refusal to purchase the Property or other similar rights in favor of third parties.

(ff)    The Approved Construction Budget is attached as Schedule IV hereto.

(gg)    There are no Material Contracts other than the Material Contracts delivered to Lender. Borrower has delivered to Lender true and complete copies of all Material Contracts and all amendments thereto. Each of the Material Contracts is in full force and effect. No party to any Material Contract has sent or received any notice of default thereunder that remains outstanding. Borrower is not in default and has no knowledge of any default under any Material Contract by any other party thereto. All amounts that are due and payable under each Material Contract by any party thereto have been paid in full. No party to any Material Contract has commenced any action or given or received any notice for the purpose of terminating such Material Contract.

(hh)    As of the Closing Date, the Property is not being used for the production, distribution or sale of marijuana, cannabis or their byproducts.

**Section 6.2    Continuation of Representations and Warranties.**

Borrower hereby covenants, warrants and agrees that (a) the representations and warranties made in Section 6.1 hereof shall be and shall remain true and correct at the time of the Closing Date and at all times thereafter so long as any part of the Indebtedness shall remain outstanding, and (b) the covenants made in Section 6.1 hereof shall remain binding upon Borrower at all times so long as any part of the Indebtedness shall remain outstanding. Each disbursement request from any Reserve shall constitute a reaffirmation that the foregoing representations and warranties are true and correct in all material respects as of the date of such disbursement.

# ARTICLE 7

## BORROWER COVENANTS.

Borrower hereby covenants and agrees with Lender that, at all times so long as any part of the Indebtedness shall remain outstanding:

### Section 7.1    Performance of Obligations.

Borrower shall promptly pay when due all Indebtedness and shall perform and comply with in a timely manner all other Obligations, and no Obligations shall be released, discharged or otherwise adversely affected by reason of any act, claim or circumstance of any kind or nature, whether or not Borrower has notice or knowledge thereof.

### Section 7.2    Existence; Compliance with Legal Requirements.

Borrower and each Borrower Party which is not a natural person shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, permits and franchises and comply with all Legal Requirements applicable to it and the Property. Neither Borrower nor any Borrower Party which is not a natural person shall engage in any dissolution, liquidation or consolidation or merger with or into any other Person except as permitted by the Loan Documents. Additionally, Borrower shall not: (a) engage in any business activity not related to the ownership and leasing of the Property;  (b) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the Property or other assets of Borrower except to the extent expressly permitted by the Loan Documents; or (c) cause, permit or suffer Parent to dissolve, wind up or liquidate or take any action, or omit to take an action, which as a result Parent would be dissolved, wound up or liquidated in whole or in part.

### Section 7.3    Single Purpose Entity.

Borrower shall at all times be a Single Purpose Entity. Borrower shall not make any change, amendment or modification to its organizational documents without Lender's prior written consent. Additionally, Borrower shall not take any action which could result in it not being a Single Purpose Entity.

### Section 7.4    ERISA.

Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the Term, as requested by Lender, stating that (a) Borrower is not an "**employee benefit plan**" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "**governmental plan**" within the meaning of Section 3(32) of ERISA, (b) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans, (c) the assets of Borrower do not constitute "**plan assets**" within the meaning of 29 C.F.R. Section 2510.3-101, (d) neither Borrower nor any Guarantor is a party in interest (as defined in Section 3(14) of ERISA) with respect to an employee benefit plan sponsored or contributed by Lender, and (e) neither Borrower nor any Guarantor is: (i) a fiduciary (including but not limited to any administrator, officer, trustee or custodian), counsel or employee of Lender; (ii) an employer any of whose employees are covered by an employee benefit plan sponsored or contributed by

41

Lender; (iii) an individual or entity providing services to an employee benefit plan sponsored or contributed by Lender; (iv) an employee organization any of whose members are covered by an employee benefit plan sponsored or contributed by Lender; (v) an owner, direct or indirect, of fifty percent (50%) or more of any entity described in clauses 7.4(e)(iii) or (iv) above; (vi) a spouse, ancestor, lineal descendant or spouse of a lineal descendant of any individual described in clauses 7.4(e)(i), (ii), (iii) or (iv) above; (vii) a corporation, partnership or trust or estate of which fifty percent (50%) or more is owned, directly or indirectly, or held by Persons described in clauses (i), (ii), (iii), (iv) or (v) above; (viii) an employee, officer, director or a ten percent or more shareholder, directly or indirectly, of a Person described in clauses 7.4(e)(iii), (iv), (v) or (vi) above or of Lender; or (ix) a ten percent (10%) or more partner or joint venture of a Person described in clauses 7.4(e) (ii), (iii), (iv), (v) or (vi) above. Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

### Section 7.5    Defense and Notice of Actions and Certain Other Events.

Borrower shall, without liability, cost or expense to Lender, protect, preserve and defend title to the Property, the Liens granted to Lender hereunder and under each of the other Loan Documents (including but not limited to the Security Instrument) and the rights or powers of Lender hereunder and under each of the other Loan Documents, against all adverse claimants to title, or any possessory or non-possessory interest in the Property. Borrower shall give Lender prompt written notice (and in no event later than ten (10) Business Days following Borrower's knowledge thereof) of (a) any fire or other casualty causing damage to the Property, (b) any actual or threatened condemnation or other taking of the Property, (c) notice from any governmental agency relating to the Property of any violation of law, (d) a change in the nature of the occupancy or permitted use of the Property, or, (e) the commencement or threatened commencement of any litigation or proceedings that seek to, or could reasonably be expected to have the effect of: (i) a Material Adverse Change; (ii) adversely affecting the validity or priority of the Liens granted Lender hereunder or under any other Loan Document; or (iii) adversely affecting the construction of the Borrower Improvements, including, without limitation, cessation of construction.  Borrower will cause any such litigation or proceedings to be vigorously contested in good faith, and in the event of an adverse ruling or decision, prosecute all allowable appeals therefrom. Without limiting the generality of the foregoing, Borrower will resist the entry or seek the stay of any temporary or permanent injunction that may be entered, and use its best efforts to bring about a favorable and speedy disposition of all such litigation or proceedings.

### Section 7.6    Right of Inspection; Due Diligence.

Lender, its agents or employees, may enter the Property at all reasonable times and upon reasonable notice (provided no notice shall be required during an Event of Default) for the purpose of (a) inspecting the Property or ascertaining Borrower's compliance with the terms of any Loan Document, and (b) conducting periodic due diligence to assess the condition of the Collateral, Borrower and the Property.

**Section 7.7    Liens**.

Borrower shall not cause, suffer or create any Liens upon all or any portion of the Property or any interest in the Property, or on any direct or indirect legal or beneficial ownership interest in Borrower, other than the Permitted Exceptions, and Borrower shall pay, at or prior to the applicable due date, all obligations secured by or reducible to Liens which now or hereafter shall encumber the Property, whether senior or subordinate hereto, including all Claims for work or labor performed, or materials or supplies furnished in connection with any work upon the Property. Notwithstanding the preceding sentence, Borrower may within thirty (30) days after Borrower first receives notice of an involuntary Lien, contest any such claim of involuntary Lien without cost or expense to Lender, but only upon posting, and concurrently supplying to Lender a certified copy of a statutory bond or other security sufficient under applicable law fully to protect any and all of the Property encumbered by such claim of involuntary Lien and otherwise sufficient in Lender's sole opinion to protect Lender against any judgment in favor of the Lien claimant. If Lender is made a party to any litigation concerning the Loan Documents, the Property or any part thereof or interest therein, or the occupancy thereof by any Person, then Borrower shall indemnify, defend and hold Lender harmless from all Claims and liability by reason of such litigation, including reasonable attorneys' fees and expenses incurred by Lender whether or not any such litigation is prosecuted to judgment. Subject to Borrower's right to contest any claim of involuntary Lien in accordance with this Section 7.8, any involuntary Lien other than a Permitted Exception shall be paid or fully discharged by Borrower within the earlier of (a) ten (10) Business Days after demand by Lender, and (b) twenty (20) days after Borrower receives notice of the filing of such Lien.

**Section 7.8    Further Assurances; Supplemental Affidavits**.

Borrower shall, at Borrower's sole cost and expense: (a) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the security interest of Lender in the Collateral at any time securing or intended to secure the Obligations of Borrower under the Loan Documents, as Lender may reasonably require; and (b) do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time, including curing any defects in the execution and delivery of the Loan Documents and executing and delivering, or causing to be executed and delivered, all such other documents, agreements and instruments as Lender may reasonably request to further evidence and more fully describe the Collateral for the Loan, to correct any omissions in the Loan Documents, to perfect, protect or preserve any Liens created under any of the Loan Documents, or to make any recordings, file any notices, or obtain any consents, as may be necessary or appropriate in connection therewith.

**Section 7.9    Financial Reporting**.

(a)    Borrower shall keep and maintain or will cause to be kept and maintained proper and accurate books and records, in accordance with the Approved Accounting Method, or such other accounting method acceptable to Lender, reflecting the financial affairs of Borrower. Lender shall have the right from time to time during normal business hours upon reasonable

notice to Borrower to examine such books and records at the office of Borrower or such other Person maintaining such books and records and to make such copies or extracts thereof as Lender shall desire. Borrower shall pay any costs reasonably incurred by Lender to examine such books, records and accounts, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

(b)    Borrower shall furnish to Lender:

(i)    Within ninety (90) days after the end of each of Borrower's and Parent's fiscal year, consolidated and consolidating annual financial statements of Borrower and Parent in accordance with Paragraph (t) of **Exhibit C** to this Agreement, on a cash basis, including the notes thereto, consisting of a balance sheet at the end of such completed fiscal year and the related statements of income, retained earnings, cash flows and owners' equity for such completed fiscal year, which financial statements shall be prepared and certified without qualification by an independent certified public accounting firm satisfactory to Lender and accompanied by related management letters, if available.

(ii)    All such financial statements, including, without limitation, those described in Section 7.9(a) above, shall be accompanied by a certificate, executed on behalf of Borrower and Parent, stating that such annual financial statement presents fairly the financial condition and the results of operations of Borrower and Parent. Together with such financial statements, Borrower shall furnish to Lender a certificate, executed on behalf of Borrower, certifying as of the date thereof whether to Borrower's knowledge there exists an Event of Default by Borrower under the Loan Documents and if such Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same.

(c)    Borrower shall cause Guarantor to furnish to Lender:

(i)    (A) within thirty (30) days of filing but not later than October 15th, complete federal and state tax returns and (B) within ninety (90) days after the end of each calendar year, a personal financial statement prepared by an accountant, which financial statement shall include a statement showing the maximum amount of their contingent liabilities or their debts as such debts become absolute and matured.

(ii)    All such financial statements shall be accompanied by a certificate, executed on behalf of such Guarantor, stating that (A) such financial statement (1) is true, complete and accurate in all material respects, and (2) presents fairly the financial condition and the results of operations of such Guarantor in all material respects, and (B) as of the date thereof, such Guarantor, together with the other Guarantors (if any), are in compliance with the financial covenants applicable to such Guarantors in the applicable Guaranty.

(d)    Borrower will furnish Lender on or before the thirty (30) days after the end of each calendar month, the following items, accompanied by a certificate from the authorized officer of Borrower, certifying that such items are true, correct, accurate, and complete in all material respects and fairly present the financial condition and results of the operations of Borrower and the Property in all material respects:

(i)       Financial statements of Borrower;

(ii)      A statement of any litigation or legal action pending or threatened against Borrower; and

(iii)     A certificate, executed on behalf of Borrower, certifying as of the date thereof whether to Borrower's knowledge there exists an Event of Default by Borrower under the Loan Documents and if such Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same.

(e)       Lender and Borrower shall hold a quarterly review meeting or teleconference if requested by Lender.

(f)       Borrower shall furnish to Lender, within ten (10) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Property and the financial affairs of Borrower as may be reasonably requested by Lender.

(g)       From and after the occurrence of an Event of Default, Lender may require, upon written demand and in its sole discretion, audited financial statements of Borrower and Guarantor.

(h)       Without limiting any of Lender's rights or remedies in the event of any failure by Borrower to comply with the provisions of this Section 7.9, if Borrower fails to deliver to Lender any of the financial statements or other information required herein on or before the applicable date required in this Section 7.9 (the "Information Delivery Date"), and if Borrower continues to fail to deliver any such financial statements or other information for ninety (90) days after the Information Delivery Date, Borrower shall pay to Lender a fee in the amount of Two Hundred Fifty and No/100 Dollars ($250.00) per day commencing on the Information Delivery Date until such time as Borrower has delivered all of the financial statements or other information required to be delivered by Borrower pursuant to, and in the form required by, this Section 7.9.

**Section 7.10   Taxes**.

(a)       Borrower's Obligation for Payment of Taxes. Except to the extent Lender makes payments of Taxes from the Tax Reserve (for the periods and payments so covered by such payments), Borrower shall pay or cause to be paid all Taxes when due and payable. Borrower shall deliver promptly to Lender receipts or other reasonable evidence of such payment (and such evidence shall be furnished no later than the date that Taxes would otherwise be delinquent). Borrower shall not suffer, permit, initiate, or otherwise cause for any purpose, the joint assessment of (i) the Property with any other real property constituting a tax lot separate from the Property, or (ii) the Land and the Personal Property, or any other procedure whereby the lien of real property taxes and assessments and the lien of personal property taxes shall be assessed, levied or charged against the Land as a single lien. While any Obligation remains outstanding, the Property shall be segregated on the applicable tax rolls from all other property, both real and personal. Borrower's obligations under this Section 7.10 shall not be affected by any damage to, defects in or destruction of the Property or any other event, including obsolescence of all or any part of the Property.

45

(b)    Contest of Taxes. After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes, provided that (i) no Default or Event of Default has occurred and is continuing; (ii) such proceeding shall suspend the collection of the applicable Taxes from Borrower and the Property or Borrower shall have paid all of the applicable Taxes under protest, (iii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (iv) neither the Property nor any part thereof or interest therein may be sold, forfeited, terminated, cancelled or lost so long as the contest is being pursued, and (v) Borrower shall have deposited with Lender adequate reserves for the payment of the applicable Taxes, together with all interest and penalties thereon, unless Borrower has paid all of the applicable Taxes under protest or Borrower shall have furnished such other security as may be accepted by Lender in its sole discretion to insure the payment of any contested Taxes, together with all interest and penalties thereon.

**Section 7.11    Insurance.**

(a)    Insurance Requirements. Borrower shall maintain such Policies in compliance with and subject to the terms and conditions of **Exhibit D**.

(b)    Borrower's Failure to Maintain Insurance. If Borrower fails to maintain and deliver to Lender certificates of insurance required by Lender as set forth herein and within the time periods required herein, upon ten (10) days prior written notice to Borrower, or such shorter period as may be required in order to insure all Policies required hereunder remain in place, Lender may procure such insurance at Borrower's sole cost and expense, with interest thereon at the Default Rate.

(c)    Adjustment of Casualty Insurance Proceeds. Borrower shall cause any Policy in respect of loss or damage to the Property to provide that any loss equal to or greater than TWO HUNDRED SEVENTY-FIVE THOUSAND AND NO/100 DOLLARS ($275,000.00) (the "**Restoration Threshold**") shall be adjusted by Borrower and Lender together, and Borrower may not settle such loss or claim without the prior written consent of Lender. Any Policy in respect of loss or damage to the Property may provide that, provided no Default or Event of Default has occurred and is continuing, any loss that is less than the Restoration Threshold shall be adjusted solely by Borrower provided such adjustment is carried out in a competent and timely manner. During the continuance of a Default or an Event of Default, all losses shall be adjusted solely by Lender.

(d)    Release. Borrower, for itself, and on behalf of its insurers, hereby releases and waives any right to recover against Lender on account of any liability for: damages for injury to or death of persons; any loss or damage to property, including the property of any occupant of the Property; any loss or damage to buildings or other improvements comprising the Property; any other direct or indirect loss or damage caused by fire or other risks, which loss or damage is or would be covered by the insurance required to be carried hereunder by Borrower, or is otherwise insured; or claims arising by reason of any of the foregoing, except to the extent caused by the gross negligence or willful misconduct of Lender.

      (e)    <u>Miscellaneous</u>. Lender shall not, by reason of accepting, rejecting, obtaining or failing to obtain insurance, incur any liability for (i) the existence, nonexistence, form, amount or legal sufficiency thereof, (ii) the solvency or insolvency of any insurer, or (iii) the payment of losses. All insurance required hereunder or carried by Borrower shall be procured at Borrower's sole cost and expense. Borrower shall deliver to Lender receipts reasonably satisfactory to Lender evidencing full payment of the premiums therefor, except to the extent Lender makes payments from the Insurance Reserve (for the periods and payments so covered by such payments). In the event of foreclosure on, or other transfer of title in lieu of foreclosure of, the Property, all of Borrower's interest in and to any and all Policies in force shall pass to Lender, or the transferee or purchaser as the case may be, and Lender is hereby irrevocably authorized to assign in Borrower's name to such purchaser or transferee all such Policies, which may be amended or rewritten to show the interest of such purchaser or transferee.

**BORROWER HEREBY ACKNOWLEDGES AND AGREES THAT IT IS AWARE OF AND UNDERSTANDS SCHOOLCRAFT V. ROSS (81 CAL. APP. 3D 75 (1981)) AND ITS PROGENY AS WELL AS CALIFORNIA CIVIL CODE SECTION 2924.7 AND FINANCIAL CODE SECTIONS 1227.3 AND 7462, WHICH PERMIT LENDER TO REQUIRE INSURANCE BUT OBLIGATE LENDER TO ALLOW BORROWER TO USE CASUALTY INSURANCE PROCEEDS FOR THE PURPOSE OF REPAIRING OR RESTORING THE PREMISES PLEDGED AS SECURITY FOR THE BORROWER'S OBLIGATIONS TO LENDER UNLESS LENDER'S SECURITY HAS BEEN IMPAIRED. BORROWER HEREBY ACKNOWLEDGES AND AGREES THAT, IN THE EVENT OF A CASUALTY TO THE PREMISES, IF BORROWER FAILS TO REPAIR OR RESTORE THE PREMISES IN A MANNER CONSISTENT WITH THE PROVISIONS OF THIS AGREEMENT, REGARDLESS OF WHETHER SUCH FAILURE IS THE RESULT OF ANY VOLUNTARY ACTION OR INACTION BY BORROWER, OR ANY ACT OR DETERMINATION OF ANY GOVERNMENTAL AUTHORITY (WHETHER PURSUANT TO ANY ZONING, LAND USE OR OTHER ORDINANCE, CODE, REGULATION OR REQUIREMENT OR OTHERWISE), SUCH FAILURE IS AND SHALL BE DEEMED A SUBSTANTIAL IMPAIRMENT OF THE PROPERTY ENTITLING LENDER TO APPLY THE NET INSURANCE PROCEEDS TO THE INDEBTEDNESS IN SUCH ORDER AND MANNER AS LENDER MAY ELECT, WHETHER OR NOT DUE AND PAYABLE, WITHOUT PAYMENT OF ANY PREPAYMENT PREMIUM, WITH ANY EXCESS PAID TO BORROWER. BY INITIALING THIS PROVISION IN THE SPACE PROVIDED BELOW, BORROWER**

**HEREBY ACKNOWLEDGES AND AGREES THAT THE TERMS OF THIS PROVISION HAVE BEEN SPECIFICALLY BARGAINED FOR AND ARE A MATERIAL INDUCEMENT FOR LENDER TO MAKE THE LOAN AND WITHOUT WHICH LENDER WOULD NOT MAKE THE LOAN.**

**BORROWER'S INITIALS:** _____

**Section 7.12    Disposition of Insurance and Condemnation Proceeds and Damages.**

(a)    Lender's Rights in Proceeds and Damages; Settlement of Proceeds.

(i)    Borrower hereby assigns to Lender as security for the Indebtedness and all other Obligations (A) any award for damages suffered or compensation paid by reason of a taking for public use, or an action in eminent domain, or the exercise of the police power, whether by a condemnation proceeding or otherwise (such as by inverse condemnation), or any transfer of all or any part of the Property in avoidance thereof, affecting the Property, (B) all proceeds of any Policies paid by reason of loss sustained to the Property, and (C) all claims, damages, causes of action, against or from any party or parties, with respect to the Property, or any funds received or receivable in connection with any damage to the Property, incurred as a result of any cause whatsoever (collectively, "**Property Claim Proceeds**").

(ii)    Except with respect to proceeds that are less than the Restoration Threshold (which may be payable directly to Borrower subject to Section 7.12(b)), all Property Claim Proceeds shall be paid by the Person making payment directly to Lender; provided, however, that if for any reason such payment is made to Borrower, or to Borrower and Lender jointly, Borrower shall promptly endorse such payment to Lender. After first deducting all costs and expenses of Lender reasonably incurred in connection with the settlement or recovery of any Property Claim Proceeds, Lender may, at its option and without regard to the adequacy of the security hereunder (but subject to Section 7.12(b)), apply any such sum it retains hereunder to any Indebtedness whether due or not, and in such order or priority as Lender may determine. Application of all or any portion of such funds shall not cure or waive any Default or Event of Default, notice of a Default or an Event of Default or invalidate any acts done pursuant to such notice. Borrower shall execute such further assignments, documents or instruments as Lender may from time to time require in order to evidence the assignment hereunder.

(iii)    If, on any loss of or damage to the Property or on a partial taking or condemnation of the Property, Lender is not entitled under law to retain the entirety of any Property Claim Proceeds, then Lender shall be entitled to apply the Property Claim Proceeds to the repayment of the Indebtedness to the extent necessary in Lender's judgment to reduce the Indebtedness by the ratio which the value of the Property remaining encumbered hereby bears to the value of the Property encumbered hereby immediately prior to such loss, damage or partial condemnation or taking, as determined by Lender's appraiser retained for such purpose.

(iv)    Any net proceeds or award remaining after full and final payment of the Obligations shall be returned to Borrower.

(b)    Use of Property Claim Proceeds to Repair Property.

(i)    In the event of damage to or destruction of the Property from any cause for which Borrower has a claim to Property Claim Proceeds, and so long as no Default or Event of Default shall have occurred and is continuing, Lender shall make available to Borrower the Property Claim Proceeds available as a result of such damage or destruction (in each case after deducting costs and expenses reasonably incurred by Lender in connection with the settlement or recovery of any proceeds as provided in Section 7.12 for use by Borrower in the reconstruction and repair of the damaged Improvements to their prior condition on the terms and conditions set forth in Section 7.12(b)(ii) below, in lieu of applying such net proceeds to the Indebtedness pursuant to Section 7.12(a).

(ii)    In the event the Property Claim Proceeds for any casualty are equal to or less than the Restoration Threshold, Lender agrees to make the Property Claim Proceeds available to Borrower, solely for the purpose of repairing and restoring the applicable damage. In the event the Property Claim Proceeds exceed the Restoration Threshold, Lender agrees to make the Property Claim Proceeds available to Borrower only upon satisfaction of each of the following conditions: (A) Lender shall be satisfied in its sole discretion, that by expenditure of the net proceeds hereunder the Property damaged or destroyed shall be fully restored within a reasonable period of time to the condition and value contemplated by this Agreement, and all payments required under the Loan will continue to be paid; (B) in Lender's good faith judgment, such work of repair and restoration can be completed in the ordinary course of business not later than the earlier of (1) six (6) months prior to the Maturity Date and (2) the outside date, if any, under any Lease or any Legal Requirement; (C) Lender shall have reviewed and approved Borrower's plans and specifications for the work of repair and restoration, Borrower's architect and any general contractors, subcontractors and material suppliers employed to perform such work; (D) if so required by Lender in its Permitted Discretion, all general contractors, all major subcontractors and material suppliers shall have supplied one hundred percent (100%) performance and completion bonds; (E) if the net insurance proceeds available are insufficient for payment of the full cost of restoration or repair and the payments under the Loan during the Completion period, as estimated by Lender, then Borrower shall have deposited with Lender sufficient additional funds to insure payment of all such costs, or made arrangements acceptable to Lender for such sufficient additional funds, such additional funds to be disbursed for costs incurred in the manner herein specified prior to the disbursement of any other funds held by Lender; (F) rent loss or business interruption insurance is available to cover the full amount of any loss of income from the Property during its repair and restoration; provided, however, in the event Lender reasonably determines in its sole discretion that the proceeds of such rent loss or business interruption insurance is insufficient, Lender may, at its sole discretion, require Borrower to fund an additional reserve account to cover the full amount of any loss of income from the Property during its repair and restoration; (G) evidence of the implementation of builder's risk coverage for the Property with coverage and in such amounts as Lender shall request and which otherwise complies with the insurance requirements set forth in Section 7.11 hereof; (H) the full cost of repair and restoration is estimated not to exceed ten percent (10.0%) of the outstanding principal balance of the Loan as of such date of determination; (I) if the Property Claim Proceeds are derived from a partial condemnation of the Property, the condemnation, in the judgment of Lender, shall have no Material Adverse Change on the operation or value of the Property; and (J) Borrower shall have satisfied such other conditions as Lender may in good faith

49

determine to be appropriate. The disbursement of all or any Property Claim Proceeds to Borrower pursuant to this Section 7.12(b) shall not cure or waive any Default or Event of Default or notice of a Default or an Event of Default or invalidate any acts done pursuant to such notice. In the event that any of the conditions to Borrower's right to utilize Property Claim Proceeds are not satisfied or fulfilled at any time, such Property Claim Proceeds shall be applied as provided in Section 7.12(a).

(iii)    Property Claim Proceeds held by Lender hereunder for Borrower's benefit shall bear interest; provided, however, that Lender shall have no duties or obligations with respect thereto, or with respect to the provisions of this Section 7.12(b), other than that of a lender; and the reasonable costs and expenses of Lender incurred in connection therewith shall be paid by Borrower (and Lender shall be entitled to pay such costs and expenses out of the insurance proceeds held by Lender) and shall be deemed Loan Expenses hereunder. Specifically, but without limiting the generality of the foregoing, no relationship of trust, or any other duty in the nature of fiduciary duties or otherwise, shall be imposed or implied by the status or actions of Lender hereunder; and under no circumstances shall Lender become obligated to take any action to repair or reconstruct any damaged or destroyed Property.

**Section 7.13    Maintenance and Preservation of the Property.**

(a)    Borrower's Obligation for Maintenance of Property and Security. Borrower shall: (i) keep the Property in good condition and repair, and replace any items comprising the Property as they become obsolete or worn out with items of at least the same utility, quality and value, free of any Liens other than the Permitted Exceptions, reasonable wear and tear excepted; (ii) not remove or demolish the Property; (iii) restore promptly and in good and workmanlike manner any part of the Property which may be damaged or destroyed (subject to receipt of Property Claim Proceeds for such purpose); (iv) comply with and not suffer violations of any Legal Requirements and requirements of insurance companies and any bureau or agency which establishes standards of insurability; (v) not commit or permit physical waste of the Property; (vi) do all other acts which from the character or use of the Property may be reasonably necessary to maintain and preserve its value or to protect the security hereof; (vii) perform and comply in all material respects with all obligations required to be performed or complied with in any leases, licenses, concessions, management agreements, or like material agreements affecting the Property or the operation or use thereof; (viii) pay any and all charges, assessments or fees imposed in connection with the delivery, installation or maintenance of any utility services or installations on, to or for the Property on or prior to the due date thereof; (ix) not change the use of the Property to anything other than the current use of the Property; (x) not drill for or extract, or enter into a lease or any other type of agreement for the drilling for or extraction of, oil, gas or other hydrocarbon substances, or any mineral of any kind, on, in or under the Property; (xi) make no assignment of rents of the Property except to Lender; and (xii) execute and, where appropriate, acknowledge and deliver, such further documents or instruments as Lender reasonably deems necessary or appropriate to preserve, continue and perfect the security provided for herein.

(b)    Lender's Approval Rights for Work. Except to the extent contemplated by this Agreement, Borrower shall not undertake or suffer to be made any material alteration, addition, relocation, removal or demolition of, or structural or other material change in, any building, improvement, fixture, machinery, or equipment comprising the Property, whether in

connection with a new Lease or otherwise, (collectively, an "**Alteration**"), without the prior written approval of Lender, which approval may be withheld in Lender's sole discretion; provided; however, that Borrower may undertake one or more Alterations, without Lender's prior written consent, subject to the prior satisfaction of each of the following conditions (i) each such Alteration does not exceed FIFTY THOUSAND AND NO/100 DOLLARS ($50,000.00) in total costs, (ii) such Alterations do not exceed ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($100,000.00) in the aggregate during the Term, (iii) such work does not affect the roof or the structure of the building and improvements comprising the Property, or adversely affect or diminish the value of the Property or arise as a result of any damage (other than ordinary wear and tear) or destruction to the Property, and (iv) such work is designed (if applicable) by licensed professionals and is constructed by licensed contractors, all qualified for such purpose, and in accordance with all applicable laws, ordinances, regulations, Permits and approvals.

Lender reserves the right to use the services of Lender's Construction Consultant in connection with the approval and ongoing monitoring of any such Alteration.

(c)     Compliance with Legal Requirements. Without the prior written consent of Lender, Borrower shall not seek, make or consent to any change in the lot or parcel boundaries, zoning, conditions of use, or any other Legal Requirements which would constitute a violation of the warranties and representations herein contained, or would change the nature of the intended use or occupancy of the Property. Borrower shall, within the ten (10) Business Days after receipt by Borrower or its representative, deliver to Lender copies of any and all approvals, permits required pursuant to applicable Legal Requirements with respect to the Property or any other improvements thereon, or the occupancy, use and enjoyment thereof. Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner that could reasonably be expected to result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Lender.

### Section 7.14   Borrower Improvements; Construction Activities.

Without in any way limiting the other requirements expressly set forth herein respecting renovation and construction, Borrower shall commence construction of the Borrower Improvements on or before the Commencement Date and Complete all Borrower Improvements, in conformance with the Plans and Specifications and on a lien-free basis, on or before the Completion Date. Borrower shall be solely responsible for all costs and expenses of all Borrower Improvements.

### Section 7.15   Phase II Existing Debt.

At all times throughout the Term, and until the Indebtedness is repaid in full to Lender, the outstanding principal amount under the Phase II Existing Loan shall not exceed an amount equal to Twenty-Five Million and No/100 Dollars ($25,000,000.00).

**Section 7.16   Proceedings to Enjoin.**

If any proceedings are filed or are threatened to be filed seeking to (a) enjoin or otherwise prevent or declare invalid or unlawful the occupancy, maintenance or operation of the Property or any portion thereof, (b) adversely affect the validity or priority of the Liens and security interests granted Lender hereunder or under any other Loan Document, (c) adversely affect the financial condition of Borrower, or (d) adversely affect the financial condition of Guarantor in a manner that could reasonably be anticipated to result in a Material Adverse Change, then Borrower will notify Lender of such proceedings and within two (2) Business Days following Borrower's actual notice of such proceedings, Borrower will cause such proceedings to be vigorously contested in good faith, and in the event of an adverse ruling or decision, prosecute all allowable appeals therefrom. Without limiting the generality of the foregoing, Borrower will resist the entry or seek the stay of any temporary or permanent injunction that may be entered, and use its best efforts to bring about a favorable and speedy disposition of all such proceedings.

**Section 7.17   Distributions.**

Borrower shall not make any Distributions (including Distributions of any accumulated earnings and profits) during the Term.

**Section 7.18   Transfer or Encumbrance of the Property.**

Borrower acknowledges that the financial standing and managerial and operational ability of Borrower are substantial and material considerations to Lender in their agreement to make the Loan and that any encumbrance or transfer of an interest in the Property will materially impair Lender's security hereunder. In order to induce Lender to make the Loan, Borrower agrees (subject to the further terms and conditions of this Section 7.18): (i) not to change, directly or indirectly, the ownership of Borrower or Parent; and (ii) not to effect a Transfer without in each instance first obtaining Lender's prior written consent, which consent may be withheld for any reason, or given upon such terms and conditions as Lender shall require, all within Lender's sole discretion, to the extent permitted by applicable law. Borrower acknowledges and agrees that any transaction or event of any kind effecting a Transfer or further encumbering the Property, or changing the identity of the parties primarily liable for performance of Borrower's covenants under this Agreement shall constitute an impairment of Lender's security interests under this Agreement.

**Section 7.19   Leases.**

Borrower shall not enter into any Lease without the prior written consent of Lender. All Leases shall be expressly subordinate to the Security Instrument unless Lender elects in writing, at its sole option, to subordinate the Security Instrument to a particular Lease or Leases. Additionally, all Leases shall provide, in a manner approved by Lender, that the tenant thereunder shall recognize as its lessor and attorn to any Person succeeding to the interest of Borrower upon foreclosure of the Security Instrument (or deed in lieu thereof).

**Section 7.20** **Prohibition Against Additional Recordings**.

Borrower will not record or permit to be recorded any document, instrument, agreement or other writing against the Property without the prior written consent of Lender. Borrower will not enter into, modify, waive, grant any consent under, or release, surrender or terminate any easements, restrictive covenants or other instruments constituting Permitted Exceptions, or suffer, consent to or permit the foregoing, without Lender's prior written consent, which consent may be granted or denied in Lender's sole discretion.

**Section 7.21** **Change in Name**.

Borrower will not change its name without first obtaining the prior written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed. In the event Lender grants such consent, Borrower shall, at Borrower's sole cost and expense, take all action required by Lender for the purpose of perfecting or protecting the lien and security interest of Lender. Borrower shall promptly notify Lender in writing of any change in Borrower's organizational identification number.

**Section 7.22** **Debt Cancellation; Settlement of Claims**.

Borrower shall not, in any calendar year, without the consent of Lender, (a) cancel or otherwise forgive or release any Debt owed to Borrower by any Person, or (b) settle any Claim against Borrower, other than a fully insured third party Claim.

**Section 7.23** **Affiliate Transactions**.

Borrower shall not enter into, or be a party to, any transaction with any Borrower Party or any Affiliate of any Borrower Party, directly or indirectly, without the prior written consent of Lender.

**Section 7.24** **Limitation on Issuance of Equity Interests**.

Without the prior written consent of Lender, Borrower will not issue any Equity Interests in Borrower other than those that have been issued as of the date hereof.

**Section 7.25** **Compliance**.

Borrower shall not be in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might materially adversely affect the condition (financial or otherwise) or business of Borrower. Borrower shall not commit any act that may give any Governmental Authority the right to cause Borrower to forfeit the Property or any part thereof or any monies paid in performance of Borrower's Obligations under any of the Loan Documents. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture. Borrower shall cooperate fully with Lender with respect to, and permit Lender, at its option to participate in, any proceedings before any Governmental Authority which may in any way affect the rights of Lender under any Loan Document.

### Section 7.26    Anti-Terrorism; OFAC; Patriot Act.

No Borrower Party shall, nor shall any Borrower permit any person Controlling, Controlled by or under common Control with Borrower Party or any other Transaction Person to, (a) be or become a Person whose property or interests in property are blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit or Support Terrorism (66 Fed. Reg. 49079 (2001)), (b) engage in any dealings or transactions prohibited by Section 2 of such executive order, or otherwise be associated with any such Person in any manner in violation of Section 2 of such executive order, or (c) otherwise become a Person on the list of Specially Designated Nationals and Blocked Persons in violation of the limitations or prohibitions under any other OFAC regulation or executive order. Borrower shall, promptly following a request by Lender, provide all documentation and other information that Lender requests in order to comply with its ongoing obligations under applicable "**know your customer**" and anti-money laundering rules and regulations, including the Patriot Act.

### Section 7.27    Material Contracts.

Borrower shall: (a) pay, observe and perform in all material respects all terms, covenants and conditions of each Material Contract prior to the expiration of any applicable grace period provided therein; (b) not cause or permit the occurrence of any event that would cause any Material Contract to terminate, or that would entitle any other party to a Material Contract to terminate such Material Contract or that could give rise to the creation of a lien on the Property or any portion thereof; (c) not enter into a Material Contract without Lender's prior written consent; (d) not agree to or permit the termination of any Material Contract; and (e) not cause or permit any Material Contract to be modified or supplemented without Lender's consent (other than pursuant to a modification or supplement that is entirely ministerial in nature), which consent shall, so long as no Event of Default is continuing, not be unreasonably withheld or delayed. In addition to the foregoing, Borrower shall not enter into any Property Management Agreement without Lender's prior written consent. Upon execution of the Property Management Agreement, Borrower and Property Manager shall enter into an assignment and subordination of management agreement in form and substance satisfactory to Lender. In the event that, with the prior written consent of Lender, the Property Management Agreement is terminated, Borrower shall engage a replacement property manager satisfactory to Lender in its reasonable discretion pursuant to a replacement property management agreement satisfactory to Lender in its reasonable discretion. Concurrently with the execution of a replacement property management agreement acceptable to Lender in its reasonable discretion, Borrower and the replacement property manager shall execute an assignment and subordination of management agreement in form and substance acceptable to Lender in its reasonable discretion.

### Section 7.28    Limitation on Debt.

Neither Borrower nor any Borrower Party shall directly or indirectly create, incur or assume, or suffer to exist or remain obligated with respect to, any Debt other than Permitted Debt.

**Section 7.29    Changes in Approved Construction Budget.**

Borrower shall cause all Borrower Improvements to be constructed in accordance with the Approved Construction Budget, and shall make no changes to the Approved Construction Budget without the prior written consent of Lender, except to the extent expressly permitted pursuant Section 5.3(a) hereof.

**Section 7.30    Hazardous Materials Covenants.**

Borrower hereby covenants and agrees as follows:

(a)    No Hazardous Activities. Borrower shall not permit or cause the Property to be used as a site for the use, generation, manufacture, storage, treatment, disposal, discharge, release, transportation or presence of any Hazardous Materials.

(b)    Compliance. Borrower shall comply and cause the Property to comply with all Hazardous Materials Laws. In addition, if there is mold (including, without limitation, Toxic Mold), mildew, and viruses, whether or not living, present on or about the Property which could reasonably be anticipated to have a Material Adverse Change on the Property, or poses a threat to the life, safety or health of the occupants therein, Borrower shall remedy such condition to Lender's satisfaction.

(c)    Notices. Borrower shall, upon becoming aware of the same, promptly notify Lender in writing of: (i) the discovery of any Hazardous Materials on, under or about the Property; (ii) any knowledge by Borrower that the Property does not comply with any Hazardous Materials Laws; or (iii) any Claims or actions pending or threatened against Borrower or the Property relating to Hazardous Materials or pursuant to Hazardous Materials Laws (individually and collectively, "**Hazardous Materials Claims**").

(d)    Remedial Action. In response to the presence of any Hazardous Materials on, under or about the Property, subject to Lender's prior approval, Borrower shall promptly (and in all events within the time period required under applicable Hazardous Materials Laws) take, at Borrower's sole cost and expense, all remedial action required by any Hazardous Materials Laws or any judgment, consent decree, settlement or compromise with respect to any Hazardous Materials Claims.

**Section 7.31    In-Balance.**

Borrower shall at all times cause the undisbursed portion of the Construction Costs Holdback (taking into account any Cost Savings) and the Borrower Funded Site Improvements Holdback that is allocated to the soft costs, hard costs, and other capital expenditures required by Lender to be equal to or greater than the amount which Lender from time to time determines in its Permitted Discretion necessary to pay, through Completion, all costs to Complete all work required to be Completed under the Approved Construction Budget through the Term of the Loan ("**In-Balance**"). If Lender determines in its Permitted Discretion at any time that the undisbursed Loan funds (and available Holdbacks and Reserve funds) are insufficient for said purposes, then Borrower shall deposit the amount of such deficiency ("**Construction Gap Funds**") into a reserve account held by Lender (the "**Balance Reserve Account**") within ten (10) Business Days

of Lender's written demand and, notwithstanding anything to the contrary in this Agreement, Lender shall not be required to disburse any proceeds of the Loan until Borrower deposits such Construction Gap Funds into the Balance Reserve Account as required by this Section 7.31. Borrower's failure to fund any In-Balance demand made by Lender within the time required shall be an immediate Event of Default without further notice or demand by Lender. Any funds deposited in accordance with this paragraph shall be available for payment of costs and expenses enumerated in this Section 7.31 prior to the disbursement of the Construction Costs Holdback and/or Borrower Funded Site Improvements Holdback, as applicable.

## ARTICLE 8

## DEFAULTS

**Section 8.1    Event of Default**.

Each of the following events shall constitute an event of default hereunder (an "**Event of Default**"):

(a)    (i) any monthly installment of interest due under this Agreement is not paid when due, or (ii) any payment of principal due under this Agreement or the payment due on the Maturity Date is not paid when due, or (iii) any Contingent Interest is not paid when due, or (iv) any other portion of the Indebtedness, or any other amount required to be paid hereunder or under any other Loan Document is not paid when due, or, if no due date is stated, within five (5) days of written demand;

(b)    The failure to pay Taxes when the same are due and payable (unless Borrower satisfied the conditions for disbursement of such funds and Lender fails to disburse such funds to pay the Taxes when and as due in violation of this Agreement) subject to Borrower's right to contest Taxes pursuant to Section 7.10(b);

(c)    Any representation or warranty made by Borrower or any Borrower Party herein or in any other Loan Document or in any report, certificate, financial statement or other instrument, agreement or document furnished by Borrower or any other Borrower Party in connection with the Loan or any Loan Document shall have been false or misleading in any material respect as of the date the representation or warranty was made (or remade in accordance with the terms of this Agreement or any other Loan Document); provided, however, if (i) Borrower or any Borrower Party makes a good faith, unintentional misrepresentation, and (ii) the underlying facts or situation that rendered such representation inaccurate or untrue can be remedied to Lender's satisfaction (in its Permitted Discretion) within thirty (30) days following the earlier to occur of the discovery of such misrepresentation by Borrower or written notice from Lender to Borrower of such misrepresentation and Borrower or any Borrower Party, as applicable, actually remedies said underlying facts or situation so as to make the original representation true and correct on a going forward basis prior to the expiration of said thirty (30) day period, then such misrepresentation shall not be deemed to be an Event of Default;

(d)    The existence of any collusion, fraud, dishonesty or bad faith by or with the acquiescence of Borrower or any other Borrower Party which in any way relates to or affects the Loan or the Property;

(e)    The occurrence of any condemnation proceeding that, in the reasonable judgment of Lender, (i) significantly impairs the value of the remaining Property, (ii) materially alters the Lease or the operations at such remaining Property, or (iii) renders all or a material portion of such remaining Property unusable for its intended purposes;

(f)    Borrower or any other Borrower Party shall:

(i)    file a voluntary petition in bankruptcy or for an arrangement or reorganization under any federal or state bankruptcy, insolvency or debtor relief law or statute (hereinafter referred to as a "**Bankruptcy Proceeding**");

(ii)    file any answer in any Bankruptcy Proceeding or any other action or proceeding admitting insolvency or inability to pay its debts;

(iii)    fail to oppose, or fail to obtain a vacation or stay of, any involuntary Bankruptcy Proceeding within ninety (90) days after the filing thereof;

(iv)    solicit or cause to be solicited, or any Affiliate of any Borrower Party solicits or causes to be solicited, petitioning creditors for any involuntary Bankruptcy Proceeding against Borrower Party;

(v)    be granted a decree or order for relief, or be adjudicated a bankrupt or declared insolvent in any Bankruptcy Proceeding, whether voluntary or involuntary;

(vi)    have a trustee or receiver appointed for or have any court take jurisdiction of its property, or the major part thereof, or all of any portion of the Property, in any voluntary or involuntary proceeding for the purpose of reorganization, arrangement, dissolution or liquidation, and, with respect to an involuntary proceeding only, such trustee or receiver is not discharged or such jurisdiction is not relinquished, vacated or stayed on appeal or otherwise, within ninety (90) days after the commencement thereof;

(vii)    make an assignment for the benefit of creditors;

(viii)    consent to any appointment of a receiver or trustee or liquidator of all of its property, or the major part thereof, or all or any portion of the Property or all or any portion of the property of Borrower Party; or

(ix)    have an attachment or execution levied with respect to, or other judicial seizure be effected for, all or substantially all of its assets or all or any portion of the Property, or the placing of any attachment, levy of execution, charging order, or other judicial seizure on the interest of Parent in Borrower.

(g)    The occurrence of any Transfer;

(h)    The breach of any of the representations, warranties or covenants contained in Article 6 of this Agreement;

(i)    The occurrence of a Material Adverse Change;

(j)    The dissolution, termination or merger, whether voluntarily or involuntarily, of Borrower or any other Borrower Party that is not a natural person;

(k)    Any default in any of the Loan Documents beyond any applicable notice and cure period, including, without limitation, failure by any Guarantor to comply with the financial covenants set forth in the Guaranty;

(l)    The entry of a final judgment, final order or final decree for the payment of money against any Borrower Party (other than Guarantor) in excess of one percent (1%) of the Loan Proceeds, which is not satisfied and paid, or enforcement of which has not been stayed, within sixty (60) days after the date of entry of such judgment, order or decree;

(m)    The term of any Policy required by this Agreement shall expire or lapse, or Borrower receives notice of cancellation of any such Policy and Borrower does not provide Lender with written evidence of a replacement or renewal Policy complying with this Agreement at least ten (10) Business Days prior to the date of cancellation or expiration of such Policy;

(n)    This Agreement or any other Loan Document shall, in whole or in part, terminate, cease to be effective or cease to be a legally valid, binding and enforceable obligation of Borrower or any other Borrower Party; any party to any Loan Document (other than Lender) shall assert in writing that such document has ceased to be in full force and effect; or the Liens created pursuant to any Loan Document shall cease to be a fully perfected enforceable first priority security interest due to an act or omission of Borrower or any Borrower Party;

(o)    Borrower attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(p)    Any required permit, certificate or approval with respect to the Property lapses or ceases to be in full force and effect and is not reinstated within thirty (30) days of the date of the lapse occurs;

(q)    Any Event of Default identified in any other provision of this Agreement occurs, or any Event of Default (as defined in the Security Instrument or any other Loan Document) occurs, or a default occurs under any term, covenant or provision set forth herein or in any other Loan Document which specifically contains a notice requirement or grace period and such notice has been given and such grace period has expired;

(r)    (i) a default or breach by Borrower under any Lease which shall not be cured within any applicable grace period set forth therein, or (ii) any modification, amendment, cancellation, termination or assignment or sublet of any Lease that is entered into or consented to without the prior written consent of Lender in violation of Section 7.21 hereof;

(s)    Borrower or any other Borrower Party fails to perform or cause to be performed any other obligation or observe any other condition, covenant, term, agreement or provision required to be performed or observed by Borrower or any other Borrower Party contained in this Agreement or any other Loan Document and not specifically referred to elsewhere in this Section 8.1 or the default section of such other Loan Document; provided, however, that if such failure by its nature can be cured, then so long as the continued operation

58

and safety of the Property, and the priority, validity and enforceability of the Liens created by the Security Instrument or any of the other Loan Documents and the value of the Property is not impaired, threatened or jeopardized in any material respect, then Borrower shall have a period of thirty (30) days after Borrower obtains knowledge of such failure or receives written notice of such failure to cure the same (provided, however, that such period shall be limited to ten (10) days if such failure can be cured by the payment of money) and an Event of Default shall not be deemed to exist during the cure period, provided, further, that if such failure cannot be cured by the payment of money and Borrower commences to cure such failure during the cure period and is diligently and in good faith attempting to effect such cure, the cure period shall be extended for thirty (30) additional days, but in no event shall the cure period be longer than ninety (90) days in the aggregate;

(t)    If Borrower fails to commence construction of the Borrower Improvements on or before the Commencement Date or if, subsequent to the commencement of construction of the Improvements, such construction is, (i) discontinued due to acts or matters within Borrower's control for a period of twenty (20) or more consecutive days; (ii) not carried on with reasonable dispatch; (iii) not Completed by the Completion Date; or (iv) if Borrower is unable to satisfy any condition of Borrower's right to receive additional advances of Loan Proceeds hereunder for a period in excess of thirty (30) days after Lender's refusal to make any further such additional advances;

(u)    If any building permit for all or any portion of the Property shall be removed or suspended for twenty (20) days or longer, or if, after Completion, Borrower fails to comply with any Legal Requirements pertaining to the Property, such that an occupancy permit is or would be denied due to such condition or circumstance and such condition or circumstance remains unchanged and uncured upon the expiration of thirty (30) days after the occurrence of thereof;

(v)    Borrower executes any conditional bill of sale, chattel mortgage or other security instrument covering any materials, Fixtures or articles intended to be incorporated in the Borrower Improvements or the appurtenances thereto, or covering articles of personal property placed in the Borrower Improvements, or files a financing statement publishing notice of such security instrument, or if any of such materials, Fixtures or articles are not purchased in such a manner that the ownership thereof vests unconditionally in Borrower, free from encumbrances, on delivery at the Land, or if Borrower does not produce to Lender upon reasonable demand the contracts, bills of sale, statements, receipted vouchers or agreements, or any of them, under which Borrower claims title to such materials, Fixtures and articles;

(w)    A closing and funding under the Phase II Refinancing Loan does not occur on or before the date that is ten (10) Business Days after Lender delivers written notice to the effect that Lender is prepared to consummate the Phase II Refinancing Loan subject only to satisfaction of the conditions precedent set forth in clauses 1, 2 and 3 in **Exhibit F** hereto, or the Affiliates of Borrower which together own all of the Phase II Parcels fail to accept and borrow the Phase II Refinancing Loan and to repay the Phase II Existing Debt with the proceeds thereof on or prior to such date, for any reason other than breach by Lender of its commitment set forth in hereof; or

59

(x)    At any time after the Phase II Refinancing Loan is made, an "Event of Default" (as defined in any of the Phase II Refinancing Loan Documents) occurs.

**Section 8.2    Remedies Conferred upon Lender**. Upon the occurrence and continuance of any Event of Default, in addition to any other rights or remedies available to it pursuant to the Loan Documents or at law or in equity, Lender may take such action, without notice, or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property, and without limiting the foregoing, Lender may pursue any one or more of the following remedies concurrently or successively, it being the intent hereof that none of such remedies shall be to the exclusion of any others:

(a)    Take possession of the Property and do anything required, necessary or advisable in Lender's sole judgment to fulfill the Obligations of Borrower. Without restricting the generality of the foregoing and for the purposes aforesaid, Borrower hereby appoints and constitutes Lender as Borrower's lawful attorney-in-fact with full power of substitution in the premises to perform the following actions:

(i)    to make Protective Advances or to advance funds in excess of the stated amount of the Loan to preserve the Collateral;

(ii)    without inquiring into and without respect to the validity thereof, to pay, settle or compromise all existing bills and claims which may be Liens, or to avoid such bills and claims becoming Liens, against the Property or any portion of the Property or as may be necessary or desirable for the clearance of title to the Property or portion thereof;

(iii)    to prosecute and defend actions or proceedings in connection with the Property;

(iv)    to take action and require such performance as Lender deems necessary or advisable under any of the bonds to be furnished hereunder and to make settlements and compromises with the surety or sureties thereunder, and in connection therewith, to execute instruments of release and satisfaction; and

(v)    to do any and every act which Borrower might do in its own behalf with respect to the Property, including but not limited to executing new Leases and complying with any obligations of the landlord thereunder, it being understood and agreed that this power of attorney shall be a power coupled with an interest and cannot be revoked.

(b)    Withhold further disbursement of the proceeds of the Loan and terminate any of its obligations to Borrower;

(c)    Declare all Indebtedness to be due and payable forthwith, without presentment, demand, protest or other notice of any kind, all of which Borrower hereby expressly waives; provided, that without limiting the foregoing, upon any Event of Default described in Section 8.1(f), the entire Indebtedness and all other Obligations shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained in any Loan Document to the contrary notwithstanding;

(d)    In addition to any rights of setoff that Lender may have under applicable law, Lender, without notice of any kind to Borrower, may appropriate and apply to the payment of the Indebtedness or of any sums due under this Agreement any and all balances, deposits, credits, accounts, certificates of deposit, instruments or money of Borrower then or thereafter in the possession of Lender; and

(e)    Exercise or pursue any other remedy or cause of action permitted at law or in equity or under this Agreement or any other Loan Document, including, but not limited to, foreclosure of the Security Instrument and enforcement of all Loan Documents.

**Section 8.3    Right of Lender to Make Advances to Cure Event of Defaults; Obligatory Advances**.

If Borrower shall fail to perform any of its covenants or agreements herein or in any of the other Loan Documents contained, Lender may (but shall not be required to) perform any of such covenants and agreements, and any amounts expended by Lender in so doing pursuant to this Section 8.3 hereof and any amounts otherwise advanced by Lender pursuant to this Agreement shall be deemed advanced by Lender under an obligation to do so regardless of the identity of the Person or Persons to whom said funds are disbursed.

**Section 8.4    Payment of Costs, Expenses and Attorneys' Fees**.

All costs and expenses incurred by Lender pursuant to this Article 8 (including court costs and reasonable attorneys' fees and costs) whether or not incurred in litigation and whether or not foreclosure is concluded, including, without limitation, reasonable attorneys' fees, costs and expenses incurred in connection with any judicial or non-judicial foreclosure of the Security Instrument or the other Loan Documents, or in connection with both judicial and non-judicial foreclosure, if Lender shall elect to pursue each such remedy whether concurrently or independently, and the costs and expenses of retaking, holding, preparing for sale or selling all or any portion of the Collateral shall be secured by the Security Instrument and shall bear interest at the Default Rate from the date of expenditure until such sums have been paid. In addition, Borrower acknowledges and agrees that following a Default, (a) Lender shall have the right to retain counsel for itself and (b) Borrower shall be responsible for paying all of the costs and expenses described above that are incurred by Lender. This provision is separate and several and shall survive merger into judgment hereon.

**Section 8.5    Remedies Cumulative; No Waiver**.

All rights and remedies of Lender hereunder and under the other Loan Documents are cumulative and not alternative, and are in addition to all rights and remedies otherwise provided by law. No exercise of any right or remedy by Lender shall constitute a waiver of any other right or remedy. No delay or omission by Lender to exercise any right, power or remedy hereunder shall impair any such right or remedy, or be construed as a waiver of any Event of Default, or any acquiescence therein. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing, (i) to the extent permitted by applicable law, Lender is not subject to any "**one action**" or "**election of remedies**" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property, the Security Instruments have

been foreclosed, the Property has been sold and/or otherwise realized upon in satisfaction of the Indebtedness or the Indebtedness has been paid in full. Nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to any particular portion of the Property for the satisfaction of any of the Obligations in preference or priority to any other portion of the Property, and Lender may seek satisfaction out of the entire Property or any part thereof, in its sole discretion, in respect of the Obligations. By accepting payment of any part of the Indebtedness after its due date or later performance of any Obligation, Lender shall not waive its right against any Person obligated directly or indirectly hereunder, or on any Obligation, either to require prompt payment when due of all other Indebtedness or to declare an Event of Default for failure to make such prompt payment or render such performance; and Lender's acceptance of partial payment of any portion of the Indebtedness after its due date (which may be applied to such outstanding payment obligations as Lender may elect, notwithstanding Borrower's instructions to the contrary), or acceptance of partial performance of any Obligation in default, shall not cure such payment failure or default, or affect any notice of an Event of Default or sale heretofore given or recorded, unless such notice is expressly revoked in writing by Lender. For avoidance of doubt, (i) any reference in this Agreement or in any other Loan Document to an Event of Default "**continuing**" or words of similar import, shall not be deemed to imply or create any obligation on the part of Lender to waive, or to accept a cure of, an Event of Default, and (ii) once an Event of Default "**occurs**" it shall be deemed to continue unless and until Lender agrees in writing to waive or accept the cure of such Event of Default, which Lender shall decide in its sole discretion.

### Section 8.6    <u>Severance</u>.

Lender shall have the right from time to time to sever this Agreement, the Note (if applicable) and the other Loan Documents into one or more separate notes, mortgages and other security documents in such denominations and priorities of payment and liens as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies. Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender; provided, however, that in each such instance the outstanding principal balance of all notes (or other components of the Loan) immediately after the effective date of such severance equals the outstanding principal balance of the Loan immediately prior to such severance and the weighted average of the interest rates for all notes (or such other components of the Loan) immediately after the effective date of such modification equals the interest rate on the Loan immediately prior to such modification. Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such severance, Borrower ratifying all that such attorney shall do by virtue thereof; provided, that Lender shall not exercise its rights under such appointment unless Borrower has failed to execute any such documents within five (5) Business Days after request by Lender. All costs and expenses (including reasonable attorneys' fees) incurred by Lender in connection with any such severance shall be paid by Borrower upon request by Lender.

**Section 8.7**    **Default Rate**.

From and after the occurrence and during the existence of an Event of Default, interest on all Indebtedness, at Lender's option in its sole discretion, shall accrue at the Default Rate and be payable on demand. The failure of Lender to charge interest at the Default Rate shall not be evidence of the absence of an Event of Default or waiver of an Event of Default by Lender.

## ARTICLE 9

## MISCELLANEOUS

**Section 9.1**    **Notices**. All notices or other written communications hereunder shall be deemed to have been properly given (a) upon delivery if delivered in person, (b) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, (c) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, or (d) one (1) Business Day after delivery if sent by email, provided that the recipient has acknowledged receipt by telephone and that a carbon copy of such notice is sent simultaneously by the other methods provided in this Section. All notices or other written communications hereunder shall be addressed to the individuals at the addresses set forth below, or at such other address as such party may, at least ten (10) days in advance, designate by written notice to the other parties. Any notice to legal counsel or other Person other than the primary addressee for Borrower or Lender below shall be a courtesy copy only and shall not affect the timeliness or effectiveness of delivery of any notice.

| | |
|---|---|
| **To Borrower:** | Treetop Development, LLC<br>9454 Wilshire Boulevard, Suite 208<br>Beverly Hills, California 90212<br>Attention: Mohamed Hadid<br>Email: hadidaspen@aol.com |
| **With a copy to:** | Hadid Development<br>1507 7th Street, #610<br>Santa Monica, California 90401<br>Attention: Justin Cozart<br>Email: justin@privatewealthbank.com |
| **With a copy to:** | Law Offices of Abdulaziz, Grossbart & Rudman<br>6454 Coldwater Canyon Avenue<br>North Hollywood, California 91606<br>Attention: Bruce Rudman<br>Email: bdr@agrlaw.com |

**To Lender:**        Skylark Capital Management, LLC
                     c/o Eisner, P.C.
                     9601 Wilshire Boulevard, 7th Floor
                     Beverly Hills, California 90210
                     Attention: Brian D. Kilb
                     Email: bkilb@eisnerlaw.com

**Section 9.2**    <u>**Reimbursement for Expenses**</u>.

Borrower shall pay (on the date of the initial funding of the Loan, and thereafter, as the case may be) all reasonable legal fees and all other costs and expenses reasonably incurred by Lender or Servicer or any of their Affiliates (individually or collectively, as the context may apply, a **"Reimbursement Party"**), prior to or after the Closing Date, including, without limitation, the following: (a) all expenses reasonably incurred by any Reimbursement Party in connection with the Loan, including fees and expenses of any Reimbursement Party's attorneys, environmental, engineering, appraisal, and other consultants; (b) judgment and tax lien searches; (c) title search fees; (d) Other Taxes, directly or indirectly, arising out of the Collateral; (e) wire transfer fees; (f) any other fees, charges or taxes for the negotiation, modification, recording or filing of the Loan Documents and all legal opinions by counsel for any Person pursuant to the Loan Documents; (g) all expenses of any Reimbursement Party reasonably incurred in connection with the administration of the Loan, including audit costs inspection fees, attorneys' fees and disbursement; (h) settlement of condemnation and casualty awards; (i) premiums for title insurance and endorsements thereto; (j) monitoring Borrower's ongoing performance of and compliance with its agreements and covenants contained in the Loan Documents; and (k) all amounts expended, advanced or incurred by any Reimbursement Party to enforce, protect, or collect payment of the Indebtedness and the Liens granted therein or to enforce any Loan Document, or to defend or assert the rights and claims of any Reimbursement Party under the Loan Documents, in any litigation or administrative proceeding related to ERISA, or with respect to the Collateral in any Proceeding, which amounts will include all court costs, reasonable attorneys' fees and expenses, fees of auditors and accountants, and investigation expenses as may be incurred by any Reimbursement Party in connection with any such Proceeding, together with interest at the Default Rate on each such amount from the date of disbursement until the date of reimbursement to the respective Reimbursement Party, all of which shall constitute part of the Indebtedness and shall be secured by the Loan Documents. This provision is separate and several, and shall survive merger into judgment hereon. The parties hereto acknowledge that the costs of any in-house counsel, auditors, or other in-house consultants used for any of the purposes set forth under this Agreement shall be considered a reimbursable expense. All costs and expenses described in this <u>Section 9.2</u> shall be deemed **"Loan Expenses"**.

**Section 9.3**    <u>**Indemnity**</u>.

(a)    Borrower shall indemnify, defend and hold harmless each Indemnified Person from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever, including the reasonable fees and disbursements of counsel for any Indemnified Person, in connection with any Proceeding (whether or not such Indemnified Person shall be designated a party thereto), that may be imposed on, incurred by, or asserted against any Indemnified Person

by any Person (other than an Indemnified Person) in any manner, directly or indirectly, arising out of the Property, the Loan or the Loan Document (collectively, the "**Indemnified Liabilities**"). Notwithstanding the foregoing, Borrower shall not have any obligation to an Indemnified Person hereunder to the extent that it is determined, by court of competent jurisdiction in a final non-appealable ruling, that such Indemnified Liabilities were directly caused by the gross negligence or willful misconduct of such Indemnified Person.

(b)    To the extent that the undertaking to indemnify, defend and hold harmless set forth in this Section may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Lender or any other Indemnified Person. Any amounts payable to any Indemnified Person by reason of the application of this Section shall be payable on demand and shall bear interest at the Default Rate from the date loss or damage is sustained by any Indemnified Person until paid. The obligations and liabilities of Borrower under this Section 9.3 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents.

(c)    To the extent Borrower is obligated, pursuant to any Loan Document, to indemnify, defend, or prosecute any Proceeding in favor of any Indemnified Person, such Indemnified Person shall have the right of full participation in any such Proceeding, with counsel of such Indemnified Person's choice. Any Indemnified Person may, in its Permitted Discretion, take such actions as it deems necessary and appropriate to investigate, defend or settle any event or other remedial or corrective actions with respect to such event as may be necessary for the protection of such Indemnified Person or Collateral. The parties hereto acknowledge that the use of the words "**counsel**" herein shall include in-house legal counsel and outside legal counsel. Borrower shall give notice to Lender of the initiation of all Proceedings prosecuted or required to be defended by Borrower, or which are subject to Borrower's indemnity obligations under any Loan Document, promptly after the receipt by Borrower of notice of the existence of any such proceeding. As used herein, "**Proceeding**" shall include litigation, arbitration, investigative, or administrative proceedings, actions, matters, hearings, whether commenced, threatened, or potential in nature.

(d)    The parties hereto acknowledge that the costs of any in-house counsel, auditors, or other in-house consultants used for any of the purposes set forth under this Agreement shall be considered a reimbursable expense.

**Section 9.4    Amendments and Waivers.**

Any consent or waiver by Lender to or of any term, covenant or condition under the Loan Documents, or of any Default or Event of Default, or failure by Lender to insist upon strict performance by Borrower Party of any term, covenant or condition contained in any Loan Document, shall be effective or binding upon Lender only if made in writing by Lender; and no such consent, waiver or failure to insist shall be implied from any conduct, course of conduct, or act of Lender, or any omission by Lender to take any action with respect thereto. No failure by Lender to insist upon the strict performance of any covenant, agreement, term or condition of any Loan Document or to exercise any right, power or remedy consequent upon a breach thereof shall constitute a waiver, express or implied, of any such breach or of such covenant, agreement, term

or condition. A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. No modification, amendment, extension, discharge, termination or waiver of any provision of any Loan Document shall in any event be effective unless the same shall be in a writing signed by Borrower and Required Lender.

### Section 9.5    Invalid Provisions.

If any provision of any Loan Document is held to be illegal, invalid or unenforceable, such provision shall be fully severable; the Loan Documents shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part thereof; the remaining provisions thereof shall remain in full effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance therefrom; and in lieu of such illegal, invalid or unenforceable provision there shall be added automatically as a part of such Loan Document a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible to be legal, valid and enforceable.

### Section 9.6    Loan Agreement Provisions Control over Other Instruments.

The provisions of this Agreement shall prevail notwithstanding any contrary provisions in any other Loan Document.

### Section 9.7    Approvals; Third Parties; Conditions.

Except where otherwise expressly provided in the Loan Documents, in any instance where the approval, consent or the exercise of Lender's judgment is required, the granting or denial of such approval or consent and the exercise of such judgment shall be (a) within the sole discretion of Lender; and (b) deemed to have been given only by a specific writing intended for such purpose executed by Lender. All approval rights retained or exercised by Lender with respect to leases, contracts, plans, studies and other matters are solely to facilitate Lender's credit underwriting, and shall not be deemed or construed as a determination that Lender has passed on the adequacy thereof for any other purpose and may not be relied upon by Borrower or any other Person. This Agreement is for the sole and exclusive use of Lender, Borrower and each Guarantor and may not be enforced, nor relied upon, by any Person other than Lender, Borrower and each Guarantor. All conditions of the obligations of Lender hereunder, are imposed solely and exclusively for the benefit of Lender, its successors and assigns, and no other Person shall have standing to require satisfaction of such conditions or be entitled to assume that Lender will refuse to make advances in the absence of strict compliance with any or all of such conditions, and no other Person shall, under any circumstances, be deemed to be a beneficiary of such conditions, any and all of which may be freely waived in whole or in part by Lender at any time in Lender's sole discretion, as the case may be.

### Section 9.8    Lender Not in Control; No Partnership.

None of the covenants or other provisions contained in this Agreement shall, or shall be deemed to, give Lender the right or power to exercise control over the affairs or management of Borrower, the power of Lender being limited to the rights to exercise the remedies referred to in the Loan Documents. Borrower covenants and agrees that the relationship between Borrower and Lender is, and at all times shall remain, solely that of debtor and creditor.

66

No covenant or provision of the Loan Documents is intended, nor shall it be deemed or construed, to create a partnership, joint venture, agency or common interest in profits or income between Lender and Borrower or to create equity in the Property in Lender. Lender neither undertakes nor assumes any responsibility or duty to Borrower or to any other Person with respect to the Property or the Loan, except as expressly provided in the Loan Documents; and notwithstanding any other provision of the Loan Documents: (a) Lender is not, and none shall be construed as, a partner, joint venturer, alter ego, manager, controlling person or other business associate or participant of any kind of Borrower or its stockholders, members, or partners and Lender does not intend to ever assume such status; (b) Lender shall not in any event be liable for any debts, expenses or losses incurred or sustained by Borrower; and (c) Lender shall not be deemed responsible for or a participant in any acts, omissions or decisions of Borrower or its stockholders, members, or partners. Lender, on the one hand, and Borrower and the Borrower Parties, on the other hand, disclaim any intention to create any partnership, joint venture, agency or common interest in profits or income between Lender, on the one hand, and Borrower and the Borrower Parties, on the other hand, or to create an equity in the Property in Lender, or any sharing of liabilities, losses, costs or expenses. The Borrower Parties are experienced in the ownership and operation of properties similar to the Property, and Borrower is solely relying upon such expertise and its business plan in connection with the ownership and operation of the Property. The Borrower is not relying on either Lender or Lender's expertise, business acumen or advice in connection with the Property.

### Section 9.9    Time of the Essence.

Time is of the essence with respect to this Agreement and the other Loan Documents, and each representation, warranty, covenant and condition hereunder and thereunder.

### Section 9.10    Successors and Assigns.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except that (a) Borrower may not assign or transfer its rights hereunder or any interest herein or delegate its duties hereunder without the prior written consent of Lender, and (b) Lender shall have the right to assign its rights (in whole or in part, whether by operation of law (pursuant to a merger or other successor in interest) or otherwise) hereunder in accordance with this Agreement. Any reference to a Person under the Loan Documents shall be deemed to include such Person's successors and assigns, to the extent permitted by the terms hereof.

### Section 9.11    Renewal, Extension or Rearrangement.

All provisions of the Loan Documents shall apply with equal effect to each and all amendments thereof and any Notes hereinafter executed which in whole or in part represent a renewal, extension, increase or rearrangement of the Loan.

### Section 9.12    Cumulative Rights.

The rights and remedies of Lender as provided in the Loan Documents shall be cumulative and concurrent and may be pursued singly, successively or together against any Borrower Party, the Collateral, or any other Persons who are, or may become liable for all or any

part of the Obligations, and any other funds, property or security held by Lender for the payment hereof, or otherwise, at the sole discretion of Lender. Failure to exercise any such right or remedy shall in no event be construed as a waiver or release of such rights or remedies, or the right to exercise them at any later time. The right, if any, of Borrower, and all other Persons, who are, or may become, liable for the Obligations, to plead any and all statutes of limitation as a defense is expressly waived by each and all of such parties to the full extent permissible by law.

**Section 9.13   Singular and Plural; Phases; Construction.**

Wherever the context of any Loan Document may so require, the gender shall include the masculine, feminine and neuter, and the singular shall include the plural and vice versa. When used in the Loan Documents, the phrase "**including**" (or a word of similar import) shall mean "**including, but not limited to**", the phrase "**satisfactory to Lender**" shall mean "**in form and substance satisfactory to Lender in all respects**", and the words "**herein**", "**hereof**", "**hereunder**" and other words of similar import shall refer to this Agreement as a whole and not to any particular provision. The Loan Documents shall be construed as though drafted by all of the parties thereto and shall not be construed against or in favor of any party. All accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP as applied on a consistent basis.

**Section 9.14   Exhibits; Schedules; and Recitals.**

The exhibits, schedules, and recitals described in the beginning paragraphs of this Agreement and attached to this Agreement and the other Loan Documents, as applicable, are incorporated herein and therein and shall be considered a part of this Agreement and such other Loan Documents for the purposes stated herein and therein.

**Section 9.15   Titles of Articles, Sections and Subsections.**

All titles or headings to articles, sections, subsections or other divisions of this Agreement and the other Loan Documents or the exhibits hereto and thereto are only for the convenience of the parties and shall not be construed to have any effect or meaning with respect to the other content of such articles, sections, subsections or other divisions, such other content being controlling as to the agreement between the parties hereto.

**Section 9.16   Survival.**

All of the representations, warranties, covenants, and indemnities hereunder and under the other Loan Documents, and any reaffirmation, modification or amendment thereof made in accordance with the terms and conditions of the Loan Documents, shall survive (a) the indefeasible repayment in full of the Indebtedness and the release of the Liens securing the Loan, (b) the transfer (by sale, foreclosure, conveyance in lieu of foreclosure or otherwise) of any or all right, title and interest in and to the Property to any Person, whether or not an Affiliate (except to the extent that such transfer results in the satisfaction of the Indebtedness and all obligations of Borrower Parties under the Loan Documents and Guaranties), and (c) in the case of Lender may assign any interest in its the Loan in accordance with the terms of this Agreement, the making of such assignment, notwithstanding that Lender may cease to be the "**Lender**" or the only "**Lender**" hereunder.

**Section 9.17   Representation by Legal Counsel.**

Borrower acknowledges that it has been advised by Lender to seek the advice of legal counsel in connection with the negotiation and preparation of the Loan Documents. If Borrower has chosen not to obtain legal representation, whether due to cost considerations or for other reasons, the lack of such representation shall not furnish Borrower with any defense to the enforcement of Lender's rights under the Loan Documents.

**Section 9.18   Waiver of Jury Trial.**

**EACH PARTY, TO THE MAXIMUM EXTENT PERMITTED BY LAW, (a) EXPRESSLY, KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR INCIDENTAL TO THE DEALINGS OF THE PARTIES WITH RESPECT TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED BY ANY LOAN DOCUMENT, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, AND (b) AGREES AND CONSENTS THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS LOAN AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES TO THE WAIVER OF THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY.**

**Section 9.19   Governing Law.**

This Agreement was accepted by Lender in the state of California, which state the parties agree has a substantial relationship to the parties and to the underlying transaction embodied hereby. Accordingly, in all respects, including, without limiting the generality of the foregoing, matters of construction, validity, enforceability and performance, this Agreement and the other Related Documents and the obligations arising hereunder and thereunder shall be governed by, and construed in accordance with, the laws of the state of California applicable to contracts made and performed in such state and any applicable law of the United States of America, except that at all times the provisions for the foreclosure of liens under the Security Instrument and the creation, perfection and enforcement of the security interests created pursuant thereto and pursuant to the other Related Documents in any Collateral located in the state in which the Property is located shall be governed by and construed according to the law of the state where the Property is located. Except as provided in the immediately preceding sentence, Borrower hereby unconditionally and irrevocably waives, to the fullest extent permitted by law, any claim to assert that the law of any other jurisdiction governs this Agreement and the other Related Documents.

**Section 9.20   Waivers.**

**EACH BORROWER PARTY AGREES THAT IT WILL NOT ASSERT ANY CLAIM, AND HEREBY WAIVES ANY CLAIM, AGAINST LENDER OR ANY OTHER INDEMNIFIED PERSON UNDER ANY LOAN DOCUMENT ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES. BORROWER EXPRESSLY AND UNCONDITIONALLY WAIVES, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY LENDER PURSUANT TO ANY LOAN DOCUMENT, ANY AND EVERY RIGHT IT MAY HAVE TO (a) INTERPOSE ANY COUNTERCLAIM THEREIN UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH COUNTERCLAIM MUST BE ASSERTED IN SUCH PROCEEDING, OR (b) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH SUIT, ACTION OR PROCEEDING MUST BE CONSOLIDATED WITH THE PROCEEDING BROUGHT BY LENDER.**

**Section 9.21    Entire Agreement**.

This Agreement and the other Loan Documents embody the entire agreement and understanding among Lender and Borrower and supersede all prior agreements and understandings between such parties relating to the subject matter hereof and thereof. Accordingly, the Loan Documents may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

**Section 9.22    Injunctive Relief**.

Borrower recognizes that in the event Borrower fails to perform, observe or discharge any of its Obligations hereunder or under any of the other Loan Documents, no remedy of law will provide adequate relief to Lender, and agrees that Lender shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

**Section 9.23    Counterparts**.

This Agreement may be executed in multiple counterparts, each of which shall constitute an original, but all of which shall constitute one document. Receipt of an executed signature page to this Agreement by facsimile, electronic mail, or other electronic transmission shall constitute effective delivery thereof.

**Section 9.24    Refinance of Phase II Existing Loan**.

(a)    Lender agrees, upon the request of one or more Affiliates of Borrower which together own all of the Phase II Parcels (the "**Phase II Borrower(s)**"), to refinance the Phase II Existing Debt upon substantially the same terms and conditions as are set forth with respect to the Loan in this Agreement and the other Loan Documents and otherwise upon the terms set forth in **Exhibit F** hereto (the "**Phase II Refinancing Loan**"). Lender's commitment to provide the Phase II Refinancing Loan shall expire on the date that is twelve (12) months after the Closing Date.

70

(b)     Lender shall have a right to require one or more Affiliates of Borrower which together own all of the Phase II Parcels to accept and borrow the Phase II Refinancing Loan (and to repay the Phase II Existing Debt with the proceeds thereof), at any time after the Closing Date, upon ten (10) Business Days' written notice by Lender to the effect that Lender is prepared to consummate the Phase II Refinancing Loan subject only to satisfaction of the conditions precedent set for in clauses 1, 2 and 3 in **Exhibit F** hereto. Such right shall expire six (6) months after the Closing Date, *provided* that Lender may extend such right for an additional six (6) month period by re-allocating and funding $1,000,000 of the Loan amount from the Construction Costs Holdback to increase the Borrower Funded Phase II Interest Reserve, which re-allocation Lender may do in its sole and absolute discretion.

### Section 9.25   Assignments, Participations, and Syndications

(a)     Lender may, at any time assign all or a portion of its rights and delegate all or a portion of its obligations under the Loan Documents (including all its rights and obligations with respect to the Loan) to one or more Persons (a "**Transferee**") and there shall be no limitation or restriction on Lender's ability to assign, pledge or otherwise transfer any Note or other Obligation. The Transferee and Lender shall execute such loan assignment and assumption documentation as may be required by Lender, which shall be in form and substance reasonably acceptable to Lender in its discretion. Upon such transfer, (i) the Transferee thereunder shall be a party hereto and, have the same rights, benefits and obligations as it would if it were Lender hereunder, and (ii) Lender shall be relieved of its obligations hereunder with respect to the assigned portion of the Loan. Borrower hereby acknowledges and agrees that any assignment will give rise to a direct obligation of Borrower to the Transferee and that the Transferee shall be considered to be a "**Lender**" hereunder.

(b)     Lender may at any time, sell participations in all or any part of its rights and obligations under this Agreement and the other Loan Documents (including all its rights and obligations with respect to the Loan) to one or more Persons (each, a "**Participant**"). In the event of any such sale by Lender of a participation to a Participant, (i) Lender's obligations under this Agreement to the other parties to this Agreement shall remain unchanged, (ii) Lender shall remain solely responsible for the performance thereof, (iii) Lender shall remain the holder of the Loan (and any Note evidencing the Loan) for all purposes under this Agreement and the other Loan Documents, (iv) Borrower (and any other party to the Loan Documents) shall continue to deal solely and directly with Lender in connection with Lender's rights and obligations under this Agreement and the other Loan Documents, and (v) all amounts payable pursuant to Agreement by Borrower hereunder shall be determined as if Lender had not sold such participation. Any agreement pursuant to which Lender shall sell any such participation shall provide that Lender shall retain the sole right and responsibility to exercise Lender's rights and enforce Lender's obligations hereunder, including the right to consent to any amendment, supplement, modification or waiver of any provision of this Agreement or any of the other Loan Documents. Borrower hereby acknowledges and agrees that the Participant under each participation shall, solely for the purposes of any indemnity obligations of Borrower hereunder, be considered to be a "**Lender**" hereunder, and Borrower agrees to use commercially reasonable efforts (at no cost to Borrower Parties) to assist Lender in assigning or selling participations in all or any part of the Loan made by Lender to another Person identified by Lender.

71

(c)     Lender, on behalf of Borrower, shall maintain at its address set forth herein a copy of any documentation entered into in connection with a transfer of the Loan by Lender and a written or electronic register (the "**Register**") for the recordation of the names and addresses of Lender and any Transferees and the Advances made by, and the principal amount of the Loan owing to, and the Notes evidencing the Loan owned by, Lender and each Transferee from time to time. Borrower and Lender shall treat each Person whose name is recorded in the Register as the owner of the Loan, the Notes and the Advances recorded therein for all purposes of this Agreement. The Register shall be available for inspection by Borrower at any reasonable time and from time to time upon reasonable prior notice.

(d)     Notwithstanding anything in this Agreement to the contrary, no assignment under Section 9.25 of any rights or obligations under or in respect of the Loan or the Notes evidencing the Loan shall be effective unless and until Lender shall have recorded the assignment pursuant to Section 9.25(c). Lender shall promptly record any such transfer of Lender's interests in the Loan in the Register and give prompt notice of such acceptance and recordation to Lender. On or prior to such effective date, Borrower, at its own expense, shall, upon the request of Lender or the Transferee, as applicable, execute and deliver to Lender, within five (5) Business Days of any request, new Notes substantially in the form of the original Note executed by Borrower on the Closing Date with changes as required to reflect the interest held by Lender and its Transferee; provided that Borrower shall not be required to execute any documents which materially modify the terms of any of the Loan Documents or materially impair the rights of Borrower under such Loan Documents.

(e)     Except as otherwise provided in this Section 9.25 Lender shall not, as between Borrower Parties and Lender, be relieved of any of its obligations hereunder as a result of any sale, assignment, transfer or negotiation of, or granting of participation in, all or any part of the Loan or other Obligations owed to Lender. Lender may furnish any information concerning Borrower Parties in the possession of Lender from time to time to assignees and participants (including prospective assignees and participants), subject to confidentiality requirements hereunder.

(f)     Notwithstanding any other provision set forth in this Agreement:

(i)     Lender may at any time create a security interest in all or any portion of its rights under this Agreement, including, without limitation, the Loan owing to it and the Notes held by it and the other Loan Documents and Collateral.

(ii)     (A) Lender and its Affiliates shall not be required to execute and deliver any documentation in connection with any transaction involving its Affiliates or lender, (B) no lender to or funding or financing source of Lender or its Affiliates shall be considered a Transferee, (C) there shall be no limitation or restriction on Lender's ability to assign or otherwise transfer any Loan Document to any such Affiliate or lender or funding or financing source, and (D) there shall be no limitation or restriction on such Affiliates' or lenders' or financing or funding sources' ability to assign or otherwise transfer any Loan Document, Loan, Note or Obligation (or any of its rights thereunder or interest therein).

(g)     The Loan Documents shall inure to the benefit of Lender, any Transferee, any Participant (to the extent expressly provided herein only) and all future holders of the Notes,

the Obligations and/or any of the Collateral, and each of their respective successors and permitted assigns. Each Loan Document shall be binding upon the Persons that are parties thereto and their respective successors and assigns, and no such Person other than Lender may assign, delegate or transfer any Loan Document or any of its rights or obligations thereunder without the prior written consent of Lender. No rights are intended to be created under any Loan Document for the benefit of any third party donee, creditor or incidental beneficiary of Borrower. Nothing contained in any Loan Document shall be construed as a delegation to Lender of any other Person's duty of performance. Borrower acknowledges and agrees that Lender at any time and from time to time may (i) divide and reissue (without substantive changes other than those resulting from such division) the Notes, and/or (ii) sell, assign or grant participating interests in or transfer all or any part of its rights or obligations under any Loan Document, Note, the Obligations and/or the Collateral to other Persons, in each case on the terms and conditions provided herein. Each Transferee and Participant shall have all of the rights, obligations and benefits with respect to the Obligations, Notes, Collateral and/or Loan Documents held by it as fully as if the original holder thereof; provided, that, notwithstanding anything to the contrary in any Loan Document, Borrower shall not be obligated to pay under this Agreement to any Transferee or Participant any sum in excess of the sum which it would have been obligated to pay to Lender had such participation not been effected. Lender may disclose to any Transferee or Participant all information, reports, financial statements, certificates and documents obtained under any provision of any Loan Document; provided, that Transferees and Participants shall be subject to the confidentiality provisions contained herein that are applicable to Lender. Borrower shall, at Borrower's sole cost and expense, execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to consummate the actions contemplated by this Section 9.25.

(h)    Lender may assign or pledge all or any portion of the Loan to the FDIC, any Federal Reserve Bank, the Federal Home Loan Bank or the United States Treasury as collateral security to secure obligations of Lender, including without limitation, any assignment or pledge pursuant to Regulation A of the Board of Governors of the Federal Reserve System and any Operating Circular issued by such Federal Reserve Bank; provided, that any payment in respect of the Loan made by Borrower to or for the account of Lender in accordance with the terms of this Agreement shall satisfy Borrower's obligations hereunder in respect to the Loan to the extent of such payment. No such assignment shall release Lender from its obligations hereunder.

(i)    If requested by Lender, Borrower shall use commercially reasonable efforts to assist Lender in satisfying the due diligence or other underwriting requirements of any proposed or prospective Transferee or Participant (including, without limitation, with respect to the form of Loan Documents), including, without limitation, to:

(i)    provide updated appraisals, environmental audits, reviews and reports, property condition reports and other due diligence investigations of the Property (such information shall hereinafter be referred to collectively as the "**Updated Information**"), together with appropriate verification of the Updated Information through letters or certificates of appraisers, engineers, environmental assessment experts and other experts or third party providers of such information, reports or Updated Information, in form and substance acceptable to Lender and such proposed or prospective Transferee or Participant;

(ii)    provide opinions of counsel, which may be relied upon by Lender and such proposed or prospective Transferee or Participant, and their respective counsel, agents and representatives, as to the Loan Documents and/or bankruptcy non-consolidation or any other opinion customary in limited recourse financing transactions with respect to real properties similar to the Property, which counsel and opinions shall be reasonably satisfactory to Lender and such proposed or prospective Transferee or Participant;

(iii)    provide, and cause to be provided, updated representations and warranties made in the Loan Documents and make, and cause to be made, such additional representations and warranties as reasonably may be requested by Lender or such proposed or prospective Transferee or Participant and consistent with the facts covered by such representations and warranties as they exist on the date thereof;

(iv)    execute, and cause to be executed, such amendments, replacements or other modifications to Borrower's or Parent's organizational documents or the Loan Documents as may be requested by Lender or such proposed or prospective Transferee or Participant; provided, however, that Borrower shall not be required (i) to amend, restate or otherwise modify any organizational document, other than to comply with then-customary criteria for bankruptcy-remote, special purpose companies in transactions comparable to the Loan, or (ii) to amend, restate or otherwise modify any Loan Document if such amendment, restatement or other modification would (A) increase the weighted average interest rate or change the amortization of principal set forth herein or in the Note (except that the weighted average interest rate or the amortization of principal may subsequently change due to involuntary prepayments or if an Event of Default shall occur), (B) amend or otherwise modify any other material economic term of the Loan or (C) make any material term or provision of such Loan Document materially more onerous to Borrower;

(v)    attend meetings with such proposed or prospective Transferee or Participant, provide access to the Property and conduct tours of the Property; and

(vi)    Borrower agrees that Lender may disclose any information relating to Borrower, its Affiliates, the Property or any aspect of the Loan (including information provided by or on behalf of Borrower or any of its Affiliates to Lender) to any proposed or prospective Transferee or Participant.

### Section 9.26    Limitation on Liability of Lender's Members, Employees, Etc.

Any obligation or liability whatsoever of Lender which may arise at any time under this Agreement or any other Loan Document shall be satisfied, if at all, out of Lender's assets only. No such obligation or liability shall be personally binding upon, nor shall resort for the enforcement thereof be had to, the property of Lender's members, shareholders, directors, officers, employees or agents, regardless of whether such obligation or liability is in the nature of contract, tort or otherwise.

### Section 9.27    Confidentiality and Publicity.

(a)    Borrower and Lender hereby agree that either party or any Affiliate thereof may (i) disclose a general description of transactions arising under the Loan Documents for

advertising, marketing or other similar purposes and (ii) use Borrower's or any Borrower Party's name, logo or other indicia germane to such party in connection with such advertising, marketing or other similar purposes. Borrower agrees, and agrees to cause each of its Affiliates, (A) not to transmit or disclose any provision of any Loan Document to any Person (other than to Borrower's advisors and officers on a need-to-know basis) without Lender's prior written consent, (B) to inform all Persons of the confidential nature of the Loan Documents and to direct them not to disclose the same to any other Person and to require each of them to be bound by these provisions and (C) not to use Lender's name (or the name of any of Lender's Affiliates) in connection with any press releases or such similar purposes without Lender's prior written consent.

(b)     Lender and Borrower shall exercise commercially reasonable efforts to maintain in confidence, in accordance with its customary procedures for handling confidential information, all written non-public information of any party to any Loan Document that any party to any Loan Document furnishes on a confidential basis ("**Confidential Information**"), other than any such Confidential Information that becomes generally available to the public or becomes available to Lender or Borrower from a source other than a party to a Loan Document and that is not known to such recipient to be subject to confidentiality obligations; provided, that Lender, Borrower and their respective Affiliates shall have the right to disclose Confidential Information to: (i) any Borrower Party or its Affiliates, (ii) such Person's Affiliates; (iii) such Person's or such Person's Affiliates' lenders, funding or financing sources; (iv) such Person's or such Person's Affiliates' directors, officers, trustees, partners, members, managers, employees, agents, advisors, representatives, attorneys, equity owners, professional consultants, and portfolio management services; (v) any Person to whom Lender offers or proposes to offer to sell, assign or transfer the Loan or any part thereof or any interest or participation therein; (vi) any Person that provides statistical analysis and/or information services to Lender or its Affiliates; or (vii) any Governmental Authority to which Lender is subject at the request or pursuant to any requirement of such Governmental Authority, or in connection with an examination of Lender by any such Governmental Authority; and any Person (A) to the extent required by applicable law, (B) in response to any subpoena or other legal process or informal investigative demand, or (C) in connection with any Proceeding.

### Section 9.28   Estoppel Certificates.

Within ten (10) Business Days after Lender's request therefor, Borrower shall deliver a duly acknowledged written statement setting forth the amount of the Indebtedness, stating whether any setoffs or defenses exist and the specific nature thereof, and attesting to such other matters with respect to the Loan Documents, or any Indebtedness, which Lender may request. Failure of Borrower to execute, acknowledge and return such statement within the time period herein specified shall be deemed an admission by Borrower that the information contained in the statement is true and correct. Borrower acknowledges that any such statement may be relied upon by any transferee or assignee of Lender, or any other Person participating in the Loan or the Loan Documents.

### Section 9.29   Retention of Servicer.

Lender reserves the right to retain a servicer (a "**Servicer**") selected by Lender to service the Loan, including any "**master servicer**" or "**special servicer**" appointed under the

terms of any pooling and servicing agreement or similar agreement entered into as a result of a securitization. Such Servicer shall act as its Lender hereunder with such powers as are specifically delegated to the Servicer by it, whether pursuant to the terms of this Agreement, any pooling and servicing agreement or similar agreement entered into as a result of a securitization or otherwise, together with such other powers as are reasonably incidental thereto. Borrower shall pay any reasonable fees and expenses of the Servicer including, without limitation, fees for portfolio management, capital analytics fees, Default rate fees and Event of Default rate fees.

**Section 9.30    Taxes**.

(a)    Subject to Section 9.30(f), any and all payments by or on account of any obligations of Borrower to Lender under this Agreement or any other Loan Document shall be made free and clear of, and without deduction or withholding for, any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto (including penalties, interest and additions to tax), imposed by any Governmental Authority, excluding, in the case of Lender, (i) such taxes (including income taxes or franchise taxes) as are imposed on or measured by the net income, overall receipts or total capital of Lender by the jurisdiction in which Lender is organized or maintains a lending office or any political subdivision thereof, and (ii) any branch profits taxes imposed by the United States of America (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being referred to specifically for purposes of this Section 9.30 as "**Covered Taxes**").

(b)    In addition, Borrower shall pay to the relevant Governmental Authority any present or future stamp or documentary taxes or any other excise, transfer, or property taxes, charges or similar levies which arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any other Loan Document (hereinafter referred to as "**Other Taxes**").

(c)    Subject to Section 9.30(f), Borrower shall indemnify and hold harmless Lender for the full amount of any and all Covered Taxes or Other Taxes (including any Covered Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 9.30) paid or payable by Lender and any liability (other than any penalties, interest, additions, and expenses that accrue both (i) after the 180th day after the receipt by Lender of written notice of the assertion of such Covered Taxes or Other Taxes and (ii) before the date that Lender provides Borrower with a certificate relating thereto pursuant to Section 9.30(i)) arising therefrom or with respect thereto, whether or not such Covered Taxes or Other Taxes were correctly or legally asserted by the relevant Governmental Authority. Payments under this indemnification shall be made within ten (10) days from the date Lender makes written demand therefor.

(d)    If Borrower shall be required by applicable law to deduct or withhold any Covered Taxes or Other Taxes from or in respect of any sum payable hereunder to Lender, then, subject to Section 9.30(f):

(i)    the sum payable shall be increased to the extent necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 9.30(d)), Lender receives an amount equal to the sum it would have received had no such deductions been made;

(ii)    Borrower shall make such deductions; and

(iii)    Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(e)    Within ten (10) days after the date of any payment by Borrower of Covered Taxes or Other Taxes to a Governmental Authority, Borrower shall furnish to Lender the original or a certified copy of a receipt evidencing payment thereof, or other evidence of payment satisfactory to Lender.

(f)    Borrower will not be required to pay any additional amounts in respect of United States Federal income tax pursuant to Section 9.30(d) to Lender or to indemnify Lender pursuant to Section 9.30(c) to the extent that (i) the obligation to withhold amounts with respect to United Stated Federal income tax existed on the date hereof with respect to Lender or (if with respect to any Transferee) the date a Transferee became a party to this Agreement or, with respect to payments to a lending office newly designated by Lender or a Transferee (a "**New Lending Office**"), the date Lender or a Transferee designated such New Lending Office with respect to the Loan; provided, however, that this clause (i) shall not apply to the extent the additional amounts Lender or a Transferee through a New Lending Office would be entitled to receive (without regard to this clause (i)) do not exceed the additional amounts that Lender or a Transferee making the designation of such New Lending Office would have been entitled to receive in the absence of such transfer by Lender to a Transferee or such designation; or (ii) the Internal Revenue Service has determined (which determination shall be final and non-appealable) that Lender is treated as a "**conduit entity**" within the meaning of Treasury Regulation Section 1.881-3 or any successor provision; provided, however, nothing contained in this clause (ii) shall preclude the payment of additional amounts or indemnity payments by Borrower to the person for whom the "**conduit entity**" is acting.

(g)    If Borrower is required to pay additional amounts to or for the account of Lender pursuant to this Section 9.30, then Lender shall use its reasonable efforts (consistent with legal and regulatory restrictions) to file any certificate or document reasonably requested by Borrower or to designate a lending office from a different jurisdiction (if such a lending office exists) so as to eliminate or reduce any such additional payments by Borrower which may accrue in the future if such filing or changes, in the reasonable judgment of Lender, would not require Lender to disclose information Lender deems confidential and is not otherwise disadvantageous to Lender.

(h)    If Lender, in its reasonable judgment, receives a refund of any Covered Taxes or Other Taxes as to which it has been indemnified by Borrower or with respect to which Borrower has paid additional amounts pursuant to this Section 9.30 it shall promptly pay to Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by Borrower under this Section 9.30 with respect to the Covered Taxes or Other Taxes giving rise to such refund) and any interest paid by the relevant Governmental Authority with respect to such refund; provided, that Borrower, upon the request of Lender, shall repay the amount paid over to Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to Lender in the event Lender is required to repay the applicable refund to such Governmental Authority.

(i)     Lender, if claiming reimbursement or compensation pursuant to this Section 9.30, shall deliver to Borrower a certificate setting forth in reasonable detail the amount payable to Lender hereunder and such certificate shall be conclusive and binding on Borrower in the absence of manifest error.

(j)     The agreements and obligations of Borrower in this Section 9.30 shall survive the payment of all other Obligations.

*[Remainder of page intentionally left blank;
signature pages follow]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**BORROWER:**

**TREETOP DEVELOPMENT, LLC,**
a California limited liability company

By:    Casablanca Grand LLC,
        a California limited liability company,
        its sole member

        By:_____
          Name: Mohamed Hadid
          Title: Sole Member and Manager

**LENDER:**

**SKYLARK CAPITAL MANAGEMENT, LLC,**
a California limited liability company

By:_____
    Name:_____
    Title:_____

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**BORROWER:**

**TREETOP DEVELOPMENT, LLC,**
a California limited liability company

By:     Casablanca Grand LLC,
        a California limited liability company,
        its sole member

        By: _____
            Name: Mohamed Hadid
            Title: Sole Member and Manager


**LENDER:**

**SKYLARK CAPITAL MANAGEMENT, LLC,**
a California limited liability company


By: _____
    Name: _____
    Title: _____

**EXHIBIT A**

**LEGAL DESCRIPTION OF PROPERTY**

PARCEL 1:

LOT 4 OF TRACT NO. 10202, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 182, PAGE(S) 15 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM THE SOUTHERLY 330 FEET OF SAID LOT 4.

ALSO EXCEPT THAT PORTION INCLUDED IN TRACT NO. 10926 AS PER MAP RECORDED IN BOOK 206, PAGES 37 TO 41, INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ALSO EXCEPT THAT PORTION OF SAID LOT 4 DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF TRACT NO. 9146, IN SAID CITY, COUNTY AND STATE, AS RECORDED IN BOOK 187, PAGE 22 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE WESTERLY ALONG THE NORTHERLY LINE OF SAID LOT 4 NORTH 88 DEGREES 59 MINUTES 39 SECONDS WEST 156.14 FEET; THENCE SOUTHERLY, LEAVING SAID NORTHERLY LINE ALONG A LINE THAT IS PARALLEL TO AND DISTANT 441.44 FEET EASTERLY OF THE WESTERLY LINE OF SAID LOT 4, SOUTH 0 DEGREE 32 MINUTES 49 SECONDS EAST 331.64 FEET; THENCE SOUTH 88 DEGREES 59 MINUTES 52 SECONDS EAST 99.75 FEET TO A POINT IN THE WESTERLY LINE OF TRACT NO. 10926, IN SAID CITY, COUNTY AND STATE AS PER MAP RECORDED IN BOOK 206, PAGES 37 TO 41, INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE NORTHERLY ALONG THE SAID WESTERLY LINE NORTH 1 DEGREE 31 MINUTES 03 SECONDS EAST 57.12 FEET; THENCE NORTH 5 DEGREES 13 MINUTES 42 SECONDS EAST 76.82 FEET; THENCE NORTH 34 DEGREES 26 MINUTES 49 SECONDS EAST 120.35 FEET TO THE BEGINNING OF A NON-TANGENT CURVE CONCAVE NORTHEASTERLY AND HAVING A RADIUS OF 26.00 FEET, A RADIAL LINE FROM SAID POINT BEARS SOUTH 2 DEGREES 54 MINUTES 50 SECONDS WEST; THENCE ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 135 DEGREES 26 MINUTES 26 SECONDS AN ARC DISTANCE OF 61.46 FEET TO A POINT IN THE WESTERLY LINE OF SAID TRACT NO. 9146; THENCE NORTHERLY ALONG SAID WESTERLY LINE NORTH 3 DEGREES 03 MINUTES 11 SECONDS WEST TO THE TRUE POINT OF BEGINNING.

PARCEL 2:

THAT PORTION OF TRACT NO. 9146, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 187, PAGE 22 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY,

LYING WEST OF THE WEST LINE OF LOT 19 OF TRACT NO. 10926, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 206, PAGES 37 TO 41, INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 3:

THE SOUTHERLY 330 FEET OF LOT 4 OF TRACT NO. 10202, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 182, PAGE 15 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THAT PORTION OF SAID LOT INCLUDED WITHIN TRACT NO. 10926, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 206, PAGES 37 TO 43, INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 4:

THE SOUTH HALF OF THE SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 1, TOWNSHIP 1 SOUTH, RANGE 15 WEST OF THE SAN BERNARDINO MERIDIAN, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF THE SURVEY OF SAID LAND ON FILE IN THE BUREAU OF MANAGEMENT.

EXCEPT THAT PORTION OF SAID SOUTH HALF INCLUDED WITHIN THE LINES OF TRACT NO. 12321, AS PER MAP RECORDED IN BOOK, PAGES 18 AND 19 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 5:

LOT 12 OF TRACT NO. 12321, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 320, PAGES 18 AND 19 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 6:

PARCEL D OF PARCEL MAP NO. 1987, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 31, PAGE 81 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM THAT PORTION OF SAID LAND BEGINNING AT THE MOST NORTHEASTERLY CORNER OF SAID PARCEL D, SAID CORNER ALSO BEING A POINT IN THE SOUTHERLY RIGHT-OF-WAY OF CEDARBROOK DRIVE, 34 FEET WIDE, AS SHOWN ON SAID PARCEL MAP, THENCE ALONG THE EASTERLY LINE OF SAID PARCEL D SOUTH 2° 44' 22" EAST 42.36 FEET, THENCE SOUTH 27° 27' 10"

WEST 46.00 FEET, THENCE SOUTH 3° 30' 00" EAST 67.00 FEET, THENCE LEAVING SAID EASTERLY LINE AT RIGHT ANGLES TO COLDWATER CANYON DRIVE, NORTH 89° 41' 30" WEST 15.00 FEET, THENCE PARALLEL TO SAID COLDWATER CANYON DRIVE, NORTH 0° 18' 30" EAST 148.53 FEET TO A POINT IN SAID SOUTHERLY RIGHT OF WAY, THENCE ALONG SAID SOUTHERLY RIGHT OF WAY, NORTH 87° 15' 15" EAST 29.33 FEET TO THE POINT OF BEGINNING.

## EXHIBIT B

## DRAW PROCEDURES AND CONDITIONS TO DISBURSEMENTS

Disbursements from the Construction Costs Holdback shall be used to pay for the purposes provided for such Holdback as described the Loan Agreement, as applicable. Advances from any such Holdback shall be subject to the conditions precedent set forth in the Loan Agreement and shall be further subject to the following terms and conditions:

(a)      Following receipt and approval of a draw request substantially in the form attached hereto as Annex 1 to Exhibit B (each, a "**Disbursement Request**", and collectively, the "**Disbursement Requests**"), Lender shall make advances from the specified Holdback within ten (10) Business Days of receipt of all of the foregoing documentation from or on behalf of Borrower, further subject to the following:

(i)      Lender shall make advances with respect to materials and equipment that are included in the Approved Construction Budget and are not yet incorporated into Improvements as of the date of the applicable advance, but are temporarily stored at the Project or off site at a facility located in the United States of America ("**Stored Materials**") so long as Lender shall have received the following items, each in form and substance reasonably satisfactory to Lender;

(A)      Evidence that the Borrower has an obligation under the applicable contract, subcontract or purchase order to pay for such materials and equipment prior to their installation;

(B)      Evidence that the ownership of such materials and equipment is vested in the Borrower free of any liens and claims of third parties, including, without limitation, bills of sale and conditional lien waivers from the respective contractor, subcontractor or vendor and that such material and equipment are clearly marked to indicate the ownership thereof by the Borrower (as evidenced by photographs provided to Lender);

(C)      Evidence that such stored materials are included within the coverages of insurance policies carried by the Borrower or applicable warehousemen or proof of other insurance which has been approved by Lender;

(D)      Evidence reasonably acceptable to Lender that the stored materials are reasonably protected against vandalism, casualty, theft or damage;

(E)      Evidence that advances made by Lender for said materials or equipment stored off site do not, at any one time, exceed, in the aggregate, an amount equal to five percent (5%) of total hard costs set forth in the Approved Construction Budget, inclusive of the amount requested;

(F)      Evidence that Lender has a perfected first security interest in such material prior to or simultaneous with the making of such advances; and

(G)    Evidence that such material stored off-site has been incorporated into the Project with ninety (90) days of delivery of such stored materials to the Project site from such off-site storage location for all materials produced in the United States of America; provided, however, that no such timing limitations shall apply for materials which are manufactured and/or sourced outside the continental United States;

(ii)    If reasonably requested by Lender in relation to any new construction, a notice of commencement shall be filed prior to commencement of applicable work to be performed, if any, in form approved by Lender and as required by applicable law; and

(iii)    Advances will be made no more frequently than once per calendar month.

(b)    Lender shall disburse any advance from such Holdback directly to Borrower or its designee to pay any specific invoice. Borrower hereby irrevocably directs and authorizes Lender to so advance such amounts from the applicable Holdback. Lender may, at Borrower's expense, conduct an audit, inspection, or review of the Property to confirm the amount of the requested improvements advance.

(c)    Borrower shall not use any portion of any advance from any Holdback for payment of any other cost except as specifically set forth in a Disbursement Request approved by Lender.

(d)    Borrower shall have furnished to Lender evidence that all required inspections by governmental authorities, if any, have been satisfactorily completed as and when required by applicable law.

(e)    If so required by Lender, Lender shall have received a report of Lender's Construction Consultant, which report shall confirm that the Disbursement Request is accurate and complete, and that the work covered by the applicable request for advance has been performed and the applicable materials or goods, as applicable, have been furnished.

(f)    Lender reserves the right to require, in its sole good faith discretion, a date down endorsement in form acceptable to Lender, in its sole good faith discretion, for Lender's title policy in relation to the Property as a condition to any or all advances from any Holdback or Reserve.

(g)    Such other documents or items as Lender or its counsel may require in their reasonable discretion.

(h)    No Default or Event of Default shall have occurred and be continuing.

(i)    Unless otherwise disclosed to Lender, the representations and warranties contained in the Loan Documents are true and correct in all material respects as if remade on the date of the advance and on the date that the advance is requested and all representations and warranties of Borrower contained in the Loan Documents shall be deemed to be remade on the date of any subsequent advances or release.

Exhibit B - 2

(j)      There shall not have occurred in Borrower, any Guarantor, the Property or any other Collateral or local rental market conditions which has (or, in Lender's sole but good faith determination, may in the future have) a Material Adverse Change upon the value of the Collateral (including, without limitation, the Property) or the right or ability of Lender to receive payment in full of all amounts payable by Borrower to Lender under this Agreement or the other Loan Documents.

(k)      The Loan shall be In-Balance in accordance with Section 7.31 of the Loan Agreement.

(l)      Borrower shall have paid Lender's costs and expenses in connection with such advance (including title charges, and costs and expenses of Lender's Construction Consultant and reasonable attorneys, as applicable), if any, to the extent set forth herein.

(m)      No condemnation or adverse, as determined by Lender in its Permitted Discretion, zoning or usage change proceeding shall have occurred or shall have been threatened against the Property, the Property shall not have suffered any significant damage by fire or other casualty which has not been repaired or is not being restored in accordance with the Loan Agreement; no applicable law, regulation, ordinance, moratorium, injunctive proceeding, restriction, litigation, action, citation or similar proceeding or matter shall have been enacted, adopted, or threatened by any governmental authority, which is reasonably like to have, in Lender's reasonable judgment, a Material Adverse Change on the Property or Borrower's ability to perform its obligations under the Loan Documents.

(n)      Borrower has received no written notice and has no knowledge of any litigation, proceedings (including a Bankruptcy Proceeding), Liens or claims of Lien, either filed or threatened against Borrower or the Property, except the Liens of Lender, Permitted Exceptions and Liens that remain unsatisfied or un-bonded for a period of less than twenty (20) days after the date of filing or service.

(o)      Lender shall have the right to condition any disbursement for payment of costs and expenses of making Borrower Improvements to the Property upon Lender's receipt and reasonable approval of the following:

(i)      confirmation that Borrower commenced construction of the Borrower Improvements on or prior to the Commencement Date and has Completed or is projected to Complete the Borrower Improvements on or prior to the Completion Date;

(ii)      from each materials dealer, contractor or subcontractor who has done work or furnished materials for construction of the portion of the Borrower Improvements covered by such disbursement as may be requested by Lender: (A) unconditional lien releases in the forms attached hereto as Annex 2 (or, to the extent proceeds of the disbursement are being used to make final payments to such contractor, subcontractor or materialman, conditional lien waivers in the forms attached hereto as Annex 2 so long as such conditional lien waivers are supplemented by unconditional lien waivers delivered to Lender after payment has been made to such contractor, subcontractor or materialman), (B) evidence acceptable to Lender (in its Permitted Discretion) and its Construction Consultant (in its reasonable discretion) that the work

under such contract with each such contractor, subcontractor or materialman has been completed in full, and (C) such other instruments and documents as Lender may specify, in form and content, and containing such certifications, approvals and other data and information, as Lender may require in its reasonable discretion;

(iii)    copies of invoices for all items or materials already paid for by Borrower from its own funds and for which the disbursement is being requested and otherwise any receipted invoices of bills of sale for any materials or items for which such disbursement is requested;

(iv)    evidence satisfactory to Lender that the applicable portion of the Borrower Improvements being constructed can be constructed in conformance with the portion of the Approved Construction Budget designated for the applicable Borrower Improvement construction. To the extent Borrower is required to deposit with Lender Construction Gap Funds in accordance with Section 7.31 of the Loan Agreement, Guarantor shall guarantee the payment to Lender of all required Construction Gap Funds pursuant to the Completion Guaranty. Any fees and costs payable to any Affiliate of any Borrower Party as part of costs or expenses incurred in connection with the construction of the Borrower Improvements expenditures shall be subject to the prior written approval of Lender, which approval may be granted or withheld in Lender's sole and absolute discretion;

(v)    separate performance and payment bonds, in form and substance, and issued by sureties, acceptable to Lender, and with Lender as a dual obligee under each, bonding each contract or subcontract relating to construction of the Borrower Improvements designated by Lender; and

(vi)    Borrower acknowledges that each disbursement will be subject to a ten percent (10%) retention, which shall be disbursed for the benefit or account of Borrower only upon the later of (1) Completion of the relevant Borrower Improvements in accordance with the applicable approved Plans and Specifications, all Legal Requirements, applicable laws and delivery of a statutory "**Notice of Completion**" (or local equivalent of the same), (2) the expiration of the applicable statutory lien period (or receipt of lien waivers from all potential lien claimants in form and substance acceptable to Lender in its sole discretion), and (3) Lender's receipt of a mechanics' lien endorsement (or other endorsement to the Title Policy acceptable to Lender in its sole and absolute discretion confirming the priority of Lender's security interest in the Property over any such liens).

**Annex 1 to Exhibit B**

**Disbursement Request**

Skylark Capital Management, LLC
8445 Santa Monica Boulevard
Los Angeles, California 90069
Attention: Zach Vella

**PROPERTY NAME:** Eagle's Nest (the "**Project**")
**BORROWER:** Treetop Development, LLC, a California limited liability company (the "**Borrower**")
**DRAW NO:** _____

Reference is hereby made to that certain Loan Agreement dated as of July 31, 2018 (as may be amended, restated, supplemented, or otherwise modified from time to time, the "**Loan Agreement**") between Borrower and Skylark Capital Management, LLC, as lender (in such capacity, together with its successors and assigns, "**Lender**"). Capitalized words and phrases used herein without definition shall have the respective meanings ascribed to such words and phrases in the Loan Agreement.

1.      Pursuant to the Loan Agreement, Borrower hereby requests a disbursement from the Construction Costs Holdback in the amount of $[_____].

2.      Borrower acknowledges that the approval of this disbursement from the Construction Costs Holdback by Lender is subject to all of the terms and conditions precedent for the disbursement of amounts as set forth in Exhibit B to the Loan Agreement, including, without limitation, inspection of the Property, verification of the matters set forth in this Disbursement Request, and the availability of funds in such Holdback.

3.      The Borrower agrees to provide a Vendor Payee List (Sworn Owner's Statement) showing the name and the amount currently due each party to whom Borrower is obligated for labor, material, and/or services supplied in relation to the disbursement requested in this Disbursement Request.

4.      The Borrower hereby represents, warrants and covenants with Lender as follows:

        (a)      all conditions precedent to the disbursement from the Construction Costs Holdback requested hereunder have been satisfied, including, without limitation, performance of all of the Obligations of Borrower under the Loan Agreement and the other Loan Documents required to have been performed as of the date hereof;

        (b)      except as otherwise identified to Lender in writing, all representations and warranties made by Borrower to Lender in the Loan Agreement and otherwise in connection with the Loan continue to be accurate;

        (c)      no Default or Event of Default exists under the Loan Agreement;

(d)      Borrower has not received notice and has no knowledge of any litigation, proceedings (including proceedings under Title 11 of the United States Code), Liens or claims of Lien, either filed or threatened against Borrower, any Borrower Party or the Property, except the Liens of Lender and those which have heretofore been specifically identified in writing to Lender;

(e)      the requested disbursement from the Construction Costs Holdback will be used to pay or reimburse Borrower for expenditures described in the applicable subsection of Section 2.2 or otherwise approved in writing by Lender;

(f)      all disbursements from any Holdback previously advanced or disbursed by Lender to Borrower for labor, materials, and/or services furnished prior to this Disbursement Request have been paid to the parties entitled to such payment and have been used substantially for the purpose for which they were requested;

(g)      the total amount of the requested disbursement pursuant to this Disbursement Request represents the actual amount payable to those third parties who have performed work on the Property, and all of such disbursement requested hereby will be used as payment for work or materials on the Property described on the attached documentation and for no other reason;

(h)      Borrower has attached hereto all lien waivers and documents necessary to evidence that the materials, work and/or expenditures to be funded by the requested disbursement have been installed, completed and are paid for, or will be paid for, upon such disbursement to Borrower or its designee; and

(i)      Borrower shall provide Lender with any additional documentation and/or other evidence as Lender shall request, to establish that the expenditures to be funded by the requested disbursement have been installed, completed and are paid for or will be paid upon such disbursement to Borrower or its designee.

5.      The amount of change orders in dispute between Borrower and the third party completing the work to be reimbursed and/or funded by the disbursement requested hereby is $[_____].

6.      Borrower hereby agrees and acknowledges that this affidavit is made for the purpose of inducing Lender to make a disbursement from the Construction Costs Holdback to Borrower, and Lender is relying upon the accuracy of such matters in making such disbursement, and Borrower certifies that the statements made herein and in any documents submitted herewith are true and correct.

7.      Borrower requests that this draw be funded and that the funds be deposited to the following account number _____ at _____.

IN WITNESS WHEREOF, Borrower has executed this Disbursement Request as of
_____, 20__.

**<u>BORROWER:</u>**

**TREETOP DEVELOPMENT, LLC,**
a California limited liability company

By:    Casablanca Grand LLC,
        a California limited liability company
        its sole member

        By: _____
        Name: Mohamed Hadid
        Title: Sole Member and Manager

**Annex 2 to Exhibit B**

**Lien Release Forms**

[See attached]

## CONDITIONAL WAIVER AND RELEASE ON PROGRESS PAYMENT
### (*Civil Code* §8132)

NOTICE: THIS DOCUMENT WAIVES THE CLAIMANT'S LIEN, STOP PAYMENT NOTICE, AND PAYMENT BOND RIGHTS EFFECTIVE ON RECEIPT OF PAYMENT. A PERSON SHOULD NOT RELY ON THIS DOCUMENT UNLESS SATISFIED THAT THE CLAIMANT HAS RECEIVED PAYMENT.

**Identifying Information**

Name of Claimant: _____

Name of Customer: _____

_____

Job Location: _____

_____

Owner: _____

Through Date: _____

**Conditional Waiver and Release**

This document waives and releases lien, stop payment notice, and payment bond rights the claimant has for labor and service provided, and equipment and material delivered, to the customer on this job through the Through Date of this document. Rights based upon labor or service provided, or equipment or material delivered, pursuant to a written change order that has been fully executed by the parties prior to the date that this document is signed by the claimant, are waived and released by this document, unless listed as an Exception below. This document is effective only on the claimant's receipt of payment from the financial institution on which the following check is drawn:

Maker of Check: _____

Amount of Check: $ _____

Check Payable to: _____

**Exceptions**

This document does not affect any of the following:
    (1)    Retentions.
    (2)    Extras for which the claimant has not received payment.
    (3)    The following progress payments for which the claimant has previously given a conditional waiver and release but has not received payment:

Date(s) of waiver and release: _____

Amount(s) of unpaid progress payment(s): $_____

(4) Contract rights, including (A) a right based on rescission, abandonment, or breach of contract, and (B) the right to recover compensation for work not compensated by the payment.

**Signature**

Date of Signature: _____

_____
(Company Name)

_____
(Claimant's Signature)

_____
(Claimant's Name & Title)

Exhibit B - 9

**UNCONDITIONAL WAIVER AND RELEASE ON PROGRESS PAYMENT**
*(Civil Code* §8134)

NOTICE TO CLAIMANT: THIS DOCUMENT WAIVES AND RELEASES LIEN, STOP PAYMENT NOTICE, AND PAYMENT BOND RIGHTS UNCONDITIONALLY AND STATES THAT YOU HAVE BEEN PAID FOR GIVING UP THOSE RIGHTS. THIS DOCUMENT IS ENFORCEABLE AGAINST YOU IF YOU SIGN IT, EVEN IF YOU HAVE NOT BEEN PAID. IF YOU HAVE NOT BEEN PAID, USE A CONDITIONAL WAIVER AND RELEASE FORM.

**Identifying Information**

Name of Claimant: _____

Name of Customer: _____

_____

Job Location: _____

_____

Owner: _____

Through Date: _____

**Unconditional Waiver and Release**

This document waives and releases lien, stop payment notice, and payment bond rights the claimant has for labor and service provided, and equipment and material delivered, to the customer on this job through the Through Date of this document. Rights based upon labor or service provided, or equipment or material delivered, pursuant to a written change order that has been fully executed by the parties prior to the date that this document is signed by the claimant, are waived and released by this document, unless listed as an Exception below. The claimant has received the following progress payment:

$ _____

**Exceptions**

This document does not affect any of the following:
    (1)    Retentions.
    (2)    Extras for which the claimant has not received payment.
    (3)    Contract rights, including (A) a right based on rescission, abandonment, or breach of contract, and
          (B) the right to recover compensation for work not compensated by the payment.

**Signature**

Date of Signature: _____

_____
(Company Name)

_____
(Claimant's Signature)

_____
(Claimant's Name & Title)

Exhibit B - 10

**CONDITIONAL WAIVER AND RELEASE**
**ON FINAL PAYMENT**
(*Civil Code* §8136)

NOTICE: THIS DOCUMENT WAIVES THE CLAIMANT'S LIEN, STOP PAYMENT NOTICE, AND PAYMENT BOND RIGHTS EFFECTIVE ON RECEIPT OF PAYMENT. A PERSON SHOULD NOT RELY ON THIS DOCUMENT UNLESS SATISFIED THAT THE CLAIMANT HAS RECEIVED PAYMENT.

**Identifying Information**

Name of Claimant: _____

Name of Customer: _____

_____

Job Location: _____

Owner: _____

_____

**Conditional Waiver and Release**

This document waives and releases lien, stop payment notice, and payment bond rights the claimant has for labor and service provided, and equipment and material delivered, to the customer on this job. Rights based upon labor or service provided, or equipment or material delivered, pursuant to a written change order that has been fully executed by the parties prior to the date that this document is signed by the claimant, are waived and released by this document, unless listed as an Exception below. This document is effective only on the claimant's receipt of payment from the financial institution on which the following check is drawn:

Maker of Check: _____

Amount of Check: $ _____

Check Payable to: _____

**Exceptions**

This document does not affect any of the following:
Disputed claims for extras in the amount of: $ _____

**Signature**

Date of Signature: _____        _____
                                                (Company Name)

                                                _____
                                                (Claimant's Signature)

                                                _____
                                                (Claimant's Name & Title)

Exhibit B - 11

## UNCONDITIONAL WAIVER AND RELEASE ON FINAL PAYMENT
### (*Civil Code* §8138)

NOTICE TO CLAIMANT: THIS DOCUMENT WAIVES AND RELEASES LIEN, STOP PAYMENT NOTICE, AND PAYMENT BOND RIGHTS UNCONDITIONALLY AND STATES THAT YOU HAVE BEEN PAID FOR GIVING UP THOSE RIGHTS. THIS DOCUMENT IS ENFORCEABLE AGAINST YOU IF YOU SIGN IT, EVEN IF YOU HAVE NOT BEEN PAID. IF YOU HAVE NOT BEEN PAID, USE A CONDITIONAL WAIVER AND RELEASE FORM.

**Identifying Information**

Name of Claimant: _____

Name of Customer: _____

_____

Job Location: _____

_____

Owner: _____

**Unconditional Waiver and Release**

This document waives and releases lien, stop payment notice, and payment bond rights the claimant has for all labor and service provided, and equipment and material delivered, to the customer on this job. Rights based upon labor or service provided, or equipment or material delivered, pursuant to a written change order that has been fully executed by the parties prior to the date that this document is signed by the claimant, are waived and released by this document, unless listed as an Exception below. The claimant has been paid in full.

**Exceptions**

This document does not affect the following:
Disputed claims for extras in the amount of: $ _____

**Signature**

Date of Signature: _____    _____
                                             (Company Name)

                                             _____
                                             (Claimant's Signature)

                                             _____
                                             (Claimant's Name & Title)

Exhibit B - 12

## CONTRACTOR'S INDEMNITY AND FINAL RELEASE
## AND WAIVER OF LIENS AND CLAIMS

TO: _____         (the "**Owner**")
_____
_____

FROM: _____         (the "**Contractor**")
_____
_____

PROJECT IDENTIFICATION: _____    (the "**Project**")
APN: _____

   The Contractor hereby represents, warrants and certifies, which representations, warranties and certifications are of the essence hereof and may be fully relied upon by Owner, Lender, Title Insurer, Surety and parties with interests in the real property with respect to the above-referenced Project, as follows:

   (a)  The Contractor does hereby fully, completely and finally release and waive all mechanics' and materialmen's liens, lien rights and claims under applicable California law, which the Contractor may now have or which may arise in the future with respect to the Project on account of labor, materials or any other items used and/or furnished by the Contractor, or which may, in the future be furnished by the Contractor on the Project. Such liens and claims shall include, but not be limited to (1) any mechanic's or materialman's liens against the fee simple title in and to the real and personal property and any undisbursed Loan Proceeds applicable to the Project, (2) any right to assert or claim any such mechanic's or materialman's liens, (3) any equitable liens, (4) any right to assert a claim under any labor or material payment bond issued for the benefit of the Owner and the Lender in connection with the Project, (5) any right to assert a claim to any Loan Proceeds held by the Lender, and (6) any and all other types of liens and claims. The Contractor further certifies that the wages, taxes and fringe benefits (including, without limitation, any and all contributions to pension and other employee benefit funds, including trust funds, or other payments that the Contractor is required to make under state or federal law or under the terms of any collective bargaining agreements to which the Contractor is a party) of personnel employed by the Contractor have been fully paid. THIS RELEASE AND WAIVER IS FINAL, CONCLUSIVE, IMMEDIATELY EFFECTIVE AND UNCONDITIONAL. This release and waiver is for the benefit of, and may be relied upon by, the Owner, the entity providing the financing for the Project (the "**Lender**"), the title company providing title insurance for the Project (the "**Title Insurer**"), the Surety, and entities with interests in the real property improvements upon which the Project is constructed and their respective subsidiaries, affiliates, successors, assigns, agents and representatives.

Exhibit B - 13

(b)    The Contractor further warrants and represents that all subcontractors and suppliers to the Contractor of equipment, material or labor, with respect to the Project, either have been paid in full for the equipment, materials or labor furnished by them, or will be paid promptly therefor with the proceeds of any disbursement made pursuant to the voucher covered by this final lien release and waiver, which disbursement will be received by the Contractor for this purpose, and that a final release and waiver of liens and claims was obtained from each subcontractor and supplier.  The Contractor hereby covenants and shall indemnify, defend and hold harmless the Owner, the Lender, the Surety and the Title Insurer for and against any and all loss, liability or expenses (including court costs and reasonable attorneys' fees) which may be sustained or incurred for any failure of the Contractor to make such payments.

(c)    In the event any lien or application for lien shall be made arising out of or in connection with  labor, services, materials and/or equipment furnished by or on behalf of the Contractor, its subcontractors, consultants or materialmen of any tier, the Contractor shall immediately discharge each of said liens or applications and, in the event suit is filed as a result of such lien or application, the Contractor shall indemnify, protect, defend and hold harmless the Owner, the Lender, the Title Insurer, the Surety and all persons and entities with interests in the real property improvements upon which the Project is constructed and their respective subsidiaries, affiliates, successors, assigns, agents and representatives, from and against any and all costs, damages and expenses (including court costs and attorney's fees) resulting from or incidental to such suit, lien or application for lien.

(d)    The PAYMENT NOW DUE is $_____.  All work required by the agreement between the Owner and Contractor has been completed, and upon payment to the Contractor of the Payment Now Due, all payments due have been received.

[Remainder of Page Intentionally Left Blank]

Exhibit B - 14

In witness whereof, this Indemnity and Final Release and Waiver has been executed this _____day of _____20____.

_____
(Releasor - Contractor's Name)

By: _____Title:_____
     (Authorized Signature)

| Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

STATE OF _____       )
                                            )   ss:
COUNTY OF _____       )

I,_____, being duly sworn, depose and say that I make this Indemnity and Final Release and Waiver of Liens and Claims Certificate and Affidavit under penalty of perjury and according to law, and state that I am the _____of the Releasor identified herein, that I am fully authorized to execute this document on its behalf, and that the statements contained herein are true and correct.

By: _____

Sworn to before me this ____ day of _____, 20____.

_____
Notary Public (Signature and Seal)

My commission expires _____.

Exhibit B - 15

**EXHIBIT C**

**SINGLE PURPOSE ENTITY PROVISIONS**

Borrower and Parent shall at all times be a Single Purpose Entity. As used herein, "**Single Purpose Entity**" shall mean a corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, or any other form of entity, which complies with the provisions set forth herein, including, without limitation, the requirements that Borrower has not and shall not, and agrees that Parent has not and shall not:

(a)    with respect to Borrower, fail to be organized solely for the purpose of (i) owning the Property, (ii) entering into the Loan Documents to which it is a party, and (iii) engaging in any activity that is incidental, necessary or appropriate to accomplish the foregoing and, with respect to Parent, be organized for any purpose other than (i) owning a one hundred percent (100%) interest in Borrower, and (ii) engaging in any activity that is incidental, necessary or appropriate to the foregoing;

(b)    with respect to Borrower, engage in any business or activity other than the ownership of the Property, and activities incidental thereto, and with respect to Parent, engage in any business or activity other than the ownership of equity interests in Borrower, and activities incidental thereto;

(c)    with respect to Borrower, own any material assets other than (i) the Property, and (ii) such incidental Personal Property as may be necessary for the operation of the Property, and with respect to Parent, own any material asset other than (i) its one hundred percent (100%) equity interest in Borrower, and (ii) such incidental personal property as may be necessary to effectuate its purpose;

(d)    merge into or consolidate with any Person, to the fullest extent permitted by law, dissolve, terminate, wind up or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(e)    fail to preserve its existence as an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization or formation, and, with respect to Borrower, qualification to do business in the state where the Property is located, or without the prior written consent of Lender, amend (other than amendments that are entirely ministerial in nature), modify, terminate or fail to comply with the provisions of Borrower's organizational documents or Parent's organizational documents, as the case may be;

(f)    own, form or acquire any subsidiary or make any investment in, any Person, other than Borrower Member's equity ownership interest in Borrower;

(g)    commingle its assets with the assets of any of its equitable or beneficial owners, affiliates, principals or of any other Person nor fail to hold all of its assets in its own name;

Exhibit C - 1

(h)     incur any Debt other than the Indebtedness and Permitted Debt which is paid when due;

(i)     fail to intend to remain solvent and pay its debts and liabilities from its assets as the same shall become due;

(j)     fail to maintain its records, books of account and bank accounts separate and apart from those of the equitable or beneficial owners, principals and affiliates of Borrower or of Parent, as the case may be, the affiliates of an equitable or beneficial owner or principal of Borrower or Parent, as the case may be, and any other Person or fail to maintain such books and records in the ordinary course of its business;

(k)     except with respect to any contract or agreement expressly identified in the operating agreement of Borrower, enter into any contract or agreement with any equitable or beneficial owner, principal or affiliate of Borrower or of Parent, as the case may be, any Guarantor, or any equitable or beneficial owner, principal or affiliate thereof, except upon terms and conditions that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arms-length basis with third parties other than any equitable or beneficial owner, principal or affiliate of Borrower or of Parent, as the case may be, any Guarantor or any equitable or beneficial owner, principal or affiliate thereof;

(l)     to the fullest extent permitted by law, seek the dissolution or winding up in whole, or in part, of Borrower or of Parent, as the case may be;

(m)     fail to use commercially reasonable efforts to correct any known misunderstandings regarding the separate identity of Borrower, or of Parent, as the case may be from any equitable or beneficial owner, principal or affiliate thereof or any other Person;

(n)     guaranty or become obligated for the debts of any other Person or hold out its credit as being able to satisfy the debts of another Person; make any loans or advances to any third party, including any equitable or beneficial owner, principal or affiliate of Borrower, or of Parent, as the case may be, or any equitable or beneficial owner, principal or affiliate thereof, nor buy or hold evidence of indebtedness issued by any other Person (other than cash or investment grade securities);

(o)     (i) fail to pay any taxes required to be paid by it under applicable law or fail to file its own tax returns, or file a consolidated federal income tax return with any other entity, except to the extent that Borrower is treated as a "**disregarded entity**" for tax purposes and is not required to file tax returns under any applicable law;

(p)     fail to hold itself out to the public as a legal entity separate and distinct from any other Person;

(q)     fail to conduct its business solely in its own name, mislead others as to the identity with which such other party is transacting business, or suggest that Borrower or Parent, as the case may be, is responsible for the debts of any third party (including any equitable or beneficial owner, principal or affiliate of Borrower, or of Parent, as the case may be, or any equitable or beneficial owner, principal or affiliate thereof);

Exhibit C - 2

(r)     fail to intend to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; provided, however, that Borrower's members shall not be obligated to make additional capital contributions beyond their initial capital contributions;

(s)     hold itself out as or be considered as a department or division of (i) any equitable or beneficial owner, principal, or affiliate of Borrower or of Parent, as the case may be, (ii) any affiliate of an equitable or beneficial owner or principal of Borrower or of Parent, as the case may be, or (iii) any other Person;

(t)     fail to maintain separate financial statements and accounting records, showing its assets and liabilities separate and apart from those of any other Person (except that Borrower may be included in consolidated financial statements of another Person, so long as (i) its separate assets shall be clearly indicated as such on such statement and such statements will indicate that Borrower's assets and credit are available to satisfy the debts and other obligations of any other Person, and (ii) such assets shall also be listed on Borrower's own separate balance sheet);

(u)     fail to observe all applicable organizational formalities;

(v)     fail to pay its own liabilities, including but not limited to the salaries of its own employees (if any are required), from its own funds; (w)     fail to maintain a sufficient number of employees (if any are required) in light of its contemplated business operations;

(x)     fail to allocate fairly and reasonably any overhead expenses that are shared with an affiliate, including paying for office space and services performed by any employee of an affiliate;

(y)     fail to use separate stationery, invoices and checks bearing its own name;

(z)     pledge its assets for the benefit of any other Person, other than in connection with the Loan;

(aa)     acquire the obligations or securities of any equitable or beneficial owner, principal or affiliate of Borrower or of Parent, as the case may be, any Guarantor or any equitable or beneficial owner, principal or affiliate thereof;

(bb)     fail to maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other entity;

(cc)     with respect to Borrower, have any obligation to indemnify its equitable or beneficial owners, officers, directors or affiliates, as the case may be, or have such an obligation only if it is fully subordinated to the Loan and will not constitute a claim against it in the event that cash flow in excess of the amount required to pay the Loan is insufficient to pay such obligation;

(dd)     fail, to the fullest extent permitted by law, to consider the interests of its creditors in connection with all actions;

Exhibit C - 3

(ee)     have any of its obligations guaranteed by any equitable or beneficial owner, principal or affiliate of Borrower except Guarantor;

(ff)     fail to be formed and organized as a limited liability company under the laws of the State of California

(gg)     take for itself or cause any other Person to take any of the following actions without the prior unanimous written consent of the partners, members or managers, as applicable and the Independent Manager (as defined below) of Borrower: (i) file or consent to the filing of any bankruptcy, insolvency or reorganization case or proceeding; institute any proceedings under any applicable insolvency law; file an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature or otherwise seek any relief under any laws relating to the relief from debts or the protection of debtors generally, (ii) seek, consent to or acquiesce to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for itself or any other entity, (iii) make an assignment of its assets for the benefit of its creditors or an assignment of the assets of another entity for the benefit of such entity's creditors, or (iv) take any action in furtherance of the foregoing.

(hh)     with respect to the Borrower, fail to have one (1) **Springing Member**". The Springing Member shall have no interest in the Borrower of any nature whatsoever unless and until the Springing Member is admitted as a member of the Borrower in accordance with this subparagraph (hh). Upon the occurrence of any event that causes the Parent to cease to be a member of the Borrower (a "**Member Cessation Event**"), the Springing Member, shall, without any action of any Person and simultaneously with a Member Cessation Event, automatically be admitted to the Borrower as a member and the Borrower's existence and purpose shall continue without dissolution. It is the intent of this subparagraph (hh) that the Borrower never have more than one (1) Springing Member at any particular point in time. No Springing Member may resign from the Borrower or transfer its rights as Springing Member (or as member) unless a successor Springing Member (or member) has been admitted to the Borrower as a Springing Member (or member) by executing a counterpart to Borrower's operating agreement; provided, however, the Springing Member shall automatically cease to be a member of the Borrower upon the admission to the Borrower of a substitute member for the Parent which succeeds to the rights and interests of the Parent under Borrower's operating agreement. A Springing Member, in her, his or its capacity as such or as a member of the Borrower after her, his or its admission as a member, shall have no interest in the profits, losses and capital of the Borrower and has no right to receive any distributions of the Borrower. A Springing Member, in her, his or its capacity as such or as a member of the Borrower after her, his or its admission as a member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, the Borrower, including, without limitation, the merger, consolidation or conversion of the Borrower. Prior to her, his or its admission to the Borrower as a member in accordance with this subparagraph (hh), no Springing Member shall not be a member of the Borrower.

(ii)     with respect to the Borrower, fail at any time to have at least one (1) independent manager that is not and has not been for at least five (5) years:

Exhibit C - 4

(i)      a manager (other than in its capacity as an independent manager of Borrower or an affiliate), officer, employee, trustee, trade creditor, customer, supplier, member attorney, counsel or shareholder (or spouse, parent, sibling or child of the foregoing) of (i) Borrower, (ii) a principal of Borrower, (iii) any equitable or beneficial owner, partner, principal or affiliate of Borrower or of a principal of any such Person, or (iv) any affiliate of any equitable or beneficial owner, partner, or principal of Borrower or of a principal of any such Person; or

(ii)     a creditor, customer, supplier or Person who derives any of its purchases or revenues from its activities with (i) Borrower, (ii) a principal of Borrower, (iii) any equitable or beneficial owner, partner, principal or affiliate of Borrower or Parent or of a principal of any such Person, or (iv) any affiliate of any equitable or beneficial owner, partner, or principal of Borrower or of a principal of any such Person; (each such independent manager, an "**Independent Manager**");

a natural person who satisfies the foregoing definition other than underlineunderlinesubparagraph (ii) shall not be disqualified from serving as an Independent Manager of Borrower if such individual is an Independent Manager provided by a nationally-recognized company that provides professional independent managers (a "**Professional Independent Manager**") and other corporate services in the ordinary course of its business.  A natural person who otherwise satisfies the foregoing definition other than underlineunderlinesubparagraph  (i) by reason of being the independent manager of a "special purpose entity" affiliated with Borrower shall not be disqualified from serving as an Independent Manager of Borrower if such individual is either (i) a Professional Independent Manager or (ii) the fees that such individual earns from serving as Independent Manager of affiliates of Borrower in any given year constitute in the aggregate less than five percent (5%) of such individual's annual income for that year.

For purposes of this underlineunderlineExhibit C only, an "**affiliate**" of a Person shall mean (i) any other Person directly or indirectly Controlling, Controlled by, or under direct or indirect common Control with such Person, or (ii) any director, officer, employee, manager, child or spouse (or any trust for the benefit of a child or spouse) of any Person described in subsection (i) above.

Exhibit C - 5

**EXHIBIT D**

**INSURANCE POLICIES**

(a)    <u>Property Insurance</u>. For so long as any Obligation is outstanding, Borrower shall continuously maintain property insurance in accordance with the following provisions:

(i)    <u>Special Perils Form/All Risk Property Coverage</u>. Borrower shall maintain property insurance with respect to the Improvements, Fixtures and Personal Property insuring against any peril now or hereafter included within the classification "**All Risks of Physical Loss**", including, without limitation, losses from fire, lightning, building collapse, debris removal, windstorm, hail, explosion, smoke, aircraft and vehicle damage, riot, vandalism and malicious mischief, falling objects, impact of vehicles and aircraft, weight of snow, ice or sleet, collapse, mudslide, sinkhole, subsidence, tsunami, water damage and sprinkler leakage, in amounts at all times sufficient to prevent Borrower or Lender from becoming a co-insurer within the terms of the applicable law, but in any event such insurance shall be maintained in an amount **EQUAL TO THE FULL REPLACEMENT COST OF THE IMPROVEMENTS, FIXTURES AND PERSONAL PROPERTY. THE TERM** "**replacement cost**" means the actual replacement cost (without taking into account any depreciation and exclusive of excavations, footings and foundation, landscaping and paving) determined annually by an insurer, a recognized independent insurance agent or broker or an independent appraiser selected and paid by Borrower. The policy shall include an agreed amount endorsement or a waiver of the coinsurance requirement and an inflation guard endorsement.

(ii)    <u>Flood and Mudslide</u>. Flood and mudslide insurance in amount equal to the lesser of (1) the amount required for one hundred percent (100%) of the full replacement value of the Improvements, Fixtures and Personal Property, with co-insurance clause if any, only as acceptable to Lender, or (2) the maximum limit of coverage available with respect to the Property under the Federal Flood Insurance Program; provided that such flood and mudslide insurance shall not be required if Borrower shall provide Lender with evidence satisfactory to Lender that the Property is not situated within an area identified by the Secretary of Housing and Urban Development (or any other appropriate governmental department, agency, bureau, board, or instrumentality) as an area having special flood or mudslide hazard, and that no flood or mudslide insurance is required on the Property by any regulations under which Lender is governed.

(iii)    <u>Boiler and Machinery Coverage</u>. Borrower shall maintain broad form, replacement cost basis boiler and machinery insurance (without exclusion for explosion) covering all boilers or other pressure vessels, machinery, equipment and air conditioning or heating units located in, on or about the Property and insurance against physical loss, rental loss, extra expense, expediting loss and loss of occupancy or use arising from any breakdown in such amounts as are generally required by institutional lenders for properties comparable to the Property.

(iv)    <u>Rent Loss/Business Interruption/Extra Expense</u>. Borrower shall maintain business interruption and/or loss of "**rental income**" insurance in an amount sufficient to avoid

Exhibit D - 1

any co-insurance penalty and to provide proceeds that will cover a period of not less than twelve (12) months from the date of casualty or loss, the term "**rental income**" to mean the sum of (i) the total then ascertainable rents escalations and all other recurring sums payable under the leases affecting the subject property and (ii) the total ascertainable amount of all other amounts to be received by Borrower from third parties which are the legal obligation of the tenants, reduced to the extent such amounts would not be received because of operating expenses not incurred during a period of non-occupancy to that portion of the subject property then not being occupied. The policy shall include an agreed amount endorsement or a waiver of the coinsurance requirement.

      (v)    Building Ordinance or Law. Borrower shall maintain building ordinance coverage in amount of at least twenty-five percent (25%) of the building coverage limit.

      (vi)    Builder's Risk. Borrower shall maintain at all times during which structural construction, repair or alterations are being made with respect to the Property (1) reasonable liability insurance, to be determined by the scale and type of work being performed, to be required of all contractors involved in the work, to be primary and non-contributory to coverage provided by or under the terms or provisions of the commercial general liability insurance policy described in Paragraph (b)(i) below, and (2) the insurance provided for in Paragraph(a)(i) above written on a builder's risk completed value form (a) on a non-reporting basis, (b) against all risks of physical loss, including earthquake and flood, (c) including permission to occupy the subject property, and (d) with an agreed amount endorsement (including soft costs), specifications, blueprints/models, demolition, increased cost of construction and rental interruption for delayed opening as pertinent, waiving co-insurance provisions.

      (b)    Liability Insurance. For so long as any Obligation is outstanding, Borrower shall continuously maintain liability insurance in accordance with the following provisions:

      (i)    Commercial General Liability Insurance. Borrower shall maintain commercial general liability insurance, including bodily injury and property damage liability insurance against any and all claims, including all legal liability to the extent insurable and imposed upon Lender and all court costs and attorneys' fees and expenses, arising out of or connected with the possession, use, leasing, operation, maintenance or condition of the subject property in the minimum amount of Five Million and No/100 Dollars ($5,000,000.00) per occurrence and Ten Million and No/100 Dollars ($10,000,000.00 in the aggregate. A combination of primary and umbrella/excess liability insurance policies can be obtained to satisfy these liability limits requirements. Such liability insurance must be occurrence-based coverage, rather than claims made coverage. This insurance must stand on its own with no shared participation or proration and be on a following form basis.

      (ii)    (iii)    Automobile. Borrower shall maintain automobile liability insurance if over the road vehicles, whether owned, hired or non-owned, are operated in conjunction with the Property. The combination of the primary automobile liability and applicable umbrella/excess liability must equal a minimum of One Million and No/100 Dollars ($1,000,000.00) combined single limit.

(iv)    Workers' Compensation and Employer's Liability Insurance. Borrower shall maintain workers' compensation and employers' liability insurance with respect to any work on or about the Property. Liability limits shall be a minimum of:

(1)    Workers Compensation – Statutory as required by state law

(2)    Employers' Liability –

| | |
|---|---|
| Bodily injury by accident | $1,000,000 each accident |
| Bodily injury by disease | $1,000,000 each employee |
| Bodily injury by disease | $1,000,000 policy limit |

(c)    Additional Insurance. Borrower shall maintain such other insurance with respect to Borrower and the subject property against loss or damage of the kinds from time to time required by Lender loan class requirements to the extent such additional insurance is for perils and in amounts customarily required by institutional lender for properties or commercial activities comparable to the Property or commercial activities and to the extent such other insurance is available at commercially reasonable rates.

(d)    Insurance Company Rating/Qualification. The insurance company or companies issuing the policies required hereunder (each, a "**Policy**", and collectively, the "**Policies**") each must be a U.S. domestic insurance standard stock company or non-participating mutual company that is a primary insurer and has a current general policy rating of A- or better and a current financial size category of VIII or better by A.M. Best Company, Inc. All insurers must be licensed and in good standing in the state in which the Property is located and otherwise be acceptable to Lender.

(e)    Named Insured; Additional Insured; Loss Payable. All Policies shall name Borrower as the insured. Each Policy, except Workers Compensation, shall name Lender as an additional insured. Each Policy referred to in Paragraph (a) above must provide that all proceeds be payable to Lender and shall contain a deductible of not more than Ten Thousand Dollars ($10,000) or as otherwise acceptable to Lender. Each Policy referred to in Paragraph (b) above, except for Worker's Compensation, must be written on an occurrence form basis.

(f)    Required Provisions. All Policies shall contain: (1) the agreement of the insurer to give Lender at least thirty (30) days' notice prior to cancellation or expiration and at least ten (10) days' notice on non-payment of premium; (2) a waiver of subrogation rights against Lender and, if available, Borrower; (3) an agreement that such Policies are primary and non-contributing with any insurance that may be carried by Lender; (4) a statement that the insurance shall not be invalidated should any insured waive in writing prior to a loss any or all right of recovery against any party for loss accruing to the property described in the Policy; and (5) if obtainable, a provision that no act or omission of Borrower shall affect or limit the obligation of the insurance carrier to pay the amount of any loss sustained. As of the date hereof, and subject to any changes in such requirements which Lender may, in its sole discretion, make from time to time pursuant to its rights under this Exhibit D, each Policy shall contain a mortgagee's Loss Payable endorsement, "**Lender Clause**", or other non-contributory mortgagee clause of similar form and substance acceptable to Lender in favor of Lender as a first mortgagee.

Exhibit D - 3

**EXHIBIT E**

**LIST OF LOAN DOCUMENTS AND OTHER DOCUMENTS**

1.  Loan Agreement executed by Borrower and Lender

2.  Promissory Note executed by Borrower

3.  Construction Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing executed by Borrower, as trustor, in favor of Fidelity National Title Company, as trustee, for the benefit of Lender

4.  Indemnity Agreement executed by Guarantor in favor of Lender

5.  Completion Guaranty executed by Guarantor in favor of Lender

6.  Environmental Indemnity Agreement executed by Borrower and Guarantor in favor of Lender

7.  Assignment of Agreements executed by Borrower in favor of Lender

8.  Company Certificate executed by Borrower

9.  Contingent Interest Agreement

10. Memorandum of Understanding

11. UCC-1 Financing Statement (California)

12. Post-Closing Letter Agreement executed by Borrower

13. Assignment of Construction Agreements executed by Borrower in favor of Lender

14. Parent Pledge Agreement executed by Parent in favor of Lender

15. Sponsor Pledge Agreement executed by Sponsor in favor of Lender

# EXHIBIT F

### PHASE II REFINANCE TERM SHEET

| | |
|---|---|
| Borrower: | Borrower must be a newly-formed Delaware or California limited liability company that is a single purpose entity complying with customary bankruptcy remoteness requirements. Borrower shall at all times have one independent Manager satisfying customary bankruptcy-remote SPE requirements. Borrower must be wholly owned and controlled by another newly-formed single-purpose bankruptcy-remote Delaware or California limited liability company (the "**Parent**"), which in turn must be wholly owned and controlled by Sponsor. |
| Property: | A site located in Beverly Hills, California and including assessor parcel numbers: 4387-020-009, 4387-020-001, 4387-021-019, 4387-021-018, 4387-022-001 (each, a "**Phase II Parcel**", and collectively, the "**Phase II Property**"). Each home site to be constructed on the Property is referred to as a "**Phase II Home Site**", and collectively, the "**Phase II Project**". Each Phase II Home Site shall be owned by a separate newly-formed Delaware or California limited liability company that is a single purpose entity complying with customary bankruptcy remoteness requirements, of which Borrower is the sole member (each, a "**Phase II Subsidiary**"). |
| Phase I Construction Loan: | Loan Agreement dated as of July 31, 2018 (the "**Phase I Construction Loan Agreement**") between Treetop Development, LLC, a California limited liability company and an affiliate of Borrower which is controlled by Sponsor ("**Phase I Construction Borrower**"), and Skylark Capital Management, LLC ("**Lender**"), pursuant to which Lender committed to lend to Phase I Construction Borrower up to $92,775,000 (the "**Phase I Construction Loan**") |
| Guarantors: | Mr. Mohamed A. Hadid (the "**Sponsor**") and the Parent, on a joint and several basis. |
| Maximum Loan Amount: | Up to [$33,500,000] (the "**Loan**"). |
| Disbursed Loan Amount: | Up to [$25,000,000]. After closing, Lender shall fund Loan proceeds from the Reserves as provided below. |
| Loan Purpose: | To refinance the existing loan secured by a first mortgage lien on the Property. |
| Loan Term: | 24 months. |
| Extension Options: | Four (4) separate consecutive six (6) month extensions, subject to extension conditions to be set forth in more detail in the definitive Loan documents evidencing and governing the Loan (the "**Definitive Documents**"; the form of loan agreement is attached hereto as Annex I), including the following, in respect of each such extension: (i) Borrower shall have paid Lender an extension fee equal to 1.0% of the Maximum Loan Amount; (ii) Lender's satisfaction that there are sufficient amounts available in the Reserves to satisfy reserve requirements during each extension period; (iii) no default or potential default exists under the Definitive Documents; (iv) no occurrence of a material adverse change in (a) the financial condition of the Borrower or Sponsor or (b) the condition of the Property, and (v) the maturity date of the Phase I Construction Loan contemporaneously shall be extended to the proposed extended maturity date of the Loan in accordance with the Phase I Construction Loan Agreement. |
| Interest Rate: | One-month LIBOR+8.10%, with a LIBOR floor of the greater of (a) 1.90% or (b) the one-month LIBOR rate as of the date of closing. LIBOR shall be rounded upwards to the nearest 1/100 of 1.00%. Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year, shall be due and payable monthly in arrears, and shall accrue at the default rate and be compounded monthly if not timely paid when due. |
| Amortization: | The Loan shall be interest-only for the Loan Term (subject to mandatory prepayment from the net proceeds of sale of all or any portion of the Collateral). |

| | |
|---|---|
| Commitment Fee: | 4.0% of the Maximum Loan Amount. |
| Non-Recourse: | The Loan is non-recourse to Borrower and Guarantors, *provided* that Borrower and Guarantors shall be jointly and severally liable for Lender's environmental losses in a separate environmental indemnity agreement, as well as for Lender's losses, costs and damages arising from customary non-recourse carve-outs, certain of which would cause the Loan to become full recourse to Borrower and Guarantors, jointly and severally. |
| Collateral: | All assets of Borrower and Parent, including, without limitation, a (i) a first priority deed of trust/mortgage on the Property and all related assets; and (ii) a first priority pledge of, and security interest in, (x) 100% of the equity interests in each Phase II Subsidiary, (y) 100% of the equity interests in Borrower, by Parent, and (z) 100% of the equity interests in Parent, by Sponsor (collectively, the "**Collateral**"). |
| Reserves: | At closing, the following cash reserves (the "**Reserves**") will be established at a deposit bank approved by Lender ("**Deposit Bank**"): |
| | Tax and Insurance Reserve: At closing, Borrower shall deposit into the Tax and Insurance Reserve an amount equal to the budgeted amounts for all taxes and insurance, as determined by Lender. |
| | Interest Reserve: At closing, [$6,700,000] will be reserved against the commitment for the Maximum Loan Amount (which shall bear interest in the same manner as a funded reserve) to establish the Interest Reserve for debt service on the Loan. |
| Contingent Interest: | In connection with any future sale of the Property or any portion thereof (a "**Future Sale**"), Lender shall be entitled to 25% of Sponsor's net profits of any such sale. Lender's prior consent shall be required in connection with any Future Sale; *provided, however*, that, so long as no default or potential default exists, Lender shall allow the sale of any Phase II Home Site for a minimum release price of $17,500,000 or more or the Project for a minimum release price of $50,000,000 or more (in any such case, subject to Lender's 25% net profits interest). |
| Other Requirements: | A minimum of three (3) (and not more than four (4)) new home sites will be developed on the Phase II Parcels. |
| | When Sponsor obtains necessary permits to develop a home site and/or construct improvements on one or more Phase II Parcels, Sponsor shall form a new separate Phase II Subsidiary; and such Phase II Home Site shall be transferred to such Phase II Borrower. Each Phase II Subsidiary must be wholly owned and controlled by Borrower, which in turn must be directly or indirectly wholly owned and controlled by Sponsor. |
| | Each Phase II Home Site shall be owned by a separate Phase II Subsidiary. Sponsor shall determine the debt-free value of each Phase II Home Site, which (i) shall not exceed $60.0M in the aggregate for all Phase II Home Sites, (ii) shall not exceed $20.0M for any single Phase II Home Site, and (iii) be subject to the approval of Lender (or an affiliate of Lender designated by Lender). Existing indebtedness secured by the Phase II Parcels (which shall not exceed in the $25.0M in the aggregate; as of the date of this Term Sheet, approximately $20.0M is outstanding under an existing commitment to lend up to $25.0M) shall be allocated to and assumed by the Phase II Subsidiaries, *pro rata* in accordance with the agreed values of the respective Phase II Home Sites owned by each of them. Lender (or its designated affiliate) shall have the right to acquire up to 20% of the equity in each Phase II Subsidiary, for consideration equal to 20% of the difference between (x) the agreed value of the Phase II Home Site owned by such Phase II Subsidiary less (y) the amount of existing indebtedness allocated to such Phase II Home Site and assumed by such Phase II Subsidiary (each, a "**Phase II Option**"). |
| | Lender (or an affiliate of Lender) shall have an exclusive right to provide financing for construction of a single family residence on each Phase II Home Site on terms and conditions that are substantially the same as the Construction Loan (each a "**Phase II Loan**"). Without limitation, the definitive documentation for a Phase II Loan, if any, |

would include provision for contingent interest in the form of a profit participation upon any future sale of a Phase II Property for which Lender has made a Phase II Loan, in the amount of 25% of Sponsor's net profits of any such sale.

| | |
|---|---|
| Conditions Precedent | The Lender's obligation to make the Loan is subject to the following conditions precedent: (1) no default or potential default exists under the Definitive Documents in respect of the Loan, and (2)  Sponsor has obtained all permits necessary to construct a single family residence on at least one of the Phase II Home Sites and a roadway which provides access to all of the Phase II Home Sites, and (3) Lender shall have a first mortgage lien on all of the Phase II Property and shall receive, at Sponsor's expense, a title insurance policy with a liability limit not less than the Maximum Loan Amount, insuring the Lender's mortgage securing the Loan as a first lien on the title to the Phase II Property and issued in such form, and by such title insurance company, as shall be satisfactory to Lender (which title insurance policy shall be subject only to such exceptions as shall be approved by, and shall contain such endorsements as may be required by Lender or its counsel), and (3) Sponsor and the Borrower satisfy such other conditions precedent thereto as Lender reasonably may require. |
| Transfers of Interest: | Except as expressly permitted in the Definitive Documents, Sponsor and Borrower shall not be permitted to transfer, pledge, assign or encumber the Property, or any interest therein, or to make any transfer, pledge, assignment or encumbrance of any direct or indirect ownership interest in Borrower. |
| Exclusivity: | Neither Sponsor, Borrower nor any of their respective affiliates shall seek or attempt to obtain, make, accept, negotiate, entertain or otherwise pursue any offers to engage in any debt financing regarding the Property other than the Loan.  In the event that Borrower or any of its affiliates breaches the Exclusivity provision or Lender is ready and willing to make the Loan on the terms set forth herein and Borrower fails to close the Loan, a break-up fee of $500,000 (*plus* any enforcement costs relating thereto, the "**Break-Up Fee**") shall be immediately due and payable to Lender.  Payment of the Break-Up Fee is guaranteed by Sponsor.  The Break-Up Fee is in addition to (i) Borrower's and Sponsor's joint and several obligation to pay any Costs and Expenses.  If Lender's damages from such breaches exceed the Break-Up Fee, Borrower and Sponsor shall also be liable for any such excess damages. |
| Costs and Expenses: | Borrower shall be responsible for all costs and expenses related to the Loan ("**Costs and Expenses**"), including, but not limited to, Loan documentation and all other fees and disbursements of legal counsel to Lender.  Borrower and Sponsor agree to indemnify and hold Lender and its affiliates harmless from any and all claims and Costs and Expenses related to the Loan. Borrower understands that it will be liable for Costs and Expenses incurred whether or not the Loan is approved or closes. |

**ANNEX 1 TO**
**EXHIBIT F**

**LOAN AGREEMENT**

dated as of [_____], 201[_]

between
[_____],
a [_____],
as Borrower


and

**SKYLARK CAPITAL MANAGEMENT, LLC,**
a California limited liability company,
as Lender

## TABLE OF CONTENTS

**Page**

ARTICLE 1 CERTAIN DEFINITIONS. ...............................................................................1

ARTICLE 2 THE LOAN; INTEREST RATE; PAYMENTS.......................................................13
    Section 2.1    Evidence of Loan ..........................................................................13
    Section 2.2    Disbursement of the Loan; Loan Origination Fee. ..........................13
    Section 2.3    Interest Rate. ................................................................................14
    Section 2.4    Past Due Charge and Default Interest Rate.....................................14
    Section 2.5    Payment of Interest .......................................................................15
    Section 2.6    Maturity Date. ..............................................................................15
    Section 2.7    Prepayment. .................................................................................15
    Section 2.8    Indebtedness Absolute; No Offset; Waiver. ..................................16
    Section 2.9    Lawful Limits. ..............................................................................17
    Section 2.10    Increased Costs; Capital Adequacy. ..............................................18
    Section 2.11    Partial Release of Collateral..........................................................19
    Section 2.12    Extension of Maturity Date............................................................21

ARTICLE 3 ACCOUNTS AND RESERVES. ......................................................................22
    Section 3.1    Security Grant. ..............................................................................22
    Section 3.2    Reserves. .....................................................................................22

ARTICLE 4 CONDITIONS TO DISBURSEMENTS .............................................................24
    Section 4.1    Conditions to Loan Advance. .........................................................24

ARTICLE 5 [INTENTIONALLY OMITTED].......................................................................25

ARTICLE 6 REPRESENTATIONS AND WARRANTIES........................................................25
    Section 6.1    Representations and Warranties......................................................25
    Section 6.2    Continuation of Representations and Warranties. ............................32

ARTICLE 7 BORROWER COVENANTS............................................................................32
    Section 7.1    Performance of Obligations. ..........................................................32
    Section 7.2    Existence; Compliance with Legal Requirements. ...........................32
    Section 7.3    Single Purpose Entity....................................................................32
    Section 7.4    ERISA. ........................................................................................32
    Section 7.5    Defense and Notice of Actions and Certain Other Events................33
    Section 7.6    Right of Inspection; Due Diligence ................................................33
    Section 7.7    Liens............................................................................................34
    Section 7.8    Further Assurances; Supplemental Affidavits. ................................34
    Section 7.9    Financial Reporting.......................................................................34
    Section 7.10    Taxes. .........................................................................................36
    Section 7.11    Insurance. ....................................................................................37
    Section 7.12    Disposition of Insurance and Condemnation Proceeds and Damages.............38
    Section 7.13    Maintenance and Preservation of the Property. ...............................39

i

Section 7.14   Proceedings to Enjoin. ............................................................40
Section 7.15   Distributions...........................................................................40
Section 7.16   Transfer or Encumbrance of the Property.................................40
Section 7.17   Leases.....................................................................................41
Section 7.18   Prohibition Against Additional Recordings...............................41
Section 7.19   Change in Name.......................................................................41
Section 7.20   Debt Cancellation; Settlement of Claims..................................41
Section 7.21   Affiliate Transactions..............................................................41
Section 7.22   Limitation on Issuance of Equity Interests. ...............................41
Section 7.23   Compliance. ............................................................................41
Section 7.24   Anti-Terrorism; OFAC; Patriot Act..........................................42
Section 7.25   Material Contracts...................................................................42
Section 7.26   Limitation on Debt...................................................................43
Section 7.27   Hazardous Materials Covenants. ..............................................43

ARTICLE 8 DEFAULTS .......................................................................................43
Section 8.1    Event of Default.......................................................................43
Section 8.2    Remedies Conferred upon Lender..............................................46
Section 8.3    Right of Lender to Make Advances to Cure Event of Defaults;
               Obligatory Advances. ..............................................................48
Section 8.4    Payment of Costs, Expenses and Attorneys' Fees. .....................48
Section 8.5    Remedies Cumulative; No Waiver. .............................................49
Section 8.6    Severance. ...............................................................................49
Section 8.7    Default Rate ............................................................................50

ARTICLE 9 MISCELLANEOUS .............................................................................50
Section 9.1    Notices ....................................................................................50
Section 9.2    Reimbursement for Expenses ...................................................51
Section 9.3    Indemnity. ...............................................................................51
Section 9.4    Amendments and Waivers ........................................................52
Section 9.5    Invalid Provisions ...................................................................52
Section 9.6    Loan Agreement Provisions Control over Other Instruments .........53
Section 9.7    Approvals; Third Parties; Conditions ........................................53
Section 9.8    Lender Not in Control; No Partnership.......................................53
Section 9.9    Time of the Essence .................................................................54
Section 9.10   Successors and Assigns............................................................54
Section 9.11   Renewal, Extension or Rearrangement.......................................54
Section 9.12   Cumulative Rights ...................................................................54
Section 9.13   Singular and Plural; Phases; Construction .................................54
Section 9.14   Exhibits; Schedules; and Recitals .............................................55
Section 9.15   Titles of Articles, Sections and Subsections...............................55
Section 9.16   Survival ..................................................................................55
Section 9.17   Representation by Legal Counsel ..............................................55
Section 9.18   Waiver of Jury Trial.................................................................55
Section 9.19   Governing Law ........................................................................56
Section 9.20   Waivers ...................................................................................56
Section 9.21   Entire Agreement ....................................................................56

Section 9.22    Injunctive Relief.................................................................................56
Section 9.23    Counterparts.....................................................................................56
Section 9.24    Assignments, Participations, and Syndications .............................57
Section 9.25    Limitation on Liability of Lender's Members, Employees, Etc. ....................60
Section 9.26    Confidentiality and Publicity ........................................................60
Section 9.27    Estoppel Certificates .....................................................................61
Section 9.28    Retention of Servicer ....................................................................61
Section 9.29    Taxes.................................................................................................62

iii

## EXHIBITS

Exhibit A    Legal Description of Property

Exhibit B    [Intentionally Omitted]

Exhibit C    Single Purpose Entity Provisions

Exhibit D    Insurance Policies

Exhibit E    List of Loan Documents and Other Documents

## SCHEDULES

Schedule I    Environmental Reports

Schedule II    Borrower's Organizational Chart

Schedule III    [Intentionally Omitted]

## LOAN AGREEMENT

LOAN AGREEMENT dated as of [_____ ], 201[_] (this "**Agreement**") between [_____], a [_____] ("**Borrower**"), and **SKYLARK CAPITAL MANAGEMENT, LLC**, a California limited liability company, together with its successors and assigns ("**Lender**").

## R E C I T A L S

WHEREAS, Borrower has requested that Lender make a loan in the maximum principal amount of up to [_____ and No/100 Dollars ($_____.00)] (the "**Loan**") to be secured by, among other things, a first lien deed of trust on that certain real property legally described on **Exhibit A** attached hereto; and

WHEREAS, Lender has agreed to make the Loan upon completion of Lender's standard legal and business due diligence, satisfaction by Borrower of all the conditions precedent set forth herein and receipt of final Loan Documents, each acceptable to Lender and Borrower.

NOW, THEREFORE, in consideration of the above recitals and for other good and valuable consideration, Lender and Borrower hereby agree as follows:

## ARTICLE 1

## CERTAIN DEFINITIONS.

As used herein, the following terms have the meanings indicated:

"**Affiliate**" means, with respect to any Borrower Party: (i) any Borrower Party, or (ii) any Person that directly or indirectly (a) owns more than ten percent (10%) of, or (b) is Controlling, Controlled by, or under direct or indirect common Control with, Borrower or any Borrower Party, or (iii) any director, officer, employee, manager, child or spouse (or any trust for the benefit of a child or spouse) of any Person described in subsection (i) or (ii) above. The term "**Affiliate**" when used with reference to Lender means any entity that Controls, is Controlled by, or is under direct or indirect common Control with, Lender.

"**Agreement**" is defined in the introductory paragraph of this Agreement.

"**Appraisal**" means a written statement independently and impartially prepared by a qualified appraiser, setting forth an opinion as to the "**as-is**" market value of the applicable Property that is (i) dated not more than sixty (60) days prior to the applicable date of calculation required pursuant to the terms of this Agreement, (ii) addressed to Lender, its successors and assigns, and (iii) made in compliance with the requirements of Title XI of the Federal Institution Reform, Recovery, and Enforcement Act of 1989 and the Uniform Standards of Professional Appraisal Practice which are maintained by the Appraisal Standards Board of the Appraisal Foundation. As used herein, an Appraisal shall also mean any written supplement or update of a prior Appraisal, that otherwise satisfies the conditions set forth in this definition.

1

"**Approved Accounting Method**" means GAAP or any other method of accounting utilized by Borrower and approved by Lender, consistently applied.

"**Assignment of Agreements**" means that certain Assignment of Agreements made by Borrower in favor of Lender of even date herewith, as the same may be amended, restated, or supplemented or otherwise modified from time to time.

"**Bankruptcy Proceeding**" has the meaning given to such term in Section 8.1(f)(i).

"**Borrower**" has the meaning given to such term in the introductory paragraph.

"**Borrower Funded Interest Reserve**" has the meaning given to such term in Section 3.2(c).

"**Borrower Party**" means Borrower, Parent and the Guarantor.

"**Business Day**" means (i) any day that is not a Saturday, Sunday or other day on which commercial banks in California are authorized or required by law to remain closed and (ii) with respect to all notices, determinations, fundings and payments in connection with the LIBOR Rate, the term "**Business Day**" means any day which is a business day described in clause (i) and which is also a day for trading by and between banks in dollar deposits in the London interbank market.

"**Change in Law**" means (i) the adoption of any law, rule or regulation after the Closing Date, (ii) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (iii) compliance by Lender (or, for purposes of Section 2.10 by any lending office of Lender or by its holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date. It is expressly agreed that any regulation, letter ruling or other determination impacting or affecting the implementation of the Dodd-Frank Wall Street Reform and Consumer Protection Act, as the same is now or hereafter amended, is deemed a Change in Law.

"**Claims**" means any and all liabilities, obligations, losses, damages, penalties, claims, actions, litigation, proceedings, investigations, judgments, suits, fees, costs, expenses, charges, advances and disbursements of any kind (including, without limitation, fees, costs, expenses and charges of counsel).

"**Closing**" means the consummation of the Loan on the Closing Date upon satisfaction of the conditions thereto as determined by Lender in its sole discretion.

"**Closing Date**" means the date of this Agreement.

"**Closing Instruction Letter**" means that certain letter and escrow agreement from Lender's legal counsel, as acknowledged by Lender, Borrower and Title Company.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended (or any corresponding provision or provisions of any succeeding law).

2

"**Collateral**" means all collateral now or hereafter securing or intended to secure the Obligations, including the Property and all other property and assets of Borrower and all other property in which a lien has been granted to Lender pursuant to any of the Loan Documents.

"**Confidential Information**" has the meaning given to such term in Section 9.27(b).

"**Contingent Interest**" means twenty-five percent (25%) of the Net Sale Proceeds of all or any portion of the Property. "**Contingent Interest**" shall be in addition to (and not included in) interest accrued on the Loan at the Contract Rate and/or other amounts payable by Borrower hereunder and under the Note and the other Loan Documents, and shall be payable as additional interest on the Loan.

"**Contract Rate**" means a rate per annum equal to the LIBOR Margin plus the LIBOR Rate.

"**Control**" and any derivative of such term, including "**Controlling**" and "**Controlled**", means, when used with respect to any Person, (i) the direct or indirect beneficial ownership of fifty-one percent (51%) or more of the outstanding voting securities or voting equity of such Person or (ii) the power to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"**Covered Taxes**" has the meaning given to such term in (a).

"**Debt**" means, for any Person, without duplication: (i) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property or services for which such Person or its assets is liable, (ii) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable, if such amounts were advanced under such loan agreement or credit facility or if such letter of credit was issued, (iii) all amounts required by such Person as a guaranteed payment to partners or a preferred or special dividend, including any mandatory redemption of shares or interests, (iv) all indebtedness guaranteed by such Person, directly or indirectly, (v) all obligations under leases (including capital leases) for which such Person is liable, and (vi) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

"**Debt Service**" means, for any period of time, the sum of all scheduled principal (if any) and interest payments on the Loan that are due and payable during such period of time.

"**Default**" means the occurrence of any event, circumstance or condition which constitutes a breach of or a default under any Loan Document and which, after the giving of any required notice and/or the passage of any applicable cure period, would constitute an Event of Default under this Agreement or any other Loan Document.

"**Default Rate**" means a rate per annum equal to the lesser of (i) five percent (5%) over the Contract Rate, or (ii) the maximum rate of interest permitted to be charged by applicable

3

laws or regulation governing this Agreement until paid, such additional interest to be compounded monthly.

"**Distribution**" means any distribution of cash by Borrower to any Person having any direct or indirect legal or beneficial interest in Borrower, pursuant to such Person's interest in Borrower. "**Distribute**" shall mean the act of making a Distribution.

"**Environmental Indemnity**" means that certain Environmental Indemnity Agreement dated as of even date herewith executed by Borrower and Guarantor for the benefit of Lender, as the same may be amended, restated, supplemented or otherwise modified from time to time. The obligations under the Environmental Indemnity are not secured by the Liens granted in the Loan Documents.

"**Environmental Proceedings**" has the meaning given to such term in Section 6.1(q)(iii).

"**Environmental Reports**" means collectively the reports identified on Schedule I attached hereto.

"**Equity Interests**" means, with respect to any Person, its equity ownership interests, its membership interests, its common stock and any other capital stock or other equity ownership units of such Person authorized from time to time, and any other shares, options, interests, participations or other equivalents (however designated) of or in such Person, direct or indirect and whether voting or nonvoting, including, without limitation, common stock, options, warrants, preferred stock, phantom stock, membership units (common or preferred), stock appreciation rights, membership unit appreciation rights, convertible notes or debentures, stock purchase rights, membership unit purchase rights and all securities convertible, exercisable or exchangeable, in whole or in part, into any one or more of the foregoing.

"**ERISA**" has the meaning given to such term in Section 6.1(o).

"**Event of Default**" has the meaning given to such term in Section 8.1.

"**Federal Bankruptcy Code**" means Title 11 of the United States Code, as may be amended from time to time or any successor statute.

"**First Extended Maturity Date**" means January 29, 2021, or such earlier date on which the final payment of principal of the Loan becomes due and payable as herein provided, whether by declaration of acceleration, or otherwise.

"**Fixtures**" has the meaning given to such term in the Security Instrument.

"**Fourth Extended Maturity Date**" means July 29, 2022, or such earlier date on which the final payment of principal of the Loan becomes due and payable as herein provided, whether by declaration of acceleration, or otherwise.

"**GAAP**" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting

4

Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"**Governmental Authority**" means any federal, state, foreign, county, city, or municipal government, or political subdivision thereof, any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality or public body, or any court or administrative tribunal, whether now or hereafter in existence, and that has jurisdiction over any Borrower Party or the Property.

"**Guarantor**" means, individually and collectively, and jointly and severally, Mohamed Hadid, an individual, and Parent, and any other Person who now or hereafter guarantees any or all of the Obligations. Wherever the term Guarantor is used said term shall mean, as applicable, each one or more of the Persons who comprise Guarantor.

"**Guaranty**" means, individually and collectively, (i) that certain Indemnity Agreement dated as of even date herewith executed by each Guarantor in favor of Lender, and (ii) any other guaranty agreement executed and delivered by any Guarantor or any other Person in favor of Lender in connection with the Loan, as each may be modified, amended or restated from time to time.

"**Hazardous Materials**" means any chemical, substance, object, condition, material or waste that is or may be hazardous to human health or safety or to the environment, due to its radioactivity, ignitability, corrosivity, flammability, toxicity, infectiousness or other harmful properties or effects, including all chemicals, substances, materials and wastes that are now or hereafter may be regulated in any manner, classified as dangerous, hazardous or toxic, or as pollutants or contaminants, or to which exposure is prohibited or restricted by any federal, state or local government or public agency, board, body or authority or by any Hazardous Materials Law. Hazardous Materials include flammable explosives, radioactive materials, polychlorinated biphenyls, asbestos, mold, radon, toxic substances (including, without limitation, Toxic Mold) or other related materials whether in the form of a chemical, element, compound, solution, mixture or otherwise, including those materials defined as "**hazardous substances**", "**hazardous materials**", "**toxic substances**", "**air pollutants**", "**toxic pollutants**", "**hazardous wastes**", "**extremely hazardous waste**" or "**restricted hazardous waste**" by any Hazardous Materials Law. "**Hazardous Materials**" shall not include commercially reasonable amounts of such materials used in the ordinary course of operation of the Property which are used and stored at all times in accordance with all then applicable Hazardous Materials Laws.

"**Hazardous Materials Claims**" shall have the meaning given to such term in <u>Section 7.30(c)</u>.

"**Hazardous Materials Law**" means any federal, state, or local law, ordinance or regulation or any rule adopted or guideline promulgated pursuant thereto, or any order, ruling or directive of any federal, state, local, executive, judicial, legislative, administrative or other governmental or public agency, board, body or authority relating to health (including Toxic Mold), industrial hygiene, the environment, or the occupational or environmental conditions on, under or about the subject Property (including ambient air, soil, soil vapor, groundwater, surface

5

water or land use), whether now or hereafter in force, including those relating to the release, emission or discharge of Hazardous Materials, those in connection with the construction, fuel supply, power generation and transmission, waste disposal or any other operations or processes relating to the subject Property. Hazardous Materials Law shall include, but not be limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Emergency Planning and Community Right-to-Know Act, the Hazardous Materials Transportation Act, the Resource Conservation and Recovery Act, the Solid Waste Disposal Act, the Clean Water Act and the Clean Air Act, the Safe Drinking Water Act, and all applicable laws of the state where the Property is located.

"**Improvements**" means any building, structures, Fixtures and other improvements now or hereafter located on the Land of the Property and which are owned by Borrower.

"**Increased Cost Payment Date**" has the meaning given to such term in Section 2.10(d).

"**Indebtedness**" means, for Borrower, without duplication, all present and future indebtedness, whether direct or contingent, funded or unfunded, evidenced by or arising under this Agreement with respect to the Loan, or under any other Loan Document, together with interest thereon and all other sums due to Lender in respect of the Loan under any Loan Document (including sums added to the principal balance of the Loan in accordance with the terms of any Loan Document, all Protective Advances, Past Due Charges, Loan Expenses and all other charges, fees, costs and expenses payable pursuant to any Loan Document).

"**Indemnified Liabilities**" has the meaning given to such term in Section 9.3(a).

"**Independent Manager**" has the meaning given to such term in Paragraph (ii)(ii) of **Exhibit C** hereto.

"**Initial Maturity Date**" means July 31, 2020.

"**Land**" means, individually and collectively, each of those certain parcels of real estate legally described in **Exhibit A** to this Agreement, together with all easements and other rights appurtenant thereto.

"**Lease**" means any lease, license or agreement for use of all or any part of the Property.

"**Legal Requirements**" means all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Borrower, any Guarantor or the Property or any part thereof or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, including, without limitation, the Americans with Disabilities Act of 1990, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower or any Guarantor at any time in force affecting Borrower, any Guarantor or the Property or any part thereof, including, without limitation, any which may (i) require repairs, modifications or alterations in or to the Property or any part thereof, or (ii) in any way limit the use and enjoyment thereof.

6

"**Lender**" is defined in the introductory paragraph of this Agreement.

"**Lender's Construction Consultant**" means any Person retained by Lender, in its sole discretion, as a construction consultant in relation to the Property.

"**LIBOR Margin**" means eight and ten hundredths percent (8.10%) per annum.

"**LIBOR Rate**" means a daily fluctuating rate per annum equal to the rate of interest which is identified and normally published by Bloomberg Professional Service page USD-LIBOR-ICE as the offered rate for loans in United States dollars for a one (1) month period, rounded upwards, if necessary, to the nearest $1/100^{th}$ of one percent (0.01%). Such rate for any day shall be the rate set by the ICE Benchmark Administration as of 11:00 a.m. (London time) on such day (or if such day is not a Business Day, then as of the most recent Business Day). If Bloomberg Professional Service (or another nationally-recognized rate reporting source acceptable to Lender) no longer reports the LIBOR Rate or Lender determines in good faith that the rate so reported no longer accurately reflects the rate available to Lender in the London Interbank Market or if such index no longer exists or if page USD-LIBOR-ICE no longer exists or accurately reflects the rate available to Lender in the London Interbank Market, Lender may select a replacement index or replacement page, as the case may be. Notwithstanding the foregoing, in no event shall the LIBOR Rate be an amount less than the one-month LIBOR Rate determined on the Business Day prior to the Closing Date and one and ninety hundredths percent (1.90%).

"**Lien**" means any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, preference, assignment, security interest or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting all or any part of the Property or any interest therein, or any direct interest in Borrower, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances recorded or file against, or otherwise encumbering, the Property or any portion thereof. "**Lien**" shall not include any Permitted Exceptions.

"**Loan**" has the meaning given to such term in the Recitals.

"**Loan Advance**" has the meaning given to such term in Section 2.2(a)

"**Loan Documents**" means: this Agreement; the Note; the Contingent Interest Agreement; the Security Instrument; the Pledge Agreements; each Guaranty; the Environmental Indemnity; the Assignment of Agreements; the Uniform Commercial Code financing statements; such assignments of management agreements, brokerage agreements, contracts and other rights as may be required or otherwise requested by Lender; and all other documents evidencing, securing, governing or otherwise pertaining to the Loan and the other Obligations, including but not limited to any Note executed by Borrower, any post-closing agreement by and between Borrower and Lender and all amendments, restatements, modifications, renewals, substitutions and replacements of any of the foregoing.

"**Loan Expenses**" means all amounts described in Section 9.2 of this Agreement and any other costs or expenses identified as Loan Expenses in this Agreement or any other Loan Document.

"**Loan Origination Fee**" has the meaning given to such term in Section 2.2(b).

"**Loan Proceeds**" means all amounts advanced as part of the Loan, whether advanced directly to Borrower or otherwise.

"**Loan to Value Ratio**" means, as of any date of determination, the ratio computed as follows: (i) the numerator of the ratio shall be equal to the sum of outstanding principal balance of the Loan plus any unfunded portion of the Holdbacks; and (ii) the denominator of the ratio shall be the aggregate "**as is**" value of the Property.

"**Management Fee**" means any fee paid to a Property Manager pursuant to any Property Management Agreement.

"**Material Adverse Change**" means any development, event, condition, obligation, liability or circumstance or set of events, conditions, obligations, liabilities or circumstances or any change(s) which, as determined by Lender in good faith:

> (i)     has prevented, impeded or limited, or could reasonably be expected to prevent, impede or limit, the enforceability or validity of any Loan Document, the perfection or priority of any Lien created under any Loan Document or the remedies of Lender under any Loan Document;

> (ii)    has been, or reasonably could be expected to be, material and adverse to the ownership, use, enjoyment or value of any material portion of the Collateral or to the business, operations, prospects, properties, assets, liabilities or condition (financial or otherwise) of Borrower or any Guarantor; or

> (iii)   has materially impaired, or reasonably could be expected to materially impair, the ability of Borrower or any Guarantor to pay or perform any of its respective Obligations under the Loan Documents.

"**Material Contract**" means each contract and agreement relating to the ownership, management, development, use, operation, leasing, maintenance, repair or improvement of the Property or any other contract and/or agreement that provides for payments to or by Borrower in excess of One Hundred Thousand and No/100 Dollars ($100,000.00) per annum or that is otherwise material to the ownership of the Property or to Borrower.

"**Maturity Date**" means the Initial Maturity Date (as such Maturity Date may be extended pursuant to Section 2.12 hereof), or such earlier date on which the final payment of principal of the Loan becomes due and payable as herein provided, whether by declaration of acceleration, or otherwise.

"**Member Cessation Event**" has the meaning given to such term in **Exhibit C**.

8

"**Monthly Payment Date**" means the first (1st) day of each calendar month (or, if such first (1st) day is not a Business Day, then the first Business Day thereafter).

"**Net Sale Proceeds**" mean, in the event of a Transfer of the Property (or any portion thereof), an amount equal to (i) the sum of the gross proceeds paid or credited to Borrower on account of any such sale (together with the gross proceeds of any prior sale of any portion of the Property), minus (ii) the sum of the following: (A) the aggregate amount of cash equity Borrower and Parent have invested in the Property with respect to acquiring title, planning, engineering, designing and/or entitling (each to the extent applicable) the Property (or any portion thereof); plus (B) actual real estate commissions, if any, paid by Borrower to third party brokers (which are not Affiliates or otherwise related to Borrower, Parent or Sponsor) in connection with such Transfer(s), in an amount not to exceed reasonable, ordinary, and customary commissions for properties similar to the Property in the City of Los Angeles California; plus (C) ordinary, customary and reasonable closing costs incurred in connection with such sale(s) of a type and in an amount normally paid by a seller of residential property in the City of Los Angeles, California (including actual title policy costs, the cost of a survey, transfer taxes, recording fees, escrow charges, and reasonable seller's attorneys' fees), which are paid by Borrower to third parties who are not Affiliates of or otherwise related to Borrower or Parent; provided, however, that the maximum aggregate amount which may be deducted from the gross proceeds pursuant to items (ii) (B) and (ii) (C) above shall not exceed five percent (5%) of the gross proceeds of the sale(s) for the purpose of determining Net Sale Proceeds, unless otherwise approved in writing by Lender.

"**New Lending Office**" has the meaning given to such term in (f).

"**Note**" means any promissory note or notes, in form and substance satisfactory to Lender in its sole discretion, executed and delivered by Borrower and payable to the order of Lender, in an aggregate principal amount equal to the stated principal amount of the Loan.

"**Obligations**" means the Indebtedness and all other obligations (other than payment of the Indebtedness) of Borrower or any Borrower Party under any of the Loan Documents or under any Bank Products Agreement.

"**Obligors**" has the meaning given to such term in Section 2.8.

"**OFAC**" shall mean the U.S. Department of Treasury's Office of Foreign Asset Control.

"**Other Taxes**" has the meaning given to such term in (b).

"**Parent**" means [a newly formed California or Delaware limited liability company which will be wholly-owned by Mohamed Hadid, an individual].

"**Parent Pledge Agreement**" means that Pledge Agreement dated as of the date hereof, executed by Parent, as pledgor, in favor of Lender, as the same may be modified, amended or restated from time to time.

"**Partial Release**" means release of Lender's Lien on the Release Property, to the extent applicable.

9

"**Participant**" has the meaning given to such term in Section 9.25(b).

"**Past Due Charge**" has the meaning given to such term in Section 2.4.

"**Patriot Act**" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Title III of Pub. L. 107-56 (signed into law October 26, 2001), as amended.

"**Permitted Debt**" has the meaning given to such term in Section 6.1(s).

"**Permitted Discretion**" means a determination or judgment made in good faith in the exercise of reasonable (from the perspective of a secured lender) credit or business judgment.

"**Permitted Exceptions**" means and includes (i) applicable zoning and building ordinances and land use regulations existing as of the date hereof, (ii) the lien of taxes and assessments for the year 2018 and subsequent years not yet due and payable, (iii) any documents or matters listed on Schedule B of the Title Policy with respect to the Property, as approved by Lender, (iv) any Liens in favor of Lender, and (v) easements and encumbrances otherwise permitted under Section 7.20.

"**Person**" means any individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity.

"**Personal Property**" means the tangible personal property described in each Security Instrument.

"**Phase I Construction Loan**" means the loans made by Lender to the Phase I Construction Borrower under the Phase I Construction Loan Documents.

"**Phase I Construction Loan Documents**" means the 'Loan Documents' as defined in the Loan Agreement dated as of July 31, 2018 between Treetop Development, LLC, a California limited liability company ("**Phase I Construction Borrower**"), and Lender, as the same may be amended or otherwise modified from time to time in accordance with the terms thereof.

"**Phase II Parcels**" means [to come].

"**Pledge Agreements**" means, collectively, the Borrower Pledge Agreement and the Parent Pledge Agreement.

"**Policy**" or "**Policies**" has the meaning given to such term in Paragraph (d) of **Exhibit D**.

"**Prepayment Premium**" means, in connection with a prepayment of the Loan in whole or in part to be made on any date of determination, an amount equal to the product of (a) the portion of the Borrower Funded Interest Reserve which has not been utilized on or prior to such date to pay Debt Service in respect of the Loan in accordance with Section 3.2(c) hereof

10

*multiplied by* (b) a fraction the numerator of which is the principal amount of the Loan to be prepaid on such date, and the denominator of which is [original principal amount of the Loan].

"**Proceeding**" has the meaning given to such term in Section 9.3(c).

"**Property**" means each parcel of real estate comprising the Land and all Improvements, Personal Property, Fixtures and all related facilities and amenities, now or hereafter located on, or relating to each such parcel and the operation thereof.

"**Property Claim Proceeds**" has the meaning given to such term in Section 7.12(a)(i).

"**Protective Advance**" means any advance deemed necessary or appropriate in Lender's sole and exclusive discretion to protect or preserve the value of the Collateral, Lender's lien priority with respect to the Collateral and to ensure the Collateral's compliance with Legal Requirements.

"**Register**" has the meaning given to such term in Section 9.25(c).

"**Reimbursement Party**" has the meaning given to such term in Section 9.2.

"**Release Price**" means, with respect to any Phase II Parcel, Seventeen Million Five Hundred Thousand and No/100 Dollars ($17,500,000).

"**Release Property**" has the meaning given to such term in Section 9.29.

"**Reserves**" means, collectively, the Tax and Insurance Reserve and the Borrower Funded Interest Reserve.

"**Second Extended Maturity Date**" means July 30, 2021, or such earlier date on which the final payment of principal of the Loan becomes due and payable as herein provided, whether by declaration of acceleration, or otherwise.

"**Security Instrument**" or "**Security Instruments**" means that certain Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing executed by Borrower in favor of Lender dated as of the date hereof, as well as any similar security document executed by Borrower in favor of Lender in relation to the Property or other Collateral, each as recorded in the jurisdiction where the Property is located and as may be amended, restated, extended or supplemented from time to time.

"**Servicer**" has the meaning given to such term in Section 9.29.

"**Single Purpose Entity**" has the meaning given to such term in **Exhibit C**.

"**Special Member**" has the meaning given to such term in **Exhibit C**.

"**Springing Member**" has the meaning given to such term in **Exhibit C**.

"**Tax and Insurance Reserve**" has the meaning given to such term in Section 3.2(a)(ii).

"**Taxes**" means all taxes, assessments, levies and charges imposed by any public or quasi-public authority having jurisdiction over the Property which are or may affect, or become a Lien upon, the Property or the rents, royalties, profits and income of the Property, or interest therein, or imposed by any Governmental Authority upon Borrower or Lender by reason of their respective interests in the Property or by reason of any payment, or portion thereof, made to Lender hereunder or pursuant to any Obligation or any of the other Loan Documents, other than taxes which are measured by and imposed upon Lender's general net income.

"**Tenant**" or "**Tenants**" means, collectively or individually (as the context provides), any tenant or licensee from time to time party to any Lease of the Property.

"**Term**" means the entire term of this Agreement, which shall expire upon indefeasible repayment in full of the Indebtedness and full performance of each and every obligation to be performed by Borrower pursuant to the Loan Documents (other than those indemnification obligations and other inchoate obligations expressly stated to survive the repayment of the Indebtedness).

"**Third Extended Maturity Date**" means January 31, 2022, or such earlier date on which the final payment of principal of the Loan becomes due and payable as herein provided, whether by declaration of acceleration, or otherwise.

"**Title Company**" means [_____].

"**Title Policy**" means that certain 2015 ALTA Mortgagee Policy of Title Insurance issued by Title Company in the form of the pro forma attached to the Closing Instruction Letter.

"**Toxic Mold**" means mold or fungus of a type that may pose a risk to human health or the environment or would negatively and materially impact the value of the Property.

"**Transaction Persons**" has the meaning given to such term in Section 6.1(d).

"**Transfer**" means the sale, transfer, hypothecation, encumbrance, mortgage, conveyance, lease, alienation, assignment, disposition, divestment, or leasing with option to purchase, or assignment of the Property, or any portion thereof or interest therein (whether direct or indirect, legal or equitable, including the issuance, sale, assignment, alienation, conveyance, divestment, transfer, disposition, hypothecation, mortgage or encumbrance of any direct or indirect Equity Interest in Borrower or in any entity having an Equity Interest in Borrower, whether direct or indirect); or entering into any agreement or contract to do any of the foregoing which is not conditioned on compliance with the terms of the Loan Documents with respect to Transfers, or undertaking, suffering or causing any of the foregoing to occur voluntarily, involuntarily or by operation of law.

"**Transferee**" has the meaning given to such term in 0.

"**UCC**" means the Uniform Commercial Code as in effect in the State of California; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of California. "**UCC**" means the Uniform Commercial Code as

12

in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"**Updated Information**" has the meaning set forth in Section 9.24(i)(i).

## ARTICLE 2

## THE LOAN; INTEREST RATE; PAYMENTS.

Subject to the terms and provisions of this Agreement and the other Loan Documents, Lender hereby agrees to make, and Borrower hereby promises to repay to Lender on account of, the Loan. All proceeds of the Loan shall be funded pursuant to, and repaid in accordance with, the terms of this Agreement and the other Loan Documents.

**Section 2.1**   **Evidence of Loan**

(a)    Lender shall maintain, in accordance with its usual practice, true, correct and complete electronic or written records evidencing the outstanding Indebtedness owed by Borrower to Lender hereunder and under each of the other Loan Documents, including without limitation the amount of principal and interest payable and paid to Lender from time to time under this Agreement.

(b)    The entries made in the electronic or written records maintained pursuant to this Section 2.1 shall be prima facie evidence of the existence and amounts of the Indebtedness therein recorded; provided, however, that the failure of Lender to maintain such records or any error therein shall not in any manner affect the obligation of Borrower to repay the correct amount owed pursuant to the Loan, including all disbursements made hereunder and all other Obligations of Borrower hereunder or under any other Loan Document, in accordance with the terms of this Agreement and the other Loan Documents.

(c)    Lender will account to Borrower monthly with a written statement of the amount outstanding under the Loan, the respective balances of the Reserves and any charges and payments made pursuant to this Agreement or any other Loan Document; provided, however, that the failure of Lender to provide such written statement shall not constitute a default or breach by Lender of this Agreement or any other Loan Documents or excuse the timely payment of all Indebtedness due and payable. In the absence of manifest error, such accounting rendered by Lender shall be deemed final, binding and conclusive, unless Lender is notified by Borrower in writing to the contrary within thirty (30) calendar days of receipt of each accounting, which notice shall be deemed an objection only to items specifically objected to therein.

**Section 2.2**   **Disbursement of the Loan; Loan Origination Fee.**

(a)    Disbursement of the Loan. Upon the Closing of the Loan, Lender shall disburse an amount equal to [_____ and No/100 Dollars ($_____.00)] (the "**Loan Advance**"). A portion of the proceeds of the Loan Advance shall be paid directly to Lender in payment of the Loan Origination Fee pursuant to Section 2.2(b), and a portion of the proceeds of the Loan Advance shall be retained by Lender in respect of the Borrower Funded Interest Reserve pursuant to Section 3.2(c).

13

(b)    Loan Origination Fee. The Loan Advance shall include payment to Lender of a loan origination fee in the amount of [_____ and No/100 Dollars ($_____.00)] (the **Loan Origination Fee**"). The Loan is not a revolving credit facility and therefore, may not be drawn, repaid and redrawn. Any payments of principal on the Loan shall be applied to permanently reduce the Loan in accordance with this Agreement and, once repaid, no portion of the Loan may be re-borrowed.

**Section 2.3    Interest Rate.** Absent the existence of an Event of Default, the outstanding principal balance under the Loan shall bear interest at the Contract Rate. Whenever, subsequent to the date hereof, the LIBOR Rate is increased or decreased, the Contract Rate, as set forth herein, shall be similarly changed without notice or demand of any kind by an amount equal to the amount of such change in the LIBOR Rate on the day of such change. The monthly interest due on the principal balance of the Loan outstanding shall be computed for the actual number of days elapsed during the month in question on the basis of a year consisting of three hundred sixty (360) days (which results in higher interests, fees and costs than if a three hundred sixty-five (365) day year were used) and shall be calculated by determining the average daily principal balance outstanding for each day of the month in question. The daily rate shall be equal to 1/360th times the Contract Rate. If any statement furnished by Lender for the amount of a monthly payment due exceeded the actual amount that should have been paid because the LIBOR Rate decreased and such decrease was not reflected in the monthly statement, Borrower shall make the payment specified in the monthly statement from Lender and Borrower shall receive a credit for the overpayment, which credit shall be applied towards the next subsequent monthly payment due hereunder. If any statement furnished by Lender for the amount of a monthly payment due was less than the actual amount that should have been paid because the LIBOR Rate increased and such increase was not reflected in the monthly statement, Borrower shall make the payment specified in the monthly statement from Lender and Borrower shall be required to pay any resulting underpayment with the next subsequent monthly payment due hereunder. Provided that funds in the Borrower Funded Interest Reserve are sufficient for such purposes, Lender shall disburse to itself each month from the Borrower Funded Interest Reserve the amount necessary to pay such accrued and unpaid interest on the Loan (and Borrower hereby irrevocably authorizes such disbursement). All amounts so disbursed by Lender from the Borrower Funded Interest Reserve shall be deemed to be amounts outstanding under the Loan. Neither the depletion of or insufficiency of the Borrower Funded Interest Reserve nor the non-satisfaction of any condition to disbursement contained in Article 4 of this Agreement shall release Borrower from any of Borrower's obligations under this Agreement or the other Loan Documents, including the obligation to pay interest and other charges and payment under or with respect to the Loan when due from other funding sources of Borrower.

**Section 2.4    Past Due Charge and Default Interest Rate.** Borrower recognizes and acknowledges that any default on any payment, or portion thereof, due hereunder or to be made under any of the other Loan Documents, will result in losses and additional expenses to Lender in servicing the Indebtedness, and in losses due to Lender's loss of the use of funds not timely received. Borrower further acknowledges and agrees that in the event of any such Default, Lender would be entitled to damages for the detriment proximately caused thereby, but that it would be extremely difficult and impracticable to ascertain the extent of or compute such damages. Therefore, if for any reason Borrower fails to pay any interest or principal or any other amount required to be paid under this Agreement when due, including any payment due at

14

maturity or upon acceleration, or fails to pay any amounts due under any of the other Loan Documents when due, then Borrower shall pay to Lender, in addition to any such delinquent payment, an amount equal to five percent (5.00%) of such delinquent payment or the maximum amount permitted by applicable law ("**Past Due Charge**"). In addition, upon the Maturity Date and upon the occurrence and during the existence of an Event of Default (or upon any acceleration), interest shall automatically accrue hereunder, without notice to Borrower, at the Default Rate. The Default Rate shall be calculated and due from the date that the Default occurred which led to the Event of Default without regard to any grace or cure period as may be applicable, and shall be payable upon demand.

**Section 2.5    Payment of Interest**.

(a)    Initial Payment of Interest. On the Closing Date, Borrower shall pay to Lender interest in advance at the Contract Rate for the period of time from and including such date through (but excluding) the Monthly Payment Date in [_____] 2018 based upon the Loan amount.

(b)    Monthly Payments of Principal and Interest. Commencing on the Monthly Payment Date occurring [_____], 201[_] and continuing on each Monthly Payment Date through and including the month in which the Maturity Date occurs, Borrower hereby promises to pay monthly installments of interest as calculated in accordance with Section 2.3 above, and such interest shall be payable in arrears.

(c)    Business Days. Whenever in this Agreement or any other Loan Document any payment is required to be made on a date that is not a Business Day, such payment shall be made on the first Business Day after such date (and any such extension of time shall be included in the computation of payment of interest (including interest at the Default Rate)).

**Section 2.6    Maturity Date**. The entire balance of principal and accrued interest and other amounts then outstanding under the Loan are due and payable on the Maturity Date. Borrower acknowledges that such amount will equal the outstanding principal balance of the Loan, accrued and unpaid interest and all other amounts due and owing under this Agreement and the other Loan Documents.

**Section 2.7    Prepayment**.

(a)    Borrower shall not prepay the Loan, in full or in part, except as permitted by and in accordance with this Section 2.7(a).

(b)    Borrower may prepay the Loan in full or from time to time in part only if (A) Borrower delivers to Lender written notice of such prepayment not less than five (5) Business Days' and not more than fifteen (15) Business Days' prior to the prepayment date, which notice in each instance shall specify the date of prepayment and the principal amount of the Loan to be prepaid, and (B) such prepayment is made together with payment of the Prepayment Premium. Each prepayment notice shall be irrevocable after delivery thereof to Lender. Upon delivery of such a prepayment notice, the principal amount specified therein to be prepaid shall become due and payable on the prepayment date specified therein. In addition to payment of the Prepayment Premium, Borrower shall pay in cash any and all accrued and unpaid

15

interest on the Loan together with any prepayment of principal of the Loan, as a condition to Borrower's right to make such prepayment of principal.

(c)  <u>Acceleration</u>. If the maturity of the Loan is accelerated for any reason, other than casualty or condemnation, Borrower shall pay to Lender, in addition to all other amounts outstanding under the Loan Documents, the Prepayment Premium and Exit Fee which would be payable upon a voluntary prepayment of the Loan in full as of the date of acceleration.

(d)  <u>Acknowledgment of Borrower</u>. Borrower acknowledges that the Prepayment Premium required by this <u>Section 2.7</u> is partial compensation to Lender for the cost of reinvesting the prepayment proceeds and for the loss of the contracted rate of interest on the Loan. Furthermore, Borrower acknowledges that the loss that may be sustained by Lender as a result of such a prepayment by Borrower or acceleration of the Loan is not susceptible of precise calculation and the Prepayment Premium (and Exit Fee, if applicable) represents the good faith effort of Borrower and Lender to compensate Lender for such loss.

(e)  **TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY EXPRESSLY (I) WAIVES ANY RIGHTS IT MAY HAVE UNDER CALIFORNIA CIVIL CODE SECTION 2954.10 TO PREPAY THE NOTE, IN WHOLE OR IN PART, WITHOUT PENALTY, UPON ACCELERATION OF THE MATURITY DATE, AND (II) AGREES THAT IF, FOR ANY REASON, A PREPAYMENT OF ALL OR ANY PORTION OF THE PRINCIPAL AMOUNT OF THE NOTE IS MADE UPON OR FOLLOWING ANY ACCELERATION OF THE MATURITY DATE BY LENDER ON ACCOUNT OF ANY DEFAULT BY BORROWER INCLUDING, WITHOUT LIMITATION, ANY TRANSFER, DISPOSITION, OR FURTHER ENCUMBRANCE PROHIBITED OR RESTRICTED BY THE SECURITY INSTRUMENT, THEN BORROWER SHALL BE OBLIGATED TO PAY CONCURRENTLY WITH SUCH PREPAYMENT THE PREPAYMENT PREMIUM SPECIFIED IN THE FOREGOING PROVISIONS. BY INITIALING THIS PROVISION IN THE SPACE PROVIDED BELOW, BORROWER HEREBY DECLARES THAT THE AGREEMENT TO MAKE THE LOAN EVIDENCED BY THE NOTE AT THE CONTRACT RATE AND FOR THE TERM SET FORTH IN THIS AGREEMENT CONSTITUTES ADEQUATE CONSIDERATION, GIVEN INDIVIDUAL WEIGHT BY BORROWER FOR THIS WAIVER AND AGREEMENT.**

**Borrower's Initials: _____**

**Section 2.8    <u>Indebtedness Absolute; No Offset; Waiver</u>**. The payment obligations of Borrower hereunder are absolute and unconditional, without any right of rescission, setoff, counterclaim or defense for any reason against Lender. The Loan has not been compromised, adjusted, extended, satisfied, rescinded, set-off or modified, and the Loan Documents are not subject to any litigation, dispute, refund, claims of rescission, setoff, netting, counterclaim or defense whatsoever, including but not limited to, claims by or against Borrower, Guarantor or any other party. Payment of the Indebtedness by Borrower, when due and payable pursuant to the terms of this Agreement and the other Loan Documents, is not subject to compromise, adjustment, extension, satisfaction, rescission, set-off, counterclaim, defense, abatement, suspension, deferment, deductible, reduction, termination or modification, whether arising out of

16

transactions concerning the Loan, or otherwise. Without limitation to the forgoing, to the fullest extent permitted under applicable law and notwithstanding any other term or provision contained in this Agreement or any other Loan Document, Borrower hereby waives (and shall cause each Borrower Party to waive) (a) presentment, protest and demand, notice of default (except as expressly required in the Loan Documents), notice of intent to accelerate, notice of acceleration, notice of protest, notice of demand and of dishonor and non-payment of the Indebtedness, (b) any requirement of diligence or promptness on Lender's part in the enforcement of its rights under the provisions of this Agreement and any other Loan Document, (c) any rights, legal or equitable, to require any marshalling of assets or to require foreclosure sales in a particular order, (d) all notices of every kind and description which may be required to be given by any statute or rule of law, other than such notices that cannot be waived pursuant to applicable law pertaining to the foreclosure of the Security Instrument, (e) the benefit of all laws now existing or that may hereafter be enacted providing for any appraisement before the sale of any portion of the Collateral, (f) all rights of homestead, exemption, redemption, valuation, appraisement, stay of execution, notice of election to mature or declare due the whole of the Obligations in the event of foreclosure of the Liens created by the Loan Documents, (g) the pleading of any statute of limitations as a defense to any demand under any Loan Document, and (h) any defense to the obligation to make any payments required under the Loan Documents, including the obligation to pay Taxes based on any damage to, defects in or destruction of the Collateral or any other event, including obsolescence of any of the Collateral, it being agreed and acknowledged that such payment obligations are unconditional and irrevocable. Borrower further acknowledges and agrees (i) to any substitution, subordination, exchange or release of any security or the release of any party primarily or secondarily liable for the payment of the Loan; (ii) that Lender shall not be required to first institute suit or exhaust its remedies hereon against others liable for repayment of all or any part of the Loan, whether primarily or secondarily (collectively, the "**Obligors**"), or to perfect or enforce its rights against any Obligor or any security for the Loan; and (iii) that its liability for payment of the Loan shall not be affected or impaired by any determination that any security interest or lien taken by Lender for the benefit of Lender to secure the Loan is invalid or unperfected. Borrower acknowledges, warrants and represents in connection with each waiver of any right or remedy of Borrower contained in any Loan Document, that it has been fully informed with respect to, and represented by counsel of its choice in connection with, such rights and remedies, and all such waivers, and after such advice and consultation, has presently and actually intended, with full knowledge of its rights and remedies otherwise available at law or in equity, to waive or relinquish such rights and remedies to the full extent specified in each such waiver.

     **Section 2.9**    **Lawful Limits**. In no contingency or event whatsoever, whether by reason of acceleration or otherwise, shall the interest and other charges paid or agreed to be paid to Lender for the use, forbearance or detention of money hereunder exceed the maximum rate permissible under applicable law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto. If, due to any circumstance whatsoever, fulfillment of any provision hereof, at the time performance of such provision shall be due, shall exceed any such limit, then, the obligation to be so fulfilled shall be reduced to such lawful limit, and, if Lender shall have received interest or any other charges of any kind which might be deemed to be interest under applicable law in excess of the maximum lawful rate, then such excess shall be applied first to any unpaid fees and charges hereunder (to the extent not constituting interest under applicable law), then to unpaid principal balance owed by Borrower hereunder, and if the

then remaining excess interest is greater than the previously unpaid principal balance, Lender shall promptly refund such excess amount to Borrower and the provisions hereof shall be deemed amended to provide for such permissible rate. The terms and provisions of this <u>Section 2.9</u> shall control to the extent any other provision of any Loan Document is inconsistent herewith.

**Section 2.10    <u>Increased Costs; Capital Adequacy</u>.**

(a)    If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, Lender (except any such reserve requirement reflected in the Contract Rate);

(ii)    impose on Lender or the London Interbank Market any other condition affecting this Loan Agreement or the Loan; or

(iii)    make it unlawful for Lender to make or maintain the indebtedness evidenced by the Loan in Eurodollars;

and such Change in Law increases the cost to Lender of making or maintaining the Loan (or of maintaining its obligation to make the Loan) or reduces the amount of any sum received or receivable by Lender under this Loan Agreement (whether of principal, interest or otherwise), then Borrower shall pay to such Lender such additional amount or amounts as will compensate Lender for such additional costs incurred or reduction suffered.

(b)    If at the time of or prior to any determination of the Contract Rate, Lender determines (which determination shall be conclusive in the absence of manifest error) that by reason of circumstances affecting the London interbank market generally, (i) deposits in United States Dollars in the relevant amounts and of the relevant maturity are unavailable to Lender in the London Interbank Market, (ii) the Contract Rate does not adequately or fairly reflect the cost to Lender of making or maintaining the Loan due to changes in administrative costs, fees, tariffs or taxes or other matters outside of Lender's reasonable control or (iii) adequate and fair means do not or will not exist for determining the Contract Rate, then Lender shall promptly notify Borrower, and the Loan shall bear interest, and continue to bear interest until Lender determines that the applicable circumstance described in the foregoing clauses (i), (ii) or (iii) no longer pertains, at a fluctuating rate per annum based on a substitute index selected by Lender plus a suitable margin to approximate, in Lender's judgment, the return that Lender would have received if the circumstance had not occurred.

(c)    If Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of Lender's holding company, if any, as a consequence of this Loan Agreement or the Loan made by Lender to a level below that which Lender or its holding company, as applicable, could have achieved but for such Change in Law (taking into consideration Lender's policies and the policies of Lender's holding company, as applicable, with respect to capital adequacy), then from time to time Borrower shall pay to Lender such additional amount or

amounts as will compensate Lender's holding company, as applicable, for any such reduction suffered.

(d)    A certificate from Lender setting forth the amount or amounts necessary to compensate Lender or its holding company, under Section 2.10(a), Section 2.10(b) or Section 2.10(c) shall be delivered to Borrower and shall be conclusive absent manifest error. Borrower shall pay Lender the amount shown as due on any such certificate within ten (10) Business Days after receipt (the date of such payment being the "**Increased Cost Payment Date**").

(e)    Failure or delay on the part of Lender to demand compensation pursuant to this Section 2.10 shall not waive Lender's right to demand such compensation; provided that Borrower shall not be required to compensate Lender under this Section 2.10 for any increased costs or reductions incurred more than one hundred eighty (180) days prior to the date Lender notifies Borrower of the Change in Law giving rise to such increased costs or reductions and of Lender's intention to claim compensation for such increased costs or reduction; provided, further, if the Change in Law giving rise to such increased costs or reductions is retroactive, then such one hundred eighty (180)-day period will be extended to include the period of such retroactive effect.

(f)    Notwithstanding anything to the contrary in this Loan Agreement, the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith shall be deemed to be a Change in Law and/or a change in capital adequacy requirements, as applicable, regardless of the date enacted, adopted or issued.

**Section 2.11    Partial Release of Collateral**.  So long as no Default or Event of Default has occurred and is continuing or would result therefrom, Lender shall permit the release of Lender's Lien on any Phase II Parcel (such Phase II Parcel, a "**Release Property**") (with Lender's Lien on the remaining portion of the Property remaining in full force and effect and otherwise unaffected by such release) in the event Lender receives a Release Notice and each and all the following conditions precedent have been satisfied:

(a)    Lender shall have received from Borrower at least sixty (60) days prior to the requested date of release of the Release Property from the Lien of the Deed of Trust (such release date is referred to herein as the "**Release Date**"), a written request for the release of the Release Property (such notice is referred to herein as the "**Release Notice**");

(b)    Concurrently with the closing of Borrower's sale of the Release Property pursuant to a purchase and sale agreement therefor that is in form and substance satisfactory to Lender, Borrower shall prepay principal of the Loan pursuant to Section 2.7 hereof in an amount at least equal to the Release Price, together with accrued and unpaid interest on the Loan and all Contingent Interest that is then due and payable.  For the avoidance of doubt, if and to the extent Lender actually receives payment of the Release Price, such payment shall be applied by Lender to reduce the outstanding principal amount of the Loan, and payment of Contingent Interest shall be in addition to repayment of principal in an amount at least equal to the Release Price and payment of accrued and unpaid interest on the Loan, and such payment of Contingent Interest shall not reduce the outstanding principal amount of the Loan;

19

(c)     The partial release documents for the release of the Release Property from Lender's Lien shall be initially prepared by Borrower at its sole expense and shall also be in form and content reasonably satisfactory to Lender and its counsel, provided, however, that such release documents shall expressly state that the release of the Release Property by Lender shall be without recourse of any kind or nature to Lender and made without representation or warranty of any kind or nature from Lender. The fully-executed and acknowledged release documents shall be held by Lender's counsel in escrow to be used in connection with the Partial Release that is being undertaken in accordance with the terms of this Agreement, or if requested in writing by Borrower, the Lender-approved and fully executed and acknowledged release documents may be delivered into such sale escrow, provided that the foregoing shall all be subject to Lender's approval of such proposed title escrow agent designated by Borrower in writing so delivered to Lender, and further provided that the fully executed and acknowledged release documents shall not be released (whether by Lender's counsel or by the Lender-approved title escrow agent, as applicable) until, and only if, Lender has received payment of all amounts that are required to be paid by Borrower pursuant to this <u>Section 2.11</u>.

(d)     Lender shall have received an endorsement to the Title Policy reflecting the release of the Release Property and, if applicable, a subdivision endorsement insuring that the remaining Property consists of a legally subdivided lot or legally subdivided lots;

(e)     following the release of Lender's Lien on the Release Property, all of the covenants in the Loan Documents shall continue to be satisfied and all of the representations and warranties shall continue to be true and correct in all material respects, in each case, as to the remaining Property;

(f)     Borrower shall have paid to Lender all of Lender's out-of-pocket costs and expenses (including, without limitation, legal fees and disbursements of Lender) in connection with the release of the Release Property;

(g)     Lender shall have received evidence reasonably acceptable to Lender that the Release Property is being sold to a third-party, non-Affiliate of Borrower or any Borrower Party on an arms-length basis for which purchase no Affiliate of Borrower or any Borrower Party is providing seller financing (or any other compensation or concessions not expressly disclosed to, and approved in writing by, Lender) in connection with such sale;

(h)     Lender shall have determined that the Loan to Value Ratio, after giving effect to the release and transfer of the Release Property and the application of such Release Price to the outstanding Obligations, will not be greater than [___] percent (___%) (which determination may be based, at Lender's sole option, on an Appraisal in form and substance acceptable to Lender in the exercise of its Permitted Discretion, the cost of preparation of which shall be at Borrower's sole cost and expense); provided however, that Borrower may make a partial prepayment of the then outstanding principal balance of the Loan to Lender in order to satisfy the condition precedent set forth in this clause (h);

(i)     the remaining Property owned by Borrower after the release of the Release Property shall (i) comply with all applicable Legal Requirements, (ii) have dedicated access to a public right-of-way, (iii) not encroach upon the Release Property, and (iv) consist of legally

subdivided lots. Borrower shall provide to Lender new title reports, zoning reports and such other due diligence as Lender determines, in its Permitted Discretion, is or are necessary in order for Lender to make the applicable determinations in this Section 2.11, and Borrower shall pay the cost of each and all such items, together with the costs of Lender's review thereof, including, but not limited to, reasonable attorneys' fees actually incurred.

Section 2.12   **Extension of Maturity Date**. Borrower may request that Lender extend the Maturity Date to the First Extended Maturity Date ("**First Extension**"), and if the First Extension theretofore has occurred, to the Second Extended Maturity Date ("**Second Extension**"), and if the Second Extension theretofore has occurred, to the Third Extended Maturity Date ("**Third Extension**"), and if the Third Extension theretofore has occurred, to the Fourth Extended Maturity Date ("**Fourth Extension**") in accordance with this Section 2.12. Each such extension request shall be granted to Borrower upon the satisfaction of the following conditions:

(a)     Borrower shall have delivered to Lender a written request to extend the Maturity Date at least sixty (60) but not more than one hundred twenty (120) calendar days prior to the current applicable Maturity Date;

(b)     Borrower shall have delivered to Lender, concurrently with delivery of the written extension request in clause (a) above, an extension fee equal to the product of one percent (1.00%) and the then outstanding principal balance of the Loan plus the undisbursed Loan proceeds;

(c)     no Default or Event of Default shall have occurred and be continuing at the time of making the extension request or on the applicable Maturity Date prior to the effectiveness of any such extension;

(d)     Borrower shall have executed any agreements, documents or amendments to Loan Documents reasonably requested by Lender in connection with such extension of the applicable Maturity Date;

(e)     During the extended term of the Loan, all terms and conditions of the Loan Documents shall continue to apply;

(f)     Lender shall have determined (in its Permitted Discretion) that the funds remaining in the Reserves shall be sufficient to meet all reserve requirements during each such extension period;

(g)     Lender shall be satisfied that there has been no Material Adverse Change to (i) the financial condition of Borrower or Parent, or (ii) the value of the Collateral (including, without limitation, the Property).

(h)     Borrower shall pay all actual out-of-pocket costs and expenses incurred by Lender in connection with each such extension of the Maturity Date and Lender's reasonable attorneys' fees.

(i)      The 'Maturity Date' (as defined in the Phase I Construction Loan Documents) with respect to the Phase I Construction Loan shall, contemporaneously with such extension of the Maturity Date, be extended to the applicable extended Maturity Date.

## ARTICLE 3

## ACCOUNTS AND RESERVES.

**Section 3.1** <u>**Security Grant**</u>.

(a)      Borrower has granted to Lender, within the security agreement provisions of the Security Instrument, and hereby grants to Lender, a first lien and security interest in all of Borrower's right, title and interest (if any) in, to and under the Reserves and any and all deposit accounts in which Reserves are deposited (each, a "**Reserve Account**") (and the funds therein, any interest earned thereon and proceeds thereof), and Borrower hereby pledges all Reserves (and all such Reserve Accounts and the funds therein, any interest earned thereon and proceeds thereof) as collateral security for the payment of all Indebtedness and the performance of all Obligations. Borrower further agrees that, upon request made by Lender, it shall enter into a deposit account control agreement with Lender and the depositary bank in respect of any Reserve Account, in substantially the form of such depositary bank's form agreement for blocked accounts to which the account owner has no right of access or instruction. Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Reserve Account, any Reserve or the monies deposited in any Reserve Account or permit any Lien to attach thereto, or any levy to be made thereon, or any UCC Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto. Borrower shall not establish any deposit account other than the Reserve Accounts without prior written consent of Lender, a reaffirmation of Lender's existing security interest in such deposit account and delivery to Lender of a deposit account control agreement in form and content satisfactory to Lender in its sole discretion.

(b)      This Agreement is, among other things, intended by the parties to be a security agreement for purposes of the UCC. As such, and in connection with the security grant contained in each Security Instrument, Lender is irrevocably authorized to file UCC Financing Statements naming Borrower as debtor, to perfect Lender's security interest in the Collateral, in all jurisdictions in which Lender believes in its sole discretion that such filing is appropriate. If Lender believes that an "**all-asset**" collateral description, as contemplated by Section 9-504(2) of the UCC, is appropriate, Lender is irrevocably authorized to use such a collateral description, whether in one or more separate filings or as part of the collateral description in a filing that particularly describes the Collateral. Lender is irrevocably authorized to file such continuation statements and other similar documents as it determines, in its sole opinion, are appropriate to protect and perfect its rights.

**Section 3.2** <u>**Reserves**</u>. The Reserves will be held by Lender, and shall not constitute trust funds and may be commingled with other monies held by Lender. Disbursements by Lender from a Reserve shall be subject to all conditions to making disbursements from each such Reserve as set forth in this Agreement. Lender's rights with respect to Protective Advances or other advances permitted under any of the Loan Documents shall include the right to disburse

22

funds from any Reserve for the purpose of making any payments for which such Reserve was created. Lender shall have no obligation whatsoever to make any advances or disbursements under this Section 3.2 or pursuant to any other applicable provision hereunder if a Default or an Event of Default shall have occurred and is continuing. Borrower shall not be entitled to any earnings or interest on funds deposited in any of the Reserve unless Lender elects, in its sole discretion, that such Reserve is an interest bearing account.

        (a)    Tax and Insurance Reserve.

        (i)    Commencing on the first Monthly Payment Date and continuing on each Monthly Payment Date thereafter, Borrower shall pay to Lender a sum equal to one-twelfth (1/12th) of an amount which would be sufficient to pay the Taxes payable, or reasonably estimated by Lender to be payable based on the current Tax bills during the ensuing twelve (12) months to be held by Lender as a tax reserve to fund payment of future Taxes (the "**Tax Reserve**"). If requested by Lender, Borrower shall also deposit into the Tax Reserve an amount which, together with the aggregate of deposits to be made on each Monthly Payment Date pursuant to the first sentence of this subsection (i), shall be sufficient, as of one (1) month prior to the date on which the next installment of Taxes becomes due, to pay in full such Taxes, as estimated by Lender based on the current Tax bills. Lender shall apply such funds to, or (at the sole option of Lender) release such funds to Borrower or Property Manager (if any) for, payment of such Taxes, prior to delinquency, provided that Borrower has promptly supplied Lender with timely notice of all Taxes due.

        (ii)    Commencing on the first Monthly Payment Date and continuing on each Monthly Payment Date thereafter, Borrower shall pay to Lender a sum equal to one-twelfth (1/12th) of the most recent annual insurance premiums to be held as an insurance reserve to pay for all liability and property insurance required to be to be held and maintained (the "**Insurance Premiums**") by Borrower pursuant to this Agreement (the "**Insurance Reserve**", and together with the Tax Reserve, collectively referred to herein as the "**Tax and Insurance Reserve**"). If requested by Lender from time to time, Borrower shall also deposit into the Tax and Insurance Reserve an amount which, together with the aggregate of the monthly deposits to be made pursuant to this paragraph, shall be sufficient, as of one month prior to the date on which the next installment of the next annual Insurance Premium becomes due, to pay in full such insurance premium, as estimated by Lender based on the current invoices. Lender shall apply such funds to, or (at the sole option of Lender) release such funds to Borrower or Property Manager (if any) for, payment of such Insurance Premiums prior to delinquency, provided that Borrower has promptly supplied Lender with timely notices of all Insurance Premiums due.

        (iii)    In making any payment relating to Taxes or Insurance Premiums, Lender may do so according to any bill, statement or estimate procured from the appropriate public office, with respect to Taxes, and insurer, with respect to Insurance Premiums, without inquiry into the accuracy of such bill, statement or estimate, in any case, or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim, as it relates to Taxes. If the total amount retained in the Tax and Insurance Reserve attributable to (A) the Tax Reserve exceeds the amount of payments actually applied by Lender as set forth in Section 3.2(a)(i) above, and (B) the Insurance Reserve exceeds the amount of payments actually applied by Lender as set forth in Section 3.2(a)(ii) above, in each case, such excess may be credited by Lender on

23

subsequent payments to be made by Borrower under Section 3.2(a)(i) and Section 3.2(a)(ii), as applicable, or at the option of Lender, refunded to Borrower; but if the funds in the Tax Reserve or the Insurance Reserve shall not be sufficient to pay the sums required by Section 3.2(a)(i) and Section 3.2(a)(ii), respectively, at least thirty (30) days before the same are due and payable, Borrower shall, within ten (10) Business Days after written demand therefor from Lender, deposit with Lender the full amount of any such deficiency. At the expiration of the Term, provided the Loan and all amounts outstanding in respect thereof have been indefeasibly paid to Lender and all obligations under the Loan Documents have been satisfied, excluding any contingent obligations which specifically survive repayment, the balance, if any, of the Tax and Insurance Reserve shall be released to Borrower.

(b)    Borrower Funded Interest Reserve.  Lender shall reserve from proceeds of the Loan Advance an amount equal to [_____ and No/100 Dollars ($_____)] (the "**Borrower Funded Interest Reserve**"), the proceeds of which shall, subject to the applicable conditions to disbursement, be applied on a monthly basis to pay any shortfalls throughout the term of the Loan in respect of the Debt Service on the Loan.   All amounts so reserved by Lender in the Borrower Funded Interest Reserve shall be deemed to be amounts outstanding under the Loan. Provided that sufficient funds remain in the Borrower Funded Interest Reserve, Lender shall, and is hereby authorized by Borrower, to disburse to itself each month from the Borrower Funded Interest Reserve the amount necessary to pay the Debt Service. The depletion of the Borrower Funded Interest Reserve shall not release Borrower from any of its obligations under this Agreement or the other Loan Documents, including the obligation to pay interest and other charges and payment under or with respect to the Loan when due from other funding sources of Borrower. At the expiration of the Term, provided the Loan and all amounts outstanding in respect thereof have been indefeasibly paid to Lender and all Obligations have been satisfied, the balance, if any, of the Borrower Funded Interest Reserve shall be released to Borrower.

## ARTICLE 4

### CONDITIONS TO DISBURSEMENTS

**Section 4.1    Conditions to Loan Advance**. Lender's obligation to disburse the Loan Advance on the Closing Date is subject to the satisfaction of each of the following conditions precedent on or before the Closing Date:

(a)    Loan Documents. Lender shall have received fully executed originals of all Loan Documents;

(b)    Organizational Documents. Lender shall have received (i) copies of the [articles of organization] of Borrower, and any of its constituent members as Lender shall request; (ii) copies of the operating agreement of Borrower and any of its respective constituent members as Lender shall request; (iii) a certificate of good standing dated no earlier than thirty (30) days prior to the date of this Agreement, with respect to Borrower and any of its respective constituent members as Lender shall request, issued by the Secretary of State of the state of such entity's formation; (iv) evidence of Borrower's qualification to do business in the state in which the Property is located; and (v) duly executed authorizing resolutions in form and substance

24

satisfactory to Lender which authorize the execution, delivery and performance of the Loan Documents;

(c) <u>Title</u>. Lender shall have received and approved the Title Policy in the amount of the Loan, insuring Lender and its respective successors and/or assigns that the Security Instrument constitutes a valid first priority lien upon Borrower's interest in the Property, subject only to such title exceptions as Lender shall approve in its sole and absolute discretion, together with endorsements and otherwise in form and substance acceptable to Lender and Lender's counsel. Such Title Policy shall at all times expressly insure against any mechanics' liens;

(d) <u>Documents and Evidence</u>. Lender shall have received such further documents, reports (including, without limitation, acceptable environmental reports, soils reports, zoning reports, surveys and Appraisal(s)), agreements or evidence as Lender or Lender's counsel may request;

(e) <u>Opinions of Counsel</u>. Counsel for Borrower, Guarantor and such other parties required by Lender shall have executed and delivered an opinion letter dated as of the date of this Agreement, addressed to Lender and in form and substance satisfactory to Lender;

(f) <u>Representations and Warranties</u>. Each and every representation and warranty contained in this Agreement and the other Loan Documents shall be true and correct in all respects;

(g) <u>No Event of Default or Potential Event of Default</u>. No Default or Event of Default shall have occurred;

(h) <u>Additional Deliverables</u>. Lender shall have received any other document, material or information as Lender shall reasonably request.

## ARTICLE 5

## [INTENTIONALLY OMITTED]

## ARTICLE 6

## REPRESENTATIONS AND WARRANTIES.

**Section 6.1** <u>**Representations and Warranties**</u>. To induce Lender to execute and perform this Agreement, Borrower hereby represents, warrants and, with respect to any statement of future conduct, covenants, to Lender as follows:

(a) Borrower has good, marketable and indefeasible fee simple title to the Property, subject to no Liens except for the Permitted Exceptions. All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements in connection with the transfer of the Property to Borrower have been paid.

25

(b)    Borrower is a [limited liability company], duly formed, validly existing and in good standing under the laws of the State of [_____]. The address of Borrower's principal place of business is [_____]. Borrower is not a "**foreign person**" within the meaning of Sections 1445 or 7701 of the Code. Parent is the sole member of Borrower and is a limited liability company, duly formed, validly existing and in good standing under the laws of the State of [_____].    Borrower and Parent are duly qualified to do business and are in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, business and operations. All organizational documents of Borrower and Parent furnished to Lender are true, correct and complete copies thereof and are all in full force and effect. No default exists under any of the organizational documents and no event has occurred which, with the giving of notice or lapse of time or both, would result in any default thereunder. Attached hereto as <u>Schedule II</u> is a true and complete organizational chart of Borrower and Parent and their direct and indirect owners.

(c)    Each of Borrower and Parent is a Single Purpose Entity.

(d)    No Borrower Party, nor any Person Controlling or Controlled by Borrower Party, nor any Person who at any times owns, directly or indirectly, more than twenty percent (20%) of the outstanding Equity Interests of any Borrower Party, nor any Person having a beneficial interest in Borrower Party, nor any Person for whom any Borrower Party is acting as agent or nominee in connection with this transaction ("**Transaction Persons**") (A) is a Person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), (B) engages in any dealings or transactions prohibited by Section 2 of such executive order, or is otherwise associated with any such Person in any manner in violation of Section 2 of such executive order, or (C) is a Person on the list of Specially Designated Nationals and Blocked Persons or is in violation of the limitations or prohibitions under any other OFAC regulation or executive order.

(e)    No part of the proceeds of the Loan will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(f)    Borrower acknowledges by executing this Agreement that Lender has notified Borrower and that Borrower has notified the Borrower Parties and any Person who at any time owns, directly or indirectly, more than twenty percent (20%) of the outstanding Equity Interests of any Borrower Party that, pursuant to the requirements of the Patriot Act, Lender is required to obtain, verify and record such information as may be necessary to identify such Persons (including, without limitation the name and address of such Person) in accordance with the Patriot Act.

(g)    Borrower has full power and authority to conduct its business as presently conducted, to own the Property, to enter into this Agreement and to perform all of its duties and obligations under this Agreement and under the Loan Documents; such execution and

performance have been duly authorized by all necessary Legal Requirements. Neither Borrower nor any Borrower Party has been convicted of a felony and there are no proceedings or investigations being conducted involving criminal activities of Borrower or any Borrower Party.

        (h)      Except as disclosed in writing to Lender prior to the Closing Date, there are no actions, suits or other proceedings at law or in equity by or before any Governmental Authority now pending or, to Borrower's knowledge, threatened against any Borrower Party or Borrower, or, to Borrower's actual knowledge after due inquiry, all or any portion of the Property, which, if adversely determined, could reasonably be expected to materially adversely affect the condition (financial or otherwise) or business of Borrower Party, Borrower (including the ability of any Borrower Party or Borrower to carry out its obligations under any Loan Documents to which it is a party) or the use, value, condition or ownership of the Property.

        (i)      This Agreement, the Security Instrument, the other Loan Documents and any other documents and instruments required to be executed and delivered by Borrower and/or any Borrower Party in connection with this Loan, when executed and delivered, will constitute the duly authorized, valid and legally binding obligations of the party required to execute the same and may be enforced strictly in accordance with their respective terms (except to the extent that enforceability may be affected or limited by applicable bankruptcy, insolvency and other similar debtor relief laws affecting the enforcement of creditors' rights generally). No approval of, or consent from, any Governmental Authority or any other Person not holding a direct or indirect ownership interest in Borrower or any Borrower Party is required in connection with the execution and delivery by Borrower or any Borrower Party of this Agreement or any of the other Loan Documents to which each is a party. No basis presently exists for any claim against Lender under this Agreement, under the Loan Documents, or with respect to the Loan. Enforcement of this Agreement and the Loan Documents is subject to no defenses of any kind. The Security Instrument when properly recorded in the appropriate records, together with any UCC Financing Statements required to be filed in connection therewith, will create (i) a valid, perfected first priority Lien on Borrower's interest in the Property and (ii) valid and perfected first priority security interests in and to, and perfected collateral assignments of, all personalty, all in accordance with the terms thereof, in each case subject only to any applicable Permitted Exceptions. All mortgage, recording, stamp, intangible or other similar taxes required to be paid by any Person under applicable Legal Requirements in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents have been paid.

        (j)      The execution, delivery and performance of this Agreement, the Security Instrument, the other Loan Documents and any other documents or instruments to be executed and delivered by Borrower or any Borrower Party pursuant to this Agreement or in connection with this Loan and to the occupancy and use of the Property do not: (i) violate any Legal Requirements; or (ii) conflict with, be inconsistent with, or result in any breach or default of any of the terms, covenants, conditions or provisions of any indenture, mortgage, deed of trust, instrument, document, agreement or contract of any kind to which Borrower or any Borrower Party is a party or by which any of them may be bound. Neither Borrower nor any Borrower Party is in default (without regard to grace or cure periods) under any contract or agreement to which it is a party, the effect of which default could reasonably be expected to adversely affect

the performance by Borrower or any Borrower Party of its obligations pursuant to and as contemplated by the terms and provisions of this Agreement and/or the other Loan Documents.

(k)     No condition, circumstance, event, agreement, document, instrument, restriction, litigation or proceeding (or, to Borrower's actual knowledge, threatened litigation or proceeding or basis therefor) exists which could reasonably be expected to (i) adversely affect the validity or priority of the liens and security interests granted Lender under the Loan Documents, (ii) materially adversely affect the ability of Borrower or any Borrower Party to perform their obligations under the Loan Documents or could reasonably be anticipated to be a Material Adverse Change, or (iii) constitute an Event of Default or a Default under any of the Loan Documents.

(l)     All Collateral is located in the United States.

(m)     The Property and the present use and occupancy of the Property does not violate or conflict with any Legal Requirements, applicable law, statute, ordinance, rule, regulation or order of any kind, including, without limitation, Hazardous Material Laws, zoning, building, land use, noise abatement, occupational health and safety laws, storm and sanitary disposal regulations, or any permit, easement, covenant, condition or restriction, whether recorded or not applicable to any storm and sanitary sewage disposal system, water system, drainage system, and all mechanical systems. In addition, any applicable Governmental Authority having jurisdiction over the Property has issued the permits for the construction, tap on and operation of those systems referred to in the prior sentence. No legal proceedings are pending or, to the knowledge of Borrower, threatened with respect to the zoning of the Property. Neither the zoning nor any other right to construct, use or operate the Property is in any way dependent upon or related to any property other than the Property. There has not been committed by Borrower or any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording any Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. No portion of the Property has been purchased with proceeds of any illegal activity. If a third party is required under any covenants, conditions and restrictions of record or any other agreement to consent to the use and/or operation of the Property, such approval has been obtained from such party.

(n)     None of the proceeds of the Loan will be used by Borrower for the purpose of purchasing or carrying "**margin stock**" within the meaning of Regulation T, U or X issued by the Board of Governors of the Federal Reserve System, as at any time amended, and Borrower agrees to execute all instruments which may be necessary from time to time, if any, to comply with all the requirements of Regulation U of the Federal Reserve System, as at any time amended.

(o)     Borrower is not an "**employee benefit plan**" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") which is subject to Title I of ERISA. The assets of Borrower do not constitute "**plan assets**" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101. Borrower is not and will not be a "**governmental plan**" within the meaning of Section 3(32) of ERISA. Transactions by or with Borrower are not subject to any state or other statute, regulation or other restriction regulating

28

investments of, or fiduciary obligations with respect to, governmental plans within the meaning of Section 3(32) of ERISA which is similar to the provisions of Section 406 of ERISA or Section 4975 of the Code and which prohibit or otherwise restrict the transactions contemplated by this Agreement, including but not limited to the exercise by Lender of any of its rights under the Loan Documents.

(p)    Borrower is not (i) an "**investment company**" or a company "**controlled**" by an "**investment company**", within the meaning of the Investment Company Act of 1940, as amended, (ii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money, or (iii) a "**bank holding company**" or a direct or indirect subsidiary of a "**bank holding company**" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

(q)    Except as may be set forth in the Environmental Reports or otherwise previously disclosed to Lender in writing:

(i)    Neither Borrower nor, any portion of the Property is in violation of any Hazardous Materials Laws;

(ii)    Neither Borrower nor any other Borrower Party has received, or has received a copy of, any notice of any violation or alleged violation of any Hazardous Materials Laws with respect to the Property;

(iii)    There are no pending civil (including actions by private parties), criminal or administrative actions, suits or proceedings against Borrower, any Borrower Party or, the Property relating to environmental matters ("**Environmental Proceedings**") and neither Borrower nor any Borrower Party has any knowledge of any threatened Environmental Proceedings;

(iv)    Neither Borrower nor, due inquiry, any other Person, has used, generated, manufactured, stored or disposed of on, under or about the Property or transported to or from the Property any Hazardous Materials (other than in compliance with Hazardous Materials Laws). The inquiry, the Property is not subject to any private or governmental Lien or judicial or administrative notice or action or inquiry, investigation or claim relating to hazardous, toxic and/or dangerous substances, Toxic Mold or any other Hazardous Materials;

(v)    No Toxic Mold is on or about the Property which requires remediation under any applicable Hazardous Materials Laws or otherwise poses a danger to persons or property;

(vi)    There have been no environmental investigations, studies, audits, reviews or other analyses conducted by or on behalf of Borrower which are in Borrower's possession or control and which have not been provided to Lender; and

(vii)    The Property has not been used, permanently or temporarily, as a disposal site or storage site for any Hazardous Materials in violation of any applicable Hazardous

Materials Laws and the Property, and all parts thereof, are free of all Hazardous Materials other than Hazardous Materials that do not violate any applicable Hazardous Materials Laws.

(r)    All financial statements of Borrower or any Borrower Party submitted to Lender by Borrower, any Borrower Party or any Affiliate in connection with the Loan are true and correct in all material respects, have been prepared in accordance with the GAAP consistently applied, and fairly present the respective financial conditions and results of operations of the Persons which are their subjects. Since the date of such financial statements, there has been no Material Adverse Change in the financial condition, operations or business of Borrower, any Borrower Party, or the Property from that set forth in said financial statements.

(s)    Neither Borrower nor any Borrower Party has any Debt other than the Indebtedness and Obligations evidenced by this Agreement.

(t)    This Agreement and all financial statements, budgets, schedules, opinions, certificates, confirmations, sworn statements, applications, rent rolls, affidavits, agreements and other materials submitted to Lender in connection with or in furtherance of this Agreement by or on behalf of Borrower or any Borrower Party fully and fairly state the matters with which they purport to deal, and none misstate any material fact nor, separately or in the aggregate, fail to state any material fact necessary to make the statements made not misleading.

(u)    All utility and municipal services required for the occupancy and operation of the Property for its intended use, including water supply, storm and sanitary sewage disposal systems, cable services, electric and telephone facilities are available for use and tap-on at the boundaries of the Property. The Property has rights of access to public ways (including curb cuts and street access), and all utility, permits and easements, to the extent required for the use of the Property for its current use, have been granted and issued by all Governmental Authorities with respect to the Property.

(v)    None of the Improvements encroach upon any property line, set back line, side-yard line, or any recorded or visible easement which exists with respect to the Property.

(w)    The Property is comprised of one (1) or more parcels which constitute separate tax lots and do not constitute a portion of any other tax lot not a part of the Property.

(x)    No condemnation or other similar proceeding has been commenced or, to Borrower's knowledge, is threatened or contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

(y)    The Loan, including interest rate, fees and charges as contemplated hereby, is a business loan; the Loan is an exempted transaction under the Truth In Lending Act, 12 U.S.C. § 1601, *et seq.*; and the Loan does not, and when disbursed will not, violate the provisions of the usury laws of the State of California, or any consumer credit laws or usury laws of any state which may have jurisdiction over this transaction, Borrower or the Collateral.

(z)    As of the date hereof, there are no outstanding financing statements (other than any such statements identifying Lender as the secured party) naming Borrower or any

Borrower Party (or Affiliate thereof), as a debtor, and there are no federal tax liens against or bankruptcy filings by or against Borrower or any Borrower Party.

(aa)    To the extent required, Borrower has filed (or has obtained effective extensions for filing) all federal, state and local tax returns required to be filed and has paid or made adequate provision for the payment of all federal, state and local taxes, charges and assessments payable by Borrower.

(bb)    No Borrower Party is contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency law or the liquidation of all or a major portion of its property, and Borrower has no knowledge of any Person contemplating the filing of any such petition against any Borrower Party. In addition, no Borrower Party nor any parent, principal nor Affiliate of any Borrower Party nor any of their respective constituent members has been a debtor in any such bankruptcy proceeding, and no Borrower Party has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors. Notwithstanding anything to the contrary contained in this Section 6.1(bb), nothing in this paragraph is intended as a representation regarding any partners of Guarantor, or shareholders in the parent or constituent equity holder in any such partners or shareholders.

(cc)    Borrower has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and Borrower has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the Loan and the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total probable liabilities, including subordinated, unliquidated, disputed and/or contingent liabilities, including the maximum amount of their contingent liabilities or their debts as such debts become absolute and matured. Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur Debt and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such Debt and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower).

(dd)    The Property or any portion thereof is not subject to any Lease.

(ee)    Neither the Property nor any part thereof are subject to any purchase options, rights of first refusal to purchase the Property or other similar rights in favor of third parties.

(ff)    There are no Material Contracts other than the Material Contracts delivered to Lender. Borrower has delivered to Lender true and complete copies of all Material Contracts and all amendments thereto. Each of the Material Contracts is in full force and effect. No party to any Material Contract has sent or received any notice of default thereunder that remains outstanding. Borrower is not in default and has no knowledge of any default under any Material Contract by any other party thereto. All amounts that are due and payable under each Material Contract by any party thereto have been paid in full. No party to any Material Contract

31

has commenced any action or given or received any notice for the purpose of terminating such Material Contract.

(gg)    As of the Closing Date, the Property is not being used for the production, distribution or sale of marijuana, cannabis or their byproducts.

**Section 6.2    Continuation of Representations and Warranties**. Borrower hereby covenants, warrants and agrees that (a) the representations and warranties made in Section 6.1 hereof shall be and shall remain true and correct at the time of the Closing Date and at all times thereafter so long as any part of the Indebtedness shall remain outstanding, and (b) the covenants made in Section 6.1 hereof shall remain binding upon Borrower at all times so long as any part of the Indebtedness shall remain outstanding.

## ARTICLE 7

## BORROWER COVENANTS.

Borrower hereby covenants and agrees with Lender that, at all times so long as any part of the Indebtedness shall remain outstanding:

**Section 7.1    Performance of Obligations**. Borrower shall promptly pay when due all Indebtedness and shall perform and comply with in a timely manner all other Obligations, and no Obligations shall be released, discharged or otherwise adversely affected by reason of any act, claim or circumstance of any kind or nature, whether or not Borrower has notice or knowledge thereof.

**Section 7.2    Existence; Compliance with Legal Requirements**. Borrower and each Borrower Party which is not a natural person shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, permits and franchises and comply with all Legal Requirements applicable to it and the Property. Neither Borrower nor any Borrower Party which is not a natural person shall engage in any dissolution, liquidation or consolidation or merger with or into any other Person except as permitted by the Loan Documents. Additionally, Borrower shall not: (a) engage in any business activity not related to the ownership and leasing of the Property;  (b) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the Property or other assets of Borrower except to the extent expressly permitted by the Loan Documents; or (c) cause, permit or suffer Parent to dissolve, wind up or liquidate or take any action, or omit to take an action, which as a result Parent would be dissolved, wound up or liquidated in whole or in part.

**Section 7.3    Single Purpose Entity**. Borrower shall at all times be a Single Purpose Entity. Borrower shall not make any change, amendment or modification to its organizational documents without Lender's prior written consent. Additionally, Borrower shall not take any action which could result in it not being a Single Purpose Entity.

**Section 7.4    ERISA**. Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the Term, as requested by Lender, stating that (a) Borrower is not an **"employee benefit plan"** as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a **"governmental plan"** within the meaning of Section 3(32) of

ERISA, (b) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans, (c) the assets of Borrower do not constitute "**plan assets**" within the meaning of 29 C.F.R. Section 2510.3-101, (d) neither Borrower nor any Guarantor is a party in interest (as defined in Section 3(14) of ERISA) with respect to an employee benefit plan sponsored or contributed by Lender, and (e) neither Borrower nor any Guarantor is: (i) a fiduciary (including but not limited to any administrator, officer, trustee or custodian), counsel or employee of Lender; (ii) an employer any of whose employees are covered by an employee benefit plan sponsored or contributed by Lender; (iii) an individual or entity providing services to an employee benefit plan sponsored or contributed by Lender; (iv) an employee organization any of whose members are covered by an employee benefit plan sponsored or contributed by Lender; (v) an owner, direct or indirect, of fifty percent (50%) or more of any entity described in clauses 7.4(e)(iii) or (iv) above; (vi) a spouse, ancestor, lineal descendant or spouse of a lineal descendant of any individual described in clauses 7.4(e)(i), (ii), (iii) or (iv) above; (vii) a corporation, partnership or trust or estate of which fifty percent (50%) or more is owned, directly or indirectly, or held by Persons described in clauses (i), (ii), (iii), (iv) or (v) above; (viii) an employee, officer, director or a ten percent or more shareholder, directly or indirectly, of a Person described in clauses 7.4(e)(iii), (iv), (v) or (vi) above or of Lender; or (ix) a ten percent (10%) or more partner or joint venture of a Person described in clauses 7.4(e) (ii), (iii), (iv), (v) or (vi) above. Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

**Section 7.5    Defense and Notice of Actions and Certain Other Events**. Borrower shall, without liability, cost or expense to Lender, protect, preserve and defend title to the Property, the Liens granted to Lender hereunder and under each of the other Loan Documents (including but not limited to the Security Instrument) and the rights or powers of Lender hereunder and under each of the other Loan Documents, against all adverse claimants to title, or any possessory or non-possessory interest in the Property. Borrower shall give Lender prompt written notice (and in no event later than ten (10) Business Days following Borrower's knowledge thereof) of (a) any fire or other casualty causing damage to the Property, (b) any actual or threatened condemnation or other taking of the Property, (c) notice from any governmental agency relating to the Property of any violation of law, (d) a change in the nature of the occupancy or permitted use of the Property, or, (e) the commencement or threatened commencement of any litigation or proceedings that seek to, or could reasonably be expected to have the effect of: (i) a Material Adverse Change; or (ii) adversely affecting the validity or priority of the Liens granted Lender hereunder or under any other Loan Document.  Borrower will cause any such litigation or proceedings to be vigorously contested in good faith, and in the event of an adverse ruling or decision, prosecute all allowable appeals therefrom. Without limiting the generality of the foregoing, Borrower will resist the entry or seek the stay of any temporary or permanent injunction that may be entered, and use its best efforts to bring about a favorable and speedy disposition of all such litigation or proceedings.

**Section 7.6    Right of Inspection; Due Diligence**. Lender, its agents or employees, may enter the Property at all reasonable times and upon reasonable notice (provided no notice shall be required during an Event of Default) for the purpose of (a) inspecting the Property or

ascertaining Borrower's compliance with the terms of any Loan Document, and (b) conducting periodic due diligence to assess the condition of the Collateral, Borrower and the Property.

**Section 7.7    Liens.** Borrower shall not cause, suffer or create any Liens upon all or any portion of the Property or any interest in the Property, or on any direct or indirect legal or beneficial ownership interest in Borrower, other than the Permitted Exceptions, and Borrower shall pay, at or prior to the applicable due date, all obligations secured by or reducible to Liens which now or hereafter shall encumber the Property, whether senior or subordinate hereto, to the extent applicable, including all Claims for work or labor performed, or materials or supplies furnished in connection with any work upon the Property. Notwithstanding the preceding sentence, Borrower may within thirty (30) days after Borrower first receives notice of an involuntary Lien, contest any such claim of involuntary Lien without cost or expense to Lender, but only upon posting, and concurrently supplying to Lender a certified copy of a statutory bond or other security sufficient under applicable law fully to protect any and all of the Property encumbered by such claim of involuntary Lien and otherwise sufficient in Lender's sole opinion to protect Lender against any judgment in favor of the Lien claimant. If Lender is made a party to any litigation concerning the Loan Documents, the Property or any part thereof or interest therein, or the occupancy thereof by any Person, then Borrower shall indemnify, defend and hold Lender harmless from all Claims and liability by reason of such litigation, including reasonable attorneys' fees and expenses incurred by Lender whether or not any such litigation is prosecuted to judgment. Subject to Borrower's right to contest any claim of involuntary Lien in accordance with this Section 7.7, any involuntary Lien other than a Permitted Exception shall be paid or fully discharged by Borrower within the earlier of (a) ten (10) Business Days after demand by Lender, and (b) twenty (20) days after Borrower receives notice of the filing of such Lien.

**Section 7.8    Further Assurances; Supplemental Affidavits.** Borrower shall, at Borrower's sole cost and expense: (a) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the security interest of Lender in the Collateral at any time securing or intended to secure the Obligations of Borrower under the Loan Documents, as Lender may reasonably require; and (b) do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time, including curing any defects in the execution and delivery of the Loan Documents and executing and delivering, or causing to be executed and delivered, all such other documents, agreements and instruments as Lender may reasonably request to further evidence and more fully describe the Collateral for the Loan, to correct any omissions in the Loan Documents, to perfect, protect or preserve any Liens created under any of the Loan Documents, or to make any recordings, file any notices, or obtain any consents, as may be necessary or appropriate in connection therewith.

**Section 7.9    Financial Reporting.**

(a)    Borrower shall keep and maintain or will cause to be kept and maintained proper and accurate books and records, in accordance with the Approved Accounting Method, or such other accounting method acceptable to Lender, reflecting the financial affairs of Borrower. Lender shall have the right from time to time during normal business hours upon reasonable

notice to Borrower to examine such books and records at the office of Borrower or such other Person maintaining such books and records and to make such copies or extracts thereof as Lender shall desire. Borrower shall pay any costs reasonably incurred by Lender to examine such books, records and accounts, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

(b)     Borrower shall furnish to Lender:

(i)     Within ninety (90) days after the end of each of Borrower's and Parent's fiscal year, consolidated and consolidating annual financial statements of Borrower and Parent in accordance with Paragraph (t) of **Exhibit C** to this Agreement, on a cash basis, including the notes thereto, consisting of a balance sheet at the end of such completed fiscal year and the related statements of income, retained earnings, cash flows and owners' equity for such completed fiscal year, which financial statements shall be prepared and certified without qualification by an independent certified public accounting firm satisfactory to Lender and accompanied by related management letters, if available.

(ii)     All such financial statements, including, without limitation, those described in Section 7.9(a) above, shall be accompanied by a certificate, executed on behalf of Borrower and Parent, stating that such annual financial statement presents fairly the financial condition and the results of operations of Borrower and Parent. Together with such financial statements, Borrower shall furnish to Lender a certificate, executed on behalf of Borrower, certifying as of the date thereof whether to Borrower's knowledge there exists an Event of Default by Borrower under the Loan Documents and if such Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same.

(c)     Borrower shall cause Guarantor to furnish to Lender:

(i)     (A) within thirty (30) days of filing but not later than October 15th, complete federal and state tax returns, and (B) within ninety (90) days after the end of each calendar year, a personal financial statement prepared by an accountant, which financial statement shall include a statement showing the maximum amount of their contingent liabilities or their debts as such debts become absolute and matured.

(ii)     All such financial statements shall be accompanied by a certificate, executed on behalf of such Guarantor, stating that (A) such financial statement (1) is true, complete and accurate in all material respects, and (2) presents fairly the financial condition and the results of operations of such Guarantor in all material respects, and (B) as of the date thereof, such Guarantor, together with the other Guarantors (if any), are in compliance with the financial covenants applicable to such Guarantors in the applicable Guaranty.

(d)     Borrower will furnish Lender on or before the thirty (30) days after the end of each calendar month, the following items, accompanied by a certificate from the authorized officer of Borrower, certifying that such items are true, correct, accurate, and complete in all material respects and fairly present the financial condition and results of the operations of Borrower and the Property in all material respects:

(i)     Financial statements of Borrower;

35

(ii)     A statement of any litigation or legal action pending or threatened against Borrower; and

(iii)     A certificate, executed on behalf of Borrower, certifying as of the date thereof whether to Borrower's knowledge there exists an Event of Default by Borrower under the Loan Documents and if such Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same.

(e)     Lender and Borrower shall hold a quarterly review meeting or teleconference if requested by Lender.

(f)     Borrower shall furnish to Lender, within ten (10) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Property and the financial affairs of Borrower as may be reasonably requested by Lender.

(g)     From and after the occurrence of an Event of Default, Lender may require, upon written demand and in its sole discretion, audited financial statements of Borrower and Guarantor.

(h)     Without limiting any of Lender's rights or remedies in the event of any failure by Borrower to comply with the provisions of this Section 7.9, if Borrower fails to deliver to Lender any of the financial statements or other information required herein on or before the applicable date required in this Section 7.9 (the "**Information Delivery Date**"), and if Borrower continues to fail to deliver any such financial statements or other information for ninety (90) days after the Information Delivery Date, Borrower shall pay to Lender a fee in the amount of Two Hundred Fifty and No/100 Dollars ($250.00) per day commencing on the Information Delivery Date until such time as Borrower has delivered all of the financial statements or other information required to be delivered by Borrower pursuant to, and in the form required by, this Section 7.9.

**Section 7.10   Taxes**.

(a)     Borrower's Obligation for Payment of Taxes. Except to the extent Lender makes payments of Taxes from the Tax Reserve (for the periods and payments so covered by such payments), Borrower shall pay or cause to be paid all Taxes when due and payable. Borrower shall deliver promptly to Lender receipts or other reasonable evidence of such payment (and such evidence shall be furnished no later than the date that Taxes would otherwise be delinquent). Borrower shall not suffer, permit, initiate, or otherwise cause for any purpose, the joint assessment of (i) the Property with any other real property constituting a tax lot separate from the Property, or (ii) the Land and the Personal Property, or any other procedure whereby the lien of real property taxes and assessments and the lien of personal property taxes shall be assessed, levied or charged against the Land as a single lien. While any Obligation remains outstanding, the Property shall be segregated on the applicable tax rolls from all other property, both real and personal. Borrower's obligations under this Section 7.10 shall not be affected by any damage to, defects in or destruction of the Property or any other event, including obsolescence of all or any part of the Property.

(b)     Contest of Taxes. After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes, provided that (i) no Default or Event of Default has occurred and is continuing; (ii) such proceeding shall suspend the collection of the applicable Taxes from Borrower and the Property or Borrower shall have paid all of the applicable Taxes under protest, (iii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (iv) neither the Property nor any part thereof or interest therein may be sold, forfeited, terminated, cancelled or lost so long as the contest is being pursued, and (v) Borrower shall have deposited with Lender adequate reserves for the payment of the applicable Taxes, together with all interest and penalties thereon, unless Borrower has paid all of the applicable Taxes under protest or Borrower shall have furnished such other security as may be accepted by Lender in its sole discretion to insure the payment of any contested Taxes, together with all interest and penalties thereon.

**Section 7.11   Insurance**.

(a)     Insurance Requirements. Borrower shall maintain such Policies in compliance with and subject to the terms and conditions of **Exhibit D**.

(b)     Borrower's Failure to Maintain Insurance. If Borrower fails to maintain and deliver to Lender certificates of insurance required by Lender as set forth herein and within the time periods required herein, upon ten (10) days prior written notice to Borrower, or such shorter period as may be required in order to insure all Policies required hereunder remain in place, Lender may procure such insurance at Borrower's sole cost and expense, with interest thereon at the Default Rate.

(c)     Adjustment of Casualty Insurance Proceeds. Borrower shall cause any Policy in respect of loss or damage to the Property to provide that any loss shall be adjusted by Borrower and Lender together, and Borrower may not settle such loss or claim without the prior written consent of Lender. Any Policy in respect of loss or damage to the Property may provide that, provided no Default or Event of Default has occurred and is continuing, any loss that is less than the Restoration Threshold shall be adjusted solely by Borrower provided such adjustment is carried out in a competent and timely manner. During the continuance of a Default or an Event of Default, all losses shall be adjusted solely by Lender.

(d)     Release. Borrower, for itself, and on behalf of its insurers, hereby releases and waives any right to recover against Lender on account of any liability for: damages for injury to or death of persons; any loss or damage to property, including the property of any occupant of the Property; any loss or damage to buildings or other improvements comprising the Property; any other direct or indirect loss or damage caused by fire or other risks, which loss or damage is or would be covered by the insurance required to be carried hereunder by Borrower, or is otherwise insured; or claims arising by reason of any of the foregoing, except to the extent caused by the gross negligence or willful misconduct of Lender.

(e)     Miscellaneous. Lender shall not, by reason of accepting, rejecting, obtaining or failing to obtain insurance, incur any liability for (i) the existence, nonexistence,

form, amount or legal sufficiency thereof, (ii) the solvency or insolvency of any insurer, or (iii) the payment of losses. All insurance required hereunder or carried by Borrower shall be procured at Borrower's sole cost and expense. Borrower shall deliver to Lender receipts reasonably satisfactory to Lender evidencing full payment of the premiums therefor, except to the extent Lender makes payments from the Insurance Reserve (for the periods and payments so covered by such payments). In the event of foreclosure on, or other transfer of title in lieu of foreclosure of, the Property, all of Borrower's interest in and to any and all Policies in force shall pass to Lender, or the transferee or purchaser as the case may be, and Lender is hereby irrevocably authorized to assign in Borrower's name to such purchaser or transferee all such Policies, which may be amended or rewritten to show the interest of such purchaser or transferee.

      (f)    **BORROWER HEREBY ACKNOWLEDGES AND AGREES THAT IT IS AWARE OF AND UNDERSTANDS SCHOOLCRAFT V. ROSS (81 CAL. APP. 3D 75 (1981)) AND ITS PROGENY AS WELL AS CALIFORNIA CIVIL CODE SECTION 2924.7 AND FINANCIAL CODE SECTIONS 1227.3 AND 7462, WHICH PERMIT LENDER TO REQUIRE INSURANCE BUT OBLIGATE LENDER TO ALLOW BORROWER TO USE CASUALTY INSURANCE PROCEEDS FOR THE PURPOSE OF REPAIRING OR RESTORING THE PREMISES PLEDGED AS SECURITY FOR THE BORROWER'S OBLIGATIONS TO LENDER UNLESS LENDER'S SECURITY HAS BEEN IMPAIRED. BORROWER HEREBY ACKNOWLEDGES AND AGREES THAT, IN THE EVENT OF A CASUALTY TO THE PREMISES, IF BORROWER FAILS TO REPAIR OR RESTORE THE PREMISES IN A MANNER CONSISTENT WITH THE PROVISIONS OF THIS AGREEMENT, REGARDLESS OF WHETHER SUCH FAILURE IS THE RESULT OF ANY VOLUNTARY ACTION OR INACTION BY BORROWER, OR ANY ACT OR DETERMINATION OF ANY GOVERNMENTAL AUTHORITY (WHETHER PURSUANT TO ANY ZONING, LAND USE OR OTHER ORDINANCE, CODE, REGULATION OR REQUIREMENT OR OTHERWISE), SUCH FAILURE IS AND SHALL BE DEEMED A SUBSTANTIAL IMPAIRMENT OF THE PROPERTY ENTITLING LENDER TO APPLY THE NET INSURANCE PROCEEDS TO THE INDEBTEDNESS IN SUCH ORDER AND MANNER AS LENDER MAY ELECT, WHETHER OR NOT DUE AND PAYABLE, WITHOUT PAYMENT OF ANY PREPAYMENT PREMIUM, WITH ANY EXCESS PAID TO BORROWER. BY INITIALING THIS PROVISION IN THE SPACE PROVIDED BELOW, BORROWER HEREBY ACKNOWLEDGES AND AGREES THAT THE TERMS OF THIS PROVISION HAVE BEEN SPECIFICALLY BARGAINED FOR AND ARE A MATERIAL INDUCEMENT FOR LENDER TO MAKE THE LOAN AND WITHOUT WHICH LENDER WOULD NOT MAKE THE LOAN.**

      **BORROWER'S INITIALS:** _____

**Section 7.12**  <u>**Disposition of Insurance and Condemnation Proceeds and Damages**</u>.

      (a)    <u>Lender's Rights in Proceeds and Damages; Settlement of Proceeds</u>.

          (i)    Borrower hereby assigns to Lender as security for the Indebtedness and all other Obligations (A) any award for damages suffered or compensation paid by reason of a taking for public use, or an action in eminent domain, or the exercise of the police power,

whether by a condemnation proceeding or otherwise (such as by inverse condemnation), or any transfer of all or any part of the Property in avoidance thereof, affecting the Property, (B) all proceeds of any Policies paid by reason of loss sustained to the Property, and (C) all claims, damages, causes of action, against or from any party or parties, with respect to the Property, or any funds received or receivable in connection with any damage to the Property, incurred as a result of any cause whatsoever (collectively, "**Property Claim Proceeds**").

(ii)     Except with respect to proceeds that are less than the Restoration Threshold (which may be payable directly to Borrower subject to <u>Section 7.12(b)</u>), all Property Claim Proceeds shall be paid by the Person making payment directly to Lender; provided, however, that if for any reason such payment is made to Borrower, or to Borrower and Lender jointly, Borrower shall promptly endorse such payment to Lender. After first deducting all costs and expenses of Lender reasonably incurred in connection with the settlement or recovery of any Property Claim Proceeds, Lender may, at its option and without regard to the adequacy of the security hereunder (but subject to <u>Section 7.12(b)</u>), apply any such sum it retains hereunder to any Indebtedness whether due or not, and in such order or priority as Lender may determine. Application of all or any portion of such funds shall not cure or waive any Default or Event of Default, notice of a Default or an Event of Default or invalidate any acts done pursuant to such notice. Borrower shall execute such further assignments, documents or instruments as Lender may from time to time require in order to evidence the assignment hereunder.

(iii)     If, on any loss of or damage to the Property or on a partial taking or condemnation of the Property, Lender is not entitled under law to retain the entirety of any Property Claim Proceeds, then Lender shall be entitled to apply the Property Claim Proceeds to the repayment of the Indebtedness to the extent necessary in Lender's judgment to reduce the Indebtedness by the ratio which the value of the Property remaining encumbered hereby bears to the value of the Property encumbered hereby immediately prior to such loss, damage or partial condemnation or taking, as determined by Lender's appraiser retained for such purpose.

(b)     <u>Excess Proceeds</u>.  Any net proceeds or award remaining after full and final payment of the Obligations shall be returned to Borrower.

**Section 7.13    <u>Maintenance and Preservation of the Property</u>.**

(a)     <u>Borrower's Obligation for Maintenance of Property and Security</u>. Borrower shall: (i) keep the Property in good condition and repair, and replace any items comprising the Property as they become obsolete or worn out with items of at least the same utility, quality and value, free of any Liens other than the Permitted Exceptions, reasonable wear and tear excepted; (ii) not remove or demolish the Property; (iii) restore promptly and in good and workmanlike manner any part of the Property which may be damaged or destroyed (subject to receipt of Property Claim Proceeds for such purpose); (iv) comply with and not suffer violations of any Legal Requirements and requirements of insurance companies and any bureau or agency which establishes standards of insurability; (v) not commit or permit physical waste of the Property; (vi) do all other acts which from the character or use of the Property may be reasonably necessary to maintain and preserve its value or to protect the security hereof; (vii) perform and comply in all material respects with all obligations required to be performed or complied with in any leases, licenses, concessions, management agreements, or like material

agreements affecting the Property or the operation or use thereof; (viii) pay any and all charges, assessments or fees imposed in connection with the delivery, installation or maintenance of any utility services or installations on, to or for the Property on or prior to the due date thereof; (ix) not change the use of the Property to anything other than the current use of the Property; (x) not drill for or extract, or enter into a lease or any other type of agreement for the drilling for or extraction of, oil, gas or other hydrocarbon substances, or any mineral of any kind, on, in or under the Property; (xi) make no assignment of rents of the Property except to Lender; and (xii) execute and, where appropriate, acknowledge and deliver, such further documents or instruments as Lender reasonably deems necessary or appropriate to preserve, continue and perfect the security provided for herein.

(b)   Compliance with Legal Requirements. Without the prior written consent of Lender, Borrower shall not seek, make or consent to any change in the lot or parcel boundaries, zoning, conditions of use, or any other Legal Requirements which would constitute a violation of the warranties and representations herein contained, or would change the nature of the intended use or occupancy of the Property. Borrower shall, within the ten (10) Business Days after receipt by Borrower or its representative, deliver to Lender copies of any and all approvals, permits required pursuant to applicable Legal Requirements with respect to the Property or any other improvements thereon, or the occupancy, use and enjoyment thereof. Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner that could reasonably be expected to result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Lender.

**Section 7.14   Proceedings to Enjoin**. If any proceedings are filed or are threatened to be filed seeking to (a) enjoin or otherwise prevent or declare invalid or unlawful the occupancy, maintenance or operation of the Property or any portion thereof, (b) adversely affect the validity or priority of the Liens and security interests granted Lender hereunder or under any other Loan Document, (c) adversely affect the financial condition of Borrower, or (d) adversely affect the financial condition of Guarantor in a manner that could reasonably be anticipated to result in a Material Adverse Change, then Borrower will notify Lender of such proceedings and within two (2) Business Days following Borrower's actual notice of such proceedings, Borrower will cause such proceedings to be vigorously contested in good faith, and in the event of an adverse ruling or decision, prosecute all allowable appeals therefrom. Without limiting the generality of the foregoing, Borrower will resist the entry or seek the stay of any temporary or permanent injunction that may be entered, and use its best efforts to bring about a favorable and speedy disposition of all such proceedings.

**Section 7.15   Distributions**. Borrower shall not make any Distributions (including Distributions of any accumulated earnings and profits) during the Term.

**Section 7.16   Transfer or Encumbrance of the Property**. Borrower acknowledges that the financial standing and managerial and operational ability of Borrower are substantial and material considerations to Lender in their agreement to make the Loan and that any encumbrance or transfer of an interest in the Property will materially impair Lender's security hereunder. In order to induce Lender to make the Loan, Borrower agrees (subject to the further terms and

conditions of this <u>Section 7.18</u>): (i) not to change, directly or indirectly, the ownership of Borrower or Parent; and (ii) not to effect a Transfer without in each instance first obtaining Lender's prior written consent, which consent may be withheld for any reason, or given upon such terms and conditions as Lender shall require, all within Lender's sole discretion, to the extent permitted by applicable law. Borrower acknowledges and agrees that any transaction or event of any kind effecting a Transfer or further encumbering the Property, or changing the identity of the parties primarily liable for performance of Borrower's covenants under this Agreement shall constitute an impairment of Lender's security interests under this Agreement.

**Section 7.17** **Leases**. Borrower shall not enter into any Lease without the prior written consent of Lender. All Leases shall be expressly subordinate to the Security Instrument unless Lender elects in writing, at its sole option, to subordinate the Security Instrument to a particular Lease or Leases. Additionally, all Leases shall provide, in a manner approved by Lender, that the tenant thereunder shall recognize as its lessor and attorn to any Person succeeding to the interest of Borrower upon foreclosure of the Security Instrument (or deed in lieu thereof).

**Section 7.18** **Prohibition Against Additional Recordings**. Borrower will not record or permit to be recorded any document, instrument, agreement or other writing against the Property without the prior written consent of Lender. Borrower will not enter into, modify, waive, grant any consent under, or release, surrender or terminate any easements, restrictive covenants or other instruments constituting Permitted Exceptions, or suffer, consent to or permit the foregoing, without Lender's prior written consent, which consent may be granted or denied in Lender's sole discretion.

**Section 7.19** **Change in Name**. Borrower will not change its name without first obtaining the prior written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed. In the event Lender grants such consent, Borrower shall, at Borrower's sole cost and expense, take all action required by Lender for the purpose of perfecting or protecting the lien and security interest of Lender. Borrower shall promptly notify Lender in writing of any change in Borrower's organizational identification number.

**Section 7.20** **Debt Cancellation; Settlement of Claims**. Borrower shall not, in any calendar year, without the consent of Lender, (a) cancel or otherwise forgive or release any Debt owed to Borrower by any Person, or (b) settle any Claim against Borrower, other than a fully insured third party Claim.

**Section 7.21** **Affiliate Transactions**. Borrower shall not enter into, or be a party to, any transaction with any Borrower Party or any Affiliate of any Borrower Party, directly or indirectly, without the prior written consent of Lender.

**Section 7.22** **Limitation on Issuance of Equity Interests**. Without the prior written consent of Lender, Borrower will not issue any Equity Interests in Borrower other than those that have been issued as of the date hereof.

**Section 7.23** **Compliance**. Borrower shall not be in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might materially adversely affect the condition (financial or otherwise) or business of Borrower.

41

Borrower shall not commit any act that may give any Governmental Authority the right to cause Borrower to forfeit the Property or any part thereof or any monies paid in performance of Borrower's Obligations under any of the Loan Documents. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture. Borrower shall cooperate fully with Lender with respect to, and permit Lender, at its option to participate in, any proceedings before any Governmental Authority which may in any way affect the rights of Lender under any Loan Document.

**Section 7.24   Anti-Terrorism; OFAC; Patriot Act.** No Borrower Party shall, nor shall any Borrower permit any person Controlling, Controlled by or under common Control with Borrower Party or any other Transaction Person to, (a) be or become a Person whose property or interests in property are blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit or Support Terrorism (66 Fed. Reg. 49079 (2001)), (b) engage in any dealings or transactions prohibited by Section 2 of such executive order, or otherwise be associated with any such Person in any manner in violation of Section 2 of such executive order, or (c) otherwise become a Person on the list of Specially Designated Nationals and Blocked Persons in violation of the limitations or prohibitions under any other OFAC regulation or executive order. Borrower shall, promptly following a request by Lender, provide all documentation and other information that Lender requests in order to comply with its ongoing obligations under applicable "**know your customer**" and anti-money laundering rules and regulations, including the Patriot Act.

**Section 7.25   Material Contracts.** Borrower shall: (a) pay, observe and perform in all material respects all terms, covenants and conditions of each Material Contract prior to the expiration of any applicable grace period provided therein; (b) not cause or permit the occurrence of any event that would cause any Material Contract to terminate, or that would entitle any other party to a Material Contract to terminate such Material Contract or that could give rise to the creation of a lien on the Property or any portion thereof; (c) not enter into a Material Contract without Lender's prior written consent; (d) not agree to or permit the termination of any Material Contract; and (e) not cause or permit any Material Contract to be modified or supplemented without Lender's consent (other than pursuant to a modification or supplement that is entirely ministerial in nature), which consent shall, so long as no Event of Default is continuing, not be unreasonably withheld or delayed. In addition to the foregoing, Borrower shall not enter into any Property Management Agreement without Lender's prior written consent. Upon execution of the Property Management Agreement, Borrower and Property Manager shall enter into an assignment and subordination of management agreement in form and substance satisfactory to Lender. In the event that, with the prior written consent of Lender, the Property Management Agreement is terminated, Borrower shall engage a replacement property manager satisfactory to Lender in its reasonable discretion pursuant to a replacement property management agreement satisfactory to Lender in its reasonable discretion. Concurrently with the execution of a replacement property management agreement acceptable to Lender in its reasonable discretion, Borrower and the replacement property manager shall execute an assignment and subordination of management agreement in form and substance acceptable to Lender in its reasonable discretion.

**Section 7.26  Limitation on Debt**. Neither Borrower nor any Borrower Party shall directly or indirectly create, incur or assume, or suffer to exist or remain obligated with respect to, any Debt other than Permitted Debt.

**Section 7.27  Hazardous Materials Covenants**. Borrower hereby covenants and agrees as follows:

(a)  No Hazardous Activities. Borrower shall not permit or cause the Property to be used as a site for the use, generation, manufacture, storage, treatment, disposal, discharge, release, transportation or presence of any Hazardous Materials.

(b)  Compliance. Borrower shall comply and cause the Property to comply with all Hazardous Materials Laws. In addition, if there is mold (including, without limitation, Toxic Mold), mildew, and viruses, whether or not living, present on or about the Property which could reasonably be anticipated to have a Material Adverse Change on the Property, or poses a threat to the life, safety or health of the occupants therein, Borrower shall remedy such condition to Lender's satisfaction.

(c)  Notices. Borrower shall, upon becoming aware of the same, promptly notify Lender in writing of: (i) the discovery of any Hazardous Materials on, under or about the Property; (ii) any knowledge by Borrower that the Property does not comply with any Hazardous Materials Laws; or (iii) any Claims or actions pending or threatened against Borrower or the Property relating to Hazardous Materials or pursuant to Hazardous Materials Laws (individually and collectively, "**Hazardous Materials Claims**").

(d)  Remedial Action. In response to the presence of any Hazardous Materials on, under or about the Property, subject to Lender's prior approval, Borrower shall promptly (and in all events within the time period required under applicable Hazardous Materials Laws) take, at Borrower's sole cost and expense, all remedial action required by any Hazardous Materials Laws or any judgment, consent decree, settlement or compromise with respect to any Hazardous Materials Claims.

## ARTICLE 8

## DEFAULTS

**Section 8.1  Event of Default**. Each of the following events shall constitute an event of default hereunder (an "**Event of Default**"):

(a)  (i) any monthly installment of interest due under this Agreement is not paid when due, or (ii) any payment of principal due under this Agreement or the payment due on the Maturity Date is not paid when due, or (iii) any Contingent Interest is not paid when due; or (iv) any other portion of the Indebtedness, or any other amount required to be paid hereunder or under any other Loan Document is not paid when due, or, if no due date is stated, within five (5) days of written demand;

(b)  The failure to pay Taxes when the same are due and payable (unless Borrower satisfied the conditions for disbursement of such funds and Lender fails to disburse

such funds to pay the Taxes when and as due in violation of this Agreement) subject to Borrower's right to contest Taxes pursuant to Section 7.10(b);

(c)      Any representation or warranty made by Borrower or any Borrower Party herein or in any other Loan Document or in any report, certificate, financial statement or other instrument, agreement or document furnished by Borrower or any other Borrower Party in connection with the Loan or any Loan Document shall have been false or misleading in any material respect as of the date the representation or warranty was made (or remade in accordance with the terms of this Agreement or any other Loan Document); provided, however, if (i) Borrower or any Borrower Party makes a good faith, unintentional misrepresentation, and (ii) the underlying facts or situation that rendered such representation inaccurate or untrue can be remedied to Lender's satisfaction (in its Permitted Discretion) within thirty (30) days following the earlier to occur of the discovery of such misrepresentation by Borrower or written notice from Lender to Borrower of such misrepresentation and Borrower or any Borrower Party, as applicable, actually remedies said underlying facts or situation so as to make the original representation true and correct on a going forward basis prior to the expiration of said thirty (30) day period, then such misrepresentation shall not be deemed to be an Event of Default;

(d)      The existence of any collusion, fraud, dishonesty or bad faith by or with the acquiescence of Borrower or any other Borrower Party which in any way relates to or affects the Loan or the Property;

(e)      The occurrence of any condemnation proceeding that, in the reasonable judgment of Lender, (i) significantly impairs the value of the remaining Property, (ii) materially alters a Lease or the operations at such remaining Property, or (iii) renders all or a material portion of such remaining Property unusable for its intended purposes;

(f)      Borrower or any other Borrower Party shall:

(i)      file a voluntary petition in bankruptcy or for an arrangement or reorganization under any federal or state bankruptcy, insolvency or debtor relief law or statute (hereinafter referred to as a "**Bankruptcy Proceeding**");

(ii)      file any answer in any Bankruptcy Proceeding or any other action or proceeding admitting insolvency or inability to pay its debts;

(iii)      fail to oppose, or fail to obtain a vacation or stay of, any involuntary Bankruptcy Proceeding within ninety (90) days after the filing thereof;

(iv)      solicit or cause to be solicited, or any Affiliate of any Borrower Party solicits or causes to be solicited, petitioning creditors for any involuntary Bankruptcy Proceeding against Borrower Party;

(v)      be granted a decree or order for relief, or be adjudicated a bankrupt or declared insolvent in any Bankruptcy Proceeding, whether voluntary or involuntary;

(vi)      have a trustee or receiver appointed for or have any court take jurisdiction of its property, or the major part thereof, or all of any portion of the Property, in any

voluntary or involuntary proceeding for the purpose of reorganization, arrangement, dissolution or liquidation, and, with respect to an involuntary proceeding only, such trustee or receiver is not discharged or such jurisdiction is not relinquished, vacated or stayed on appeal or otherwise, within ninety (90) days after the commencement thereof;

(vii)    make an assignment for the benefit of creditors;

(viii)    consent to any appointment of a receiver or trustee or liquidator of all of its property, or the major part thereof, or all or any portion of the Property or all or any portion of the property of Borrower Party; or

(ix)    have an attachment or execution levied with respect to, or other judicial seizure be effected for, all or substantially all of its assets or all or any portion of the Property, or the placing of any attachment, levy of execution, charging order, or other judicial seizure on the interest of Parent in Borrower.

(g)    The occurrence of any Transfer;

(h)    The breach of any of the representations, warranties or covenants contained in Article 6 of this Agreement;

(i)    The occurrence of a Material Adverse Change;

(j)    The dissolution, termination or merger, whether voluntarily or involuntarily, of Borrower or any other Borrower Party that is not a natural person;

(k)    Any default in any of the Loan Documents beyond any applicable notice and cure period, including, without limitation, failure by any Guarantor to comply with the financial covenants set forth in the Guaranty;

(l)    The entry of a final judgment, final order or final decree for the payment of money against any Borrower Party (other than Guarantor) in excess of one percent (1%) of the Loan Proceeds, which is not satisfied and paid, or enforcement of which has not been stayed, within sixty (60) days after the date of entry of such judgment, order or decree;

(m)    The term of any Policy required by this Agreement shall expire or lapse, or Borrower receives notice of cancellation of any such Policy and Borrower does not provide Lender with written evidence of a replacement or renewal Policy complying with this Agreement at least ten (10) Business Days prior to the date of cancellation or expiration of such Policy;

(n)    This Agreement or any other Loan Document shall, in whole or in part, terminate, cease to be effective or cease to be a legally valid, binding and enforceable obligation of Borrower or any other Borrower Party; any party to any Loan Document (other than Lender) shall assert in writing that such document has ceased to be in full force and effect; or the Liens created pursuant to any Loan Document shall cease to be a fully perfected enforceable first priority security interest due to an act or omission of Borrower or any Borrower Party;

45

(o)     Borrower attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(p)     Any required permit, certificate or approval with respect to the Property lapses or ceases to be in full force and effect and is not reinstated within thirty (30) days of the date of the lapse occurs;

(q)     Any Event of Default identified in any other provision of this Agreement occurs, or any Event of Default (as defined in the Security Instrument or any other Loan Document) occurs, or a default occurs under any term, covenant or provision set forth herein or in any other Loan Document which specifically contains a notice requirement or grace period and such notice has been given and such grace period has expired;

(r)     (i) a default or breach by Borrower under any Lease which shall not be cured within any applicable grace period set forth therein, or (ii) any modification, amendment, cancellation, termination or assignment or sublet of any Lease that is entered into or consented to without the prior written consent of Lender in violation of <u>Section 7.21</u> hereof;

(s)     Borrower or any other Borrower Party fails to perform or cause to be performed any other obligation or observe any other condition, covenant, term, agreement or provision required to be performed or observed by Borrower or any other Borrower Party contained in this Agreement or any other Loan Document and not specifically referred to elsewhere in this <u>Section 8.1</u> or the default section of such other Loan Document; provided, however, that if such failure by its nature can be cured, then so long as the continued operation and safety of the Property, and the priority, validity and enforceability of the Liens created by the Security Instrument or any of the other Loan Documents and the value of the Property is not impaired, threatened or jeopardized in any material respect, then Borrower shall have a period of thirty (30) days after Borrower obtains knowledge of such failure or receives written notice of such failure to cure the same (provided, however, that such period shall be limited to ten (10) days if such failure can be cured by the payment of money) and an Event of Default shall not be deemed to exist during the cure period, provided, further, that if such failure cannot be cured by the payment of money and Borrower commences to cure such failure during the cure period and is diligently and in good faith attempting to effect such cure, the cure period shall be extended for thirty (30) additional days, but in no event shall the cure period be longer than ninety (90) days in the aggregate;

(t)     If any permit for all or any portion of the Property shall be removed or suspended for twenty (20) days or longer, or if Borrower fails to comply with any Legal Requirements pertaining to the Property, such that an occupancy permit is or would be denied due to such condition or circumstance and such condition or circumstance remains unchanged and uncured upon the expiration of thirty (30) days after the occurrence of thereof; or

(u)     An "Event of Default" (as defined in any of the Phase I Construction Refinancing Loan Documents) occurs.

**Section 8.2    <u>Remedies Conferred upon Lender</u>**. Upon the occurrence and continuance of any Event of Default, in addition to any other rights or remedies available to it

46

pursuant to the Loan Documents or at law or in equity, Lender may take such action, without notice, or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property, and without limiting the foregoing, Lender may pursue any one or more of the following remedies concurrently or successively, it being the intent hereof that none of such remedies shall be to the exclusion of any others:

(a)    Take possession of the Property and do anything required, necessary or advisable in Lender's sole judgment to fulfill the Obligations of Borrower. Without restricting the generality of the foregoing and for the purposes aforesaid, Borrower hereby appoints and constitutes Lender as Borrower's lawful attorney-in-fact with full power of substitution in the premises to perform the following actions:

(i)    to make Protective Advances or to advance funds in excess of the stated amount of the Loan to preserve the Collateral;

(ii)    without inquiring into and without respect to the validity thereof, to pay, settle or compromise all existing bills and claims which may be Liens, or to avoid such bills and claims becoming Liens, against the Property or any portion of the Property or as may be necessary or desirable for the clearance of title to the Property or portion thereof;

(iii)    to prosecute and defend actions or proceedings in connection with the Property;

(iv)    to take action and require such performance as Lender deems necessary or advisable under any of the bonds to be furnished hereunder and to make settlements and compromises with the surety or sureties thereunder, and in connection therewith, to execute instruments of release and satisfaction; and

(v)    to do any and every act which Borrower might do in its own behalf with respect to the Property, including but not limited to executing new Leases and complying with any obligations of the landlord or licensor (as the context so requires) thereunder, it being understood and agreed that this power of attorney shall be a power coupled with an interest and cannot be revoked;

(b)    Withhold further disbursement of the proceeds of the Loan and terminate any of its obligations to Borrower;

(c)    Declare all Indebtedness to be due and payable forthwith, without presentment, demand, protest or other notice of any kind, all of which Borrower hereby expressly waives; _provided_, that without limiting the foregoing, upon any Event of Default described in <u>Section 8.1(f)</u>, the entire Indebtedness and all other Obligations shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained in any Loan Document to the contrary notwithstanding;

(d)    In addition to any rights of setoff that Lender may have under applicable law, Lender, without notice of any kind to Borrower, may appropriate and apply to the payment of the Indebtedness or of any sums due under this Agreement any and all balances, deposits,

credits, accounts, certificates of deposit, instruments or money of Borrower then or thereafter in the possession of Lender; and

        (e)      Exercise or pursue any other remedy or cause of action permitted at law or in equity or under this Agreement or any other Loan Document, including, but not limited to, foreclosure of the Security Instrument and enforcement of all Loan Documents.

**Section 8.3**    **Right of Lender to Make Advances to Cure Event of Defaults; Obligatory Advances**. If Borrower shall fail to perform any of its covenants or agreements herein or in any of the other Loan Documents contained, Lender may (but shall not be required to) perform any of such covenants and agreements, and any amounts expended by Lender in so doing pursuant to this Section 8.3 hereof and any amounts otherwise advanced by Lender pursuant to this Agreement shall be deemed advanced by Lender under an obligation to do so regardless of the identity of the Person or Persons to whom said funds are disbursed.

**Section 8.4**    **Payment of Costs, Expenses and Attorneys' Fees**. All costs and expenses incurred by Lender pursuant to this Article 8 (including court costs and reasonable attorneys' fees and costs) whether or not incurred in litigation and whether or not foreclosure is concluded, including, without limitation, reasonable attorneys' fees, costs and expenses incurred in connection with any judicial or non-judicial foreclosure of the Security Instrument or the other Loan Documents, or in connection with both judicial and non-judicial foreclosure, if Lender shall elect to pursue each such remedy whether concurrently or independently, and the costs and expenses of retaking, holding, preparing for sale or selling all or any portion of the Collateral shall be secured by the Security Instrument and shall bear interest at the Default Rate from the date of expenditure until such sums have been paid. In addition, Borrower acknowledges and agrees that following a Default, (a) Lender shall have the right to retain counsel for itself and (b) Borrower shall be responsible for paying all of the costs and expenses described above that are incurred by Lender. This provision is separate and several and shall survive merger into judgment hereon.

**Section 8.5**    **Remedies Cumulative; No Waiver**. All rights and remedies of Lender hereunder and under the other Loan Documents are cumulative and not alternative, and are in addition to all rights and remedies otherwise provided by law. No exercise of any right or remedy by Lender shall constitute a waiver of any other right or remedy. No delay or omission by Lender to exercise any right, power or remedy hereunder shall impair any such right or remedy, or be construed as a waiver of any Event of Default, or any acquiescence therein. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing, (i) to the extent permitted by applicable law, Lender is not subject to any "**one action**" or "**election of remedies**" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property, the Security Instruments have been foreclosed, the Property has been sold and/or otherwise realized upon in satisfaction of the Indebtedness or the Indebtedness has been paid in full. Nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to any particular portion of the Property for the satisfaction of any of the Obligations in preference or priority to any other portion of the Property, and Lender may seek satisfaction out of the entire Property or any part thereof, in its sole discretion, in respect of the Obligations. By accepting payment of any part of the Indebtedness after its due date or later performance of any Obligation, Lender shall not waive its right against any Person obligated directly or indirectly hereunder, or on any Obligation, either to require prompt payment when due of all other Indebtedness or to declare an Event of Default for failure to make such prompt payment or render such performance; and Lender's acceptance of partial payment of any portion of the Indebtedness after its due date (which may be applied to such outstanding payment obligations as Lender may elect, notwithstanding Borrower's instructions to the contrary), or acceptance of partial performance of any Obligation in default, shall not cure such payment failure or default, or affect any notice of an Event of Default or sale heretofore given or recorded, unless such notice is expressly revoked in writing by Lender. For avoidance of doubt, (i) any reference in this Agreement or in any other Loan Document to an Event of Default "**continuing**" or words of similar import, shall not be deemed to imply or create any obligation on the part of Lender to waive, or to accept a cure of, an Event of Default, and (ii) once an Event of Default "**occurs**" it shall be deemed to continue unless and until Lender agrees in writing to waive or accept the cure of such Event of Default, which Lender shall decide in its sole discretion.

**Section 8.6**    **Severance**. Lender shall have the right from time to time to sever this Agreement, the Note (if applicable) and the other Loan Documents into one or more separate notes, mortgages and other security documents in such denominations and priorities of payment and liens as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies. Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender; provided, however, that in each such instance the outstanding principal balance of all notes (or other components of the Loan) immediately after the effective date of such severance equals the outstanding principal balance of the Loan immediately prior to such severance and the weighted average of the interest rates for all notes (or such other components of the Loan) immediately after the effective date of such modification equals the interest rate on the Loan immediately prior to such modification. Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney,

49

coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such severance, Borrower ratifying all that such attorney shall do by virtue thereof; provided, that Lender shall not exercise its rights under such appointment unless Borrower has failed to execute any such documents within five (5) Business Days after request by Lender. All costs and expenses (including reasonable attorneys' fees) incurred by Lender in connection with any such severance shall be paid by Borrower upon request by Lender.

**Section 8.7    Default Rate**. From and after the occurrence and during the existence of an Event of Default, interest on all Indebtedness, at Lender's option in its sole discretion, shall accrue at the Default Rate and be payable on demand. The failure of Lender to charge interest at the Default Rate shall not be evidence of the absence of an Event of Default or waiver of an Event of Default by Lender.

# ARTICLE 9

## MISCELLANEOUS

**Section 9.1    Notices**. All notices or other written communications hereunder shall be deemed to have been properly given (a) upon delivery if delivered in person, (b) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, (c) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, or (d) one (1) Business Day after delivery if sent by email, provided that the recipient has acknowledged receipt by telephone and that a carbon copy of such notice is sent simultaneously by the other methods provided in this Section. All notices or other written communications hereunder shall be addressed to the individuals at the addresses set forth below, or at such other address as such party may, at least ten (10) days in advance, designate by written notice to the other parties. Any notice to legal counsel or other Person other than the primary addressee for Borrower or Lender below shall be a courtesy copy only and shall not affect the timeliness or effectiveness of delivery of any notice.

|  |  |
|---|---|
| **To Borrower:** | [_____] |
| **with a copy to:** | [_____] |
| **To Lender:** | Skylark Capital Management, LLC<br>8445 Santa Monica Boulevard<br>West Hollywood, California 90069<br>Attention: Jonathan Shapiro<br>Email: Jon@skylarkcap.com |
| **with a copy to:** | Eisner, P.C.<br>9601 Wilshire Boulevard, 7th Floor<br>Beverly Hills, California 90210<br>Attention: Brian D. Kilb<br>Email: bkilb@eisnerlaw.com |

50

**Section 9.2**    **Reimbursement for Expenses**. Borrower shall pay (on the date of the initial funding of the Loan, and thereafter, as the case may be) all reasonable legal fees and all other costs and expenses reasonably incurred by Lender or Servicer or any of their Affiliates (individually or collectively, as the context may apply, a "**Reimbursement Party**"), prior to or after the Closing Date, including, without limitation, the following: (a) all expenses reasonably incurred by any Reimbursement Party in connection with the Loan, including fees and expenses of any Reimbursement Party's attorneys, environmental, engineering, appraisal, and other consultants; (b) judgment and tax lien searches; (c) title search fees; (d) Other Taxes, directly or indirectly, arising out of the Collateral; (e) wire transfer fees; (f) any other fees, charges or taxes for the negotiation, modification, recording or filing of the Loan Documents and all legal opinions by counsel for any Person pursuant to the Loan Documents; (g) all expenses of any Reimbursement Party reasonably incurred in connection with the administration of the Loan, including audit costs inspection fees, attorneys' fees and disbursement; (h) settlement of condemnation and casualty awards; (i) premiums for title insurance and endorsements thereto; (j) monitoring Borrower's ongoing performance of and compliance with its agreements and covenants contained in the Loan Documents; and (k) all amounts expended, advanced or incurred by any Reimbursement Party to enforce, protect, or collect payment of the Indebtedness and the Liens granted therein or to enforce any Loan Document, or to defend or assert the rights and claims of any Reimbursement Party under the Loan Documents, in any litigation or administrative proceeding related to ERISA, or with respect to the Collateral in any Proceeding, which amounts will include all court costs, reasonable attorneys' fees and expenses, fees of auditors and accountants, and investigation expenses as may be incurred by any Reimbursement Party in connection with any such Proceeding, together with interest at the Default Rate on each such amount from the date of disbursement until the date of reimbursement to the respective Reimbursement Party, all of which shall constitute part of the Indebtedness and shall be secured by the Loan Documents. This provision is separate and several, and shall survive merger into judgment hereon. The parties hereto acknowledge that the costs of any in-house counsel, auditors, or other in-house consultants used for any of the purposes set forth under this Agreement shall be considered a reimbursable expense. All costs and expenses described in this Section 9.2 shall be deemed "**Loan Expenses**".

**Section 9.3**    **Indemnity**.

(a)    Borrower shall indemnify, defend and hold harmless each Indemnified Person from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever, including the reasonable fees and disbursements of counsel for any Indemnified Person, in connection with any Proceeding (whether or not such Indemnified Person shall be designated a party thereto), that may be imposed on, incurred by, or asserted against any Indemnified Person by any Person (other than an Indemnified Person) in any manner, directly or indirectly, arising out of the Property, the Loan or the Loan Document (collectively, the "**Indemnified Liabilities**"). Notwithstanding the foregoing, Borrower shall not have any obligation to an Indemnified Person hereunder to the extent that it is determined, by court of competent jurisdiction in a final non-appealable ruling, that such Indemnified Liabilities were directly caused by the gross negligence or willful misconduct of such Indemnified Person.

(b)     To the extent that the undertaking to indemnify, defend and hold harmless set forth in this Section may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Lender or any other Indemnified Person. Any amounts payable to any Indemnified Person by reason of the application of this Section shall be payable on demand and shall bear interest at the Default Rate from the date loss or damage is sustained by any Indemnified Person until paid. The obligations and liabilities of Borrower under this Section 9.3 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents.

(c)     To the extent Borrower is obligated, pursuant to any Loan Document, to indemnify, defend, or prosecute any Proceeding in favor of any Indemnified Person, such Indemnified Person shall have the right of full participation in any such Proceeding, with counsel of such Indemnified Person's choice. Any Indemnified Person may, in its Permitted Discretion, take such actions as it deems necessary and appropriate to investigate, defend or settle any event or other remedial or corrective actions with respect to such event as may be necessary for the protection of such Indemnified Person or Collateral. The parties hereto acknowledge that the use of the words "**counsel**" herein shall include in-house legal counsel and outside legal counsel. Borrower shall give notice to Lender of the initiation of all Proceedings prosecuted or required to be defended by Borrower, or which are subject to Borrower's indemnity obligations under any Loan Document, promptly after the receipt by Borrower of notice of the existence of any such proceeding. As used herein, "**Proceeding**" shall include litigation, arbitration, investigative, or administrative proceedings, actions, matters, hearings, whether commenced, threatened, or potential in nature.

(d)     The parties hereto acknowledge that the costs of any in-house counsel, auditors, or other in-house consultants used for any of the purposes set forth under this Agreement shall be considered a reimbursable expense.

**Section 9.4    Amendments and Waivers**. Any consent or waiver by Lender to or of any term, covenant or condition under the Loan Documents, or of any Default or Event of Default, or failure by Lender to insist upon strict performance by Borrower Party of any term, covenant or condition contained in any Loan Document, shall be effective or binding upon Lender only if made in writing by Lender; and no such consent, waiver or failure to insist shall be implied from any conduct, course of conduct, or act of Lender, or any omission by Lender to take any action with respect thereto. No failure by Lender to insist upon the strict performance of any covenant, agreement, term or condition of any Loan Document or to exercise any right, power or remedy consequent upon a breach thereof shall constitute a waiver, express or implied, of any such breach or of such covenant, agreement, term or condition. A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. No modification, amendment, extension, discharge, termination or waiver of any provision of any Loan Document shall in any event be effective unless the same shall be in a writing signed by Borrower and Required Lender.

**Section 9.5    Invalid Provisions**. If any provision of any Loan Document is held to be illegal, invalid or unenforceable, such provision shall be fully severable; the Loan Documents shall be construed and enforced as if such illegal, invalid or unenforceable provision had never

comprised a part thereof; the remaining provisions thereof shall remain in full effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance therefrom; and in lieu of such illegal, invalid or unenforceable provision there shall be added automatically as a part of such Loan Document a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible to be legal, valid and enforceable.

**Section 9.6**  **Loan Agreement Provisions Control over Other Instruments**. The provisions of this Agreement shall prevail notwithstanding any contrary provisions in any other Loan Document.

**Section 9.7**  **Approvals; Third Parties; Conditions**. Except where otherwise expressly provided in the Loan Documents, in any instance where the approval, consent or the exercise of Lender's judgment is required, the granting or denial of such approval or consent and the exercise of such judgment shall be (a) within the sole discretion of Lender; and (b) deemed to have been given only by a specific writing intended for such purpose executed by Lender. All approval rights retained or exercised by Lender with respect to leases, contracts, plans, studies and other matters are solely to facilitate Lender's credit underwriting, and shall not be deemed or construed as a determination that Lender has passed on the adequacy thereof for any other purpose and may not be relied upon by Borrower or any other Person. This Agreement is for the sole and exclusive use of Lender, Borrower and each Guarantor and may not be enforced, nor relied upon, by any Person other than Lender, Borrower and each Guarantor. All conditions of the obligations of Lender hereunder, are imposed solely and exclusively for the benefit of Lender, its successors and assigns, and no other Person shall have standing to require satisfaction of such conditions or be entitled to assume that Lender will refuse to make advances in the absence of strict compliance with any or all of such conditions, and no other Person shall, under any circumstances, be deemed to be a beneficiary of such conditions, any and all of which may be freely waived in whole or in part by Lender at any time in Lender's sole discretion, as the case may be.

**Section 9.8**  **Lender Not in Control; No Partnership**. None of the covenants or other provisions contained in this Agreement shall, or shall be deemed to, give Lender the right or power to exercise control over the affairs or management of Borrower, the power of Lender being limited to the rights to exercise the remedies referred to in the Loan Documents. Borrower covenants and agrees that the relationship between Borrower and Lender is, and at all times shall remain, solely that of debtor and creditor. No covenant or provision of the Loan Documents is intended, nor shall it be deemed or construed, to create a partnership, joint venture, agency or common interest in profits or income between Lender and Borrower or to create equity in the Property in Lender. Lender neither undertakes nor assumes any responsibility or duty to Borrower or to any other Person with respect to the Property or the Loan, except as expressly provided in the Loan Documents; and notwithstanding any other provision of the Loan Documents: (a) Lender is not, and none shall be construed as, a partner, joint venturer, alter ego, manager, controlling person or other business associate or participant of any kind of Borrower or its stockholders, members, or partners and Lender does not intend to ever assume such status; (b) Lender shall not in any event be liable for any debts, expenses or losses incurred or sustained by Borrower; and (c) Lender shall not be deemed responsible for or a participant in any acts, omissions or decisions of Borrower or its stockholders, members, or partners. Lender, on the one hand, and Borrower and the Borrower Parties, on the other hand, disclaim any intention to create

53

any partnership, joint venture, agency or common interest in profits or income between Lender, on the one hand, and Borrower and the Borrower Parties, on the other hand, or to create an equity in the Property in Lender, or any sharing of liabilities, losses, costs or expenses. The Borrower Parties are experienced in the ownership and operation of properties similar to the Property, and Borrower is solely relying upon such expertise and its business plan in connection with the ownership and operation of the Property. The Borrower is not relying on either Lender or Lender's expertise, business acumen or advice in connection with the Property.

**Section 9.9    Time of the Essence**. Time is of the essence with respect to this Agreement and the other Loan Documents, and each representation, warranty, covenant and condition hereunder and thereunder.

**Section 9.10    Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except that (a) Borrower may not assign or transfer its rights hereunder or any interest herein or delegate its duties hereunder without the prior written consent of Lender, and (b) Lender shall have the right to assign its rights (in whole or in part, whether by operation of law (pursuant to a merger or other successor in interest) or otherwise) hereunder in accordance with this Agreement. Any reference to a Person under the Loan Documents shall be deemed to include such Person's successors and assigns, to the extent permitted by the terms hereof.

**Section 9.11    Renewal, Extension or Rearrangement**. All provisions of the Loan Documents shall apply with equal effect to each and all amendments thereof and any Notes hereinafter executed which in whole or in part represent a renewal, extension, increase or rearrangement of the Loan.

**Section 9.12    Cumulative Rights**. The rights and remedies of Lender as provided in the Loan Documents shall be cumulative and concurrent and may be pursued singly, successively or together against any Borrower Party, the Collateral, or any other Persons who are, or may become liable for all or any part of the Obligations, and any other funds, property or security held by Lender for the payment hereof, or otherwise, at the sole discretion of Lender. Failure to exercise any such right or remedy shall in no event be construed as a waiver or release of such rights or remedies, or the right to exercise them at any later time. The right, if any, of Borrower, and all other Persons, who are, or may become, liable for the Obligations, to plead any and all statutes of limitation as a defense is expressly waived by each and all of such parties to the full extent permissible by law.

**Section 9.13    Singular and Plural; Phases; Construction**. Wherever the context of any Loan Document may so require, the gender shall include the masculine, feminine and neuter, and the singular shall include the plural and vice versa. When used in the Loan Documents, the phrase "**including**" (or a word of similar import) shall mean "**including, but not limited to**", the phrase "**satisfactory to Lender**" shall mean "**in form and substance satisfactory to Lender in all respects**", and the words "**herein**", "**hereof**", "**hereunder**" and other words of similar import shall refer to this Agreement as a whole and not to any particular provision. The Loan Documents shall be construed as though drafted by all of the parties thereto and shall not be construed against or in favor of any party. All accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP as applied on a consistent basis.

**Section 9.14    Exhibits; Schedules; and Recitals**. The exhibits, schedules, and recitals described in the beginning paragraphs of this Agreement and attached to this Agreement and the other Loan Documents, as applicable, are incorporated herein and therein and shall be considered a part of this Agreement and such other Loan Documents for the purposes stated herein and therein.

**Section 9.15    Titles of Articles, Sections and Subsections**. All titles or headings to articles, sections, subsections or other divisions of this Agreement and the other Loan Documents or the exhibits hereto and thereto are only for the convenience of the parties and shall not be construed to have any effect or meaning with respect to the other content of such articles, sections, subsections or other divisions, such other content being controlling as to the agreement between the parties hereto.

**Section 9.16    Survival**. All of the representations, warranties, covenants, and indemnities hereunder and under the other Loan Documents, and any reaffirmation, modification or amendment thereof made in accordance with the terms and conditions of the Loan Documents, shall survive (a) the indefeasible repayment in full of the Indebtedness and the release of the Liens securing the Loan, (b) the transfer (by sale, foreclosure, conveyance in lieu of foreclosure or otherwise) of any or all right, title and interest in and to the Property to any Person, whether or not an Affiliate (except to the extent that such transfer results in the satisfaction of the Indebtedness and all obligations of Borrower Parties under the Loan Documents and Guaranties), and (c) in the case of Lender may assign any interest in its the Loan in accordance with the terms of this Agreement, the making of such assignment, notwithstanding that Lender may cease to be the "**Lender**" or the only "**Lender**" hereunder.

**Section 9.17    Representation by Legal Counsel**. Borrower acknowledges that it has been advised by Lender to seek the advice of legal counsel in connection with the negotiation and preparation of the Loan Documents. If Borrower has chosen not to obtain legal representation, whether due to cost considerations or for other reasons, the lack of such representation shall not furnish Borrower with any defense to the enforcement of Lender's rights under the Loan Documents.

**Section 9.18    Waiver of Jury Trial. EACH PARTY, TO THE MAXIMUM EXTENT PERMITTED BY LAW, (a) EXPRESSLY, KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR INCIDENTAL TO THE DEALINGS OF THE PARTIES WITH RESPECT TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED BY ANY LOAN DOCUMENT, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, AND (b) AGREES AND CONSENTS THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS LOAN AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES TO THE WAIVER OF THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY.**

**Section 9.19  <u>Governing Law</u>**. This Agreement was accepted by Lender in the state of California, which state the parties agree has a substantial relationship to the parties and to the underlying transaction embodied hereby. Accordingly, in all respects, including, without limiting the generality of the foregoing, matters of construction, validity, enforceability and performance, this Agreement and the other Related Documents and the obligations arising hereunder and thereunder shall be governed by, and construed in accordance with, the laws of the state of California applicable to contracts made and performed in such state and any applicable law of the United States of America, except that at all times the provisions for the foreclosure of liens under the Security Instrument and the creation, perfection and enforcement of the security interests created pursuant thereto and pursuant to the other Related Documents in any Collateral located in the state in which the Property is located shall be governed by and construed according to the law of the state where the Property is located. Except as provided in the immediately preceding sentence, Borrower hereby unconditionally and irrevocably waives, to the fullest extent permitted by law, any claim to assert that the law of any other jurisdiction governs this Agreement and the other Related Documents.

**Section 9.20  <u>Waivers</u>. EACH BORROWER PARTY AGREES THAT IT WILL NOT ASSERT ANY CLAIM, AND HEREBY WAIVES ANY CLAIM, AGAINST LENDER OR ANY OTHER INDEMNIFIED PERSON UNDER ANY LOAN DOCUMENT ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES. BORROWER EXPRESSLY AND UNCONDITIONALLY WAIVES, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY LENDER PURSUANT TO ANY LOAN DOCUMENT, ANY AND EVERY RIGHT IT MAY HAVE TO (a) INTERPOSE ANY COUNTERCLAIM THEREIN UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH COUNTERCLAIM MUST BE ASSERTED IN SUCH PROCEEDING, OR (b) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH SUIT, ACTION OR PROCEEDING MUST BE CONSOLIDATED WITH THE PROCEEDING BROUGHT BY LENDER.**

**Section 9.21  <u>Entire Agreement</u>**. This Agreement and the other Loan Documents embody the entire agreement and understanding among Lender and Borrower and supersede all prior agreements and understandings between such parties relating to the subject matter hereof and thereof. Accordingly, the Loan Documents may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

**Section 9.22  <u>Injunctive Relief</u>**. Borrower recognizes that in the event Borrower fails to perform, observe or discharge any of its Obligations hereunder or under any of the other Loan Documents, no remedy of law will provide adequate relief to Lender, and agrees that Lender shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

**Section 9.23  <u>Counterparts</u>**. This Agreement may be executed in multiple counterparts, each of which shall constitute an original, but all of which shall constitute one document. Receipt

of an executed signature page to this Agreement by facsimile, electronic mail, or other electronic transmission shall constitute effective delivery thereof.

**Section 9.24**   **Assignments, Participations, and Syndications**

(a)   Lender may, at any time assign all or a portion of its rights and delegate all or a portion of its obligations under the Loan Documents (including all its rights and obligations with respect to the Loan) to one or more Persons (a "**Transferee**") and there shall be no limitation or restriction on Lender's ability to assign, pledge or otherwise transfer any Note or other Obligation. The Transferee and Lender shall execute such loan assignment and assumption documentation as may be required by Lender, which shall be in form and substance reasonably acceptable to Lender in its discretion. Upon such transfer, (i) the Transferee thereunder shall be a party hereto and, have the same rights, benefits and obligations as it would if it were Lender hereunder, and (ii) Lender shall be relieved of its obligations hereunder with respect to the assigned portion of the Loan. Borrower hereby acknowledges and agrees that any assignment will give rise to a direct obligation of Borrower to the Transferee and that the Transferee shall be considered to be a "**Lender**" hereunder.

(b)   Lender may at any time, sell participations in all or any part of its rights and obligations under this Agreement and the other Loan Documents (including all its rights and obligations with respect to the Loan) to one or more Persons (each, a "**Participant**"). In the event of any such sale by Lender of a participation to a Participant, (i) Lender's obligations under this Agreement to the other parties to this Agreement shall remain unchanged, (ii) Lender shall remain solely responsible for the performance thereof, (iii) Lender shall remain the holder of the Loan (and any Note evidencing the Loan) for all purposes under this Agreement and the other Loan Documents, (iv) Borrower (and any other party to the Loan Documents) shall continue to deal solely and directly with Lender in connection with Lender's rights and obligations under this Agreement and the other Loan Documents, and (v) all amounts payable pursuant to Agreement by Borrower hereunder shall be determined as if Lender had not sold such participation. Any agreement pursuant to which Lender shall sell any such participation shall provide that Lender shall retain the sole right and responsibility to exercise Lender's rights and enforce Lender's obligations hereunder, including the right to consent to any amendment, supplement, modification or waiver of any provision of this Agreement or any of the other Loan Documents. Borrower hereby acknowledges and agrees that the Participant under each participation shall, solely for the purposes of any indemnity obligations of Borrower hereunder, be considered to be a "**Lender**" hereunder, and Borrower agrees to use commercially reasonable efforts (at no cost to Borrower Parties) to assist Lender in assigning or selling participations in all or any part of the Loan made by Lender to another Person identified by Lender.

(c)   Lender, on behalf of Borrower, shall maintain at its address set forth herein a copy of any documentation entered into in connection with a transfer of the Loan by Lender and a written or electronic register (the "**Register**") for the recordation of the names and addresses of Lender and any Transferees and the Advances made by, and the principal amount of the Loan owing to, and the Notes evidencing the Loan owned by, Lender and each Transferee from time to time. Borrower and Lender shall treat each Person whose name is recorded in the Register as the owner of the Loan, the Notes and the Advances recorded therein for all purposes

of this Agreement. The Register shall be available for inspection by Borrower at any reasonable time and from time to time upon reasonable prior notice.

(d)    Notwithstanding anything in this Agreement to the contrary, no assignment under Section 9.25 of any rights or obligations under or in respect of the Loan or the Notes evidencing the Loan shall be effective unless and until Lender shall have recorded the assignment pursuant to Section 9.25Section 9.25(c). Lender shall promptly record any such transfer of Lender's interests in the Loan in the Register and give prompt notice of such acceptance and recordation to Lender. On or prior to such effective date, Borrower, at its own expense, shall, upon the request of Lender or the Transferee, as applicable, execute and deliver to Lender, within five (5) Business Days of any request, new Notes substantially in the form of the original Note executed by Borrower on the Closing Date with changes as required to reflect the interest held by Lender and its Transferee; provided that Borrower shall not be required to execute any documents which materially modify the terms of any of the Loan Documents or materially impair the rights of Borrower under such Loan Documents.

(e)    Except as otherwise provided in this Section 9.25 Lender shall not, as between Borrower Parties and Lender, be relieved of any of its obligations hereunder as a result of any sale, assignment, transfer or negotiation of, or granting of participation in, all or any part of the Loan or other Obligations owed to Lender. Lender may furnish any information concerning Borrower Parties in the possession of Lender from time to time to assignees and participants (including prospective assignees and participants), subject to confidentiality requirements hereunder.

(f)    Notwithstanding any other provision set forth in this Agreement:

(i)    Lender may at any time create a security interest in all or any portion of its rights under this Agreement, including, without limitation, the Loan owing to it and the Notes held by it and the other Loan Documents and Collateral.

(ii)    (A) Lender and its Affiliates shall not be required to execute and deliver any documentation in connection with any transaction involving its Affiliates or lender, (B) no lender to or funding or financing source of Lender or its Affiliates shall be considered a Transferee, (C) there shall be no limitation or restriction on Lender's ability to assign or otherwise transfer any Loan Document to any such Affiliate or lender or funding or financing source, and (D) there shall be no limitation or restriction on such Affiliates' or lenders' or financing or funding sources' ability to assign or otherwise transfer any Loan Document, Loan, Note or Obligation (or any of its rights thereunder or interest therein).

(g)    The Loan Documents shall inure to the benefit of Lender, any Transferee, any Participant (to the extent expressly provided herein only) and all future holders of the Notes, the Obligations and/or any of the Collateral, and each of their respective successors and permitted assigns. Each Loan Document shall be binding upon the Persons that are parties thereto and their respective successors and assigns, and no such Person other than Lender may assign, delegate or transfer any Loan Document or any of its rights or obligations thereunder without the prior written consent of Lender. No rights are intended to be created under any Loan Document for the benefit of any third party donee, creditor or incidental beneficiary of Borrower.

Nothing contained in any Loan Document shall be construed as a delegation to Lender of any other Person's duty of performance. Borrower acknowledges and agrees that Lender at any time and from time to time may (i) divide and reissue (without substantive changes other than those resulting from such division) the Notes, and/or (ii) sell, assign or grant participating interests in or transfer all or any part of its rights or obligations under any Loan Document, Note, the Obligations and/or the Collateral to other Persons, in each case on the terms and conditions provided herein. Each Transferee and Participant shall have all of the rights, obligations and benefits with respect to the Obligations, Notes, Collateral and/or Loan Documents held by it as fully as if the original holder thereof; provided, that, notwithstanding anything to the contrary in any Loan Document, Borrower shall not be obligated to pay under this Agreement to any Transferee or Participant any sum in excess of the sum which it would have been obligated to pay to Lender had such participation not been effected. Lender may disclose to any Transferee or Participant all information, reports, financial statements, certificates and documents obtained under any provision of any Loan Document; provided, that Transferees and Participants shall be subject to the confidentiality provisions contained herein that are applicable to Lender. Borrower shall, at Borrower's sole cost and expense, execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to consummate the actions contemplated by this Section 9.25.

(h)    Lender may assign or pledge all or any portion of the Loan to the FDIC, any Federal Reserve Bank, the Federal Home Loan Bank or the United States Treasury as collateral security to secure obligations of Lender, including without limitation, any assignment or pledge pursuant to Regulation A of the Board of Governors of the Federal Reserve System and any Operating Circular issued by such Federal Reserve Bank; provided, that any payment in respect of the Loan made by Borrower to or for the account of Lender in accordance with the terms of this Agreement shall satisfy Borrower's obligations hereunder in respect to the Loan to the extent of such payment. No such assignment shall release Lender from its obligations hereunder.

(i)    If requested by Lender, Borrower shall use commercially reasonable efforts to assist Lender in satisfying the due diligence or other underwriting requirements of any proposed or prospective Transferee or Participant (including, without limitation, with respect to the form of Loan Documents), including, without limitation, to:

(i)    provide updated appraisals, environmental audits, reviews and reports, property condition reports and other due diligence investigations of the Property (such information shall hereinafter be referred to collectively as the "**Updated Information**"), together with appropriate verification of the Updated Information through letters or certificates of appraisers, engineers, environmental assessment experts and other experts or third party providers of such information, reports or Updated Information, in form and substance acceptable to Lender and such proposed or prospective Transferee or Participant;

(ii)    provide opinions of counsel, which may be relied upon by Lender and such proposed or prospective Transferee or Participant, and their respective counsel, agents and representatives, as to the Loan Documents and/or bankruptcy non-consolidation or any other opinion customary in limited recourse financing transactions with respect to real properties

similar to the Property, which counsel and opinions shall be reasonably satisfactory to Lender and such proposed or prospective Transferee or Participant;

(iii)    provide, and cause to be provided, updated representations and warranties made in the Loan Documents and make, and cause to be made, such additional representations and warranties as reasonably may be requested by Lender or such proposed or prospective Transferee or Participant and consistent with the facts covered by such representations and warranties as they exist on the date thereof;

(iv)    execute, and cause to be executed, such amendments, replacements or other modifications to Borrower's or Parent's organizational documents or the Loan Documents as may be requested by Lender or such proposed or prospective Transferee or Participant; provided, however, that Borrower shall not be required (i) to amend, restate or otherwise modify any organizational document, other than to comply with then-customary criteria for bankruptcy-remote, special purpose companies in transactions comparable to the Loan, or (ii) to amend, restate or otherwise modify any Loan Document if such amendment, restatement or other modification would (A) increase the weighted average interest rate or change the amortization of principal set forth herein or in the Note (except that the weighted average interest rate or the amortization of principal may subsequently change due to involuntary prepayments or if an Event of Default shall occur), (B) amend or otherwise modify any other material economic term of the Loan or (C) make any material term or provision of such Loan Document materially more onerous to Borrower;

(v)    attend meetings with such proposed or prospective Transferee or Participant, provide access to the Property and conduct tours of the Property; and

(vi)    Borrower agrees that Lender may disclose any information relating to Borrower, its Affiliates, the Property or any aspect of the Loan (including information provided by or on behalf of Borrower or any of its Affiliates to Lender) to any proposed or prospective Transferee or Participant.

**Section 9.25    Limitation on Liability of Lender's Members, Employees, Etc.** Any obligation or liability whatsoever of Lender which may arise at any time under this Agreement or any other Loan Document shall be satisfied, if at all, out of Lender's assets only. No such obligation or liability shall be personally binding upon, nor shall resort for the enforcement thereof be had to, the property of Lender's members, shareholders, directors, officers, employees or agents, regardless of whether such obligation or liability is in the nature of contract, tort or otherwise.

**Section 9.26    Confidentiality and Publicity**

(a)    Borrower and Lender hereby agree that either party or any Affiliate thereof may (i) disclose a general description of transactions arising under the Loan Documents for advertising, marketing or other similar purposes and (ii) use Borrower's or any Borrower Party's name, logo or other indicia germane to such party in connection with such advertising, marketing or other similar purposes. Borrower agrees, and agrees to cause each of its Affiliates, (A) not to transmit or disclose any provision of any Loan Document to any Person (other than to

Borrower's advisors and officers on a need-to-know basis) without Lender's prior written consent, (B) to inform all Persons of the confidential nature of the Loan Documents and to direct them not to disclose the same to any other Person and to require each of them to be bound by these provisions and (C) not to use Lender's name (or the name of any of Lender's Affiliates) in connection with any press releases or such similar purposes without Lender's prior written consent.

(b)     Lender and Borrower shall exercise commercially reasonable efforts to maintain in confidence, in accordance with its customary procedures for handling confidential information, all written non-public information of any party to any Loan Document that any party to any Loan Document furnishes on a confidential basis ("**Confidential Information**"), other than any such Confidential Information that becomes generally available to the public or becomes available to Lender or Borrower from a source other than a party to a Loan Document and that is not known to such recipient to be subject to confidentiality obligations; provided, that Lender, Borrower and their respective Affiliates shall have the right to disclose Confidential Information to: (i) any Borrower Party or its Affiliates, (ii) such Person's Affiliates; (iii) such Person's or such Person's Affiliates' lenders, funding or financing sources; (iv) such Person's or such Person's Affiliates' directors, officers, trustees, partners, members, managers, employees, agents, advisors, representatives, attorneys, equity owners, professional consultants, and portfolio management services; (v) any Person to whom Lender offers or proposes to offer to sell, assign or transfer the Loan or any part thereof or any interest or participation therein; (vi) any Person that provides statistical analysis and/or information services to Lender or its Affiliates; or (vii) any Governmental Authority to which Lender is subject at the request or pursuant to any requirement of such Governmental Authority, or in connection with an examination of Lender by any such Governmental Authority; and any Person (A) to the extent required by applicable law, (B) in response to any subpoena or other legal process or informal investigative demand, or (C) in connection with any Proceeding.

**Section 9.27    Estoppel Certificates**. Within ten (10) Business Days after Lender's request therefor, Borrower shall deliver a duly acknowledged written statement setting forth the amount of the Indebtedness, stating whether any setoffs or defenses exist and the specific nature thereof, and attesting to such other matters with respect to the Loan Documents, or any Indebtedness, which Lender may request. Failure of Borrower to execute, acknowledge and return such statement within the time period herein specified shall be deemed an admission by Borrower that the information contained in the statement is true and correct. Borrower acknowledges that any such statement may be relied upon by any transferee or assignee of Lender, or any other Person participating in the Loan or the Loan Documents.

**Section 9.28    Retention of Servicer**. Lender reserves the right to retain a servicer (a "**Servicer**") selected by Lender to service the Loan, including any "**master servicer**" or "**special servicer**" appointed under the terms of any pooling and servicing agreement or similar agreement entered into as a result of a securitization. Such Servicer shall act as its Lender hereunder with such powers as are specifically delegated to the Servicer by it, whether pursuant to the terms of this Agreement, any pooling and servicing agreement or similar agreement entered into as a result of a securitization or otherwise, together with such other powers as are reasonably incidental thereto. Borrower shall pay any reasonable fees and expenses of the

61

Servicer including, without limitation, fees for portfolio management, capital analytics fees, Default rate fees and Event of Default rate fees.

**Section 9.29   Taxes**.

(a)    Subject to Section 9.30Section 9.30(f), any and all payments by or on account of any obligations of Borrower to Lender under this Agreement or any other Loan Document shall be made free and clear of, and without deduction or withholding for, any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto (including penalties, interest and additions to tax), imposed by any Governmental Authority, excluding, in the case of Lender, (i) such taxes (including income taxes or franchise taxes) as are imposed on or measured by the net income, overall receipts or total capital of Lender by the jurisdiction in which Lender is organized or maintains a lending office or any political subdivision thereof, and (ii) any branch profits taxes imposed by the United States of America (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being referred to specifically for purposes of this Section 9.30 as "**Covered Taxes**").

(b)    In addition, Borrower shall pay to the relevant Governmental Authority any present or future stamp or documentary taxes or any other excise, transfer, or property taxes, charges or similar levies which arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any other Loan Document (hereinafter referred to as "**Other Taxes**").

(c)    Subject to Section 9.30Section 9.30(f), Borrower shall indemnify and hold harmless Lender for the full amount of any and all Covered Taxes or Other Taxes (including any Covered Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 9.30) paid or payable by Lender and any liability (other than any penalties, interest, additions, and expenses that accrue both (i) after the 180th day after the receipt by Lender of written notice of the assertion of such Covered Taxes or Other Taxes and (ii) before the date that Lender provides Borrower with a certificate relating thereto pursuant to Section 9.30Section 9.30(i)) arising therefrom or with respect thereto, whether or not such Covered Taxes or Other Taxes were correctly or legally asserted by the relevant Governmental Authority. Payments under this indemnification shall be made within ten (10) days from the date Lender makes written demand therefor.

(d)    If Borrower shall be required by applicable law to deduct or withhold any Covered Taxes or Other Taxes from or in respect of any sum payable hereunder to Lender, then, subject to Section 9.30Section 9.30(f):

(i)    the sum payable shall be increased to the extent necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 9.30Section 9.30(d)), Lender receives an amount equal to the sum it would have received had no such deductions been made;

(ii)    Borrower shall make such deductions; and

(iii)     Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(e)     Within ten (10) days after the date of any payment by Borrower of Covered Taxes or Other Taxes to a Governmental Authority, Borrower shall furnish to Lender the original or a certified copy of a receipt evidencing payment thereof, or other evidence of payment satisfactory to Lender.

(f)     Borrower will not be required to pay any additional amounts in respect of United States Federal income tax pursuant to Section 9.30Section 9.30(d) to Lender or to indemnify Lender pursuant to Section 9.30Section 9.30(c) to the extent that (i) the obligation to withhold amounts with respect to United Stated Federal income tax existed on the date hereof with respect to Lender or (if with respect to any Transferee) the date a Transferee became a party to this Agreement or, with respect to payments to a lending office newly designated by Lender or a Transferee (a "**New Lending Office**"), the date Lender or a Transferee designated such New Lending Office with respect to the Loan; provided, however, that this clause (i) shall not apply to the extent the additional amounts Lender or a Transferee through a New Lending Office would be entitled to receive (without regard to this clause (i)) do not exceed the additional amounts that Lender or a Transferee making the designation of such New Lending Office would have been entitled to receive in the absence of such transfer by Lender to a Transferee or such designation; or (ii) the Internal Revenue Service has determined (which determination shall be final and non-appealable) that Lender is treated as a "**conduit entity**" within the meaning of Treasury Regulation Section 1.881-3 or any successor provision; provided, however, nothing contained in this clause (ii) shall preclude the payment of additional amounts or indemnity payments by Borrower to the person for whom the "**conduit entity**" is acting.

(g)     If Borrower is required to pay additional amounts to or for the account of Lender pursuant to this Section 9.30, then Lender shall use its reasonable efforts (consistent with legal and regulatory restrictions) to file any certificate or document reasonably requested by Borrower or to designate a lending office from a different jurisdiction (if such a lending office exists) so as to eliminate or reduce any such additional payments by Borrower which may accrue in the future if such filing or changes, in the reasonable judgment of Lender, would not require Lender to disclose information Lender deems confidential and is not otherwise disadvantageous to Lender.

(h)     If Lender, in its reasonable judgment, receives a refund of any Covered Taxes or Other Taxes as to which it has been indemnified by Borrower or with respect to which Borrower has paid additional amounts pursuant to this Section 9.30 it shall promptly pay to Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by Borrower under this Section 9.30 with respect to the Covered Taxes or Other Taxes giving rise to such refund) and any interest paid by the relevant Governmental Authority with respect to such refund; provided, that Borrower, upon the request of Lender, shall repay the amount paid over to Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to Lender in the event Lender is required to repay the applicable refund to such Governmental Authority.

(i)      Lender, if claiming reimbursement or compensation pursuant to this Section 9.30, shall deliver to Borrower a certificate setting forth in reasonable detail the amount payable to Lender hereunder and such certificate shall be conclusive and binding on Borrower in the absence of manifest error.

(j)      The agreements and obligations of Borrower in this Section 9.30 shall survive the payment of all other Obligations.

*[Remainder of page intentionally left blank;*
*signature pages follow]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**BORROWER:**

[_____],
a [_____]

By:_____
  Name:
  Title:

**LENDER:**

**SKYLARK CAPITAL MANAGEMENT, LLC,**
a California limited liability company

By:_____
  Name:
  Title:

[End of Signatures]

# EXHIBIT A

## LEGAL DESCRIPTION OF PROPERTY

[TO BE ATTACHED]

# EXHIBIT B

# [INTENTIONALLY OMITTED]

**EXHIBIT C**

**SINGLE PURPOSE ENTITY PROVISIONS**

Borrower and Parent shall at all times be a Single Purpose Entity. As used herein, "**Single Purpose Entity**" shall mean a corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, or any other form of entity, which complies with the provisions set forth herein, including, without limitation, the requirements that Borrower has not and shall not, and agrees that Parent has not and shall not:

(a)    with respect to Borrower, fail to be organized solely for the purpose of (i) owning the Property, (ii) entering into the Loan Documents to which it is a party, and (iii) engaging in any activity that is incidental, necessary or appropriate to accomplish the foregoing and, with respect to Parent, be organized for any purpose other than (i) owning a one hundred percent (100%) interest in Borrower, and (ii) engaging in any activity that is incidental, necessary or appropriate to the foregoing;

(b)    with respect to Borrower, engage in any business or activity other than the ownership of the Property, and activities incidental thereto, and with respect to Parent, engage in any business or activity other than the ownership of equity interests in Borrower, and activities incidental thereto;

(c)    with respect to Borrower, own any material assets other than (i) the Property, and (ii) such incidental Personal Property as may be necessary for the operation of the Property, and with respect to Parent, own any material asset other than (i) its one hundred percent (100%) equity interest in Borrower, and (ii) such incidental personal property as may be necessary to effectuate its purpose;

(d)    merge into or consolidate with any Person, to the fullest extent permitted by law, dissolve, terminate, wind up or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(e)    fail to preserve its existence as an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization or formation, and, with respect to Borrower, qualification to do business in the state where the Property is located, or without the prior written consent of Lender, amend (other than amendments that are entirely ministerial in nature), modify, terminate or fail to comply with the provisions of Borrower's organizational documents or Parent's organizational documents, as the case may be;

(f)    own, form or acquire any subsidiary or make any investment in, any Person, other than Parent's equity ownership interest in Borrower;

(g)    commingle its assets with the assets of any of its equitable or beneficial owners, affiliates, principals or of any other Person nor fail to hold all of its assets in its own name;

Exhibit C - 1

(h)    incur any Debt other than the Indebtedness and Permitted Debt which is paid when due;

(i)    fail to intend to remain solvent and pay its debts and liabilities from its assets as the same shall become due;

(j)    fail to maintain its records, books of account and bank accounts separate and apart from those of the equitable or beneficial owners, principals and affiliates of Borrower or of Parent, as the case may be, the affiliates of an equitable or beneficial owner or principal of Borrower or Parent, as the case may be, and any other Person or fail to maintain such books and records in the ordinary course of its business;

(k)    except with respect to any contract or agreement expressly identified in the [operating agreement] of Borrower, enter into any contract or agreement with any equitable or beneficial owner, principal or affiliate of Borrower or of Parent, as the case may be, any Guarantor, or any equitable or beneficial owner, principal or affiliate thereof, except upon terms and conditions that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arms-length basis with third parties other than any equitable or beneficial owner, principal or affiliate of Borrower or of Parent, as the case may be, any Guarantor or any equitable or beneficial owner, principal or affiliate thereof;

(l)    to the fullest extent permitted by law, seek the dissolution or winding up in whole, or in part, of Borrower or of Parent, as the case may be;

(m)    fail to use commercially reasonable efforts to correct any known misunderstandings regarding the separate identity of Borrower, or of Parent, as the case may be from any equitable or beneficial owner, principal or affiliate thereof or any other Person;

(n)    guaranty or become obligated for the debts of any other Person or hold out its credit as being able to satisfy the debts of another Person; make any loans or advances to any third party, including any equitable or beneficial owner, principal or affiliate of Borrower, or of Parent, as the case may be, or any equitable or beneficial owner, principal or affiliate thereof, nor buy or hold evidence of indebtedness issued by any other Person (other than cash or investment grade securities);

(o)    (i) fail to pay any taxes required to be paid by it under applicable law or  fail to file its own tax returns, or file a consolidated federal income tax return with any other entity, except to the extent that Borrower is treated as a "**disregarded entity**" for tax purposes and is not required to file tax returns under any applicable law;

(p)    fail to hold itself out to the public as a legal entity separate and distinct from any other Person;

(q)    fail to conduct its business solely in its own name, mislead others as to the identity with which such other party is transacting business, or suggest that Borrower or Parent, as the case may be, is responsible for the debts of any third party (including any equitable or beneficial owner, principal or affiliate of Borrower, or of Parent, as the case may be, or any equitable or beneficial owner, principal or affiliate thereof);

Exhibit C - 2

(r)    fail to intend to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; provided, however, that Borrower's members shall not be obligated to make additional capital contributions beyond their initial capital contributions;

(s)    hold itself out as or be considered as a department or division of (i) any equitable or beneficial owner, principal, or affiliate of Borrower or of Parent, as the case may be, (ii) any affiliate of an equitable or beneficial owner or principal of Borrower or of Parent, as the case may be, or (iii) any other Person;

(t)    fail to maintain separate financial statements and accounting records, showing its assets and liabilities separate and apart from those of any other Person (except that Borrower may be included in consolidated financial statements of another Person, so long as (i) its separate assets shall be clearly indicated as such on such statement and such statements will indicate that Borrower's assets and credit are available to satisfy the debts and other obligations of any other Person, and (ii) such assets shall also be listed on Borrower's own separate balance sheet);

(u)    fail to observe all applicable organizational formalities;

(v)    fail to pay its own liabilities, including but not limited to the salaries of its own employees (if any are required), from its own funds;

(w)    fail to maintain a sufficient number of employees (if any are required) in light of its contemplated business operations;

(x)    fail to allocate fairly and reasonably any overhead expenses that are shared with an affiliate, including paying for office space and services performed by any employee of an affiliate;

(y)    fail to use separate stationery, invoices and checks bearing its own name;

(z)    pledge its assets for the benefit of any other Person, other than in connection with the Loan;

(aa)   acquire the obligations or securities of any equitable or beneficial owner, principal or affiliate of Borrower or of Parent, as the case may be, any Guarantor or any equitable or beneficial owner, principal or affiliate thereof;

(bb)   fail to maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other entity;

(cc)   with respect to Borrower, have any obligation to indemnify its equitable or beneficial owners, officers, directors or affiliates, as the case may be, or have such an obligation only if it is fully subordinated to the Loan and will not constitute a claim against it in the event that cash flow in excess of the amount required to pay the Loan is insufficient to pay such obligation;

Exhibit C - 3

(dd)    fail, to the fullest extent permitted by law, to consider the interests of its creditors in connection with all actions;

(ee)    have any of its obligations guaranteed by any equitable or beneficial owner, principal or affiliate of Borrower except Guarantor;

(ff)    fail to be formed and organized as a limited liability company under the laws of the State of [_____]

(gg)    take for itself or cause any other Person to take any of the following actions without the prior unanimous written consent of the partners, members or managers, as applicable and the Independent Manager (as defined below) of Borrower: (i) file or consent to the filing of any bankruptcy, insolvency or reorganization case or proceeding; institute any proceedings under any applicable insolvency law; file an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature or otherwise seek any relief under any laws relating to the relief from debts or the protection of debtors generally, (ii) seek, consent to or acquiesce to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for itself or any other entity, (iii) make an assignment of its assets for the benefit of its creditors or an assignment of the assets of another entity for the benefit of such entity's creditors, or (iv) take any action in furtherance of the foregoing.

(hh)    with respect to the Borrower, fail to have one (1) **"Springing Member"**. The Springing Member shall have no interest in the Borrower of any nature whatsoever unless and until the Springing Member is admitted as a member of the Borrower in accordance with this subparagraph (hh). Upon the occurrence of any event that causes the Parent to cease to be a member of the Borrower (a **"Member Cessation Event"**), the Springing Member, shall, without any action of any Person and simultaneously with a Member Cessation Event, automatically be admitted to the Borrower as a member and the Borrower's existence and purpose shall continue without dissolution. It is the intent of this subparagraph (hh) that the Borrower never have more than one (1) Springing Member at any particular point in time. No Springing Member may resign from the Borrower or transfer its rights as Springing Member (or as member) unless a successor Springing Member (or member) has been admitted to the Borrower as a Springing Member (or member) by executing a counterpart to Borrower's operating agreement; provided, however, the Springing Member shall automatically cease to be a member of the Borrower upon the admission to the Borrower of a substitute member for the Parent which succeeds to the rights and interests of the Parent under Borrower's operating agreement. A Springing Member, in her, his or its capacity as such or as a member of the Borrower after her, his or its admission as a member, shall have no interest in the profits, losses and capital of the Borrower and has no right to receive any distributions of the Borrower. A Springing Member, in her, his or its capacity as such or as a member of the Borrower after her, his or its admission as a member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, the Borrower, including, without limitation, the merger, consolidation or conversion of the Borrower. Prior to her, his or its admission to the Borrower as a member in accordance with this subparagraph (hh), no Springing Member shall not be a member of the Borrower.

Exhibit C - 4

(ii)    with respect to the Borrower, fail at any time to have at least one (1) independent manager that is not and has not been for at least five (5) years:

(i)    a manager (other than in its capacity as an independent manager of Borrower or an affiliate), officer, employee, trustee, trade creditor, customer, supplier, member attorney, counsel or shareholder (or spouse, parent, sibling or child of the foregoing) of (i) Borrower, (ii) a principal of Borrower, (iii) any equitable or beneficial owner, partner, principal or affiliate of Borrower or of a principal of any such Person, or (iv) any affiliate of any equitable or beneficial owner, partner, or principal of Borrower or of a principal of any such Person; or

(ii)    a creditor, customer, supplier or Person who derives any of its purchases or revenues from its activities with (i) Borrower, (ii) a principal of Borrower, (iii) any equitable or beneficial owner, partner, principal or affiliate of Borrower or Parent or of a principal of any such Person, or (iv) any affiliate of any equitable or beneficial owner, partner, or principal of Borrower or of a principal of any such Person; (each such independent manager, an "**Independent Manager**");

a natural person who satisfies the foregoing definition other than <u>subparagraph (ii)</u> shall not be disqualified from serving as an Independent Manager of Borrower if such individual is an Independent Manager provided by a nationally-recognized company that provides professional independent managers (a "**Professional Independent Manager**") and other corporate services in the ordinary course of its business. A natural person who otherwise satisfies the foregoing definition other than <u>subparagraph (i)</u> by reason of being the independent manager of a "special purpose entity" affiliated with Borrower shall not be disqualified from serving as an Independent Manager of Borrower if such individual is either (i) a Professional Independent Manager or (ii) the fees that such individual earns from serving as Independent Manager of affiliates of Borrower in any given year constitute in the aggregate less than five percent (5%) of such individual's annual income for that year.

For purposes of this <u>Exhibit C</u> only, an "**affiliate**" of a Person shall mean (i) any other Person directly or indirectly Controlling, Controlled by, or under direct or indirect common Control with such Person, or (ii) any director, officer, employee, manager, child or spouse (or any trust for the benefit of a child or spouse) of any Person described in subsection (i) above.

Exhibit C - 5

## EXHIBIT D

### INSURANCE POLICIES

(a)  <u>Liability Insurance</u>. For so long as any Obligation is outstanding, Borrower shall continuously maintain liability insurance in accordance with the following provisions:

(i)  <u>Commercial General Liability Insurance</u>. Borrower shall maintain commercial general liability insurance, including bodily injury and property damage liability insurance against any and all claims, including all legal liability to the extent insurable and imposed upon Lender and all court costs and attorneys' fees and expenses, arising out of or connected with the possession, use, leasing, operation, maintenance or condition of the subject property in the minimum amount of Five Million and No/100 Dollars ($5,000,000.00) per occurrence and Ten Million and No/100 Dollars ($10,000,000.00 in the aggregate. A combination of primary and umbrella/excess liability insurance policies can be obtained to satisfy these liability limits requirements. Such liability insurance must be occurrence-based coverage, rather than claims made coverage. This insurance must stand on its own with no shared participation or proration and be on a following form basis.

(b)  <u>Additional Insurance</u>. Borrower shall maintain such other insurance with respect to Borrower and the subject property against loss or damage of the kinds from time to time required by Lender loan class requirements to the extent such additional insurance is for perils and in amounts customarily required by institutional lender for properties or commercial activities comparable to the Property or commercial activities and to the extent such other insurance is available at commercially reasonable rates.

(c)  <u>Insurance Company Rating/Qualification</u>. The insurance company or companies issuing the policies required hereunder (each, a "**Policy**", and collectively, the "**Policies**") each must be a U.S. domestic insurance standard stock company or non-participating mutual company that is a primary insurer and has a current general policy rating of A- or better and a current financial size category of VIII or better by A.M. Best Company, Inc. All insurers must be licensed and in good standing in the state in which the Property is located and otherwise be acceptable to Lender.

(d)  <u>Named Insured; Additional Insured</u>. All Policies shall name Borrower as the insured. Each Policy shall name Lender as an additional insured.

(e)  <u>Required Provisions</u>. All Policies shall contain: (1) the agreement of the insurer to give Lender at least thirty (30) days' notice prior to cancellation or expiration and at least ten (10) days' notice on non-payment of premium; (2) a waiver of subrogation rights against Lender and, if available, Borrower; (3) an agreement that such Policies are primary and non-contributing with any insurance that may be carried by Lender; (4) a statement that the insurance shall not be invalidated should any insured waive in writing prior to a loss any or all right of recovery against any party for loss accruing to the property described in the Policy; and (5) if obtainable, a provision that no act or omission of Borrower shall affect or limit the obligation of the insurance carrier to pay the amount of any loss sustained. As of the date hereof, and subject to any changes in such requirements which Lender may, in its sole discretion, make from time to time pursuant

to its rights under this Exhibit D, each Policy shall contain a mortgagee's Loss Payable endorsement, "**Lender Clause**", or other non-contributory mortgagee clause of similar form and substance acceptable to Lender in favor of Lender as a first mortgagee.

**EXHIBIT E**

**LIST OF LOAN DOCUMENTS AND OTHER DOCUMENTS**

16.    Loan Agreement executed by Borrower and Lender

17.    Promissory Note executed by Borrower

18.    Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing executed by Borrower, as trustor, in favor of [_____], as trustee, for the benefit of Lender

19.    Indemnity Agreement executed by Guarantor in favor of Lender

20.    Environmental Indemnity Agreement executed by Borrower and Guarantor in favor of Lender

21.    Assignment of Agreements executed by Borrower in favor of Lender

22.    Company Certificate executed by Borrower

23.    Contingent Interest Agreement

24.    UCC-1 Financing Statement (_____)

25.    Post-Closing Agreement

26.    Borrower and Guarantor's Certificate executed by Borrower and Guarantor

27.    Borrower Pledge Agreement executed by Borrower in favor of Lender

28.    Parent Pledge Agreement executed by Parent in favor of Lender

**EXHIBIT F**

**SCHEDULE I**

**ENVIRONMENTAL REPORTS**

[TO BE LISTED, IF APPLICABLE]

**EXHIBIT F**

**SCHEDULE II**

**BORROWER'S ORGANIZATIONAL CHART**

[TO BE ATTACHED]

**SCHEDULE I**

**ENVIRONMENTAL REPORTS**

[TO BE LISTED, IF APPLICABLE]

**SCHEDULE II**

**BORROWER'S ORGANIZATIONAL CHART**

[TO BE ATTACHED]

# EXHIBIT C

## PROMISSORY NOTE

$92,775,000.00                                                    July 31, 2018

      **FOR VALUE RECEIVED, TREETOP DEVELOPMENT, LLC**, a California limited liability company ("**Borrower**"), promises to pay to the order of **SKYLARK CAPITAL MANAGEMENT, LLC**, a California limited liability company ("**Skylark**" and, together with all subsequent holders of this Note, "**Holder**"), at its offices located at 9601 Wilshire Boulevard, 7th Floor, Beverly Hills, California 90210, or at such other place as Holder hereof may designate in writing from time to time, in lawful money of the United States of America and in immediately available funds, the principal amount of **NINETY-TWO MILLION SEVEN HUNDRED SEVENTY-FIVE THOUSAND AND NO/100 DOLLARS ($92,775,000.00)** or, if less, the aggregate outstanding principal amount of loans and advances made to Borrower pursuant to the Loan Agreement dated as of July 31, 2018 (as amended or otherwise modified from time to time, the "**Loan Agreement**") between Borrower and Skylark, and to pay interest on the unpaid principal amount from time to time outstanding hereunder on each Monthly Payment Date at the rate or rates of interest provided therefor in the Loan Agreement *plus* Contingent Interest (as defined in the Contingent Interest Agreement dated as of July 31, 2018 (the "**Contingent Interest Agreement**") between Borrower and Skylark, which is attached hereto as **Annex A** and is incorporated herein by reference and forms a part of this Note) on the dates and in the amounts set forth in the Contingent Interest Agreement.  This Note evidences the obligation of Borrower to repay the Loan and all other Obligations of Borrower under the Loan Agreement and the other Loan Documents, to pay accrued interest on the Loan, to pay Prepayment Premium and the Exit Fee (if any, and if applicable), and to pay Contingent Interest. The Borrower's obligations under this Note and the other Loan Documents (including, without limitation, the Contingent Interest Agreement) are secured by, among other things, the Construction Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of July 31, 2018 made by Borrower, as trustor, for the benefit of Holder encumbering the Property.  Terms defined in the Loan Agreement and not otherwise defined herein are used herein as therein defined.

      Borrower shall make payments of principal of this Note and accrued interest on the principal balance of this Note and all other Obligations in accordance with the provisions of the Loan Agreement.

      If not sooner paid, the entire outstanding principal amount of this Note and all accrued interest hereon (other than Contingent Interest, which shall be paid on the dates and in the amounts provided in the Contingent Interest Agreement) shall be paid on the Maturity Date.

      Interest on the principal amount of this Note outstanding from time to time will accrue from the date of this Note until payment in full thereof in accordance with the applicable provisions of the Loan Agreement.

      Payments of Contingent Interest shall be made on the dates and in the amounts set forth in the Contingent Interest Agreement.  Such dates may occur before, on and/or after the Maturity Date.  If the Contingent Interest Agreement has not terminated in accordance with its terms, and all Contingent Interest due and payable thereunder has not been paid in full, on or before the date

Loan, then this Note shall continue in full force and effect after payment in full of principal of and such interest on the Loan, to evidence Borrower's obligation to pay Contingent Interest. This Note may continue in full force and effect after the Maturity Date (notwithstanding payment in full of principal of and accrued interest on the Loan on or before the Maturity Date) if the Contingent Interest Agreement continues in effect, until all Contingent Interest has been paid in full.

Borrower may prepay the principal amount outstanding from time to time hereunder as provided in the Loan Agreement, subject to concurrent payment of any Prepayment Premium and the Exit Fee (if applicable), and other restrictions on such prepayment set forth in the Loan Agreement.

This Note is the "Note" as defined in and made pursuant to the Loan Agreement, and all of the terms, covenants and conditions of the Loan Agreement (including all Exhibits and Schedules thereto) and all other instruments evidencing or securing the indebtedness hereunder are hereby made a part of this Note and are deemed incorporated herein.

Upon the occurrence and during the continuance of an Event of Default (or upon the occurrence of any "Sale" or "Other Triggering Event" or any "Recovery" (as such terms are defined in the Contingent Interest Agreement) which results in the full repayment of the principal amount of this Note), Holder may, at its option and in accordance with the terms of the Loan Agreement and the other Loan Documents, in addition to any other remedies to which it may be entitled by law, declare the total unpaid principal amount of the indebtedness evidenced hereby, together with all accrued but unpaid interest thereon, including without limitation all Contingent Interest then due but unpaid, and all other sums owing hereunder, under the Loan Agreement or under any other Loan Document, to be immediately due and payable.

All agreements between Borrower and Holder are expressly limited so that in no contingency or event whatsoever, whether by reason of advancement of the proceeds hereof, acceleration of maturity of the unpaid principal balance hereof, or otherwise, shall the amount paid or agreed to be paid to Holder for the use, forbearance or detention of the money to be advanced hereunder exceed the highest lawful rate permissible under applicable usury laws. If, from any circumstances whatsoever, fulfillment of any provision hereof, of the Loan Agreement or of any other Loan Documents shall involve transcending the limit of validity prescribed by any law which a court of competent jurisdiction may deem applicable hereto, then, *ipso facto*, the obligation to be fulfilled shall be reduced to the limit of such validity, and, if from any circumstance Holder shall ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance due hereunder and not to the payment of interest. This provision shall control every other provision of all agreements between Borrower and Holder with respect to the Loan.

Time is of the essence in performance of Borrower's obligations under this Note.

**OTHER THAN THE NOTICES EXPRESSLY REQUIRED UNDER THE PROVISIONS OF THE LOAN AGREEMENT, PRESENTMENT FOR PAYMENT, NOTICE OF NONPAYMENT OR DISHONOR, PROTEST, NOTICE OF PROTEST,**

**DEMAND, NOTICE OF DEMAND, NOTICE OF ACCELERATION OR INTENT TO ACCELERATE AND ALL OTHER NOTICES IN CONNECTION WITH THE DELIVERY, ACCEPTANCE, PERFORMANCE, DEFAULT OR ENFORCEMENT OF THIS NOTE ARE HEREBY IRREVOCABLY WAIVED BY BORROWER TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW.**

No single or partial exercise of any power hereunder, under the Loan Agreement or under any other Loan Document shall preclude other or further exercise thereof or the exercise of any other power. Holder shall at all times following the occurrence and during the continuance of an Event of Default have the right to proceed against any portion of the Collateral in such order and in such manner as Holder may deem fit, without waiving any rights with respect to any other security. No delay or omission on the part of Holder in exercising any right or remedy hereunder or under the Loan Agreement or under any other Loan Document shall operate as a waiver of such right or remedy or of any other right or remedy under this Note nor as a waiver of such right or remedy in connection with any future default.

In the event any one or more of the provisions contained in this Note shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Note, but this Note shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

**TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER AND HOLDER (BY ITS ACCEPTANCE HEREOF) EACH HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVE ANY AND ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND OR CLARIFY ANY RIGHT, POWER, REMEDY OR DEFENSE ARISING OUT OF OR RELATED TO THIS NOTE, THE OTHER LOAN DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN, WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE, OR WITH RESPECT TO ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY. BORROWER AND HOLDER (BY ITS ACCEPTANCE HEREOF) AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A JUDGE AND NOT BEFORE A JURY. BORROWER AND HOLDER FURTHER WAIVE ANY RIGHT TO SEEK TO CONSOLIDATE ANY SUCH LITIGATION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER LITIGATION IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED. FURTHER, BORROWER HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF HOLDER, NOR ANY HOLDER'S COUNSEL, HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT HOLDER WOULD NOT, IN THE EVENT OF SUCH LITIGATION, SEEK TO ENFORCE THIS WAIVER OF RIGHT TO JURY TRIAL PROVISION. BORROWER ACKNOWLEDGES THAT THE PROVISIONS OF THIS PARAGRAPH ARE A MATERIAL INDUCEMENT TO HOLDER'S ACCEPTANCE OF THIS NOTE AND THE OTHER LOAN DOCUMENTS.**

This Note and all transactions hereunder or evidenced herein shall be governed by, and construed and enforced in accordance with, the internal laws of the State of California, without regard to conflict of laws principles .

This Note shall not constitute nor effect a novation of any of the obligations, liabilities and indebtedness of Borrower under the Loan Agreement or any other Loan Document, and such obligations, indebtedness, and liabilities of Borrower shall continue in full force and effect and the liens and security interests granted under the Loan Documents securing payment thereof shall be continuing.

All notices or other written communications hereunder shall be delivered in accordance with Section 9.1 of the Loan Agreement.

Upon transfer of this Note in accordance with the terms and conditions of the Loan Agreement, Borrower hereby waives notice of any such transfer (unless required by the terms and conditions of the Loan Agreement), and Holder may deliver all Collateral, or any part thereof, to the transferee.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, Borrower has caused this Promissory Note to be signed in its corporate name by its duly authorized officer on the date fist above written.

**BORROWER:**

**TREETOP DEVELOPMENT, LLC,**
a California limited liability company

By:    Casablanca Grand LLC,
       a California limited liability company,
       its sole member

       By:_____
       Name:  Mohamed Hadid
       Title:  Sole Member and Manager

S - 1

# EXHIBIT D

**RECORDING REQUESTED BY,**
**AND AFTER RECORDING RETURN TO:**

Eisner, P.C.
9601 Wilshire Blvd., 7th Floor
Beverly Hills, California 90210
Attn: Brian D. Kilb

(SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY)

## CONSTRUCTION DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING

ATTENTION COUNTY RECORDER: THIS INSTRUMENT IS INTENDED TO BE EFFECTIVE AS A FINANCING STATEMENT FILED AS A FIXTURE FILING PURSUANT TO SECTION 9502 OF THE CALIFORNIA COMMERCIAL CODE. PORTIONS OF THE GOODS COMPRISING A PART OF THE MORTGAGED PROPERTY ARE OR ARE TO BECOME FIXTURES RELATED TO THE REAL PROPERTY DESCRIBED IN <u>EXHIBIT A</u> HERETO. THIS INSTRUMENT IS TO BE FILED FOR RECORD IN THE RECORDS OF THE COUNTY WHERE DEEDS OF TRUST ON REAL PROPERTY ARE RECORDED AND SHOULD BE INDEXED AS BOTH A DEED OF TRUST AND AS A FINANCING STATEMENT COVERING FIXTURES. THE ADDRESSES OF TRUSTOR (DEBTOR) AND AGENT (SECURED PARTY) ARE SPECIFIED IN SECTION 7.1 OF THIS INSTRUMENT.

THIS DEED OF TRUST SECURES A NOTE AND LOAN AGREEMENT WHICH PROVIDE FOR A VARIABLE INTEREST RATE AND CONTINGENT INTEREST, AND THE LOAN AGREEMENT IS A SHARED APPRECIATION LOAN.

NOTE: THIS DEED OF TRUST SECURES AN OBLIGATION INCURRED IN PART FOR THE CONSTRUCTION OF IMPROVEMENTS ON LAND AND IS A "CONSTRUCTION MORTGAGE" AS THAT TERM IS DEFINED IN CALIFORNIA COMMERCIAL CODE SECTION 9334(h).

THIS CONSTRUCTION DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING (this "**Security Instrument**") is made as of July 31, 2018, by **TREETOP DEVELOPMENT, LLC**, a California limited liability company ("**Trustor**"), to **FCI LENDER SERVICES, INC.**, a California corporation, as trustee ("**Trustee**"), for the benefit of **SKYLARK CAPITAL MANAGEMENT, LLC**, a California limited liability company ("**Lender**").

## RECITALS:

A.    Trustor is the owner of (i) a fee simple interest in the Real Property (as hereinafter defined) and (ii) title to the Improvements (as hereinafter defined).

B.    Lender has agreed to make a loan to Trustor in the maximum principal amount of up to NINETY-TWO MILLION SEVEN HUNDRED SEVENTY-FIVE THOUSAND AND NO/100 DOLLARS ($92,775,000.00) (the "**Loan**") pursuant to that certain Loan Agreement of even date herewith by and between Trustor and Lender (said Loan Agreement and any and all extensions and renewals thereof, amendments thereto and substitutions or replacements therefor is referred to herein as the "**Loan Agreement**").

B.    The Loan is evidenced by that certain Promissory Note dated as of even date herewith in the stated maximum principal amount of the Loan, made by Trustor payable to the order of Lender (as the same may be amended, modified, restated, severed, consolidated, renewed, replaced or supplemented from time to time, the "**Note**"). This Security Instrument, the Loan Agreement, the Note, and any of the other documents evidencing or securing the Loan, as amended, supplemented or otherwise modified from time to time, are collectively referred to as the "**Loan Documents**".

**NOW, THEREFORE**, Trustor, in consideration of the Indebtedness (as hereinafter defined), the Other Obligations (as hereinafter defined) and the trust created by this Security Instrument, irrevocably grants, conveys and assigns to Trustee, in trust, with power of sale, Trustor's interest in the Mortgaged Property (as hereinafter defined).

**TO SECURE TO LENDER** the repayment of the Indebtedness, and all renewals, extensions and modifications of the Indebtedness, together with the Other Obligations, including without limitation the payment of all sums advanced by or on behalf of Lender to protect the security of this Security Instrument, and the performance of the covenants and agreements of Trustor contained in the Loan Documents.

Trustor represents and warrants that Trustor is lawfully seized of the Mortgaged Property and has the right, power and authority to grant, convey and assign the Mortgaged Property, and that the Mortgaged Property is unencumbered (other than the Permitted Exceptions). Trustor covenants that Trustor will warrant and defend generally the title to the Mortgaged Property against all claims and demands, subject to the Permitted Exceptions.

1.    **DEFINITIONS; RECITALS.** Certain terms used in this Security Instrument are defined below and certain other terms used in this Security Instrument are defined elsewhere in this Security Instrument. All capitalized terms used herein and not defined herein shall have the

meanings assigned to such terms in the Loan Agreement. All recitals to this Security Instrument are hereby incorporated by reference as if expressly set forth herein.

**1.1** "**Events of Default**" shall mean the occurrence of an "**Event of Default**" pursuant to the Loan Agreement or a default, beyond any applicable notice and cure periods in any other Loan Document, if any.

**1.2** "**Fixtures**" has the meaning given to such term in the definition of "**Mortgaged Property**."

**1.3** "**Improvements**" has the meaning given to such term in the definition of "**Mortgaged Property**."

**1.4** "**Indebtedness**" means all present and future indebtedness evidenced by or arising under the Note or the Loan Agreement with respect to the Loan, or under any other Loan Document, together with interest thereon and all other sums due to Lender in respect of the Loan under any Loan Document (including sums added to the principal balance of the Loan in accordance with the terms of any Loan Document, all Protective Advances, Prepayment Premiums, Past Due Charges, and all other charges, fees, costs and expenses payable pursuant any Loan Document).

**1.5** "**Leases**" means all leases, subleases, licenses, concessions, tenancies, occupancy agreements and other agreements entered into by or on behalf of Trustor (or any predecessor of Trustor, to the extent Trustor or the Mortgaged Property (hereinafter defined) remain subject thereto), whether made before or after the filing by or against Trustor of any petition for relief under 11 U.S.C. § 101, et seq., as the same may be amended from time to time (the "**Bankruptcy Code**"), demising, leasing or granting rights of possession or use of all or any portion of the Mortgaged Property, together with all modifications, extensions or renewals thereof now existing or hereafter permitted under the Loan Documents.

**1.6** "**Loan Documents**" means this Security Instrument, the Loan Agreement, the Note, and all other documents and instruments now and hereafter evidencing or securing the Loan or the obligations secured by this Security Instrument, as amended, supplemented or otherwise modified from time to time. The Environmental Indemnity is not one of the "Loan Documents" as defined in the Loan Agreement.

**1.7** "**Mortgaged Property**" means all of Trustor's right, title and interest in, to and under the following: the Real Property; all buildings and other improvements ("**Improvements**") now or hereafter located on the Real Property, and any and all right, title or interest in any other real property or improvements comprised in the Real Property, which right, title or interest is acquired by Trustor after the date of this Security Instrument; the Personal Property; all development rights transferred or appurtenant to the Real Property, all easements and other rights now or hereafter made appurtenant to the Real Property; all additions and accretions to the Real Property; all fixtures, machinery, equipment, and appliances at any time attached to, or located in or on the Real Property in which Trustor has an interest (the "**Fixtures**"); all rights in or to existing or future streets or public places; all existing and future minerals, oil, gas and other hydrocarbon substances upon, under or through the Real Property; all water and water rights,

705816_3

pumps and pumping plants, and existing and future water stock relating thereto, if any; all existing and future shares of stock or other evidence of ownership of any part of the foregoing property and all intangible property and rights relating to the foregoing property, or the operation thereof or used in connection therewith, including all options, sales contracts and rights of first refusal of any nature whatsoever, covering all or any portion of such property, together with any deposits or other payments made in connection therewith, existing and future development rights, permits and approvals, air rights and other similar land use permits, approvals or entitlements; and all proceeds of any of the foregoing. Any reference in this Security Instrument to the "**Mortgaged Property**" shall mean the Mortgaged Property described in this Section, any part thereof, or any interest therein.

      **1.8**    "**Obligations**" means the Indebtedness and the Other Obligations, collectively.

      **1.9**    "**Other Obligations**" means the performance of all obligations (other than payment of the Indebtedness) of Trustor under any of the Loan Documents (other than the Environmental Indemnity, which indemnity is not secured by this Security Instrument). For avoidance of doubt, "**Other Obligations**" does not include any obligations of the Guarantors under the Loan Documents.

      **1.10**    "**Personal Property**" means all "**Accounts**", "**Cash proceeds**", "**Chattel paper**", "**Collateral**", "**Commercial tort claims**", "**Deposit accounts**", "**Documents**", "**Electronic chattel paper**", "**Equipment**", "**Fixtures**", "**General intangibles**", "**Goods**", "**Instruments**", "**Inventory**", "**Investment property**", "**Letter-of-credit rights**", "**Noncash proceeds**", "**Payment intangibles**", "**Proceeds**", "**Software**", "**Supporting Obligations**", and "**Tangible chattel paper**", as defined in the Uniform Commercial Code, in which Trustor has any interest, whether currently owned or hereafter acquired, including but not limited to all such property relating to, generated from, arising out of or incidental to the ownership, development, use or operation of the Real Property (whether or not subsequently removed from the Real Property (other than that portion of the Mortgaged Property consisting of the Real Property)), including, without limitation, all (i) machinery, tools, appliances, apparatus, equipment, and fittings; (ii) rugs, carpets and other floor coverings; (iii) draperies and drapery rods and brackets, awnings, window shades, venetian blinds and curtains; (iv) lamps, chandeliers, and other lighting fixtures; (v) office maintenance and other supplies; (vi) apparatus, appliances, furniture and furnishings, and supplies; (vii) hardscaping, landscaping, emblements and standing timber, crops, grapevines and any fruits or produce therefrom growing or to be grown on the Mortgaged Property (including all such crops, grapevines and any fruits or produce therefrom following severance from the Mortgaged Property), tresllis' and all other supporting structures for copes and grapevines; (viii) interior and exterior affixed or appurtenant (on any surface) statuaries, architectural fixtures and ornamentation, including, but not limited to balustrades, canopies, colonnades, crestings, cupolas, cornices, entablatures, facades, grilles, latticework, lintels, parapets, porticos, spandrels, rails, mouldings, reliefs, friezes, panels, decorative stuccowork, woodwork and plasterwork, and the like; (ix) lease guarantees, contracts, contract rights, permits, and certificates; (x) Leases, lease guarantees, contracts, contract rights, franchise agreements, licenses, permits and certificates; (xi) deposits, funds, money and deposit accounts; (xii) tenements, hereditaments and appurtenances; (xiii) approvals and parcel maps (whether tentative or final), building permits and certificates of occupancy; (xiv) to the extent assignable, names under or by which the Mortgaged Property or any of the Improvements may at any time

be operated or known and rights to carry on business under any such names or any variant thereof; (xv) to the extent assignable, tradenames, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Real Property and Improvements; (xvi) management agreements, service contracts, supply contracts or other contracts or agreements; (xvii) warranties; (xviii) water stock and utilities stocks; (xix) shares of stock or other evidence of ownership of any part of the Mortgaged Property or Improvements that is owned by Trustor in common with others, and all documents of membership in any owners' or members' association or similar group having responsibility for managing, maintaining or operating any part of the Mortgaged Property or Improvements; (xx) plans and specifications prepared for construction of Improvements on the Mortgaged Property, or any part thereof, and studies, data and drawings related thereto, including, without limitation, studies, data or reports relating to toxic or hazardous wastes or materials located on the Mortgaged Property, all environmental audits, studies and reports, approvals and agreements, and contracts and agreements of Trustor relating to the aforesaid plans and specifications or to the aforesaid studies, data, reports and drawings or to the construction of Improvements on the Mortgaged Property; (xxi) sales agreements, marketing studies, feasibility studies, deposit receipts, escrow agreements and other ancillary documents and agreements entered into respecting the sale to any purchasers of any part of the Mortgaged Property and other proceeds of the sale thereof; (xxii) damages, royalties and revenue of every kind, nature and description whatsoever that Trustor may be entitled to receive from any person or entity owning or having or hereafter acquiring a right to the oil, gas or mineral rights and reservations of the Real Property, if any; (xxiii) deposits made with or other security given to utility companies by Trustor with respect to the Mortgaged Property and/or Improvements; (xxiv) subject to Section 3.2 of the Loan Agreement, advance payments of insurance premiums made by Trustor with respect to, and all claims or demands with respect to, insurance; (xxv) negotiable certificates of deposit of Trustor in Lender's possession and all accounts of Trustor maintained with Lender and each deposit account of Trustor assigned or pledged to Lender pursuant to any agreement; (xxvi) subject to Section 7.12 of the Loan Agreement, insurance proceeds (including insurance proceeds for insurance not required under the terms of this Security Instrument); (xxvii) subject to Section 7.13 of the Loan Agreement, condemnation awards; (xxviii) subject to Sections 7.12 or 7.13 of the Loan Agreement, causes of action, claims, compensation, awards and recoveries for any damage or injury to the Mortgaged Property and/or Improvements or for any loss or diminution in value of the Mortgaged Property and/or Improvements; (xxvix) books and records, including, without limitation, all computer records, computer tapes and electronic and electromagnetic representations and reproductions thereof; (xxx) guaranties of and security for any of the foregoing; (xxxi) all reserve, deposit and impound accounts including without limitation the Reserves (as defined in the Loan Agreement) and all Loan accounts established pursuant to the Loan Agreement either as reserves or accounts for the Loan; (xxxii) all substitutions, renewals, improvements, attachments, accessions, additions and replacements to any of the foregoing; and all "**Proceeds**" (as such term is defined in the Uniform Commercial Code), collections, insurance proceeds and products of any of the property listed in (i) through (xxxii) above, proceeds of any voluntary or involuntary disposition or claim respecting any part thereof (pursuant to judgment, condemnation award or otherwise) and all documents, instruments, general intangibles, goods, equipment, inventory, chattel paper, monies, accounts, deposit accounts and other personal property that may arise from the sale or disposition of any of the foregoing, all guaranties of and security for any of the foregoing, and all books and

705816_3

records, including, without limitation, all computer records, computer tapes and electronic and electromagnetic representations and reproductions thereof, relating to any of the foregoing. The Personal Property shall specifically not include (A) names under or by which the Mortgaged Property or any of the Improvements may at any time be operated or known and rights to carry on business under any such names or any variant thereof, or (B) trademarks, other intellectual property or good will; provided, however, Lender shall have a non-exclusive, fully-paid, and irrevocable license to Trustor's trade-name and trademarks, which license shall be exercisable by Lender or its Affiliate for a period not to exceed three-hundred sixty five (365) days, or such shorter period as is necessary to sell, assign or transfer its rights in the Mortgaged Property, following a foreclosure, deed in lieu of foreclosure or other transfer of the Mortgaged Property pursuant to Lender exercising its rights and remedies hereunder.

**1.11** "**Real Property**" means, individually and collectively, the following: the real property described in Exhibit A attached hereto, and all right, title or interest in any other real property, buildings or improvements comprised in the Real Property, and which right, title or interest is acquired by Trustor after the date of this Security Instrument.

**1.12** "**Rents**" means all rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payment and consideration of whatever form or nature received by or paid to or for the account of or benefit of Trustor or any of its Affiliates, or any of their agents or employees, from, and only from, any and all sources arising from or attributable to the Mortgaged Property, including all credit card receipts collected from tenants, parking charges, and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Mortgaged Property, service charges, vending machine sales, laundry charges and any other items of revenue, receipts and/or income and proceeds, if any, from business interruption or other loss of income insurance, whether paid or accruing before or after the filing by or against Trustor of any petition for relief under the Bankruptcy Code.

**1.13** "**Uniform Commercial Code**" means the Uniform Commercial Code as enacted in the State of California, as amended from time to time.

**2.**    **ASSIGNMENT OF RENTS**. Trustor absolutely, unconditionally and irrevocably assigns to Lender the Leases and the Rents. This assignment is an absolute and present assignment from Trustor to Lender and not merely the passing of a security interest. Notwithstanding the immediately preceding sentence, Lender confers upon Trustor the license to collect and retain the Rents as they become due and payable and otherwise deal with the Leases, subject, however, to the right of Lender to revoke such license at any time upon the occurrence and continuance of an Event of Default in its sole discretion and without notice to Trustor, whereupon Lender shall have the absolute right to revoke such authority and collect and retain the Rents without taking possession of all or any part of the Mortgaged Property; provided, however, that in the event Trustor causes such Event of Default (and any other Event of Default then existing) to be cured, as determined by Lender in its sole and absolute discretion, such license to collect and retain the Rents as they become due and payable and otherwise deal with

5

705816_3

the Leases shall immediately be reinstated in favor of Trustor. The right to collect Rents herein provided shall not cause Lender to be a "**mortgagee in possession**" for any purpose, nor shall such right impose upon Lender the duty to produce Rents or maintain the Mortgaged Property in whole or in part. Possession of the Mortgaged Property by a receiver appointed by a court of competent jurisdiction shall not be considered possession of the Mortgaged Property by Lender for purposes hereof. Following the occurrence and during the continuance of an Event of Default, Lender may apply, in its sole discretion and in any order of priority, any Rents collected against the costs of collection and any Indebtedness of Trustor arising under the Loan Documents. Collection of any Rents shall not cure or waive any Event of Default or notice of Event of Default, or invalidate any acts done pursuant to such notice.

3.    **SECURITY AGREEMENT AND FIXTURE FILING**.

    **3.1    Grant of Security Interest**. Trustor hereby grants to Lender a first priority lien security interest in the Personal Property to secure all of the Obligations. This Security Instrument constitutes a security agreement with respect to all Personal Property in which Lender is granted a security interest hereunder, and Lender shall have all of the rights and remedies of a secured party under the Uniform Commercial Code as well as all other rights and remedies available at law or in equity.

    **3.2    Perfection**. Trustor will execute, acknowledge, deliver and cause to be recorded or filed, in the manner and place required by any present or future law, any instrument that may be requested by Lender in its Permitted Discretion to publish notice or protect, perfect, preserve, continue, extend, or maintain the security interest and lien, and the priority thereof, of this Security Instrument or the interest of Lender in the Mortgaged Property, including, without limitation, deeds of trust, security agreements, financing statements, continuation statements, and instruments of similar character, and Trustor shall pay or cause to be paid (a) all filing and recording taxes and fees incident to each such filing or recording, (b) all expenses, including without limitation, actual and reasonable attorneys' fees and costs (of both in house and outside counsel), incurred by Lender in connection with the preparation, execution, and acknowledgement of all such instruments, and (c) all federal, state, county and municipal stamp taxes and other taxes, duties, imposts, assessments, and charges arising out of or in connection with the execution and delivery of such instruments. Trustor hereby consents to, and hereby ratifies, the filing of any financing statements relating to the Loan made prior to the date hereof. Trustor hereby irrevocably constitutes and appoints Lender as the attorney-in-fact of Trustor, to execute, deliver and, if appropriate, file with the appropriate filing officer or office any such instruments if Trustor should fail to do so within five (5) Business Days of written demand by Lender. In addition, Trustor hereby authorizes Lender to cause any financing statement or fixture filing to be filed or recorded without the necessity of obtaining the consent of Trustor.

    **3.3    Place of Business**. Trustor maintains a place of business, as set forth as the address of Trustor in Section 7.1 below, and Trustor will notify Lender in writing of any change in its place of business within five (5) days of such change. Trustor is organized under the laws of the State of California.

    **3.4    Fixtures**. This Security Instrument is also to be recorded as a "**fixture filing**" in accordance with Uniform Commercial Code Section 9-502(c), and covers goods that are or are to

6

705816_3

become Fixtures.  For the purposes of this fixture filing, the "Debtor" is the Trustor and the "Secured Party" is the Lender.  Trustor is the record owner of the Mortgaged Property.

**4.**    **REPRESENTATIONS AND WARRANTIES**.  Trustor represents and warrants that there are no Leases in place at the Property or any other possessory interests in the Property.

**5.**    **COVENANTS**. Trustor covenants and agrees that:

**5.1    Performance of Obligations**. Trustor shall promptly pay when due the Indebtedness and shall perform and comply with in a timely manner all Other Obligations.

**5.2    Title**. Trustor warrants and represents that (a) Trustor lawfully holds a fee simple interest in and to the Real Property and title to all other Mortgaged Property and has the right to encumber the same; (b) the person executing this Security Instrument on behalf of Trustor has the full right, power and authority to do so on behalf of Trustor; (c) this Security Instrument, as so executed and delivered, is a valid and fully binding obligation of Trustor, enforceable in accordance with its terms; (d) Trustor, its authorized employees, agents and representatives, have all reviewed, approved, and been fully advised with respect to this Security Instrument, the Loan, the Loan Documents, and any other document or instrument executed and delivered in connection therewith or as security therefor, and (e) Trustor has complied with all non-residential building energy disclosures as required by applicable law.

**5.3    Incorporation by Reference**. All the covenants, conditions and agreements contained in the Loan Agreement and all and any of the other Loan Documents, are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein. In the event of any inconsistency between the provisions of this Security Instrument or any of the other Loan Documents and the provisions of the Loan Agreement, the provisions of the Loan Agreement shall control.

**5.4    Insurance**. Trustor shall obtain and maintain, or cause to be maintained, in full force and effect at all times insurance with respect to Trustor and the Mortgaged Property as required pursuant to the Loan Agreement.

**5.5    Maintenance of Mortgaged Property**. Trustor shall cause the Mortgaged Property to be maintained in a good and safe condition and repair. The Improvements, the Fixtures and the Personal Property shall not be removed, demolished or materially altered without the consent of Lender, except as expressly provided in the Loan Agreement. Trustor shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any casualty or become damaged, worn or dilapidated or which may be affected by any condemnation, and shall complete and pay for any structure at any time in the process of construction or repair on the Real Property.

**5.6    Waste**. Trustor shall not commit or suffer any physical waste of the Mortgaged Property or make any change in the use of the Mortgaged Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Mortgaged Property, or take any action that is reasonably likely to invalidate or allow the cancellation of any Policy, or do or permit to be done thereon anything that may in any way materially impair the value of the Mortgaged Property or the security of this Security Instrument. Trustor will not,

7

without the prior written consent of Lender which consent shall not be unreasonably withheld, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Real Property, regardless of the depth thereof or the method of mining or extraction thereof.

**5.7    Performance of Other Agreements**. Trustor shall observe and perform each and every term, covenant and provision to be observed or performed by Trustor pursuant to the Loan Agreement, any other Loan Document and any other agreement or recorded instrument affecting or pertaining to the Mortgaged Property and any amendments, modifications or changes thereto.

**5.8    Change of Name or Ownership Structure**. Except as permitted under Sections 7.21 and 7.24 of the Loan Agreement, Trustor shall not change Trustor's name or the direct or indirect ownership of Trustor without first obtaining the prior written consent of Lender. Trustor hereby authorizes, prior to or contemporaneously with the effective date of any such change, any financing statement or amendment to financing statement required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein. At the request of Lender, Trustor shall execute a certificate in form satisfactory to Lender listing the trade names under which Trustor intends to operate the Mortgaged Property, and representing and warranting that Trustor does business under no other trade name.

**5.9    Use of Funds**. All funds disbursed in accordance with the Note shall be used solely for business or commercial purposes and no funds disbursed thereunder shall be used for personal, family or household purposes and no portion of the Mortgaged Property shall be used as Trustor's primary residence nor shall it be construed as owner-occupied.

**5.10    Due On Sale Or Encumbrance - Consent By Lender**.  Lender may, at Lender's option, declare immediately due and payable all sums secured by this Deed of Trust upon a Sale or Transfer.  A "Sale or Transfer" means (x) the sale, transfer, hypothecation, pledge, mortgage, assignment, encumbrance, lease or conveyance of all or any portion of the Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of sale, transfer, hypothecation, pledge, mortgage, assignment, encumbrance, lease or conveyance of an interest in the Real Property, and (y) if Trustor is a corporation, partnership, limited liability company, joint venture, estate or trust (a) the transfer, assignment, hypothecation, pledge, mortgage, encumbrance or conveyance of more than twenty-five percent (25%) of the direct or indirect legal or beneficial interests in such entity or (b) any change in the control or management of such entity, even if the change in control or management entails a change in ownership of less than twenty-five percent (25%)

## 6.    <u>DEFAULT PROVISIONS</u>.

**6.1    Rights and Remedies**. Upon the occurrence and during the continuance of an Event of Default (regardless of the pendency of any proceeding which has or might have the effect of preventing Trustor from complying with the terms of this Security Instrument), and in

8

705816_3

addition to such other rights as may be available under any other Loan Document or under applicable law, but subject at all times to any mandatory legal requirements:

6.1.1  Acceleration. Lender may declare the Indebtedness to be forthwith due and payable, whereupon the same shall become and be forthwith due and payable, without other notice or demand of any kind.

6.1.2  Uniform Commercial Code.  Lender shall, with respect to the Personal Property, have all the rights, options and remedies of a secured party under the Uniform Commercial Code, including without limitation, the right to the possession of any such property or any part thereof, and the right to enter with legal process any premises where any such property may be found.  Any requirement of the Uniform Commercial Code for reasonable notification shall be met by mailing written notice to Trustor at its address set forth in Section 6.1 hereof at least ten (10) days prior to the sale or other event for which such notice is required. Any such sale may be held as part of and in conjunction with any foreclosure sale of the other properties and rights constituting the Mortgaged Property in order that the Mortgaged Property, including the Personal Property, may be sold as a single parcel if the Lender elects.  Trustor hereby agrees that if the Lender demands or attempts to take possession of the Personal Property or any portion thereof in exercise of its rights and remedies hereunder, Trustor will promptly turn over and deliver possession thereof to the Lender, and Trustor authorizes, to the extent Trustor may now or hereafter lawfully grant such authority, the Lender, its employees and agents, and potential bidders or purchasers to enter upon the Real Property or any other office, building or property where the Personal Property or any portion thereof may at the time be located (or believed to be located) and the Lender may (a) remove the same therefrom or render the same inoperable (with or without removal from such location); (b) repair, operate, use or manage the Personal Property or any portion thereof; (c) maintain, repair or store the Personal Property or any portion thereof; (d) view, inspect and prepare the Personal Property or any portion thereof for sale, lease or disposition; (e) sell, lease, dispose of or consume the same or bid thereon; or (f) incorporate the Personal Property or any portion thereof into the Real Property and sell, convey or transfer the same. The expenses of retaking, selling and otherwise disposing of the Personal Property, including reasonable attorneys' fees and legal expenses incurred in connection therewith, shall constitute additional Obligations hereunder and shall be payable upon demand, with interest thereon at the Default Rate until paid.

6.1.3  Foreclosure Sale.  Lender may invoke the power of sale and any other remedies permitted by California law or provided in this Security Instrument or in any other Loan Document, including, without limitation, those powers set forth in Sections 2924 et seq. and Section 2938 of the California Civil Code or any successor provision of law.  Trustor acknowledges that the power of sale granted in this Security Instrument may be exercised by Lender without prior judicial hearing.  Lender shall be entitled to collect all costs and expenses incurred in pursuing such remedies, including attorneys' fees, costs of documentary evidence, abstracts and title reports.

(a)    If the power of sale is invoked, Lender shall execute a written notice of the occurrence of an Event of Default and of Lender's election to cause the Mortgaged Property to be sold and shall cause the notice to be recorded in each county in which the Mortgaged Property or some part of the Mortgaged Property is located. Trustee shall give notice

of default and notice of sale and shall sell the Mortgaged Property according to California law. Trustee may sell the Mortgaged Property at the time and place and under the terms designated in the notice of sale in one or more parcels and in such order as Trustee may determine. Trustee may postpone the sale of all or any part of the Mortgaged Property by public announcement at the time and place of any previously scheduled sale. Lender or Lender's designee may purchase the Mortgaged Property at any sale.

(b)    At the sale, Lender shall be entitled to credit bid, or to instruct Trustee, on behalf of Lender to credit bid, up to and including the entire amount of the Indebtedness plus Trustee's fees and expenses. Trustee shall deliver to the purchaser at the sale, within a reasonable time, but in any event within ten (10) calendar days, after the sale, a deed or other instrument of conveyance conveying the Mortgaged Property so sold without any express or implied covenant or warranty. The recitals in Trustee's deed shall be prima facie evidence of the truth of the statements made in those recitals. Trustee shall apply the proceeds of the sale in the following order: (i) to all costs and expenses of exercising the power of sale, including the payment of Trustee's fees and attorneys' fees and costs of title evidence; (ii) to the Indebtedness in such order as Lender, in Lender's discretion, directs; (iii) to the Other Obligations to the extent liquidated or otherwise ascertainable; and (iv) the excess, if any, to the person or persons legally entitled to the excess.

(c)    The foregoing rights are without prejudice to Lender's rights to conduct a judicial foreclosure of all or any portion of the Mortgaged Property. Each right and remedy provided in this Security Instrument is distinct from all other rights or remedies under this Security Instrument or any other Loan Document or afforded by applicable law, and each shall be cumulative and may be exercised concurrently, independently, or successively, in any order.

(d)    In the event of any sale or sales made under or by virtue of this Section 6 (whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale), the entire principal of, and interest on, the Note, if not previously due and payable, and all other sums, including the prepayment premium, if any, required to be paid by Trustor pursuant to the Loan Agreement, this Security Instrument or the Note, shall immediately, anything in the Loan Agreement, the Note or this Security Instrument to the contrary notwithstanding, become due and payable.

(e)    IN ORDER TO INDUCE LENDER TO MAKE THE LOAN SECURED HEREBY, TRUSTOR AGREES THAT, IF ALL OR ANY PART OF THE PROPERTY OR ANY INTEREST IN IT IS SOLD OR TRANSFERRED (AS EACH TERM IS DEFINED IN SECTION 5.10 ABOVE) (OR IF A BENEFICIAL INTEREST IN TRUSTOR IS SOLD OR TRANSFERRED AND TRUSTOR IS NOT A NATURAL PERSON) WITHOUT LENDER'S PRIOR WRITTEN CONSENT, LENDER MAY, AT ITS OPTION, REQUIRE IMMEDIATE PAYMENT IN FULL OF ALL SUMS EVIDENCED BY THE NOTE AND SECURED BY THIS DEED OF TRUST. HOWEVER, THIS OPTION SHALL NOT BE EXERCISED BY LENDER IF EXERCISE IS PROHIBITED BY FEDERAL LAW AS OF THE DATE OF THIS DEED OF TRUST. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, THE TERMS "TRANSFER" OR "TRANSFERRED" SHALL NOT INCLUDE ANY OF THE TRANSFERS SET FORTH IN 12 U.S.C. 1701J-3(D),

705816_3

12 C.F.R. SECTION 591.5(B) AND CALIFORNIA CIVIL CODE SECTION 2924.6. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, IF LENDER EXERCISES THIS OPTION, LENDER SHALL GIVE TRUSTOR NOTICE OF ACCELERATION. THE NOTICE SHALL PROVIDE A PERIOD OF NOT LESS THAN THIRTY (30) DAYS FROM THE DATE THE NOTICE IS DELIVERED OR MAILED WITHIN WHICH TRUSTOR MUST PAY ALL SUMS EVIDENCED BY THIS DEED OF TRUST. IF TRUSTOR FAILS TO PAY THESE SUMS PRIOR TO THE EXPIRATION OF THIS PERIOD, LENDER MAY INVOKE ANY REMEDIES PERMITTED BY THIS DEED OF TRUST WITHOUT FURTHER NOTICE OR DEMAND ON TRUSTOR.

6.1.4   Appointment of Receiver. Lender shall, as a matter of right, without notice and without giving bond to Trustor or anyone claiming by, under or through it, and without regard to the solvency or insolvency of Trustor or the then value of the Mortgaged Property, be entitled to apply to have a receiver appointed pursuant to applicable law of all or any part of the Mortgaged Property and the Rents, with such power as the court making such appointment shall confer, and Trustor hereby consents to the appointment of such receiver and shall not oppose any such appointment. Any such receiver may, to the extent permitted under applicable law, without notice, enter upon and take possession of the Mortgaged Property or any part thereof by summary proceedings, ejectment or otherwise, and may remove Trustor or other persons and any and all property therefrom, and may hold, operate and manage the same and receive all Rents accruing with respect thereto or any part thereof, whether during the pendency of any foreclosure or until any right of redemption shall expire or otherwise. Trustor agrees to promptly deliver to any such receiver all Leases, Rents, documents, financial data and other information requested by such receiver in connection with the Mortgaged Property and, without limiting the foregoing, Trustor hereby authorizes Lender to deliver to any such receiver any or all of the Leases, Rents, documents, data and information in Lender's possession relating to the Mortgaged Property.

6.1.5   Taking Possession of Rents, Etc. Upon demand by Lender, Trustor shall surrender all rents, issues or profits to Lender pursuant to California Civil Code Section 2938 and shall cooperate with Lender in making demand on tenants to pay rent directly to Lender as permitted thereunder. Trustor acknowledges that an enforcement action hereunder shall not make the Lender a "**mortgagee in possession**" but Lender shall be permitted to enter upon and take possession of all documents, books, records, papers, and accounts of Trustor relating thereto. The collection of Rents by the Lender shall in no way waive the right of the Lender to foreclose this Security Instrument in the event of any said Event of Default. Nothing herein contained shall be construed as constituting Lender a "**mortgagee in possession**" in the absence of the actual taking of possession of the Mortgaged Property and excluding Trustor therefrom. The right to enter and take possession of the Mortgaged Property and use any Personal Property therein, to manage, operate, conserve and improve the same, and to collect the Rents, shall be in addition to all other rights or remedies of Lender hereunder or afforded by law, and may be exercised concurrently therewith or independently thereof. The expenses (including any receiver's fees, reasonable counsel fees, costs and agent's compensation) incurred pursuant to the powers herein contained shall be secured hereby which expenses Trustor promises to pay upon demand together with interest thereon at the Default Rate until paid. Lender shall not be liable to account to Trustor for any action taken pursuant hereto other than to account for any Rents actually received by Lender. Without taking possession of the Mortgaged Property, Lender may, in the event the Mortgaged Property becomes vacant or is abandoned, take such steps as it deems appropriate to protect and

705816_3

secure the Mortgaged Property (including hiring watchmen therefor) and all costs incurred in so doing shall constitute additional Obligations payable upon demand with interest thereon at the Default Rate until paid.

      6.1.6   <u>Environmental Provisions</u>. Without limiting any of the remedies provided in this Security Instrument, Trustor acknowledges and agrees that each of the provisions in Section 6.1(q) of the Loan Agreement is an environmental provision (as defined in Section 736(f)(2) of the California Code of Civil Procedure) made by Trustor relating to the real property security (the "**Environmental Provisions**"), and that Trustor's failure to comply with any of the Environmental Provisions will be a breach of contract that will entitle Lender to pursue the remedies provided by Section 736 of the California Code of Civil Procedure ("**Section 736**") for the recovery of damages and for the enforcement of the Environmental Provisions.  Pursuant to Section 736, Lender's action for recovery of damages or enforcement of the Environmental Provisions shall not constitute an action within the meaning of Section 726(a) of the California Code of Civil Procedure or constitute a money judgment for a deficiency or a deficiency judgment within the meaning of Sections 580a, 580b, 580d, or 726(b) of the California Code of Civil Procedure.  Trustor and Lender agree that:  (a) this Article is intended as Lender's written request for information (and Trustor's response) concerning the environmental condition of the real property security as required by California Code of Civil Procedure Section 726.5; and (b) each provision in this Section (together with any indemnity applicable to a breach of any such provision) with respect to the environmental condition of the real property security is intended by Lender and Trustor to be an "environmental provision" for purposes of Section 736.

      6.1.7   <u>Exercise Other Rights and Remedies</u>. To exercise or invoke any and all other rights and remedies as may be available to Lender now or hereafter at law or in equity.

      6.1.8   <u>Indemnity</u>. The Trustor shall indemnify, defend, protect and hold harmless Lender and all other Indemnified Persons (as defined in the Loan Agreement) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, reasonable costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of both in-house and outside counsel for Lender and such other Indemnified Person) in connection with any and all Indemnified Liabilities (as defined and described in the Loan Agreement).

To the extent permitted by law, no action taken, or right or remedy invoked, by Lender under this <u>Section 6.1</u>, including the appointment of a receiver for the Mortgaged Property, or the entry into possession of the Mortgaged Property, or any part thereof, by such receiver, or otherwise, shall be deemed to make Lender a "**mortgagee in possession**" or otherwise responsible or liable in any manner with respect to the Mortgaged Property, or the use, occupancy, enjoyment or operation of all or any part thereof. In no event shall Lender be required to accept a cure of any default beyond the applicable grace, notice and cure periods provided in the Loan Documents, if any, notwithstanding any statement or provision to the effect that rights or remedies are available while an Event of Default "**exists**", "**continues**" or is "**outstanding**", or during the "**existence**" or "**continuation**" of an Event of Default (or any similar statement or provision) in any of the Loan Documents, or anything else in the Loan Documents.

**6.2    Payment of Costs, Expenses and Attorneys' Fees**. All costs and expenses incurred by Lender pursuant to <u>Section 6.1</u> (including court costs and attorneys' fees and costs of both in-house and outside counsel), whether or not incurred in litigation and whether or not foreclosure is concluded, including, without limitation, attorneys' fees and costs of both in-house and outside counsel incurred in connection with any judicial or nonjudicial foreclosure of this Security Instrument or the other Loan Documents, or in connection with both judicial and nonjudicial foreclosure, if Lender shall elect to pursue each such remedy whether concurrently or independently and reasonable attorneys' fees and costs of in-house counsel of Lender) shall be secured by this Security Instrument and shall bear interest at the Default Rate, from the date of expenditure until such sums have been paid. Lender shall be entitled to bid, at any sale of the Mortgaged Property held pursuant to <u>Section 6.1.3</u> above, the amount of all such costs, expenses, and interest in addition to the amount of all other Obligations by a credit bid as the equivalent of cash.

**6.3    Protective Advances**.

6.3.1    Advances, disbursements and expenditures made by Lender for the following purposes, whether before and during a foreclosure, and at any time prior to sale, and, where applicable, after sale, and during the pendency of any related proceedings, for the following purposes, shall, in addition to those otherwise authorized by this Security Instrument, constitute "**Protective Advances**":

(a)    all advances by Lender in accordance with the terms of this Security Instrument to: (i) preserve or maintain, repair, restore or rebuild the Improvements upon the Mortgaged Property; (ii) preserve the lien of this Security Instrument or the priority thereof; or (iii) enforce this Security Instrument;

(b)    payments by Lender of: (i) when due installments of principal, interest or other obligations; (ii) when due installments of real estate taxes and assessments, general and special and all other taxes and assessments of any kind or nature whatsoever which are assessed or imposed upon the mortgaged real estate or any part thereof; (iii) other obligations authorized by this Security Instrument; or (iv) any other amounts in connection with other liens, encumbrances or interests reasonably necessary to preserve the status of Lender as holder of a first priority lien on the Mortgaged Property;

(c)    advances by Lender in settlement or compromise of any claims asserted by claimants under senior mortgages or any other prior liens;

(d)    reasonable attorneys' fees and other costs incurred: (i) in connection with the foreclosure of this Security Instrument; (ii) in connection with any action, suit or proceeding brought by or against the Lender for the enforcement of this Security Instrument or arising from the interest of the Lender hereunder; or (iii) in the preparation for the commencement or defense of any such foreclosure or other action;

(e)    advances of any amount required to make up a deficiency in deposits for installments of taxes and assessments and insurance premiums as may be authorized by this Security Instrument;

705816_3

(f)      expenses incurred and expenditures made by Lender for any one or more of the following: (i) premiums for casualty and liability insurance paid by Lender whether or not Lender or a receiver is in possession, if reasonably required, in reasonable amounts, and all renewals thereof; (ii) repair or restoration of damage or destruction in excess of available insurance proceeds or condemnation awards; (iii) payments required or deemed by Lender to be for the benefit of the Mortgaged Property under any grant or declaration of easement, easement agreement, agreement with any adjoining land owners or instruments creating covenants or restrictions for the benefit of or affecting the mortgaged real estate; (iv) shared or common expense assessments payable to any association or corporation in which the owner of the mortgaged real estate is a member in any way affecting the mortgaged real estate; or (v) pursuant to any lease or other agreement for occupancy of the mortgaged real estate;

6.3.2    All Protective Advances shall be additional Obligations, and shall become immediately due and payable without notice and with interest thereon from the date of the advance until paid at the Default Rate.

6.3.3    This Security Instrument shall be a lien for all Protective Advances as to subsequent purchasers and judgment creditors from the time this Security Instrument is recorded.

6.3.4    All Protective Advances shall apply to and be included in:

(a)      determination of the amount of the Obligations at any time;

(b)      the Indebtedness found due and owing to the Lender in the judgment of foreclosure and any subsequent supplemental judgments, orders, adjudications or findings by the court of any additional Indebtedness becoming due after such entry of judgment, it being agreed that in any foreclosure judgment, the court may reserve jurisdiction for such purpose;

(c)      application of income in the hands of any receiver or Lender in possession; and

(d)      computation of any deficiency judgment pursuant to applicable law.

**6.4      Remedies Cumulative; No Waiver**.    All rights and remedies of Lender hereunder and under the other Loan Documents are cumulative and not alternative, and are in addition to all rights and remedies otherwise provided by law, and any or all of such rights and remedies shall be concurrent and may be pursued singly, successively or together against Trustor, any Borrower Party, the Mortgaged Property, any other collateral securing the Obligations, or any other Persons who are, or may become liable for all or any part of the Obligations, and any other funds, property or security held by Lender for the payment hereof, or otherwise, at the sole and absolute discretion of Lender. No exercise of any right or remedy by Lender shall constitute a waiver of any other right or remedy. No delay or omission by Lender to exercise any right, power or remedy hereunder shall impair any such right or remedy, or be construed as a waiver of any Event of Default, or any acquiescence therein. Without limiting the generality of the foregoing, Trustor agrees that if an Event of Default is continuing, to the extent permitted by applicable law, (a) Lender is not subject to any "one action," "anti-deficiency" or

14

"election of remedies" law or rule, and (b) all liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Mortgaged Property, this Security Instrument has been foreclosed, the Mortgaged Property has been sold and/or otherwise realized upon in satisfaction of the Indebtedness or the Indebtedness has been paid in full. Nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to any particular portion of the Mortgaged Property for the satisfaction of any of the Obligations in preference or priority to any other portion of the Mortgaged Property, and Lender may seek satisfaction out of the entire Mortgaged Property or any part thereof, in its sole and absolute discretion, in respect of the Obligations. By accepting payment of any part of the Indebtedness after its due date or later performance of any Obligation, Lender shall not waive its right against any Person obligated directly or indirectly under the Loan Agreement, this Security Instrument or any other Loan Document, or on any Obligation, either to require prompt payment when due of all other Indebtedness or to declare an Event of Default for failure to make such prompt payment or render such performance; and Lender's acceptance of partial payment of any portion of the Indebtedness after its due date (which may be applied to such outstanding payment obligations as Lender may elect, notwithstanding Trustor's instructions to the contrary), or acceptance of partial performance of any Obligation in default, shall not cure such payment failure or default, or affect any notice of an Event of Default or sale heretofore given or recorded, unless such notice is expressly revoked in writing by Lender.

**6.5    Releases, Extensions, Modifications and Additional Security**. Without affecting the liability of any person for payment of the Indebtedness, or the lien or priority of this Security Instrument or any other Loan Document upon the Mortgaged Property, Lender may, in its sole and absolute discretion, from time to time, with or without notice, do one or more of the following: release the liability of any person for the payment of all or any portion of the Indebtedness; make any agreement or take any action extending the maturity or otherwise altering the terms or increasing the amount of all or any portion of the Indebtedness; and accept additional security, or release all or a portion of the Mortgaged Property and other security held to secure the Indebtedness. If Lender holds any other or additional security for the payment of the Indebtedness or performance of any Other Obligation, then any sale or foreclosure of such security upon any Event of Default, in the sole discretion of Lender, may be prior to, subsequent to, or contemporaneous with, any sale or foreclosure hereunder and any property in which Lender holds a security interest may be sold as a unit with the Mortgaged Property.

**6.6    Waiver of Right to Redeem - Waiver of Appraisement, Valuation, Etc**. To the extent permitted by law, Trustor waives (a) the benefit of all present or future laws providing for any appraisement before sale of any portion of the Mortgaged Property, (b) all rights of redemption, valuation, appraisement, stay of execution, notice of election to mature or declare due the whole of the Indebtedness and marshalling in the event of foreclosure of the lien created by this Security Instrument, (c) all rights and remedies which Trustor may have or be able to assert by reason of the laws of the State of California pertaining to the rights and remedies of sureties, (d) the right to assert any statute of limitations as a bar to the enforcement of the lien of this Security Instrument or to any action brought to enforce the Note or any other obligation secured by this Security Instrument, and (e) any rights, legal or equitable, to require marshalling of assets or to require upon foreclosure sales in a particular order, including any rights under California Civil Code Sections 2899 and 3433. Lender shall have the right to determine the

705816_3

order in which any or all of the Mortgaged Property shall be subjected to the remedies provided by this Security Instrument. Lender shall have the right to determine the order in which any or all portions of the Indebtedness are satisfied from the proceeds realized upon the exercise of the remedies provided by this Security Instrument. By signing this Security Instrument, Trustor does not waive its rights under Section 2924c of the California Civil Code.

7. **MISCELLANEOUS**.

     **7.1** **Notices**. All notices given pursuant to this Security Instrument shall be sufficient if given in writing and shall be deemed to have been properly given (i) upon delivery if delivered in person, (ii) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, or (iv) one (1) Business Day after delivery if sent by email, provided that the recipient has acknowledged receipt by telephone and that a carbon copy of such notice is sent simultaneously by the other methods provided in this Section, addressed to the addresses set forth below in this Section or as such party may from time to time designate by written notice to the other parties. Either party by notice to the other in the manner provided herein may designate additional or different addresses for subsequent notices or communications. Any notice to legal counsel or other Person other than the primary addressee for Trustor or Lender below shall be a courtesy copy only and shall not affect the timeliness or effectiveness of delivery to Trustor or Lender.

| | |
|---|---|
| To Trustor: | Treetop Development, LLC<br>9454 Wilshire Boulevard, Suite 208<br>Beverly Hills, California 90210<br>Attention: Mohamed Hadid<br>Email: hadidaspen@aol.com |
| With a copy to: | Hadid Development<br>1507 7th Street, #610<br>Santa Monica, California 90401<br>Attention: Justin Cozart<br>Email: justin@privatewealthbank.com |
| With a copy to: | Law Offices of Abdulaziz, Grossbart & Rudman<br>6454 Coldwater Canyon Avenue<br>North Hollywood, California 91606<br>Attention: Bruce Rudman<br>Email: bdr@agrlaw.com |
| To Lender: | Skylark Capital Management, LLC |

705816_3

c/o Eisner, P.C.
9601 Wilshire Boulevard, 7th Floor
Beverly Hills, California 90210
Attention: Michael Eisner
E-mail: meisner@eisnerlaw.com

With a copy to:    Eisner, P.C.
9601 Wilshire Boulevard, 7th Floor
Beverly Hills, California 90210
Attention: Brian D. Kilb
E-mail: bkilb@eisnerlaw.com

**7.2    Time of the Essence**. Time is of the essence with respect to this Security Instrument and the other Loan Documents, and each representation, warranty, covenant and condition hereunder and thereunder.

**7.3    Successors and Assigns; Agent as Agent**. This Security Instrument and all provisions hereof shall be binding upon and enforceable against the Trustor and its assigns and other successors. This Security Instrument and all provisions hereof shall inure to the benefit of the Lender, its successors and assigns and any holder or holders, from time to time, of the Obligations, or any interest therein. Notwithstanding anything to the contrary in this Security Instrument, if the Obligations are held by more than one holder, the parties agree that Lender shall act as agent for the pro rata benefit of such holders.

**7.4    Amendments**. This Security Instrument may be amended at any time and from time to time only by an amendment in writing executed by Lender and Trustor.

**7.5    Rules of Construction**. When the identity of the parties or other circumstances make appropriate, the neuter gender shall include the feminine and masculine, and the singular number shall include the plural. Specific enumeration of rights, powers and remedies of Lender and of acts which they may do and of acts Trustor must do or not do shall not exclude or limit the general. The headings of each Section are for information and convenience and do not limit or construe the contents of any provision hereof. The provisions of this Security Instrument shall be construed as a whole according to their common meaning, not strictly for or against any party and consistent with the provisions herein contained, in order to achieve the objectives and purposes of these grants. The use in this Security Instrument (including any Exhibit hereto) of the words "**including**", "**such as**" or words of similar import when following any general term, statement or matter shall not be construed to limit such statement, term or matter to the specific items or matters, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest possible scope of such statement, term or matter; the use herein of the words "**costs**" or "**expenses**" shall include the cost of title evidence and fees and costs of attorneys for Lender (both in house and outside counsel); and the use herein of the word "**prompt**", or "**immediately**" in any form, or words of similar import, when used with reference to any notice required to be given or act to be undertaken by Trustor shall mean notice given or act performed not later than five (5) days after the occurrence of the specified event for which notice or action is required, unless another time period is made expressly applicable. Unless otherwise specified, the words "**hereof**", "**herein**" and "**hereunder**" and words of similar import

705816_3

when used in this Security Instrument shall refer to this Security Instrument as a whole and not to any particular provision of this Security Instrument. If Trustor is composed of more than one person or entity, then the obligations of Trustor under this Security Instrument, the Loan Agreement and under the other Loan Documents are joint and several; and each covenant, warranty, representation and agreement of Trustor hereunder and thereunder shall be deemed made by each such person or entity comprising Trustor, both individually and collectively.

**7.6    Severability**. If any term of this Security Instrument, or the application thereof to any person or circumstances, shall to any extent be invalid or unenforceable, the remainder of this Security Instrument, or the application of such term to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term of this Security Instrument shall be valid and enforceable to the fullest extent permitted by law.

**7.7    Substitute Trustee**. Lender, at Lender's option, may from time to time, by a written instrument, appoint a successor trustee, which instrument, when executed and acknowledged by Lender and recorded in the office of the Recorder of the county or counties where the Mortgaged Property is situated, shall be conclusive proof of proper substitution of the successor trustee. The successor trustee shall, without conveyance of the Mortgaged Property, succeed to all the title, power and duties conferred upon the Trustee in this Security Instrument and by California law. The instrument of substitution shall contain the name of the original Lender, Trustee and Trustor under this Security Instrument, the book and page where this Security Instrument is recorded, and the name and address of the successor trustee. If notice of default has been recorded, this power of substitution cannot be exercised until after the costs, fees and expenses of the then acting Trustee have been paid to such Trustee, who shall endorse receipt of those costs, fees and expenses upon the instrument of substitution. The procedure provided for substitution of trustee in this Security Instrument shall govern to the exclusion of all other provisions for substitution, statutory or otherwise.

**7.8    Statement of Obligation**. Lender may collect a fee not to exceed the maximum allowed by applicable law for furnishing the statement of obligation as provided in Section 2943 of the Civil Code of California.

**7.9    Governing Law**. THIS AGREEMENT WAS ACCEPTED BY LENDER IN THE STATE OF CALIFORNIA, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY. ACCORDINGLY, IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY, ENFORCEABILITY AND PERFORMANCE, THIS AGREEMENT AND THE OTHER RELATED DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE FORECLOSURE OF LIENS UNDER THE DEED OF TRUST AND THE CREATION, PERFECTION AND ENFORCEMENT OF THE SECURITY INTERESTS CREATED PURSUANT THERETO AND PURSUANT TO THE OTHER RELATED DOCUMENTS IN ANY COLLATERAL

705816_3

LOCATED IN THE STATE IN WHICH THE PROPERTY IS LOCATED SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE WHERE THE PROPERTY IS LOCATED. EXCEPT AS PROVIDED IN THE IMMEDIATELY PRECEDING SENTENCE, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE OTHER RELATED DOCUMENTS.

**7.10    Venue.** (a)    ANY CLAIM OR ACTION ARISING UNDER THIS AGREEMENT OR THE OTHER RELATED DOCUMENTS MAY, AT LENDER'S OPTION, BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE STATE OF CALIFORNIA, AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

**7.11    Commingling of Funds.** No sums collected or retained by Lender shall be deemed to be held in trust; and Lender may commingle any and all such funds or proceeds with its general assets and shall not be liable for the payment of any interest or other return thereon, except to the minimum extent required by law.

**7.12    Late Charges; Default Rate; Prepayment; Variable Rate.** The Loan Agreement contains provisions imposing a late charge and past due rate of interest if payments are not timely made, and prepayment restrictions and premiums as more particularly described in the Loan Agreement. The Loan bears interest at a variable rate of interest.

**7.13    Waiver of Jury Trial.**

7.13.1 TO THE FULLEST EXTENT NOT PROHIBITED BY APPLICABLE LAW, TRUSTOR AND, BY ITS ACCEPTANCE OF THIS SECURITY INSTRUMENT, LENDER, EACH HEREBY (i) EXPRESSLY, KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION ARISING UNDER THIS SECURITY INSTRUMENT OR IN ANY WAY CONNECTED WITH OR INCIDENTAL TO THE DEALINGS OF THE PARTIES WITH RESPECT TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, AND (ii) AGREES AND CONSENTS THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS SECURITY INSTRUMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES TO THE WAIVER OF THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY.

7.13.2 IN THE EVENT ANY SUCH CLAIM OR CAUSE OF ACTION IS BROUGHT OR FILED IN ANY UNITED STATES FEDERAL COURT SITTING IN THE STATE OF CALIFORNIA OR IN ANY STATE COURT OF THE STATE OF CALIFORNIA,

705816_3

AND THE WAIVER OF JURY TRIAL SET FORTH IN SECTION 7.13.1 IS DETERMINED OR HELD TO BE INEFFECTIVE OR UNENFORCEABLE, THE PARTIES AGREE THAT ALL CLAIMS AND CAUSES OF ACTION SHALL BE RESOLVED BY REFERENCE TO A PRIVATE JUDGE SITTING WITHOUT A JURY, PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 638, BEFORE A MUTUALLY ACCEPTABLE REFEREE OR, IF THE PARTIES CANNOT AGREE, A REFEREE SELECTED BY THE PRESIDING JUDGE OF THE SUPERIOR COURT OF CALIFORNIA FOR THE COUNTY OF LOS ANGELES. SUCH PROCEEDING SHALL BE CONDUCTED IN LOS ANGELES COUNTY, CALIFORNIA, WITH CALIFORNIA RULES OF EVIDENCE AND DISCOVERY APPLICABLE TO SUCH PROCEEDING. IN THE EVENT CLAIMS OR CAUSES OF ACTION ARE TO BE RESOLVED BY JUDICIAL REFERENCE, ANY PARTY MAY SEEK FROM ANY COURT HAVING JURISDICTION THEREOVER ANY PREJUDGMENT ORDER, WRIT OR OTHER RELIEF AND HAVE SUCH PREJUDGMENT ORDER, WRIT OR OTHER RELIEF ENFORCED TO THE FULLEST EXTENT PERMITTED BY LAW NOTWITHSTANDING THAT ALL CLAIMS AND CAUSES OF ACTION ARE OTHERWISE SUBJECT TO RESOLUTION BY JUDICIAL REFERENCE. NOTWITHSTANDING THE FOREGOING, NOTHING IN THIS SECTION 7.13.2 SHALL LIMIT THE RIGHT OF ANY PARTY TO EXERCISE SELF-HELP REMEDIES SUCH AS SETOFF, FORECLOSURE AGAINST, OR SALE OF, ANY REAL OR PERSONAL PROPERTY COLLATERAL OR SECURITY, OR TO OBTAIN PROVISIONAL OR ANCILLARY REMEDIES FROM A COURT OF COMPETENT JURISDICTION BEFORE, AFTER, OR DURING THE PENDENCY OF ANY REFERENCE PROCEEDING.  THE EXERCISE OF ANY ONE OR MORE REMEDIES DOES NOT WAIVE THE RIGHT OF EITHER PARTY TO RESORT TO REFERENCE.  AT LENDER'S OPTION, FORECLOSURE UNDER THIS SECURITY INSTRUMENT MAY BE ACCOMPLISHED EITHER BY EXERCISE OF POWER OF SALE UNDER THIS SECURITY INSTRUMENT OR BY JUDICIAL FORECLOSURE.

    **7.14    Reconveyance**. Upon payment of the Indebtedness, Lender shall request Trustee to reconvey the Mortgaged Property and shall surrender this Security Instrument and the Note to Trustee. Trustee shall reconvey the Mortgaged Property without warranty to the person or persons legally entitled to the Mortgaged Property. Such person or persons shall pay Trustee's reasonable costs incurred in so reconveying the Mortgaged Property.

    **7.15    Counterparts**. This Security Instrument may be executed in any number of counterparts, all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page. Receipt of an executed signature page to this Security Instrument by facsimile or other electronic transmission shall constitute effective delivery thereof.

[SIGNATURE PAGE FOLLOWS]

705816_3

**IN WITNESS WHEREOF**, Trustor has executed this Construction Deed Of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing on the day and year set forth above.

**TRUSTOR:**

**TREETOP DEVELOPMENT, LLC,**
a California limited liability company

By:    Casablanca Grand LLC,
        a California limited liability company,
        its sole member

By:_____
Name: Mohamed Hadid
Title: Sole Member and Manager

---

Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

STATE OF _California_     )
                       ) ss:
COUNTY OF _Los Angeles_   )

On this _18_ day of _July_, 2018 before me _Thomas Gallagher_ (notary public), personally appeared _Mohamed Hadid_ (print name), who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _____   (notary public)

(NOTARY SEAL)

THOMAS GALLAGHER
Notary Public - California
Los Angeles County
Commission # 2166833
My Comm. Expires Oct 30, 2020

S-1

## EXHIBIT A

## LEGAL DESCRIPTION

PARCEL 1:

LOT 4 OF TRACT NO. 10202, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 182, PAGE(S) 15 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM THE SOUTHERLY 330 FEET OF SAID LOT 4.

ALSO EXCEPT THAT PORTION INCLUDED IN TRACT NO. 10926 AS PER MAP RECORDED IN BOOK 206, PAGES 37 TO 41, INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ALSO EXCEPT THAT PORTION OF SAID LOT 4 DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF TRACT NO. 9146, IN SAID CITY, COUNTY AND STATE, AS RECORDED IN BOOK 187, PAGE 22 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE WESTERLY ALONG THE NORTHERLY LINE OF SAID LOT 4 NORTH 88 DEGREES 59 MINUTES 39 SECONDS WEST 156.14 FEET; THENCE SOUTHERLY, LEAVING SAID NORTHERLY LINE ALONG A LINE THAT IS PARALLEL TO AND DISTANT 441.44 FEET EASTERLY OF THE WESTERLY LINE OF SAID LOT 4, SOUTH 0 DEGREE 32 MINUTES 49 SECONDS EAST 331.64 FEET; THENCE SOUTH 88 DEGREES 59 MINUTES 52 SECONDS EAST 99.75 FEET TO A POINT IN THE WESTERLY LINE OF TRACT NO. 10926, IN SAID CITY, COUNTY AND STATE AS PER MAP RECORDED IN BOOK 206, PAGES 37 TO 41, INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE NORTHERLY ALONG THE SAID WESTERLY LINE NORTH 1 DEGREE 31 MINUTES 03 SECONDS EAST 57.12 FEET; THENCE NORTH 5 DEGREES 13 MINUTES 42 SECONDS EAST 76.82 FEET; THENCE NORTH 34 DEGREES 26 MINUTES 49 SECONDS EAST 120.35 FEET TO THE BEGINNING OF A NON-TANGENT CURVE CONCAVE NORTHEASTERLY AND HAVING A RADIUS OF 26.00 FEET, A RADIAL LINE FROM SAID POINT BEARS SOUTH 2 DEGREES 54 MINUTES 50 SECONDS WEST; THENCE ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 135 DEGREES 26 MINUTES 26 SECONDS AN ARC DISTANCE OF 61.46 FEET TO A POINT IN THE WESTERLY LINE OF SAID TRACT NO. 9146; THENCE NORTHERLY ALONG SAID WESTERLY LINE NORTH 3 DEGREES 03 MINUTES 11 SECONDS WEST TO THE TRUE POINT OF BEGINNING.

PARCEL 2:

THAT PORTION OF TRACT NO. 9146, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 187, PAGE 22 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY,

LYING WEST OF THE WEST LINE OF LOT 19 OF TRACT NO. 10926, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 206, PAGES 37 TO 41, INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 3:

THE SOUTHERLY 330 FEET OF LOT 4 OF TRACT NO. 10202, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 182, PAGE 15 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THAT PORTION OF SAID LOT INCLUDED WITHIN TRACT NO. 10926, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 206, PAGES 37 TO 43, INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 4:

THE SOUTH HALF OF THE SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 1, TOWNSHIP 1 SOUTH, RANGE 15 WEST OF THE SAN BERNARDINO MERIDIAN, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF THE SURVEY OF SAID LAND ON FILE IN THE BUREAU OF MANAGEMENT.

EXCEPT THAT PORTION OF SAID SOUTH HALF INCLUDED WITHIN THE LINES OF TRACT NO. 12321, AS PER MAP RECORDED IN BOOK, PAGES 18 AND 19 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 5:

LOT 12 OF TRACT NO. 12321, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 320, PAGES 18 AND 19 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 6:

PARCEL D OF PARCEL MAP NO. 1987, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 31, PAGE 81 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM THAT PORTION OF SAID LAND BEGINNING AT THE MOST NORTHEASTERLY CORNER OF SAID PARCEL D, SAID CORNER ALSO BEING A POINT IN THE SOUTHERLY RIGHT-OF-WAY OF CEDARBROOK DRIVE, 34 FEET WIDE, AS SHOWN ON SAID PARCEL MAP, THENCE ALONG THE EASTERLY LINE OF SAID PARCEL D SOUTH 2° 44' 22" EAST 42.36 FEET, THENCE SOUTH 27° 27' 10"

WEST 46.00 FEET, THENCE SOUTH 3° 30' 00" EAST 67.00 FEET, THENCE LEAVING SAID EASTERLY LINE AT RIGHT ANGLES TO COLDWATER CANYON DRIVE, NORTH 89° 41' 30" WEST 15.00 FEET, THENCE PARALLEL TO SAID COLDWATER CANYON DRIVE, NORTH 0° 18' 30" EAST 148.53 FEET TO A POINT IN SAID SOUTHERLY RIGHT OF WAY, THENCE ALONG SAID SOUTHERLY RIGHT OF WAY, NORTH 87° 15' 15" EAST 29.33 FEET TO THE POINT OF BEGINNING.

Exhibit A - Page 3

# EXHIBIT E

**This page is part of your document - DO NOT DISCARD**



## 20220551753



**Pages:**
**0006**

**Recorded/Filed in Official Records**
**Recorder's Office, Los Angeles County,**
**California**

**05/23/22 AT 08:00AM**

| | |
|---|---|
| FEES: | 41.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| SB2: | 75.00 |
| PAID: | 116.00 |



**L E A D S H E E T**



202205230180021

**00022367095**



013423085

**SEQ:**
**01**

SECURE - 8:00AM



**THIS FORM IS NOT TO BE DUPLICATED**

E405200

2019823CAD_Package_3

FOR REFERENCE ONLY: 20220551753

RECORDING REQUESTED BY:

CALIFORNIA TD SPECIALISTS
Attn: Teri Snyder


WHEN RECORDED MAIL TO:

CALIFORNIA TD SPECIALISTS
Attn: Teri Snyder
8190 EAST KAISER BLVD.
ANAHEIM HILLS, CA 92808

---

Title Order No.: 2019823cad
APN: 4352-001-051, 4352-001-044,
4352-001-047, 4387-025-001, 4387-
026-012, 4387-022-021

Trustee Sale No.: 85647

Loan No.: 399340614
SPACE ABOVE THIS LINE FOR RECORDER'S USE ONLY

# NOTICE OF TRUSTEE'S SALE

**NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED**
注：本文件包含一个信息摘要
참고사항: 본 첨부 문서에 정보 요약서가 있습니다
NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP
LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY

**[PURSUANT TO CIVIL CODE 2923.3(a), THE SUMMARY OF INFORMATION REFERRED TO ABOVE IS NOT ATTACHED TO THE RECORDED COPY OF THIS DOCUMENT BUT ONLY TO THE COPIES PROVIDED TO THE TRUSTOR.]**

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 7/31/2018. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

---

**On 6/15/2022 at 10:30 AM, CALIFORNIA TD SPECIALISTS, AS TRUSTEE** as the duly appointed Trustee under and pursuant to Deed of Trust recorded on 8/3/2018 as Instrument No. 20180781683 in book ////, page //// of official records in the Office of the Recorder of Los Angeles County, California, executed by:

TREETOP DEVELOPMENT, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

, as Trustor

SKYLARK CAPITAL MANAGEMENT, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

, as Beneficiary

**WILL SELL AT PUBLIC AUCTION TO THE HIGHEST BIDDER FOR CASH (payable at time of sale in lawful money of the United States, by cash, a cashier's check drawn by a state or national bank, a check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, savings association, or savings bank specified in section 5102 of the Financial Code and authorized to do business in this state). At: Behind the fountain located in Civic Center Plaza located at 400 Civic Center Plaza, Pomona, CA 91766,**

1




| | |
|---|---|
| **Title Order No.:** | 2019823cad |
| **Trustee Sale No.:** | 85647 |
| **Loan No.:** | 399340614 |
| **APN:** | 4352-001-051, 4352-001-044, 4352-001-047, 4387-025-001, 4387-026-012, 4387-022-021 |

### NOTICE OF TRUSTEE'S SALE - continued

all right, title and interest conveyed to and now held by it under said Deed of Trust in the property situated in said County, California describing the land therein:  See Exhibit "A" Attached Hereto And Made A Part Hereof.

The property heretofore described is being sold "as is".  The street address and other common designation, if any, of the real property described above is purported to be:    9650 CEDARBROOK DR
BEVERLY HILLS, CA 90210 "VACANT LAND.   DIRECTIONS MAY BE OBTAINED BY WRITTEN REQUEST SUBMITTED TO THE BENEFICIARY WITHIN 10 DAYS AFTER THE FIRST PUBLICATION OF THIS NOTICE AT THE FOLLOWING ADDRESS: BENEFICIARY, C/O CALIFORNIA TD SPECIALISTS, ATTN: PATRICIO S. INCE', 8190 EAST KAISER BLVD., ANAHEIM HILLS, CA  92808." .

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein.  Said sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by said Deed of Trust, with interest thereon, as provided in said note(s), advances, if any, under the terms of the Deed of Trust, estimated fees, charges and expenses of the Trustee and of the trusts created by said Deed of Trust, to-wit:

$61,588,040.73 **(Estimated)**
Accrued interest and additional advances, if any, will increase this figure prior to sale.

The beneficiary under said Deed of Trust heretofore executed and delivered to the undersigned a written Declaration of Default and Demand for Sale, and a written Notice of Default and Election to Sell.  The undersigned caused said Notice of Default and Election to Sell to be recorded in the county where the real property is located and more than three months have elapsed since such recordation.

**DATE:**  5/18/2022

CALIFORNIA TD SPECIALISTS, AS TRUSTEE, as Trustee
8190 EAST KAISER BLVD., ANAHEIM HILLS, CA  92808
PHONE: 714-283-2180
**FOR TRUSTEE SALE INFORMATION LOG ON TO:** www.stoxposting.com
**CALL:** 844-477-7869

PATRICIO S. INCE', VICE PRESIDENT

**CALIFORNIA TD SPECIALISTS IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

| | |
|---|---|
| **Title Order No.:** | 2019823cad |
| **Trustee Sale No.:** | 85647 |
| **Loan No.:** | 399340614 |
| **APN:** | 4352-001-051, 4352-001-044, 4352-001-047, 4387-025-001, 4387-026-012, 4387-022-021 |

"**NOTICE TO POTENTIAL BIDDERS:** If you are considering bidding on this property lien, you should understand that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not on the property itself. Placing the highest bid on a trustee auction does not automatically entitle you to free and clear ownership of the property. You should also be aware that the lien being auctioned off may be a junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all liens senior to the lien being auctioned off, before you can receive clear title to the property. You are encouraged to investigate the existence, priority, and size of the outstanding lien that may exist on this property by contacting the county recorder's office or a title insurance company, either of which may charge you a fee for this information. If you consult either of these resources, you should be aware that the same lender may hold more than one mortgage or deed of trust on the property.

**NOTICE TO PROPERTY OWNER:** The sale date shown on this notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of California Civil Code. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale. If you wish to learn whether your sale date has been postponed, and if applicable, the rescheduled time and date for the sale of this property, you may call 844-477-7869, or visit this Internet Web site www.stoxposting.com, using the file number assigned to this case T.S.# 85647.  Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the Internet Web site. The best way to verify postponement information is to attend the scheduled sale."

For sales conducted after January 1, 2021:
**NOTICE TO TENANT**: You may have a right to purchase this property after the trustee auction pursuant to Section 2924m of the California Civil Code. If you are an "eligible tenant buyer," you can purchase the property if you match the last and highest bid placed at the trustee auction. If you are an "eligible bidder," you may be able to purchase the property if you exceed the last and highest bid placed at the trustee auction. There are three steps to exercising this right of purchase. First, 48 hours after the date of the trustee sale, you can call 844-477-7869, or visit this internet website www.stoxposting.com, using the file number assigned to this case 85647 to find the date on which the trustee's sale was held, the amount of the last and highest bid, and the address of the trustee. Second, you must send a written notice of intent to place a bid so that the trustee receives it no more than 15 days after the trustee's sale. Third, you must submit a bid; by remitting the funds and affidavit described in Section 2924m(c) of the Civil Code; so that the trustee receives it no more than 45 days after the trustee's sale. If you think you may qualify as an "eligible tenant buyer" or "eligible bidder," you should consider contacting an attorney or appropriate real estate professional immediately for advice regarding this potential right to purchase.

TS# 85647

APN # 'S  4352-001-051, 4352-001-044, 4352-001-047, 4387-025-001, 4387-026-012, 4387-022-021

LEGAL DESCRIPTION

EXHIBIT "A"

Parcel 1:

Lot 4 of Tract No. 10202, in the City of Los Angeles, County of Los Angeles, State of California, as per Map recorded in Book 182, Page(s) 15 of Maps, in the Office of the County Recorder of said County.

Except therefrom the southerly 330 feet of said Lot 4.

Also except that portion included in Tract No. 10926 as per Map recorded in Book 206, Pages 37 to 41, inclusive of Maps, in the Office of the County Recorder of said County.

Also except that portion of said Lot 4 described as follows:

Beginning at the northwest corner of Tract No. 9146, in said City, County and State, as recorded in Book 187, Page 22 of Maps, in the Office of the County Recorder of said County; thence westerly along the northerly line of said Lot 4 north 88 degrees 59 minutes 39 seconds west 156.14 feet; thence southerly, leaving said northerly line along a line that is parallel to and distant 441.44 feet easterly of the westerly line of said Lot 4, south 0 degree 32 minutes 49 seconds east 331.64 feet; thence south 88 degrees 59 minutes 52 seconds east 99.75 feet to a point in the westerly line of Tract No. 10926,in said City, County and State as per Map recorded in Book 206, Pages 37 to 41, inclusive of Maps, in the Office of the County Recorder of said County; thence northerly along the said westerly line north 1 degree 31 minutes 03 seconds east 57.12 feet; thence north 5 degrees 13 minutes 42 seconds east 76.82 feet; thence north 34 degrees 26 minutes 49 seconds east 120.35 feet to the beginning of a non-tangent curve concave northeasterly and having a radius of 26.00 feet, a radial line from said point bears south 2 degrees 54 minutes 50 seconds west; thence along said curve through a central angle of 135 degrees 26 minutes 26 seconds an arc distance of 61.46 feet to a point in the westerly line of said Tract No. 9146; thence northerly along said westerly line north 3 degrees 03 minutes 11 seconds west 48.37 feet to the true point of beginning.

Parcel 2:

That portion of Tract No. 9146, in the City of Los Angeles, County of Los Angeles, State of California, as per Map recorded in Book 187, Page 22 of Maps, in the Office of the County Recorder of said County, lying west of tub west line of Lot 19 of Tract No. 10926, in the City of Los Angeles, County of Los Angeles, State of California, as per Map recorded in Book 206, Pages 37 to 41, inclusive of Maps, in the Office of the County Recorder of said County.

Parcel 3:

The southerly 330 feet of Lot 4 of Tract No. 10202, in the City of Los Angeles, County of Los Angeles, State of California, as per Map recorded in Book 182, Page 15 of Maps, in the Office of the County Recorder of said County.

Except that portion of said lot included within Tract No. 10926, in the City of Los Angeles, County of Los Angeles, State of California, as per Map recorded in Book 206, Pages 37 to 43, inclusive of Maps, in the Office of the County Recorder of said County.

LEGAL DESCRIPTION CONTINUED

Parcel 4:

The south half of the southeast quarter of the southwest quarter of Section 1, Township 1 South, Range 15 West of the San Bernardino Meridian, in the City of Los Angeles, County of Los Angeles, State of California, according to the Official Plat of the survey of said land on file in the Bureau of Management.

Except that portion of said south half included within the lines of Tract No. 12321, as per Map recorded in Book, Pages 18 and 19 of Maps, in the Office of the County Recorder of said County.

Parcel 5:

Lot 12 of Tract No. 12321, in the City of Los Angeles, County of Los Angeles, State of California, as per Map recorded in Book 320, Pages 18 and 19 of Maps, in the Office of the County Recorder of said County.

Parcel 6:

Parcel D of Parcel Map No. 1987, in the City of Los Angeles, County of Los Angeles, State of California, as per Map recorded in Book 31, Page 81 of Parcel Maps, in the Office of the County Recorder of said County.

Except therefrom that portion of said land beginning at the most northeasterly corner of said Parcel D, said corner also being a point in the southerly right-of-way of Cedarbrook Drive, 34 feet wide, as shown on said Parcel Map, thence along the easterly line of said Parcel D south 2° 44' 22" east 42.36 feet, thence south 27° 27' 10" west 46.00 feet, thence south 3° 30' 00" east 67.00 feet, thence leaving said easterly line at right angles to Coldwater Canyon Drive, north 89° 41' 30" west 15.00 feet, thence parallel to said Coldwater Canyon Drive, north 0° 18' 30" east 148.53 feet to a point in said southerly right of way, thence along said southerly right of way, north 87° 15' 15" east 29.33 feet to the point of beginning.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

Maschoff Brennan, 100 Spectrum Center Drive, Suite 1200, Irvine, CA  92618

A true and correct copy of the foregoing document entitled (*specify*): **SECOND AMENDED COMPLAINT**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **March 21, 2023**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Lewis R. Landau - Lew@Landaunet.com;
William S. Brody - wbrody@buchalter.com; dbodkin@buchalter.com; IFS_filing@buchalter.com; smartin@buchalter.com;
Ronald N. Richards - ron@ronaldrichards.com; 7206828420@filings.docketbird.com;
Michael L. Wachtell  - mwachtell@buchalter.com;
Pooya E Sohi - Psohi@buchalter.com; slee@buchalter.com; docket@buchalter.com
Sharon Z. Weiss – sharon.weiss@bclplaw.com; raul.morales@bclplaw.com; REC_KM_ECF_SMO@bclplaw.com
United States Trustee (LA) - ustpregion16.la.ecf@usdoj.gov;

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) **March 21, 2023**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Presiding Judge – Hon. Sheri Bluebond, US Bankruptcy Court/edward Roybal, 255 E. Temple St., #1534, Los Angeles, CA  90012

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 21, 2023 | Clarice Dionisio | */s/ Clarice Dionisio* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                 **F 9013-3.1.PROOF.SERVICE**